# FREEDOM COURT REPORTING

**1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE NORTHERN DISTRICT OF ALABAMA
3  WESTERN DIVISION
4
5  CASE NO. 7:15-cv-01172-LSC
6
7  PERKINS COMMUNICATION, LLC,
8  and MATRIX, LLC,
9  Plaintiffs,
10  vs.
11  D'SHANNON PRODUCTS, LTD, a Minnesota
12  Limited Company, SCOTT ERICKSON
13  and MICHAEL MOORE,
14  Defendants.
15
16  VIDEO DEPOSITION
17  OF
18  JOSEPH PERKINS
19  JULY 26, 2016
20
21  TAKEN BY: Maya Rose
22  Registered Professional Reporter
23  and Notary Public

**2**

1  S T I P U L A T I O N S
2  IT IS STIPULATED AND AGREED, by and
3  between the parties, through their respective
4  counsel, that the deposition of JOSEPH PERKINS
5  may be taken before MAYA ROSE, Commissioner,
6  Court Reporter and Notary Public, State at
7  Large;
8  That the signature to and the reading of
9  the deposition by the witness is waived, the
10  deposition to have the same force and effect
11  as if full compliance had been had with all
12  laws and rules of Court relating to the taking
13  of depositions;
14  That it shall not be necessary for any
15  objections to be made by counsel to any
16  questions, except as to form or leading
17  questions, and that counsel for the parties
18  may make objections and assign grounds at the
19  time of trial, or at the time said deposition
20  is offered in evidence, or prior thereto;
21  That the notice of filing of the
22  deposition by the Commissioner is waived.
23

**3**

1  A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4  Mr. Stephen D. Wadsworth
5  Attorney at Law
6  Campbell, Guin, Williams, Guy
7  & Gidiere, LLC
8  505 North 20th Street, Suite 1600
9  Birmingham, Alabama  35203
10
11  FOR THE DEFENDANTS:
12  Mr. Timothy A. Heisterhagen
13  Attorney at Law
14  Armbrecht Jackson, LLP
15  1300 Riverview Plaza
16  63 S. Royal Street
17  Mobile, Alabama  36602
18
19  ALSO PRESENT:
20  John Badgley, Videographer
21  Danica Grosko
22
23

**4**

1  I N D E X
2
3  PAGE
4  EXAMINATION BY MR. HEISTERHAGEN:...........7
5  EXAMINATION BY MR. WADSWORTH:............232
6  REEXAMINATION BY MR. HEISTERHAGEN:.......234
7
8  E X H I B I T S
9  DEFENDANT'S NO.          PAGE
10  Exhibit 1 - BestManuals.net Baron 58    -46
11  Exhibit 2 - Affidavit of Joe Perkins in -57
12  Support of Plfs Opposition to Defts
13  Partial Motion for Summary Judgment
14  Exhibit 3 - e-mails          -77
15  Exhibit 4 - e-mail          -79
16  Exhibit 5 - estimate, major overhaul &  -85
17  conversion
18  Exhibit 6 - e-mail          -93
19  Exhibit 7 - e-mail          -95
20  Exhibit 8 - e-mail          -104
21  Exhibit 9 - article          -107
22  Exhibit 10 - e-mail w/photos      -109
23  Exhibit 11 - e-mail          -113

Exhibit
A

1 (Pages 1 to 4)

5

1      E X H I B I T S (continued)
2   DEFENDANT'S NO.          PAGE
3   Exhibit 12 - e-mail       -115
4   Exhibit 13 - e-mail w/invoice    -118
5   Exhibit 14 - airframe logbook entry   -130
6   Exhibit 15 - letter w/photos      -134
7   Exhibit 16 - e-mail       -140
8   Exhibit 17 - Dixie Air statement    -163
9   Exhibit 18 - Dixie Air statement    -168
10   Exhibit 19 - e-mails      -184
11   Exhibit 20 - e-mail       -186
12   Exhibit 21 - e-mails      -189
13   Exhibit 22 - e-mails      -191
14   Exhibit 23 - e-mail       -194
15   Exhibit 24 - e-mail       -205
16   Exhibit 25 - 5/20/15 letter     -211
17   Exhibit 26 - e-mail       -215
18   Exhibit 27 - D'Shannon Aviation invoice -225
19
20
21
22
23

7

1 representing Freedom Court Reporting. Would
2 counsel identify yourself and state whom you
3 represent?
4      MR. WADSWORTH: Stephen Wadsworth
5 of Campbell, Guin for the plaintiffs.
6      MR. HEISTERHAGEN: Tim
7 Heisterhagen of Armbrecht Jackson for the
8 defendants.
9      THE VIDEOGRAPHER: Would counsel
10 please -- or would the court reporter please
11 swear in the witness?
12
13      JOSEPH PERKINS,
14 being first duly sworn, was examined and
15 testified as follows:
16
17      THE REPORTER: Usual stipulations?
18      MR. HEISTERHAGEN: Yes.
19      MR. WADSWORTH: Yes.
20
21 EXAMINATION BY MR. HEISTERHAGEN:
22      Q. Mr. Perkins, could you state your
23 full name for the record?

6

1      I, Maya Rose, a Registered
2 Professional Reporter of Birmingham, Alabama,
3 and a Notary Public for the State of Alabama
4 at Large, acting as Commissioner, certify that
5 on this date, pursuant to the Federal Rules of
6 Civil Procedure and the foregoing stipulations
7 of counsel, there came before me at 2711
8 University Boulevard, Tuscaloosa, Alabama, on
9 the 26th day of July, 2016, commencing at 9:00
10 a.m. and concluding at 4:24 p.m., JOSEPH
11 PERKINS, witness in the above cause, for oral
12 examination, whereupon the following
13 proceedings were had and done:
14
15      THE VIDEOGRAPHER: This begins
16 disk one in the deposition of Joe Perkins in
17 the matter of Perkins Communication, Limited
18 Liability Corporation and Matrix, Limited
19 Liability Corporation versus D'Shannon
20 Products, Case Number 7:15-cv-01172-LSC.
21 We're on the record at 9 o'clock on the 26th
22 day of July 2016. This deposition is taking
23 place in Tuscaloosa. My name is John Badgley

8

1      A. Joseph Winters Perkins, Jr.
2      Q. And have you ever given a
3 deposition before?
4      A. Yes.
5      Q. Okay. So you understand that
6 everything we're going to be talking about
7 here today is being transcribed and to answer
8 saying yes or no instead of shaking your head?
9      A. Yes.
10      Q. Okay. And the only kind of ground
11 rule that I have is if I ask a question that
12 you don't understand, please let me know.
13 Otherwise, I'm going to assume that you
14 understand what I've asked you; is that fair?
15      A. That's fair.
16      Q. Okay. How many depositions have
17 you given before today?
18      A. You know, thinking back, I think
19 only one.
20      Q. Okay. What type of case was that?
21      A. It was a lawsuit in a political
22 campaign.
23      Q. Okay. And were you a defendant or

**9**

1    a plaintiff in that case?
2        A.  Neither.
3        Q.  You were just a fact witness; is
4    that right?
5        A.  Uh-huh.
6        Q.  Was that here in Tuscaloosa?
7        A.  No.
8        Q.  Was that in Montgomery?
9        A.  No.
10       Q.  Okay.  Where was it?
11       A.  It was in Birmingham.
12       Q.  Okay.  And when was that case?
13       A.  Oh, it's twenty years ago.
14       Q.  Did you offer any testimony in
15   trial in that case?
16       A.  No.
17       Q.  What is your address?
18       A.  My home address is 11828 Bent
19   Creek Lane, Northport, Alabama.
20       Q.  Okay.  And what's your birthday?
21       A.  7/22/50.
22       Q.  Okay.  So that would make you 56?
23       A.  No, 66.

**10**

1        Q.  66.
2        A.  Thank you.
3            MR. WADSWORTH:  Flattery will get
4    you everywhere, Tim.
5            MR. HEISTERHAGEN:  Or bad math.
6        Q.  (BY MR. HEISTERHAGEN:)  And are
7    you currently married, Mr. Perkins?
8        A.  Yes, sir.
9        Q.  What's your wife's name?
10       A.  Amy.
11       Q.  Last name is Perkins; is that
12   right?
13       A.  Yes.
14       Q.  And how long have you been married
15   to Amy?
16       A.  Oh, gee, twenty-seven years.
17       Q.  Okay.  Have you had any other
18   marriages other than your marriage to Amy?
19       A.  Yes.
20       Q.  How many?
21       A.  Two others.
22       Q.  Okay.  Do your ex-wives live here
23   in Tuscaloosa?

**11**

1        A.  One.
2        Q.  What is her name?
3        A.  Debbie Parker.
4        Q.  Do you have any idea what her
5    occupation is?
6        A.  Pardon?
7        Q.  Her occupation?
8        A.  She's a nurse.
9        Q.  At DCH?
10       A.  Yes.
11       Q.  Okay.  How about your other
12   ex-wife, where does she live?
13       A.  I have no idea.
14       Q.  What is her name?
15       A.  Jean, and I don't know what her
16   last name is now.
17       Q.  Okay.  Do you have any idea if she
18   lives here in the northwest part of Alabama?
19       A.  I don't think so.
20       Q.  Okay.  Other than your wife, do
21   you have any other family living in your house
22   with you?
23       A.  Living in my house with me?

**12**

1        Q.  Yes, sir.
2        A.  Thank goodness, no.
3        Q.  Do you have any children over the
4    age of nineteen?
5        A.  Oh, yes.
6        Q.  How many?
7        A.  Three.
8        Q.  Okay.  Let's start with the
9    oldest.  What is the oldest's name?
10       A.  Taylor Lee Perkins.
11       Q.  Okay.  Is Taylor a boy or a girl?
12       A.  Taylor is a girl.
13       Q.  Girl.  And where does Taylor live?
14       A.  She lives here in town.
15       Q.  Okay.
16       A.  I don't know her address.
17       Q.  Okay.  And just so you know the
18   reason I'm going through this is for purposes
19   of jury selection.
20       A.  Sure.
21       Q.  How old is Taylor?
22       A.  How old is she?
23       Q.  Yes, sir.

13

1    A. 33.
2    Q. Okay. And what is her occupation?
3    A. She's a nurse. She's a nurse
4  practitioner.
5    Q. Your middle child, what is their
6  name?
7    A. The middle child's name is Joseph
8  Winters Perkins, III. Win Perkins.
9    Q. Okay. How old is Win?
10    A. Win is 25.
11    Q. And where does he live?
12    A. Here in town, in Northport.
13    Q. Okay. And what does Win do?
14    A. He works at Alabama Power.
15    Q. And what is your youngest child's
16  name?
17    A. The youngest child's name is John
18  Perkins.
19    Q. Okay.
20    A. And he is in graduate school at
21  Auburn.
22    Q. Okay. Since he's in graduate
23  school, is his current residence address here

14

1  in Tuscaloosa or is it in Auburn?
2    A. Gee, I don't know. My
3  understanding of residence is that's kind of a
4  determination of the person who has it, and I
5  don't know what John has determined as his
6  residence.
7    Q. Okay. Do you have any other
8  family here in Tuscaloosa, Bibb or any of the
9  surrounding counties?
10    A. I have a lot of family in
11  Tuscaloosa, Tim.
12    Q. Okay. Are your family members
13  that are here in Tuscaloosa, do they generally
14  have the last name Perkins or is there another
15  name that -- whether your mom's side of your
16  family or another side of your family may go
17  by?
18    A. My father had seven brothers.
19    Q. Okay.
20    A. They were all named Perkins.
21    Q. Okay.
22    A. And a good many of them still and
23  their children live around these parts.

15

1    Q. Okay. What is your wife's maiden
2  name?
3    A. Todd.
4    Q. Todd. Are your parents still
5  living?
6    A. No.
7    Q. Do you have any brothers or
8  sisters?
9    A. Yes.
10    Q. Okay. How many?
11    A. I have a brother and a sister.
12    Q. Okay. Does your brother live in
13  this area?
14    A. Uh-huh.
15    Q. What is his name?
16    A. Timothy.
17    Q. Okay.
18    A. He's Tim.
19    Q. That's easy to remember. And how
20  old is Tim?
21    A. Tim's five years younger than me,
22  so he's 60, I guess, 60 or 61.
23    Q. And what does he do for a living?

16

1    A. He's retired.
2    Q. And how about your sister, what is
3  her name?
4    A. Cynthia.
5    Q. Last name Perkins?
6    A. Uh-huh.
7    Q. Okay. And does she live in this
8  area?
9    A. Yes.
10    Q. What is her age?
11    A. Oh, she's -- I'm horrible on dates
12  and ages, but Cindy is 53.
13    Q. Okay. What does Cindy do for a
14  living?
15    A. She's retired.
16    Q. Okay. And, Mr. Perkins, are you a
17  member of any social clubs or unions of any
18  kind?
19    A. Or unions? No. I mean, to be
20  absolutely factual, I am -- I have for a
21  number of decades been an honorary member of
22  the United Mineworkers of America.
23    Q. Okay.

1      A.   But that is not something that I
2  have to practice at or -- but that is part of
3  my -- an old résumé.
4      Q.   Okay.
5      A.   Other unions?  No other unions.
6      Q.   Okay.
7      A.   Now, you asked also about social
8  clubs?
9      Q.   Yes, sir.  Now, whether it's the
10 country club or any other social clubs.
11     A.   We're members of North River Yacht
12 Club and Indian Hills Country Club.
13     Q.   Okay.  And have you grown up here
14 in Tuscaloosa your whole life?
15     A.   Well, most of it.
16     Q.   Most of it?  Okay.
17     A.   Life is not over yet I hope.  And
18 we -- I was gone away to school for a while.
19     Q.   Okay.  Where did you go to high
20 school?
21     A.   Holt High School.
22     Q.   When did you graduate?
23     A.   1968.

1      Q.   Where did you do your undergrad?
2      A.   I did my undergraduate degree at
3  the University of Alabama.
4      Q.   Okay.  What did you major in?
5      A.   I majored in communications.
6      Q.   Okay.  And when did you graduate
7  from Alabama?
8      A.   '72 with an undergraduate.
9      Q.   Did you undergo any graduate
10 studies of any kind?
11     A.   Yes.
12     Q.   What's the highest level of degree
13 you have?
14     A.   Ph.D.
15     Q.   Okay.  Where did you obtain your
16 master's?
17     A.   I attained my master's at the
18 University of Alabama.
19     Q.   Okay.  Was that in communications
20 as well?
21     A.   Uh-huh.
22     Q.   What year would that have been?
23     A.   That would have been I guess '74.

1      Q.   And where did you obtain your
2  Ph.D.?
3      A.   My Ph.D. came from the University
4  of Alabama as well.  I actually finished
5  everything but a dissertation at another
6  school, and then came to Alabama and wrapped
7  up my work.
8      Q.   And what year would you have
9  received your Ph.D.?
10     A.   Ph.D. was awarded, I think, in
11 '99.
12     Q.   Okay.  Where did you start your
13 doctorate level work?
14     A.   In Chicago, a school called
15 Northwestern.
16     Q.   Okay.  And what made you come back
17 here to Alabama to finish up?
18     A.   Well, this is -- this is going to
19 be -- I need a copy of this later for the
20 books so I can use it.  I came back largely
21 because I was doing work here.  I actually
22 came back from Chicago initially to run a
23 political campaign.

1      Q.   Okay.  Whose campaign was that?
2      A.   A guy named Richard Shelby.
3      Q.   Okay.  And here at Alabama, what
4  did you have left to do, just your
5  dissertation?
6      A.   Yeah.  What I did, I finished my
7  work at Northwestern and passed everything
8  including my comps.
9      Q.   Okay.
10     A.   And then, gee, I guess that was
11 about '78, something like that.  I came
12 back -- Annette Shelby had directed my
13 master's thesis at Alabama, Richard's wife.
14     Q.   Okay.
15     A.   And I came back and Richard was --
16 wanted to run for office, and they -- they
17 asked me to manage his campaign.  So I did
18 that, took a break.  And then rather than
19 going back to Chicago, I waited sometime.  I
20 worked for several years and then went back to
21 Alabama, did a semester of coursework so that
22 they knew that I actually could still read and
23 write and then did my dissertation.

21

1    Q.   Okay.  What year was it that you
2  left Chicago?
3    A.   Oh, just -- it would have been
4  about '78, something like that.
5    Q.   Okay.  Do you have any other
6  graduate degrees?
7    A.   No.  No, that's all.
8    Q.   And I apologize if I've asked
9  this, but the Ph.D., is it in communications
10  as well?
11    A.   Uh-huh.
12    Q.   You currently own Perkins
13  Communication, LLC; is that correct?
14    A.   Yes.
15    Q.   Are you the sole owner of that
16  entity?
17    A.   I think so.
18    Q.   When was that entity formed?
19    A.   I don't remember.
20    Q.   Okay.  What does Perkins
21  Communication do?
22    A.   Primarily communication work for
23  corporations, for entities, for -- and some

22

1  political work, creating communication
2  campaigns and materials and strategically
3  assisting people with communication needs.
4    Q.   Is Perkins Communication, is it
5  essentially a public relations firm?
6    A.   Most of the time just to simplify
7  it, I tell people I do just public relations
8  work.
9    Q.   Okay.  And you also own Matrix,
10  LLC; is that correct?
11    A.   Yes.
12    Q.   And are you the sole owner of that
13  entity?
14    A.   I think so.
15    Q.   Do you know when Matrix was
16  formed?
17    A.   Oh, well, 1995, I think.
18    Q.   Okay.  And what type of work does
19  Matrix do?
20    A.   Many of the same things that
21  Perkins Communication does.  We're basically
22  in public relations and public policy work.
23    Q.   Okay.  Is there any reason that

23

1  you choose to use one entity over the other?
2  If a client came to you and said, Mr. Perkins,
3  I know that you do communications and public
4  relations work, is there any -- anything
5  whether it's about the client or the subject
6  matter or the type of work where you would
7  say, well, you need to use my Perkins
8  Communication entity versus my Matrix entity?
9    A.   Perkins Communication exist --
10  existed before Matrix.
11    Q.   Okay.
12    A.   There were clients that already
13  had an association with it.  Those clients
14  tended to want to continue to do work with
15  Perkins Communication.  Perkins Communication
16  has my name on it.  It is -- I am 66 years
17  old.  I envision that someday Matrix will be
18  run by somebody else and I won't be there.
19  And Perkins Communication is probably what
20  I'll do in retirement.  So that's the reason
21  that I have maintained two entities.
22    Q.   How many employees does Perkins
23  Communication have?

24

1    A.   Oh, I think probably two.
2    Q.   Okay.  And is that -- or strike
3  that.
4         Are those employees based out of
5  Tuscaloosa or somewhere else?
6    A.   I think they'd be based out of
7  Tuscaloosa.
8    Q.   Okay.  What are those employees'
9  names?
10    A.   My son, Win, works part time.
11    Q.   Okay.
12    A.   He does small things for us.  It
13  may be errand running and things like that.
14  And right now Win may be the only employee
15  because I don't guess I would count myself as
16  an employee.
17    Q.   And that's what I'm trying to find
18  out is if you have any staff or anything like
19  client development people or --
20    A.   No.
21    Q.   -- any type of employees like
22  that?
23    A.   No.

25

1    Q.  Okay.  How about Matrix, does it
2  have any employees other than you?
3    A.  Yes.
4    Q.  And is Matrix based out of here in
5  Tuscaloosa or somewhere else?
6    A.  No.  The main office of Matrix is
7  in Montgomery.
8    Q.  Okay.
9    A.  We have offices in Birmingham and
10  Atlanta.
11    Q.  Okay.  Do you have any Matrix
12  employees other than yourself that you know of
13  that live here in Tuscaloosa?
14    A.  Yes.
15    Q.  How many employees would that be?
16    A.  One.
17    Q.  Okay.  Who is that?
18    A.  Madeline Kirby.
19    Q.  And what does Madeline do?
20    A.  She handles various accounts for
21  Matrix.
22    Q.  I don't want to delve too deeply
23  into your client base, but for the purposes of

26

1  striking a jury if this case goes to trial,
2  does Perkins Communication have any current
3  clients here in Tuscaloosa County?
4    A.  Yes.
5    Q.  And just so you know, there has
6  been a protective order entered in this case
7  so this information can be subject to that
8  protective order.
9    A.  What does that mean?
10    Q.  It means that any information, to
11  the extent that it is filed with the Court,
12  would be filed under seal.  And any
13  information that's subject to the protective
14  order would be only subject to use in this
15  case and not subject to release.
16    A.  Okay.  Let me make something very
17  clear to you.  One of the things I give my
18  clients is confidentiality, and I will tell
19  you as much as I can without violating the
20  obligation that I have to them.
21    Q.  And I understand that.  And what
22  I'm trying to avoid so that you know is if
23  let's say you worked for someone's campaign

27

1  and you have a communications director that
2  you deal with on a regular basis --
3    A.  Yeah.
4    Q.  -- if that person ends up on our
5  jury pool --
6    A.  Sure.
7    Q.  -- I think we'd be entitled to
8  know that.
9    A.  I agree.
10    MR. WADSWORTH:  And, Tim, a lot of
11  that does get sussed out in voir dire.  The
12  judge --
13    MR. HEISTERHAGEN:  Yeah.
14    MR. WADSWORTH:  -- will say, who
15  knows Joe Perkins, who's familiar with Perkins
16  Communication, Matrix, so a lot of that is
17  going to get -- if it goes to trial, a lot of
18  that is going to get figured out then just
19  through the judge's questions.
20    MR. HEISTERHAGEN:  Yeah.
21    A.  And, Tim, my ability to be
22  comprehensive in answering your question would
23  be almost impossible.  So I mean, anything

28

1  specifically I can answer I will, but even if
2  I answer all your questions, it's not going to
3  be a comprehensive resolution to what you're
4  looking for.
5    Q.  (BY MR. HEISTERHAGEN:)  And I
6  understand that.  And just like there's no
7  way -- I couldn't expect you to know all of
8  your clients' employees.
9    A.  Yeah.
10    Q.  And I actually -- just one second.
11  The counties that this division of the
12  Northern District of Alabama encompasses are
13  Marion, Winston, Lamar, Fayette, Tuscaloosa,
14  Pickens County, Greene County, Sumter County,
15  and Bibb County.  If you could give me an
16  estimate, how many clients does either Perkins
17  Communication or Matrix have in those
18  counties?
19    A.  Let's see, the only client we have
20  that would have nexus in any of those counties
21  is probably a nursing home client.
22    Q.  Okay.
23    A.  That are current clients.

29

1    Q.  Okay.  Okay.  Can you tell me the
2  name of that client?
3    A.  It -- Northport Health Services.
4    Q.  To the extent that you can, what
5  does either Perkins Communication or Matrix do
6  for that client?
7    A.  We provide communication and
8  services, strategy, tactics and materials for
9  communication.
10    Q.  Okay.  Do you have a primary
11  contact at that client that you deal with on a
12  regular basis?
13    A.  No, there's several people I
14  interact with.
15    Q.  Can you tell me their names?
16    A.  Is this with an intention to go
17  question my clients --
18    Q.  No.
19    A.  -- about something?  Because if it
20  is, I'm going to stop answering.
21    Q.  It's absolutely not.  It's -- this
22  is solely with the intention that if they end
23  up on our jury pool --

30

1    A.  Okay.
2    Q.  -- I can have them -- I can do
3  what I need to do with them.
4    A.  All right.
5    Q.  I have no intention of following
6  up with these people.
7    A.  Well, Tim, for the record, I like
8  you and I think -- but for the record, if this
9  deposition results in my business being
10  threatened in any way by my clients being
11  questioned or harassed, I would take that as
12  offensive.
13    Q.  And I understand that and that is
14  not my intention.
15    A.  Okay.  Well, the man who owns
16  Northport Health Services is Norman Estes.
17    Q.  Okay.
18    A.  Then Norman has a number of people
19  who work under him.  I have worked for these
20  people for thirty years.
21    Q.  Okay.
22    A.  So I know various people that have
23  gone through the business.

31

1    Q.  Okay.
2    A.  But Norman is the owner.  He's one
3  of my primary contacts.  Brandon Farmer is
4  Norman's assistant with whom I have a lot of
5  contact.  Then we have contact with people who
6  actually run nursing homes from time to time
7  if they have something that needs to be done
8  with the nursing home.  I mean, we do all
9  their websites.
10    Q.  Okay.
11    A.  You know, so it's -- we make their
12  brochures and send it to them.
13    Q.  Okay.
14    A.  So --
15    MR. HEISTERHAGEN:  And, Stephen,
16  just for the purpose of the record, this is
17  solely for jury selection.
18    MR. WADSWORTH:  Yeah, I know.
19    MR. HEISTERHAGEN:  We're not --
20    MR. WADSWORTH:  I mean, we're --
21  it is getting to the point where it's a little
22  bit touchy.  I mean, he's got a lot of clients
23  in a lot of places and the judge will ask

32

1  questions in voir dire that will let you know
2  who knows Joe Perkins or who's aware of him --
3    MR. HEISTERHAGEN:  And --
4    MR. WADSWORTH:  -- by reputation
5  or prior business dealing.
6    MR. HEISTERHAGEN:  We're moving on
7  now anyway, so --
8    MR. WADSWORTH:  Okay.
9    Q.  (BY MR. HEISTERHAGEN:)  Mr.
10  Perkins, have you ever gone through a personal
11  bankruptcy of any kind?
12    A.  No.
13    Q.  Okay.  Have you ever been
14  convicted of a crime?
15    A.  No.
16    Q.  Okay.  I know we talked about the
17  lawsuit regarding the political campaign when
18  we started the deposition, and you did not
19  testify in court in that case; is that right?
20    A.  Right.
21    Q.  Have you testified in court in any
22  other case?
23    A.  Yes.

33

1    Q.  Okay.  How many cases have you
2  offered testimony in court?
3    A.  Gee, I think only one.
4    Q.  Okay.  And was that a criminal
5  case or a civil case?
6    A.  I think it was probably a criminal
7  case, but I'm not sure.
8    Q.  Okay.  Where did that case take
9  place?
10    A.  Mobile.
11    Q.  Okay.  And when was that?
12    A.  Oh, gee, that would have been --
13  I'm guessing now, but around 1990, something
14  like that.
15    Q.  Okay.  Do you remember who the
16  defendant was in that case?
17    A.  Well, to tell you the truth, I
18  can't.
19    Q.  Okay.
20    A.  It's -- no, I don't know who
21  exactly was the defendant.
22    Q.  And were you offering testimony as
23  a fact witness in that case?

34

1    A.  Yes.
2    Q.  Okay.  Has Perkins Communication
3  ever gone through a bankruptcy?
4    A.  No.
5    Q.  Has Perkins Communication ever
6  sued or been sued in court?
7    A.  I think we got sued -- oh, Perkins
8  Communication, no, I don't think it has.  I
9  don't it's ever sued or been sued.
10    Q.  And just for clarification, when I
11  ask that question, I mean other than this
12  case.
13    A.  Yeah, no.  No, to the best of my
14  memory, no.
15    Q.  Okay.  Has Matrix, LLC ever been
16  through a bankruptcy?
17    A.  No.
18    Q.  And other than in this case, has
19  Matrix, LLC ever sued anyone or been sued by
20  anyone?
21    A.  Once again, to the best of my
22  recollection, no.
23    Q.  Okay.  Mr. Perkins, did you do

35

1  anything to prepare for this deposition?
2  Other than --
3    MR. WADSWORTH:  Other than items
4  that are, yeah, protected by the
5  attorney-client privilege.
6    MR. HEISTERHAGEN:  Yeah.
7    A.  Then I don't know what that means,
8  Tim.  Tell me what that would mean.
9    Q.  (BY MR. HEISTERHAGEN:)  Did you
10  meet with anyone other than your attorneys to
11  prepare for this deposition?
12    A.  No.
13    Q.  Okay.  Did you review any
14  documents to prepare for the deposition?
15    MR. WADSWORTH:  Other than those
16  that were, you know, either created by work
17  product or --
18    A.  Yeah.  I mean, nothing that's not
19  part of the proceedings in the case.
20    Q.  (BY MR. HEISTERHAGEN:)  Okay.  And
21  just to clarify, so to the extent that you did
22  review anything, it was either material
23  created by your attorney or documents that are

36

1  already a part of this case; is that right?
2    MR. WADSWORTH:  Tim, and just for
3  the sake of clarity, there are twelve pages of
4  records that I gave you this morning that I
5  e-mailed to you last night.  I just received
6  those last night via e-mail and I showed Joe
7  those this morning.  They haven't been
8  produced but they will be.
9    MR. HEISTERHAGEN:  Okay.
10    MR. WADSWORTH:  The FAA documents
11  were received through a FOIA request.
12    MR. HEISTERHAGEN:  Okay.
13    MR. WADSWORTH:  To my knowledge,
14  that's it.
15    Q.  (BY MR. HEISTERHAGEN:)  Mr.
16  Perkins, you currently hold a private pilot's
17  license from the FAA; correct?
18    A.  Yes.
19    Q.  And what ratings do you currently
20  have?
21    A.  Single-engine land, multi-engine
22  land, instrument, and I have a jet-type
23  rating.

37

1    Q.  Okay.  Are all of those ratings
2  current as we sit here today?
3    A.  Uh-huh.
4    Q.  When did you first obtain your
5  private pilot's license?
6    A.  January of 1980.
7    Q.  Okay.  When did you obtain your
8  multi-engine land rating?
9    A.  I don't remember.
10   Q.  Okay.
11   A.  Five or six years after that.
12   Q.  Okay.  Do you remember when you
13 obtained your instrument rating?
14   A.  That was before I obtained my
15 multi-engine.
16   Q.  All right.
17   A.  I was instrument rated before I
18 was multi-engine rated.
19   Q.  Okay.  And did you obtain
20 your jet rating?
21   A.  In June of this year.
22   Q.  Okay.  What aircraft are you
23 currently checked out on?

38

1    A.  Well, now, I'm checked out on a
2  lot of aircrafts.
3    Q.  What aircraft are you current to
4  fly as we sit here today?
5    A.  Okay.  With those -- with those
6  ratings?
7    Q.  Yes.
8    A.  Any single-engine aircraft complex
9  piston engine I would be qualified to fly.
10   Q.  Okay.
11   A.  Any multi-engine piston aircraft I
12 would be qualified to fly.
13   Q.  Uh-huh.
14   A.  And with the jet rating -- jet
15 ratings are specific to the type, and that is
16 for an EA50.
17   Q.  Okay.  Have you -- or strike that.
18      What single-engine aircraft have
19 you flown in the last six months?
20   A.  In the last six months, probably
21 the only single-engine aircraft that I've
22 flown in the last six months is a Cessna 182.
23   Q.  And is that the 182 that's owned

39

1  by Dixie Air?
2    A.  Yes.
3    Q.  What -- strike that.
4      Other than your Baron, what
5  multi-engine aircraft have you flown in the
6  last six months?
7    A.  Well, the only other multi-engine
8  is an Eclipse 500 which is the jet.
9    Q.  Okay.  And -- but you have not
10 flown any multi-engine piston engine aircraft
11 in the last six months other than your Baron;
12 is that right?
13   A.  No.
14   Q.  I want to make sure I have that
15 question clear.  The only multi-engine
16 aircraft equipped with piston engines that you
17 have flown in the last six months is your
18 Baron; correct?
19   A.  Yes.
20   Q.  Okay.  And the Eclipse 500; is
21 that right?
22   A.  Uh-huh.
23   Q.  Is that currently hangared at

40

1  Dixie Air?
2    A.  Yes.
3    Q.  And who owns that aircraft?
4    A.  I do.
5    Q.  Has your pilot's license ever
6  lapsed or been revoked for any reason since
7  you first obtained it?
8    A.  It's never been revoked and they
9  don't lapse.
10   Q.  Have you ever failed to maintain
11 the currency requirements?
12   A.  Let's see, currency is a term of
13 art.  And there are currency requirements that
14 have to be maintained on an ongoing basis.
15 And there are times when a particular currency
16 may lapse and it only has to be usually
17 reinstated through something as simple as a
18 check ride.
19   Q.  And instead of attempting to go
20 through every small period of lapse that there
21 may have been, was your multi-engine rating
22 current in the fall of 2013?
23   A.  In the fall of 2013?

41

1    Q.  Yes, sir.
2    A.  My -- yes, my multi-engine rating
3 has never lapsed.
4    Q.  Okay.
5    A.  It has never.  Since I got it, it
6 has never lapsed.
7    Q.  That's what I wanted to know.
8    A.  And I'm not -- it's just the
9 technicality, the multi-engine rating would
10 not lapse.
11    Q.  Uh-huh.
12    A.  There are other things that can
13 lapse.
14    Q.  For example if you don't get your
15 medical?
16    A.  Well, if you didn't get your
17 medical.  Or right now, Tim, if you and I
18 wanted to go flying, legally I could not take
19 you flying at night right now because I got
20 two of these yesterday.  But to legally carry
21 passengers -- and this is a currency issue, to
22 legally carry passengers, the pilot must have
23 done three at night.  He must have done at

42

1 least three night landings in the previous 90
2 days.  So during the summer in Alabama, you've
3 got to stay up until 9 o'clock to get night
4 landings and that's after my bedtime.  So that
5 will lapse.  And then as it starts getting
6 dark earlier, then that will go back into
7 currency.
8    Q.  Okay.
9    A.  I'm not trying to be smart, but --
10    Q.  No, I understand what you're
11 saying.
12    A.  -- my multi-engine rating would
13 never lapse.  But those particular issues from
14 time to time might be an issue of currency.
15    Q.  Yeah.  Okay.  Have you ever had
16 any adverse action taken against your private
17 pilot's license by the FAA?
18    A.  No.
19    Q.  Have you ever been required by the
20 FAA to undergo additional training for any
21 reason?  And what I'm trying to find out is
22 it's my understanding that if a pilot has a
23 problem and the FAA gets involved, they may

43

1 say you need to go do some additional training
2 in this aircraft.
3    A.  No, the only time that has ever
4 taken place was this past month when I was
5 doing the jet qualification, I took one check
6 ride.  And then the FAA examiner recommended
7 that I have additional work on a missed
8 approach with one engine.
9    Q.  Okay.
10    A.  The next morning after that check
11 ride, I spent twenty minutes with an
12 instructor and then took that portion of the
13 check ride again.  That is the only time the
14 FAA has ever recommended that I have training.
15    Q.  Okay.  Back when you first
16 obtained your private pilot's license, did you
17 pass the written test on the first try?
18    A.  Uh-huh.
19    Q.  Other than the issue with the jet
20 that you just described to me, have you ever
21 failed or had to repeat any practical testing
22 or any of your check rides?
23    A.  No.

44

1    Q.  Do you have any FAA licenses other
2 than the ones we just discussed?
3    A.  No.
4    Q.  Mr. Perkins, have you ever worked
5 as an aircraft mechanic?
6    A.  No.
7    Q.  Have you ever overhauled or
8 performed any maintenance on a piston aircraft
9 engine?
10    A.  Never.
11    Q.  Have you ever done any work on a
12 piston aircraft engine?
13    A.  No.
14    Q.  Have you ever torn down a piston
15 aircraft engine?
16    A.  No.
17    Q.  Other than in this case, have you
18 ever had occasion to examine any parts that
19 were removed from a piston aircraft engine?
20    A.  Well, through the course of 36
21 years of flying, I'm sure I've had occasion to
22 look at parts from an engine but never in any
23 authoritative or contentious position.

45

```
 1      Q.  So, I mean, you may have seen some
 2   parts here and there, but you would leave any
 3   determination of problems up to your mechanic;
 4   is that right?
 5      A.  Sure.  You know, it's -- if you
 6   fly for 36 years, things get replaced on
 7   airplanes.
 8      Q.  Yeah.
 9      A.  And your mechanic comes and says,
10   look at these bearings, see how bad these
11   were, or take a look at this oil filter.  I
12   mean, that -- just like with your car.
13      Q.  Yeah.  Yeah.  Okay.  Mr. Perkins,
14   the aircraft at issue in this case is a
15   Beechcraft Baron 58; correct?
16      A.  Uh-huh.
17      Q.  And that number is 6745 Mike;
18   correct?
19      A.  Correct.
20      Q.  And this is the aircraft on which
21   the D'Shannon airframe upgrades and the
22   D'Shannon engines were installed; correct?
23      A.  Yes.
```

46

```
 1      Q.  The serial number for that
 2   aircraft is TH-1124; correct?
 3      A.  Yes.
 4      Q.  And I'd like to show you what I'm
 5   going to mark as Exhibit 1.
 6      A.  Uh-huh.
 7          (Whereupon, Defendant's
 8          Exhibit 1 was marked
 9          for identification.)
10      Q.  And Exhibit 1 is the first page of
11   a Baron 58 manual that seems that it was
12   retrieved from BestManuals.net.  If you -- and
13   just so you know, this is the POH that was
14   produced by plaintiff's counsel in this case.
15   And if you look at the serial number list in
16   the middle of the page, your serial number is
17   not included in that --
18      A.  Huh-uh.
19      Q.  -- list, is it?
20      A.  Huh-uh.
21      Q.  And I'm just confirming, you do
22   have the POH for your Baron; correct?
23      A.  Uh-huh.
```

47

```
 1      Q.  And it's in the aircraft?
 2      A.  Uh-huh.
 3      Q.  And do you know if there's any
 4   differences between the POH that's currently
 5   in your aircraft and the one that was produced
 6   to us?
 7      A.  You're not seriously asking me
 8   that question, are you?  If I know this was
 9   issued June of '03?  I mean, I've never seen
10   this before.
11      Q.  And what I'm -- I didn't figure
12   you had.  And I'm just -- what I'm trying to
13   confirm is that you actually have the POH for
14   your aircraft in the aircraft.
15      A.  Well, the answer to that question
16   is yes --
17      Q.  Okay.
18      A.  -- it's in the aircraft.
19      Q.  Okay.  And it's my understanding
20   that Perkins Communication owns the Baron;
21   correct?
22      A.  Yes.
23      Q.  Does anyone else own any interest
```

48

```
 1   in that aircraft?
 2      A.  No.
 3      Q.  When did Perkins Communication
 4   first purchase the Baron?
 5      A.  Gee, I don't remember but we've
 6   had the Baron for about, I think twelve or
 7   thirteen years.  My wife would correct me if
 8   she were here, I'm sure, but I guess we've had
 9   it for about twelve or thirteen years.
10      Q.  Do you remember about how much it
11   cost?
12      A.  It cost I think around three
13   hundred, maybe three twenty-five when we
14   bought it.
15      Q.  And just for the purposes of the
16   record, that's three hundred thousand to three
17   hundred and twenty-five thousand dollars --
18      A.  Yes.
19      Q.  -- correct?  Do you remember who
20   Perkins Communication purchased the Baron
21   from?
22      A.  Bought it through a broker out of
23   Memphis.
```

49

1     Q. Did Perkins Communication make any
2 modifications to the Baron after purchasing it
3 but before the D'Shannon modifications?
4     A. Well, no STC modifications.
5     Q. And that's mainly what I'm talking
6 about, anything that would be -- require a
7 Supplemental Type Certificate or that would
8 constitute a change in the type certificate of
9 the aircraft?
10    A. I don't think so, Tim. I think
11 the only things that we did were things like
12 upgrade radios. I don't think there was ever
13 anything done to the Baron that required an
14 STC until the D'Shannon work.
15    Q. Do you have -- well, strike that.
16     Do you know how many hours the
17 Baron currently has on it, on the airframe?
18    A. I don't recall, but that would be
19 a matter of record. I mean, that's an
20 academic question. I don't know the answer to
21 it.
22    Q. And we can look in the airframe
23 logs and find that out --

50

1    A. Yeah.
2    Q. -- correct?
3    A. Uh-huh.
4    Q. About how many hours is the Baron
5 flown per year?
6    A. Roughly a hundred to a hundred and
7 twenty, something like that.
8    Q. And does Perkins Communication use
9 the Baron exclusively for business?
10    A. Is it used exclusively for
11 business? I mean, the airplane is used for no
12 other purpose, is that the question?
13    Q. And let's start with that.
14 Generally is the Baron used exclusively for
15 business?
16    A. The Baron -- and as a matter of
17 record with IRS, the Baron is used about 90
18 percent of the time, 90 to 95 percent of the
19 time for business and about 5 percent for
20 personal use.
21    Q. Okay. Do both Perkins
22 Communication and Matrix use the Baron for
23 business?

51

1    A. The -- yes.
2    Q. Okay.
3    A. Since I own both of them --
4    Q. Yes.
5    A. -- and if I'm sitting in it, then
6 both of them are using it.
7    Q. Okay. And do you allocate the
8 time that the Baron is used between those two
9 companies?
10    A. We don't have to divide it for any
11 tax reason. Both of the companies will have
12 expenses against their record for it and
13 that's reflected in our taxes.
14    Q. Okay. And we're going to talk
15 about damages towards the end of the
16 deposition, but in this case both Perkins
17 Communication and Matrix are plaintiffs. And
18 what I'm trying to figure out is I understand
19 Perkins Communication's place because they own
20 the aircraft and any issues with the aircraft
21 are on the owner. And what I'm trying to
22 figure out is what is Matrix's role in this
23 case as it relates to their damages and

52

1 problems that were caused resulting from the
2 Baron?
3    MR. WADSWORTH: I'm going to
4 object to the form in that it calls for a
5 legal conclusion. But, Joe, if you have an
6 opinion about this, you can certainly answer.
7    A. No, I was going to say, Tim, I
8 heard what you just said but I didn't hear a
9 question. If you -- ask me a question.
10    Q. (BY MR. HEISTERHAGEN:) What
11 damages is Matrix claiming in this case?
12    MR. WADSWORTH: Same objection.
13    A. Yeah, I -- see, and I think this
14 is important. Now, I try to get away with
15 practicing law a lot of the time, but I've
16 never been able to really pull it off. I
17 didn't go to law school a single day. And
18 when we start talking about damages, that is a
19 term of art and I'm not sure I'm qualified to
20 speak to it.
21    Q. (BY MR. HEISTERHAGEN:) Why did
22 Matrix, LLC sue the defendants? Or strike
23 that. Strike that.

13 (Pages 49 to 52)

53

1      What is Matrix, LLC seeking to
2  recover in this case?
3          MR. WADSWORTH:  Same objection.
4      A.  Same objection.  I mean, damages
5  which takes us back to the root issue of a
6  legal definition of damages, and I'm not smart
7  enough to tell you what that is.
8          MR. HEISTERHAGEN:  Are you -- are
9  you going to --
10         MR. WADSWORTH:  No, I'm not
11 instructing him not to answer.  All I'm saying
12 is that, I mean, we know that there are
13 several different types of damages that are
14 going on in this case.  We have obviously the
15 loss of the airplane which goes on the owner
16 as we talked about.  We also have the rental
17 cost.  I'm not sure how that's allocated yet.
18 But, no, I'm not instructing him not to
19 answer.  I'm just --
20     A.  There are several claims in our
21 proceedings against D'Shannon.  And in each of
22 those claims Matrix would have some share of
23 the harm that was created from those claims.

54

1      Q.  (BY MR. HEISTERHAGEN:)  Okay.  And
2  is that because Matrix uses the aircraft for
3  its business?
4      A.  Tim, once again you asked me about
5  my ownership.
6      Q.  Yes.
7      A.  I own both of those businesses.
8  So to the extent that it impacts me, it
9  impacts both of those businesses.
10     Q.  Okay.  And for my clarification,
11 so let's say you were going to meet a client
12 after we finished here today.  When you sit in
13 that left seat of the Baron and you take off,
14 you don't allocate your flights and say, all
15 right, this flight is Perkins Communication or
16 this flight is Matrix; is that right?
17     A.  Well, now sometimes we have to do
18 that because if we're serving a particular
19 client, then the expenses for that trip would
20 be billed to that client.
21     Q.  Okay.  Other than you, who has
22 access to fly the Baron?
23     A.  The other primary pilot who would

55

1  ever fly the Baron is Stan Allen.
2      Q.  And Mr. Allen works at Dixie Air;
3  is that right?
4      A.  He actually works for Matrix.
5      Q.  Okay.
6      A.  He does contract work I think from
7  time to time for Dixie Air still.
8      Q.  Okay.  Is Mr. Allen based out of
9  Tuscaloosa?
10     A.  Yes.
11     Q.  Okay.  And why would he fly the
12 aircraft over you?
13     A.  If I have something else to do.
14     Q.  Okay.
15     A.  Tim, if there's a spot in the next
16 few minutes --
17     Q.  We can take a break now.
18     A.  -- can we take a short break?
19     Q.  Yeah.  We can take a break now.
20     A.  I apologize, but --
21     Q.  No.
22         MR. WADSWORTH:  Anytime you need a
23 break.

56

1          THE DEPONENT:  As you've
2  determined, I'm old and old people just have
3  to stop a lot.
4          THE VIDEOGRAPHER:  Going off the
5  record at 9:54.
6          (Whereupon, a short break was
7          taken.)
8          THE VIDEOGRAPHER:  This begins
9  tape two in the deposition of Joe Perkins.
10 Going back on the record at 10:04.
11     Q.  (BY MR. HEISTERHAGEN:)  Mr.
12 Perkins, in an affidavit you submitted in
13 response to the defendant's motion for summary
14 judgment, you stated that the Baron is the key
15 to your business.  Do you remember stating
16 that?
17     A.  That particular phrase?
18     Q.  Yes, sir.
19     A.  No, I don't.  Have you got that?
20 I'll be happy to look at it.
21     Q.  Yes, sir.
22     A.  I mean, I don't dispute it.  I
23 just don't recall it.

1    (Whereupon, Defendant's
2    Exhibit 2 was marked
3    for identification.)
4    Q.  And, Mr. Perkins, is Exhibit 2 a
5  copy of your affidavit in support of
6  Plaintiff's opposition to Defendant's partial
7  motion for summary judgment, dated April 13,
8  2016?
9    A.  Yes.
10    Q.  Okay.  And --
11    A.  It appears to be.
12    Q.  -- if you will flip to page 4,
13  paragraph 22, the second sentence states the
14  plane is the key to my business; correct?
15    A.  Uh-huh.
16    Q.  Can you explain what you meant by
17  that?
18    A.  Well, Tim, as I said earlier, we
19  have an office in Montgomery, an office in
20  Birmingham and an office in Atlanta.  We serve
21  clients in Georgia, both ends of Florida,
22  Mississippi, Louisiana, Oklahoma.
23  Yesterday -- yesterday I flew 1,500 miles for

1  business.  The ability to get to my clients is
2  extremely important.
3    Q.  Okay.  And you use the Baron for
4  that purpose; correct?
5    A.  Yes.
6    Q.  Does any person or entity other
7  than Perkins Communication, Matrix or you
8  personally use the Baron?
9    A.  No.
10    Q.  Okay.  When the Baron is used for
11  business purposes, whether it be for Perkins
12  Communication or Matrix, do you charge your
13  clients for the use of that aircraft?
14    A.  We only charge the expense for the
15  aircraft, yes.
16    Q.  So you do not charge an hourly
17  rate for the use of the aircraft?
18    A.  Well, we have a rate and I don't
19  know what the rate is, but the rate is one
20  that has been determined in conversations with
21  our accounting folks, Stan Allen who is a
22  professional pilot who has reviewed all of the
23  FAA regs and our accountants to ensure that

1  what we are doing is recouping expenses only
2  and not charging anything for aircraft rental.
3    Q.  Okay.  So then you do charge your
4  clients an hourly rate of some kind; is that
5  correct?
6    A.  I think they have established an
7  hourly rate, yes.
8    Q.  Does that hourly rate include
9  fuel?
10    A.  Yes.
11    Q.  Okay.  When you use the Baron for
12  business purposes, is there any charge to your
13  clients other than the hourly rate?
14    A.  Yes.
15    Q.  Okay.  What charge would that be?
16    A.  Well, and once again I did not
17  work out this hourly charge, but I presume
18  that there will be an allocation.  And, now,
19  once again this is an assumption on my part, I
20  did not do this, but I assume that there's an
21  allocation for some portion of the hangar fees
22  that have to be paid, for the annual
23  insurance, and potentially even for some

1  allocation for maintenance.
2    Q.  Okay.  So the hourly rate that you
3  charge to your clients is sort of an
4  all-encompassing fee for expenses, and you or
5  Perkins Communication or Matrix doesn't say,
6  here's the hourly rate and here's our charge
7  for fuel and here's our charge --
8    A.  No.
9    Q.  -- for the hangar?  You charge one
10  hourly rate to the clients; is that right?
11    MR. WADSWORTH:  Object to the
12  form.  You can answer.
13    A.  We charge one hourly rate to the
14  client?
15    Q.  (Nodding head affirmatively.)
16    A.  Once again, I don't do this.
17    Q.  Okay.
18    A.  This is not my part of the
19  business to do.  But we charge our clients for
20  the expense of the airplane, period --
21    Q.  Okay.
22    A.  -- in compliance with FAA and tax
23  regulations.

61

1    Q.  And that hourly rate is
2  essentially set up in a way that your
3  businesses do not make any profit off of it;
4  correct?
5    A.  That is the requirement.  There's
6  no profit.
7    Q.  Okay.
8    A.  We're not in the aircraft renting
9  business.
10    Q.  Okay.  Other than the Baron, do
11  you fly any other aircraft for personal use?
12    A.  Periodically.
13    Q.  Have you flown any other aircraft
14  other than the Baron for personal use in the
15  last six months?
16    A.  Yes.
17    Q.  What aircraft was that?
18    A.  The Cessna 182.
19    Q.  Okay.  And is there any specific
20  reason why you would choose to fly the 182 for
21  personal reasons over the Baron?
22    A.  The Baron may not have been
23  available.

62

1    Q.  Okay.  Does Perkins Communication
2  or Matrix use any aircraft other than the
3  Baron to perform its business?
4    A.  Yes.
5    Q.  What aircraft would that be?
6    A.  Well, we now use the Eclipse 500.
7    Q.  Okay.
8    A.  And then periodically if it's
9  needed, we will lease another aircraft.
10    Q.  Okay.  And how long -- strike
11  that.
12        How long has the jet been used for
13  the business of either Perkins Communication
14  or Matrix?
15    A.  I think we got it in October of
16  last year.
17    Q.  Okay.  And when the work was being
18  performed on the D'Shannon engines by Mike
19  Moore and his team, that would have been in
20  the summer and fall of 2013, was the Baron the
21  primary aircraft used by your businesses?
22    A.  Yes.
23    Q.  Okay.  And at the time of the low

63

1  oil pressure event in April of 2015, was the
2  Baron the primary aircraft used for your
3  businesses?
4    A.  Yes.
5    Q.  Prior to the spring of 2013, did
6  Perkins Communication or Matrix use Dixie
7  Air's Citation for business purposes?
8    A.  I don't know.
9    Q.  Has Perkins Communication or
10  Matrix ever used Dixie Air's Citation for
11  business purposes?
12    A.  Yes.
13    Q.  Why would Perkins Communication or
14  Matrix have used Dixie Air's Citation?
15    A.  For any number of reasons.  If the
16  Baron was unavailable for some reason, if the
17  trip was farther, if it required more people.
18  But primarily it would have been if the Baron
19  were unavailable.
20    Q.  Does Dixie Air have any twin
21  piston engine aircraft available for lease?
22    A.  No.
23    Q.  Do you know if any company out at

64

1  the Tuscaloosa Airport has twin piston engine
2  aircraft available for rent?
3    A.  I don't know, Tim.
4    Q.  Has Perkins Communication or
5  Matrix ever rented a Cessna 210 from Dixie?
6    A.  Yes.
7    Q.  And why would Perkins
8  Communication or Matrix have rented that 210?
9    A.  The same reason we would rent one
10  of the others, the Baron wasn't available and
11  the 210 was.
12    Q.  Is that 210 currently available
13  for rent from Dixie Air?
14    A.  It's been down for maintenance for
15  some time.  They've had to do some major work
16  on it.
17    Q.  Okay.
18    A.  I don't think it's in service
19  right now.
20    Q.  Okay.  When Dixie Air -- or strike
21  that.
22        When Perkins Communication or
23  Matrix would rent the Cessna 210 from Dixie

16  (Pages 61 to 64)

65

1 Air, would you normally be the one flying it?
2     A.  I think so.  There may have been
3 occasions when there was a contract pilot
4 flying it for someone, but -- and that
5 wouldn't have been unusual.  But probably most
6 of the time I would have been flying it.
7     Q.  Okay.  When the Baron is used for
8 either Matrix or Perkins Communication's
9 business, are you normally the one flying it?
10     A.  Most usually.  But, once again, we
11 have a full-time pilot, Stan Allen, and Stan
12 would fly it as well.
13     Q.  And you're not currently rated to
14 fly Dixie Air's Citation, are you?
15     A.  No.
16     Q.  And you've never been rated to fly
17 that aircraft, have you?
18     A.  No, I don't have a rating.  That's
19 a Cessna 501.  I do not have a 501 rating.
20     Q.  And you've never had one; correct?
21     A.  The citation?
22     Q.  Yes, sir.
23     A.  No.

66

1     Q.  Prior to the installation of the
2 D'Shannon engines and airframes upgrades, who
3 was performing the maintenance on the Baron?
4     A.  Well, the folks at Dixie Air.
5 Now, as I indicated we've had the Baron for --
6 since maybe around 2002, something like that,
7 2003.  And there have been a couple of
8 different people in the maintenance shop there
9 through that period of time.  But it's been
10 maintained at Dixie Air.
11     Q.  Okay.  And that's my next question
12 is immediately prior to -- or strike that.
13         When did Mike Terry first start
14 maintaining your aircraft at Dixie Air?
15     A.  Several years ago.  I mean, as
16 soon as he went to work there.  It's a matter
17 of record, we could find out.  But I think
18 Mike has been there four or five years.
19     Q.  Okay.  And do you remember who the
20 lead mechanic was or the director of
21 maintenance was at Dixie Air prior to Mike
22 Terry?
23     A.  The gentleman who was the lead

67

1 mechanic, his first name was Durrell, and I am
2 blocking on his last name.  I'm sorry.
3 It's -- I'm bad on names.  I've only known him
4 for twenty years.
5     Q.  That information should be in
6 the -- in your logbook somewhere, shouldn't
7 it?
8     A.  Oh, yeah, he would have signed a
9 lot of signatures.  His signature would have
10 been -- that, once again, is a matter of
11 record.  It's in the logs.
12     Q.  Do you have any idea why he left
13 Dixie Air?
14     A.  He got old.  He retired.
15     Q.  I've seen a few logbooks I believe
16 that were signed by someone named Stewart.
17     A.  Uh-huh.
18     Q.  Who was that?
19     A.  Stewart worked for some time as
20 Director of Maintenance at Dixie Air.  And I
21 think Stewart was -- and I'm not sure about
22 this, but Stewart may have been an IA in
23 addition to being an AP.

68

1     Q.  Okay.  Do you know about when he
2 would have left Dixie Air?
3     A.  I don't remember.
4     Q.  When you first purchased the
5 Baron, it was equipped with two Continental
6 IO-520-C engines; is that right?
7     A.  Uh-huh.
8     Q.  And those IO-520-C engines did not
9 have any STCs installed on them at the time
10 you purchased the Baron, did they?
11     A.  No.
12     Q.  Did you ever have the IO-520-C
13 engines overhauled before they were removed --
14     A.  No.
15     Q.  -- from the aircraft?
16     A.  No.
17     Q.  What was the condition of the two
18 IO-520-C engines at the time you first
19 contacted D'Shannon regarding the Genesis
20 upgrade?
21     A.  They were in great shape.
22     Q.  Did you have any problems with
23 those engines in the early part of 2013?

17 (Pages 65 to 68)

69

1      A.  Yes.
2      Q.  What problems did you have with
3  those 520 engines?
4      A.  There was one of the problems --
5  let me tell you what took place.  I had
6  started talking to Scott Erickson about
7  upgrades for the Baron.  I wanted to generally
8  upgrade it.  And Erickson started -- I was
9  talking with him about new windows, about
10  baffling, those things.  And then he started
11  an extremely aggressive sales promotion on the
12  new Genesis engine.  We had had some
13  discussions about upgrading to the 550s
14  because they're larger, more powerful engines.
15  And then I began having some problems with
16  both the engines frankly.  They were older.
17  They were -- they were I think both within
18  three hundred hours, four hundred hours of
19  their TBO.
20      Q.  What problems were you having with
21  the 520s?
22      A.  I don't remember specifically.
23  There were a number of small things.  Most of

70

1  it though came from my desire to upgrade the
2  Baron.
3      Q.  Okay.  So it wasn't so much the
4  problems with the 520s that caused you to buy
5  the 550s, it was more the desire to put on
6  larger engines; correct?
7      A.  Well, and see, once again, these
8  engines were starting to approach their TBO.
9  And so that decision was ahead of me anyway.
10  And I had planned to do a lot of work on the
11  Baron.
12      Q.  Okay.
13      A.  And the engine upgrade was a major
14  part of that consideration.
15      MR. WADSWORTH:  Joe, could you
16  clarify what TBO means for the record?
17      THE DEPONENT:  Time between
18  overhaul.  It's the time that you expect an
19  engine to run before it has to be removed or
20  overhauled or replaced.
21      MR. WADSWORTH:  Sorry.  I didn't
22  mean to jump in on you.  It's just that has
23  some jargon that --

71

1      MR. HEISTERHAGEN:  Yeah, we'll
2  try -- I'll try to make sure that I catch it.
3      MR. WADSWORTH:  Sure.
4      Q.  (BY MR. HEISTERHAGEN:)  It's my
5  understanding that at some point prior to
6  starting your negotiations with D'Shannon, the
7  Baron had had a gear-up landing; is that
8  correct?
9      A.  Yes.  That was a decade ago.
10      Q.  Okay.  Okay.  So that would have
11  been 2005, 2006, somewhere in there?
12      A.  Something like that.
13      Q.  Who repaired the Baron after that
14  happened?
15      A.  The folks at Dixie Air.
16      Q.  Have you ever had any work on your
17  aircraft done by Don Freeman prior to his
18  inspection of the D'Shannon engines?
19      A.  Don Freeman's shop is used by a
20  lot of people in this area because it's a
21  specialty shop.  I am sure that Don Freeman
22  has done work on things for my airplane
23  because it would have been the only place,

72

1  just like if you were doing prop work, there's
2  only one or two prop shops you can send stuff
3  to.  Anything specific I can't recall, but I
4  am -- I know that there had to have been work
5  that he did.
6      Q.  Okay.  But there's nothing you can
7  recall where you went to, say, Mike Terry or
8  someone at Dixie Air and said send this to Don
9  or have Don do it, is there?
10      A.  No.
11      Q.  Did you know Mr. Freeman before
12  this case started?  Strike that.
13      Did you know Mr. Freeman before he
14  inspected the D'Shannon engines?
15      A.  Well, "know" is a relative term.
16  I knew who he was.  I think I may have met him
17  once --
18      Q.  Okay.
19      A.  -- but it would have been in
20  passing.  But, once again, his shop -- he
21  is -- he's very well known for having a
22  specialty shop in aircraft engines.  If you
23  fly an aircraft around here for 36 years,

73

1    you're going to -- at some point you're going
2    to come across him.
3    Q.  Okay.  Have you ever been to Mr.
4    Freeman's shop?
5    A.  Yes.
6    Q.  Had you ever been there prior to
7    his inspection of the D'Shannon engines?
8    A.  Yes.  But, once again, it was
9    probably ten or twelve years ago.
10    Q.  With your 520 engines, did you
11    ever have a problem where an alternator gear
12    or something similar had gone through one of
13    the engines?
14    A.  Gone through the engine?  To my
15    knowledge an alternator gear never went
16    through one of my engines.
17    Q.  Did you have any problems with the
18    alternator or any alternator gears on one of
19    your 520 engines?
20    A.  I had a problem with an
21    alternator.
22    Q.  Okay.
23    A.  The extension in your remark that

74

1    a gear went through the engine is something I
2    have no knowledge of whatsoever.
3    Q.  Okay.  What problems did you have
4    with the alternator -- or strike that.
5    Which 520 engine was that, the
6    left hand or the right hand?
7    A.  I don't remember.
8    Q.  Okay.  What problems did you have
9    with the alternator on the 520 engine?
10    A.  The alternator quit working.
11    Q.  Do you remember when that was?
12    A.  No.
13    Q.  Okay.  And prior to the first time
14    you contacted D'Shannon regarding the airframe
15    upgrades, was the Baron airworthy and
16    available to be flown?
17    A.  Yes.
18    Q.  Okay.  Was there ever a time while
19    you were in negotiations with D'Shannon when
20    the Baron was either not airworthy or not able
21    to be flown?
22    A.  During negotiations with Shannon
23    [sic]?

75

1    Q.  With D'Shannon.
2    A.  Well, the negotiations with
3    D'Shannon have gone on for several years.
4    And, yes, there have been times during that
5    time when the airplane was not airworthy and
6    not capable of being flown, months of it
7    because Shannon -- D'Shannon had not performed
8    the work that they had been paid to do.
9    Q.  Okay.  When were the 520 engines
10    taken off the aircraft?
11    A.  A date?
12    Q.  General time frame.
13    A.  I really don't remember.  I mean,
14    once again, logbooks will tell us all of this
15    very specifically.
16    Q.  Was there a time in May of 2013
17    when the Baron was either not airworthy or
18    unable to be flown?
19    A.  In May of 2013 I have no
20    recollection of the calendar.  And, once
21    again, logbooks will tell us specifically.
22    Q.  How did you first hear of
23    D'Shannon?

76

1    A.  Their advertising.
2    Q.  Was that advertising in a magazine
3    or at a trade show or --
4    A.  Mostly Internet.  What I shopped
5    for initially was windows.  And they -- see,
6    D'Shannon owns STCs and STC is something that
7    is owned.  And if you want certain upgrades
8    even if you have the work done at some other
9    shop, D'Shannon owns the STC and it has to be
10    paid for it.
11    Q.  Okay.  So your initial
12    negotiations with D'Shannon dealt with windows
13    for the Baron; correct?
14    A.  That was my first call, yes.
15    Q.  Other than primarily Internet
16    advertising, had you ever heard of D'Shannon
17    before you called them for the first time?
18    A.  I'm sure I had.  Once again, the
19    name Beryl D'Shannon is a very old name in
20    aviation.  Beryl D'Shannon is the man from
21    whom Scott Erickson through some means
22    procured the business.
23    Q.  Do you remember when you first

77

1　contacted D'Shannon?
2　　A.　No.
3　　Q.　Okay.  Do you remember whether
4　that initial contact was via telephone or
5　e-mail?
6　　A.　Oh, no, it would had to have been
7　by telephone.
8　　Q.　And did you -- or strike that.
9　　Do you remember who you spoke with
10　during that first call?
11　Scott Erickson.
12　　Q.　And like we discussed when you
13　first called D'Shannon, all you wanted was
14　windows for the Baron; correct?
15　　A.　That was the initial call.
16　　Q.　And the scope of the products you
17　wanted to purchase from D'Shannon changed over
18　time, didn't it?
19　A.　Yes.
20　　(Whereupon, Defendant's
21　　Exhibit 3 was marked
22　　for identification.)
23　　Q.　Mr. Perkins, I'd like to show you

78

1　what I've marked as Exhibit 3.  And is Exhibit
2　3 an e-mail chain between you and Scott
3　Erickson dated May 14, 2013?
4　　A.　That's what it appears to be.
5　　Q.　And to the best of your knowledge,
6　do you have any written communications between
7　you and any representative of your businesses
8　and any representative of D'Shannon prior to
9　the e-mail that's marked as Exhibit 3?
10　　A.　To the best of my knowledge, no.
11　I mean, I could look at all the records and
12　try to date them, but --
13　　Q.　And --
14　　A.　-- I haven't done a chronological
15　listing of them.
16　　Q.　-- I'll represent to you this is
17　the earliest e-mail that I could find.
18　　A.　Uh-huh.
19　　Q.　And I just want to confirm that
20　you don't know of anything earlier.
21　　A.　As I sit here now, I know of
22　nothing earlier.
23　　Q.　Okay.  And as of May 14, 2013, had

79

1　you started to discuss purchasing two
2　overhauled Continental IO-550-C engines from
3　D'Shannon?
4　　A.　I don't think so.
5　　(Whereupon, Defendant's
6　　Exhibit 4 was marked
7　　for identification.)
8　　Q.　And, Mr. Perkins, I'd like to show
9　you what I've marked as Exhibit 4.  And is
10　Exhibit 4 an e-mail from you to Mr. Erickson
11　dated May 29, 2013?
12　　A.　(Reviewing document.)  Yeah, it
13　appears to be, yes.
14　　Q.　And in the first paragraph of that
15　e-mail, it looks like there's some
16　conversation regarding engines; is that
17　correct?
18　　A.　Yes.
19　　Q.　And at this point would you and
20　Mr. Erickson had been discussing upgrading
21　engines on the Baron?
22　　A.　Clearly.
23　　Q.　At this point do you remember

80

1　whether Mr. Erickson or anyone with D'Shannon
2　told you when the IO-550-C engines would be
3　available?
4　　A.　The -- what they represented to me
5　from the very beginning was that it would take
6　about three weeks for me to get my engines.
7　　Q.　Okay.  And the e-mail marked as
8　Exhibit 4, that specifically says that Mike
9　only had one engine core in stock; correct?
10　　A.　Right.
11　　Q.　Did you understand what that
12　meant?
13　　A.　I think I do.
14　　Q.　And -- but it's your testimony
15　from -- or strike that.
16　　When you say that from the very
17　beginning D'Shannon represented to you that it
18　would take three weeks to get the engines --
19　　A.　Uh-huh.
20　　Q.　-- what do you mean by "from the
21　very beginning"?
22　　A.　From the time that they said that
23　they would do the engine job for me, they said

1   it would take three weeks.
2     Q.  Okay.  When you are talking about
3   Mike in Exhibit 4, are you talking about Mike
4   Moore or Mike Terry?
5     A.  That must have been Mike Moore.
6     Q.  So even though the e-mail marked
7   as Exhibit 4 informed you that Mr. Moore only
8   had one engine core, it was still your
9   understanding that the engines would be
10  available three weeks from the first time you
11  discussed the engines with him; is that --
12    A.  The e-mail also says that he is
13  ordering another core.
14    Q.  And that's what I'm trying to find
15  out is that --
16    A.  That was not an impediment to them
17  keeping their initial commitment.
18    Q.  Okay.  And you didn't think that
19  was a problem, did you?
20    A.  No.  A competent engine shop
21  should have had what it needed to build the
22  engines it was selling.
23    Q.  If you look at the second

1   paragraph, the first sentence states, I'm very
2   anxious to get that project underway in that
3   the plane is now down and will not fly again
4   until you have finished your work; is that --
5     A.  Uh-huh.
6     Q.  -- correct?  Why was the plane
7   down?
8     A.  It apparently was having repairs
9   done of some type during that time.
10    Q.  Do you remember what repairs were
11  being performed at that time?
12    A.  Not specifically.
13    Q.  But any repairs that were being
14  performed should be in the logbooks; correct?
15    A.  Yes.
16    Q.  And in the third paragraph, you're
17  continuing your discussion with D'Shannon
18  about the windows; correct?
19    A.  Yes.
20    Q.  As of May 29, 2013, what were you
21  intending to purchase from D'Shannon?
22    A.  Well, at this point it appears
23  that I had made a decision about the windows,

1   which we obviously started discussing well
2   before the May 14th e-mail.  And in the two
3   weeks between the May 14th and the May 29th,
4   we had discussed engines and I was talking
5   about buying engines from them.
6     Q.  Okay.  And as of May 29, 2013, do
7   you recall discussing any parts or upgrades
8   with D'Shannon other than the windows and the
9   engines?
10    A.  Oh, yes.
11    Q.  So it sounds like the negotiations
12  were kind of just shifting as you communicated
13  more and more; is that right?
14    A.  Scott -- no, Scott Erickson was
15  constantly trying to sell something else.  He
16  was also trying to sell me an exhaust system
17  that did not exist.
18    Q.  The --
19    A.  It's mentioned in some of the
20  e-mails.  He talks about their new advanced
21  exhaust system.  He wanted me to be the first
22  airplane to buy the new advanced exhaust
23  system.  It had not even been engineered at

1   the time, but he wanted me to pay him at that
2   time for something that had not even been
3   designed.  So, yes, it was fluid, Tim.  It
4   went kind of back and forth.
5     Q.  Did you ever agree to purchase
6   that exhaust system?
7    A.  No, I did not.
8    Q.  Did you --
9    A.  I found out it did not exist.
10    Q.  And did you ever pay any money to
11  D'Shannon for that exhaust system?
12    A.  No, because I found out it did not
13  exist.
14    Q.  So the exhaust system is not a
15  part of this lawsuit, is it?
16    A.  No.  But you asked me what other
17  things.  You talked about the negotiations
18  going on back and forth and part of the
19  negotiation was Eric -- Scott Erickson
20  constantly trying to sell something
21  additional.  I called him about windows.
22    Q.  Okay.
23    A.  We went from windows to engines.

85

1  He then tried to extend that to exhaust
2  systems.
3      Q.  So although Mr. Erickson was
4  attempting to sell additional products, as of
5  May 29 of 2013 it looks like the only things
6  you were interested in were the engines and
7  the windows; correct?
8      A.  I think so.
9         (Whereupon, Defendant's
10        Exhibit 5 was marked
11        for identification.)
12     Q.  Mr. Perkins, is the document that
13 I've marked as Exhibit 5 an e-mail from Scott
14 Erickson to Scott Erickson with the subject of
15 your name dated June 7 of 2013?
16     A.  That's what it appears to be.
17     Q.  And then attached is a quote; is
18 that right?
19     A.  Uh-huh.
20     Q.  Have you ever seen the quote
21 attached to the e-mail marked as Exhibit 5?
22     A.  Yes, I think so.
23     Q.  Okay.  And the quote is an

86

1  estimate to overhaul IO-520-CBs and convert
2  them to IO-550-Cs; correct?
3      A.  I presume so.
4      Q.  Okay.  And you understand that
5  D'Shannon didn't overhaul your 520s and
6  convert them to 550s; correct?
7      A.  Yes.
8      Q.  And you know that D'Shannon sold
9  you two overhauled IO-550-Cs; correct?
10     A.  Yes.
11     Q.  To the best of your knowledge,
12 where are the 520 cores?
13        MR. WADSWORTH:  You can answer to
14 the extent you know.
15     A.  To the best of my knowledge,
16 they're sitting in a warehouse at Kurt
17 Nelson's place.
18     Q.  (BY MR. HEISTERHAGEN:)  Okay.  Did
19 you ever see those cores after they were
20 removed from your Baron?
21     A.  No.
22     Q.  Okay.  Did you ever have those
23 cores inspected after they were removed from

87

1  the Baron?
2      A.  No.  There were discussions about
3  me having them examined, but I was never
4  allowed to.
5      Q.  Okay.  When did you discuss the
6  examination of the -- or strike that.
7         Who did you discuss the
8  examination of the 520 cores with?
9      A.  Oh, with -- see, I didn't know
10 that there was an issue with the 520 core
11 until very late in the process of this entire
12 matter.  Scott Erickson began to claim that
13 there was a defect in one.  And I said before
14 I consent, I would need to inspect the core to
15 know that it was, in fact, a problem.
16     Q.  Okay.  How did that issue arise?
17     A.  At that time my lawyers were
18 talking with Scott Erickson's lawyers to try
19 to resolve the differences between us.  And at
20 some point that issue arose and I indicated
21 through my lawyers that before we did anything
22 regarding that core, it would have to be
23 inspected.

88

1      Q.  And to the best of your knowledge,
2  was D'Shannon attempting to charge you for the
3  defective core?
4      A.  I never knew that D'Shannon was
5  trying to charge me for the defective core
6  until your counterclaim was filed with an
7  invoice that I saw for the first time attached
8  to your counterclaim.
9      Q.  Okay.
10     A.  I had never seen that invoice in
11 that form in my life before that time.
12     Q.  So the issue with the 520 core
13 initially when it first arose was Mr. Erickson
14 simply claiming there was a defect of one of
15 them; is that right?
16     A.  It was stated in the exchange I
17 think primarily between lawyers.
18     Q.  And that was between your lawyer
19 Mr. Guy, and Mr. Erickson's lawyer; is that
20 correct?
21     A.  Yes.
22     Q.  Okay.  Mr. Perkins, when did you
23 first start communicating directly with Mike

1  Moore?
2     A.  Well, sometime between May 14th
3  and May 29th --
4     Q.  Okay.
5     A.  -- of that year.
6     Q.  And while the overhaul of the two
7  550-Cs were going on, did you communicate
8  regularly with Mr. Moore?
9     A.  Scott Erickson insisted that I
10  communicate directly with Mike Moore.
11     Q.  Okay.  And was Mr. Moore keeping
12  you up to date as to the status of the
13  overhaul of the two engines?
14     A.  Keeping me up to date would be a
15  misnomer.  He talked to me about the process.
16     Q.  Okay.  Why would you say keeping
17  you up to date would be a misnomer?
18     A.  Because -- what was your question?
19     Q.  Was Mr. Moore keeping you up to
20  date as to the progress of the overall on the
21  550 engines?
22     A.  Well, my conclusion at this point
23  in time that I think is strongly supported is

1  that, no, I was not being kept up to date with
2  the progress, with the actual progress.  I was
3  being talked to about the progress, but I was
4  not being kept up to date about the progress.
5     Q.  Okay.  So Mr. Moore was talking to
6  you about the overhaul of the engines;
7  correct?
8     A.  Yes.
9     Q.  Okay.  And you also spoke with Mr.
10  Ramey in North Carolina; correct?
11     A.  See, there was a point where Mike
12  Moore refused to talk to me any longer, and
13  Scott Erickson called me, and I have the date
14  somewhere in my notes.  And he said he wanted
15  my communication to be with Earl Ramey from
16  that point forward.
17     Q.  Okay.  Why did Mr. Moore stop
18  talking to you?
19     A.  Because he continued to lie to me,
20  and I know that.  Mike Moore told me later
21  that the reason that he refused to continue to
22  talk to me about the engines was that Scott
23  Erickson demanded that he deceive me and he

1  would no longer be involved in a deception
2  of -- he would no longer be involved in
3  deceiving me.
4     Q.  How did Mr. Erickson demand that
5  Mr. Moore deceive you, if you know?
6     A.  He told him to lie about the
7  status of the engines.
8     Q.  As far as you know, did Mr. Moore
9  ever lie to you about the status of the
10  engines?
11     A.  He misled me about the status of
12  the engines, yes.
13     Q.  And how did he do that?
14     A.  By telling me that they were much
15  more advanced in their production than they
16  actually were.  Scott Erickson put extreme
17  pressure on Mike Moore to deceive people.
18  Standing in the hangar at Dixie Air one day
19  when Mike Moore was in Tuscaloosa installing
20  the engines on the airplane, Scott Erickson
21  called Mike Moore about another engine for a
22  Bonanza.  And Moore standing there with his
23  phone in his hand called me over.  He said,

1  listen to this.  He put it on speaker and held
2  it for me to hear.  And I heard Scott Erickson
3  instruct Mike Moore to deceive the other man
4  who had bought the Bonanza engine, to string
5  him along and just keep him happy.  I heard
6  that take place.
7     MR. HEISTERHAGEN:  Go off the
8  record.
9     THE VIDEOGRAPHER:  This concludes
10  tape two in the deposition of Joe Perkins.
11  Going off the record at 10:56.
12     (Whereupon, a short break was
13     taken.)
14     THE VIDEOGRAPHER:  This begins
15  disk three in the deposition of Joe Perkins.
16  Going back on the record at 11:06.
17     Q.  (BY MR. HEISTERHAGEN:)  Mr.
18  Perkins, are you going to offer any opinions
19  in this case as to what caused the crankshaft
20  bolts in the left D'Shannon engine to break?
21     MR. WADSWORTH:  Object to the
22  form.  You mean Joe personally?
23     MR. HEISTERHAGEN:  Yes.  I'm just

93

1  confirming, hopefully.
2      A.  Tim, I've already told you that
3  I'm not competent to talk to you about the
4  matters of law.  I'm probably even less
5  competent to talk about engineering and those
6  things.  So I could repeat to you what experts
7  and mechanics have said, but I have no --
8      Q.  (BY MR. HEISTERHAGEN:)  Personal
9  opinions?
10     A.  None that is of value in a court
11 of law.
12     Q.  Okay.  And we're just going to
13 leave those issues to the mechanics in this
14 case; correct?
15     A.  Uh-huh.
16     Q.  Okay.
17        (Whereupon, Defendant's
18        Exhibit 6 was marked
19          for identification.)
20     Q.  Mr. Perkins, I'd like to show you
21 what I've marked as Exhibit 6.  And is Exhibit
22 6 an e-mail from Scott Erickson to you and
23 copying Mike Moore, dated June 20, 2013?

94

1      A.  Yes.
2      Q.  And as of June 20 of 2013, did you
3  know that the D'Shannon engines were still in
4  the process of being overhauled?
5      A.  What this e-mail proves, Tim, is
6  that in June 2013, that I had discussions with
7  Scott Erickson about why my engines were not
8  progressing and when they were going to be
9  delivered.  It says in quotations, what do you
10 need on the floor in front of the engines?
11 Basically what is required to be in the shop
12 to complete the installation of the
13 conversion.  Now, what this shows is that
14 Erickson is confirming that the things that
15 were necessary on June 20th were not there.
16     Q.  As of June 20th of 2013, did you
17 know that the D'Shannon engines were still in
18 the process of being overhauled?
19     A.  Yes.
20     Q.  Okay.
21     A.  I knew the job that they had
22 committed to do was not done because they
23 weren't on my airplane.

95

1        (Whereupon, Defendant's
2        Exhibit 7 was marked
3          for identification.)
4      Q.  Mr. Perkins, is the e-mail that
5  I've marked as Exhibit 7 an e-mail from you to
6  Mr. Erickson, Mr. Moore, and Midsouth
7  Avionics, dated August 16, 2013?
8      A.  Yes.
9      Q.  Okay.  And Midsouth Avionics is
10 the entity that was providing and installing
11 the Auracle engine monitor; correct?
12     A.  Right.
13     Q.  And at this point, and please
14 correct me if I'm wrong, but you seem to be
15 happy about the work being performed; is that
16 true?
17     A.  What I was doing at this point in
18 time was trying to say anything I could to get
19 my engines.  This is August the 16th.  August
20 the 16th for engines that were supposed to
21 have been delivered by the end of June.  At
22 this point what I'm trying to do is make
23 enough peace to get the engines.  And at this

96

1  point, Tim, I had paid this man tens of
2  thousands of dollars in advance.  I paid in
3  advance to Scott Erickson $133,999 in advance.
4  And on August the 16th we're still discussing
5  when we're going to get the engines.
6      Q.  The money that you paid to
7  D'Shannon in advance, how was that paid?
8      A.  By check.
9      Q.  Check.
10     A.  Or -- or sometimes by transfer
11 because he was so desperate for cash that we
12 would transfer the money to him.
13     Q.  Do you still have the canceled
14 checks or wire transfer forms?
15     A.  We've got everything, yes.
16 Certainly.  I confirmed with our accountants
17 yesterday, $133,999.
18     Q.  Mr. Perkins, when you decided to
19 purchase the IO-550-C engines from D'Shannon,
20 you understood that D'Shannon had to overhaul
21 those engines; correct?
22     A.  Yes.
23     Q.  And when you first decided to

97

1    purchase the IO-550-C engines from D'Shannon,
2    did you understand that D'Shannon had just
3    established its engine shop in North Carolina?
4        A.  I was told that the shop was up
5    and running and producing the Genesis engine.
6    And their website that I have still shots from
7    talked about the existence of their
8    state-of-the-art engine shop in North Carolina
9    that was producing the new Genesis engine.
10       Q.  And you said you have still shots
11   of the website from back in 2013?
12       A.  I think so.
13       MR. HEISTERHAGEN:  Are y'all
14   planning on using any of that stuff?
15       THE DEPONENT:  I don't know that
16   Stephen knows that I have that.
17       MR. WADSWORTH:  Yeah.  Off the
18   record.
19       THE VIDEOGRAPHER:  Going off the
20   record at 11:14.
21       (Off-the-record discussion.)
22       THE VIDEOGRAPHER:  Going back on
23   the record at 11:16.

98

1        Q.  (BY MR. HEISTERHAGEN:)  And,
2    Mr. Perkins, I know you just told me that it
3    was represented to you that the North Carolina
4    engine shop was up and running, but you
5    understood that that engine shop had just been
6    established; correct?
7        A.  I was told it had just been
8    established.  But I was given assurances that
9    it has -- that was a, quote, state-of-the-art
10   engine shop building -- I mean, the language
11   used was the most superlative in terms of the
12   abilities of the shop and the capabilities of
13   the people there.
14       Q.  As we sit here today, and of
15   course I'm not asking you to pull out the
16   document production and look through every
17   page of it, but do you recall any written
18   communications with Mr. Erickson or anyone
19   else at D'Shannon promising you the engines by
20   the end of June?
21       A.  As I sit here right now I cannot
22   recall, Tim, no.
23       Q.  Okay.

99

1        A.  What I was told repeatedly was it
2    would be a three-week job.
3        Q.  And if you look back at Exhibit 7,
4    you state that you understood that August 26th
5    was the target date to begin installing the
6    engines; correct?
7        A.  Yes.
8        Q.  And who had given you that date?
9        A.  Well, I recently talked with all
10   of you.
11       Q.  Yeah.
12       A.  And this is to Scott Erickson and
13   to Mike Moore.
14       Q.  So it was sort of a joint
15   communication on conference call or something
16   like that it sounds like?
17       A.  We had several of those, yes.
18       Q.  Okay.
19       A.  And at this time -- now, this is
20   once again recalling it, I may be inaccurate,
21   but once again, this is a matter of some
22   record that we -- I think at this time on --
23   the date of the e-mail is August the 16th.

100

1    We're talking about an installation on August
2    26th.  I don't think they even started one of
3    the engines.
4        Q.  And was August the 16th during the
5    time when you were communicating with Mike
6    Moore or was that after the time he stopped
7    communicating with you --
8        A.  Well --
9        Q.  -- if you remember?
10       A.  -- apparently, according to this,
11   I was still talking with Mike.  And the issue
12   was Mike kind of rotated off because he
13   refused, and this was -- I think Mike would
14   tell you this, he refused to talk to me for a
15   while because Erickson demanded that he lie to
16   me.  Then later on in the process,
17   particularly when we started talking about the
18   installation of the engines, we renewed some
19   communication.
20       Q.  So you started talking to Mike
21   Moore again --
22       A.  We had to have some communication
23   about the actual installation.

1    Q.  As of August 16, 2013, other than
2  having the D'Shannon engines installed, was
3  there any other work that needed to be
4  performed on the Baron to make it airworthy?
5    A.  To make it airworthy?
6    Q.  Yes, sir.
7    A.  I don't think so.
8    Q.  And we'll talk about this a little
9  more later on, but following the installation
10  of the D'Shannon engines and airframe
11  upgrades, you asked Mike Moore and Dennis
12  Hallman to perform work on the airframe of the
13  Baron; correct?
14    A.  That's true.
15    Q.  Was any of the work they performed
16  on the airframe of the Baron required to make
17  the Baron airworthy?
18    A.  No, I don't think so. When they
19  did the work on the Baron on the engine
20  installation, they discovered other things.
21  And Dennis Hallman is very good and Mike Moore
22  is very good. And I've already told you that
23  one of my goals was to really bring the Baron

1  up to some type of first-class condition.
2  That's what I was doing overall. And they had
3  a number of things that they felt needed to be
4  done to the Baron. And it was at that time
5  that -- and it's totally unrelated to the
6  engines, but then they did additional airframe
7  work on the Baron.
8    Q.  And Mr. Moore and Mr. Hallman were
9  not doing that airframe work on behalf of
10  D'Shannon; is that right?
11    A.  No.
12    Q.  And I'm going to ask that again
13  just because I said is that right and you said
14  no. So Mr. Moore and Mr. Hallman were not
15  doing the airframe work on the Baron on behalf
16  of D'Shannon, were they?
17    A.  They were not doing the airframe
18  work on behalf of D'Shannon.
19    Q.  And Mr. Moore and Mr. Hallman did
20  not install the D'Shannon engines or the
21  airframe upgrades on behalf of D'Shannon, did
22  they?
23    A.  There was a strong dispute with

1  Scott Erickson the e-mail trail will show you.
2  Even this e-mail talks about the installation,
3  getting installation done. The situation with
4  Erickson got to the point of me saying, send
5  me my engines and I will pay these people
6  independently to put them on because I've got
7  to have the airplane back.
8    So, yes, the installation was
9  supposed to have been done and there is an
10  e-mail trail that talks about Erickson
11  installing my engines. To get them put on, I
12  finally said, forget it, I will hire these two
13  people to put my engines on. So the answer to
14  your question is, no, they did not install
15  them on behalf of D'Shannon.
16    Q.  Are any of your claims in this
17  case related to the installation of the
18  engines for the D'Shannon upgrades or the
19  airframe work performed by Mike Moore and
20  Dennis Hallman?
21    A.  I don't think so. I think all of
22  our claims are directly on the engines
23  themselves.

1    Q.  Okay.
2    (Whereupon, Defendant's
3    Exhibit 8 was marked
4    for identification.)
5    Q.  Mr. Perkins, I'd like to show you
6  what I've marked as Exhibit 8. And is Exhibit
7  8 an e-mail from you to Mr. Erickson dated
8  September 15, 2013?
9    A.  Uh-huh.
10    Q.  And as of September 15, 2013, Mr.
11  Erickson or someone had informed you that only
12  one of the D'Shannon engines was ready;
13  correct?
14    A.  Yes.
15    Q.  Okay.
16    A.  Now, this was after the August
17  16th memo where we discussed that both of the
18  engines were supposed to be here to be
19  installed on August the 26th.
20    Q.  And do you remember when you were
21  first informed that only one engine was ready?
22    A.  Well, sometime before the date of
23  this. And now if we can refer directly to

105

1 this, he says -- I asked him, what time should
2 we expect the guys from Tennessee? The guys
3 from Tennessee -- Scott Erickson had presented
4 to me that the Bonanza Engine Society Team in
5 Tennessee would be coming to Tuscaloosa in
6 order to install my windows and to help with
7 the engine installation. That's what the team
8 from Tennessee is. That was untrue.
9       I was expecting the delivery of an
10 engine that afternoon. And this was not the
11 first presentation that the engines are going
12 to be there tomorrow. I mean, this had been
13 going on for two and a half months. They're
14 going to be there next week, next Tuesday.
15 And you've just confirmed for me, Tim, that on
16 September the 15th there was only one engine
17 created. And the truth is that one wasn't
18 created.
19       Q. How do you know that the engine
20 that was represented to you as being ready on
21 September 15th was not actually created?
22       A. Well, it didn't arrive for one
23 thing. If it existed, wouldn't it have

106

1 relieved an awful lot of pressure to send it?
2       Q. I'll ask the questions. Did Mr.
3 Erickson ever tell you why the engines were
4 taking so long?
5       A. He blamed everybody. He blamed
6 Mike Moore. He blamed Earl Ramey. He blamed
7 his father-in-law. It was -- it was the
8 excuse de jour.
9       Q. Did Mr. Moore ever explain to you
10 why the engines were taking so long?
11       A. I can tell you what he told me.
12       Q. What did he tell you?
13       A. Mike Moore told me that Scott
14 Erickson was a liar, that in fact the parts
15 were not there, that the tools to create the
16 engines were not present, that Erickson
17 simply -- that Mike Moore said he would send
18 orders for parts to Wisconsin to the lady who
19 handled the part ordering in Wisconsin and
20 they simply would not do it, that they could
21 not order some parts because they were so far
22 behind in payment with some vendors that the
23 vendors would not fill the order.

107

1       Q. But D'Shannon's North Carolina
2 shop did eventually acquire the parts and
3 tools they needed to overhaul the 550-C
4 engines that were being sold to you, didn't
5 they?
6       A. Well, yes.
7          (Whereupon, Defendant's
8          Exhibit 9 was marked
9          for identification.)
10       Q. Mr. Perkins, I'd like to show you
11 what I've marked as Exhibit 9. And Exhibit 9
12 is an e-mail that was sent from you to Mr.
13 Erickson on September 15, 2013; correct?
14       A. Yes.
15       Q. And that e-mail contains a link
16 to, for lack of a better term, an Internet
17 story, doesn't it?
18       A. Yes.
19       Q. And are the second two pages of
20 Exhibit 9, which are marked in the bottom
21 right corner DPL-00196 through 197, are those
22 pages the Internet story that was linked in
23 the e-mail?

108

1       A. I think so, yeah. And they're
2 still on the Internet today.
3       Q. Why did you send that link to Mr.
4 Erickson?
5       A. Apparently there had been some
6 discussion between Erickson and me about Mike
7 Moore, and for whatever reason, I'm not quite
8 sure why, but I sent it to him.
9       Q. Were you personally having any
10 problems with Mr. Moore at this point?
11       A. It was clear to me that Mr. Moore
12 was deceiving me. Now, problems, yeah. I
13 mean, this -- this is September the 15th.
14 This first e-mail is May the 29th.
15       Q. Uh-huh.
16       A. Yes, I had some problems.
17       Q. Were you attempting to turn Mr.
18 Erickson against Mr. Moore at this point?
19       A. No. As I said, Mr. Erickson was
20 blaming everyone in the world.
21       Q. Do you recall how you found this
22 Internet story? Did someone tell you about
23 it? Did you just come across it on Google or

27 (Pages 105 to 108)

1  do you remember how you found it?
2      A.  I think we just Googled it.  I
3  don't recall.
4      Q.  So essentially you were just
5  passing information along to Mr. Erickson; is
6  that right?
7      A.  Or probably validating a claim I
8  was making that there was a real problem with
9  his shop and that it needed attention and that
10  I -- that I felt that there were fundamental
11  problems about the delivery of my engine and
12  this was one of the problems.
13          (Whereupon, Defendant's
14          Exhibit 10 was marked
15          for identification.)
16      Q.  Mr. Perkins, is Exhibit 10 an
17  e-mail from Mr. Erickson to you and Kim Hines
18  with several pictures of an engine assembly
19  attached?
20      A.  Yes, it appears to be.
21      Q.  Kim Hines is a name we haven't
22  come across today.  Who is she?
23      A.  She is my business manager at

1  Matrix.
2      Q.  Okay.  Did she have any role in
3  this case other than being a point of contact
4  for either D'Shannon or Mike Moore or
5  submitting payments to D'Shannon?
6      A.  She paid the bills.
7      Q.  Okay.  And was it your
8  understanding that the photographs included in
9  Exhibit 10 were photographs of your engine
10  being assembled?
11      A.  That's what I would take from the
12  e-mail that that's its cover.  Here are some
13  shots of the engine assembly from last week.
14      Q.  So as of September 16, 2013, you
15  knew that at least one of your engines was not
16  fully overhauled; correct?
17      A.  Correct.
18      Q.  And if you were -- well, strike
19  that.
20          We've talked today and we're going
21  to talk more, you were experiencing all of
22  these problems with D'Shannon or Mike Moore
23  and the progress of receiving your engines.

1  Why didn't you ever call Scott Erickson and
2  say, just give me my money back.
3      A.  We actually had that discussion.
4  It was clear that Erickson would not be
5  favorably inclined toward that.  And at that
6  point I had tens of thousands of dollars in
7  their hands that I wasn't going to get back.
8  Also what I knew about Scott Erickson at this
9  point in time and the engine shop made me
10  extremely doubtful.  The only thing I was
11  going to get of value was hopefully the
12  delivery of the engines.
13      Q.  Did you ever specifically request
14  to get your money back?
15      A.  I had that discussion specifically
16  with Scott Erickson.
17      Q.  Okay.
18      A.  And Erickson continually had
19  another promise that we will fulfill our
20  commitment to you next Tuesday.
21      Q.  Did you --
22      A.  Are you asking me in hindsight --
23      Q.  No, no.

1      A.  -- should I have taken more action
2  against him?
3      Q.  No.  And my next question is, did
4  Mr. Erickson ever specifically tell you that
5  he would not give you your money back?
6      A.  Mr. Erickson always had another
7  reason to not give me my money back.  And it
8  was clear to me, as I've already stated, it
9  was clear to me that trying to get the money
10  from Scott Erickson -- this is a man that at
11  this point in time was being sued by his wife
12  for domestic violence; okay?  His -- they hung
13  notices of termination of electrical service
14  on the doors in North Carolina.  I understand
15  the sheriff served a notice of potential
16  eviction.  I was trying to find the best way
17  to get some value for all the money that I had
18  put there.
19      Q.  Did Mr. Erickson ever tell you
20  that he would not give you your money back?
21      A.  I never asked him point blank to
22  do it.
23      Q.  Okay.  The -- as of September 16,

1    2013, were you still communicating on a
2    somewhat regular basis with Mr. Erickson?
3        A.   Yes.
4        Q.   Okay.
5        A.   Well, I think so.  I mean,
6    obviously this -- this man is trying to
7    placate me with pictures of something on
8    September 16.
9        Q.   Would you have considered your
10   relationship with Mr. Erickson problematic as
11   of September 16, 2013?
12       A.   Problematic?
13       Q.   Yes, sir.
14       A.   Clearly somebody who had taken a
15   hundred thousand dollars of my money and had
16   clearly -- this chain of e-mails you've given
17   me in the last few minutes shows a consistent
18   attempt to deceive me about the state of the
19   engines.  Yes, what you have shown me here
20   disturbed me with Scott Erickson.
21           (Whereupon, Defendant's
22           Exhibit 11 was marked
23            for identification.)

1        Q.   Mr. Perkins, I'd like to show you
2    what I've marked as Exhibit Number 11.  And is
3    Exhibit 11 an e-mail chain between you and Mr.
4    Erickson and Bob Kobielush and Earl Ramey and
5    Mike Moore dated September 22nd, 2013?
6        A.   It is.
7        Q.   And I'd like to direct you to the
8    bottom e-mail which you sent to Mr. Erickson;
9    do you see that?
10       A.   Yes.
11       Q.   And you stated that you needed to
12   hear from Mr. Erickson by 7:30 eastern time,
13   and further stated that if the engines are not
14   on a truck headed your way, we have a serious
15   problem.
16       A.   Uh-huh.
17       Q.   It seems like this is kind of the
18   time where you've reached your breaking point;
19   is that true?
20       A.   I was pretty much close to a
21   breaking point.  This is September the 22nd.
22   Now, he tells you in this e-mail that they're
23   still a week away from -- from engines.  And

1    we have a chain of e-mails here where he talks
2    about the engines.  You asked me how I knew
3    the engines weren't completed, in this e-mail
4    he verifies that the test stand necessary to
5    test the engines before their delivery was not
6    in place.
7        Q.   So you --
8        A.   He tells you here they did not
9    have the things to finish the engines to
10   deliver them.
11       Q.   So as of September 22nd, 2013 you
12   knew that the engines were not ready; correct,
13   based on the e-mail?
14       A.   I knew what this said, yes.
15           (Whereupon, Defendant's
16           Exhibit 12 was marked
17            for identification.)
18       Q.   Mr. Perkins, is Exhibit 12 an
19   e-mail from Mr. Erickson to you and Ms. Hines
20   dated October 7, 2013?
21       A.   Yes.
22       Q.   Mr. Erickson states in the first
23   sentence of the fourth paragraph that he's

1    done listening to your threats and that you
2    have threatened him and his company more than
3    sixty times; do you see that?
4        A.   I see that.
5        Q.   Did you make any threats against
6    Mr. Erickson or his company?
7        A.   I told Mr. Erickson that if I
8    didn't get my engines, I was going to sue him.
9        Q.   Okay.  Did you threaten to report
10   either Mike Moore or Scott Erickson to the
11   attorneys general of their respective states?
12       A.   I told him that I thought that
13   what they were doing was criminal, that I
14   thought it was fraud and that I would try to
15   take whatever action I could to have the
16   appropriate legal authorities take action
17   against them.
18       Q.   Okay.  Did you threaten criminal
19   prosecution against either Mike Moore or Scott
20   Erickson?
21       A.   I told them that what I thought --
22   that they were doing was criminal, that it was
23   fraud, that they had taken my money and lied

---

117

1   to me and that I would pursue trying to get
2   the appropriate authorities in the relevant
3   states to look at what they were doing.
4      Q.  Did you file any criminal reports
5   regarding either Mr. Erickson or Mr. Moore?
6      A.  No.
7      Q.  Did you report Mr. Moore to the
8   FAA as it relates to the left D'Shannon
9   engine?
10      A.  No.
11      Q.  Have you instituted any civil
12   proceedings of any kind whether regulatory or
13   in a court of law other than this one against
14   D'Shannon Products, Limited, Mike Moore or
15   Scott Erickson?
16      A.  No.
17      Q.  As of October 7, 2013, do you
18   recall whether you were speaking with Mike
19   Moore again?
20      A.  I don't recall.
21      Q.  And if you look at the first full
22   paragraph of the e-mail, Scott said that
23   Dennis Hallman and Mike Moore are going to be

---

118

1   installing the engines and windows; do you see
2   that?
3      A.  Yes.
4      Q.  So, to the best of your
5   recollection, it would have been sometime
6   around October 7 when you sort of reinstituted
7   communications with Mr. Moore?
8      A.  Before that I'm sure.
9      Q.  Because I think you told me
10   earlier that you started to communicate with
11   him again regarding the installation of the
12   D'Shannon products; correct?
13      A.  Uh-huh.
14      (Whereupon, Defendant's
15      Exhibit 13 was marked
16      for identification.)
17      Q.  Mr. Perkins, I'm going to show you
18   what I've marked as Exhibit 13.  And Exhibit
19   13 is an e-mail from Peggy Hargreaves at
20   D'Shannon to Kim Hines at Matrix; correct?
21      A.  Yes.
22      Q.  And attached to that invoice -- or
23   sorry, attached to that e-mail are two

---

119

1   D'Shannon invoices that seemed to be
2   identical; correct?  And please take your time
3   and look through them.
4      A.  (Reviewing document.)  They appear
5   to be identical, yeah.
6      Q.  And I'm going to focus on the
7   documents in the bottom right marked
8   Plaintiffs 118 and 119 just so we can be on
9   the same page.  Have you seen the invoice that
10   is labeled Plaintiffs 118 and 119 before?
11      A.  I may have.  I really don't
12   recall.
13      Q.  Did you --
14      A.  I'm sure.
15      Q.  I'm sorry?
16      A.  I'm sure Kim probably showed it to
17   me.
18      Q.  Do you recall personally reviewing
19   any invoices from D'Shannon?
20      A.  All the invoices that came in came
21   across my desk, yes.
22      Q.  And I want to go through these
23   products.  The first line item is a 3/8 inch

---

120

1   solar gray windshield replacement that cost
2   $1,750; correct?
3      A.  That's what it says.
4      Q.  Had you agreed to purchase that
5   product from D'Shannon?
6      A.  Yes.
7      Q.  And you received that product;
8   correct?
9      A.  Actually I'm not sure we received
10   that product.  I think what they actually did
11   was substitute another product other than the
12   one we ordered.
13      Q.  And what makes you believe that?
14      A.  Because through this entire
15   process on the windows -- see, and this isn't
16   part of this action, this lawsuit, but what
17   took place on the windows is Scott Erickson
18   promised me those windows and he had no
19   ability to deliver them.  Now, we went through
20   a great deal of hurraying trying to get the
21   windows.  And then Scott Erickson actually
22   started substituting what I -- other products
23   for what I had ordered.  In the end what was

1  delivered to Dixie Air to be installed wasn't
2  even installable. It had to be sent back and
3  replaced. So, Tim, I am not sure if what is
4  on this piece of paper is what I got. The
5  windows that I have that I paid the money for
6  leak like sieves and don't fit.
7      MR. WADSWORTH: Tim, for the
8  record, there is one small difference between
9  these invoices.
10     THE DEPONENT: What is that?
11     MR. HEISTERHAGEN: What is that?
12     MR. WADSWORTH: The very first
13  line it reflects the difference between a
14  half-inch solar gray windshield replacement
15  and the 3/8 solar gray windshield replacement.
16  They knocked $200 off. One was 1,950 and --
17     THE DEPONENT: That's what I was
18  recalling.
19     Q. (BY MR. HEISTERHAGEN:) Okay.
20     A. They substituted the windows
21  because he couldn't deliver what I had
22  ordered.
23     Q. And what you just told me, does

1  that apply in your opinion to all of the
2  windows listed on this invoice?
3      A. The windows fit horribly. And
4  that has not been part of our contention or
5  harm. That was just something I just -- I
6  never wanted to see Scott Erickson again and I
7  just forgot about it and just decided to try
8  to fix it. But they fit horribly. And that's
9  what I had recalled, that they had substituted
10  one for the other and I hadn't noticed that.
11     I also think -- now, this is
12  something that I'll have to ask him about, I
13  don't think, and this is -- I'm doing this
14  from memory, I'm not sure this invoice
15  accurately reflects all the charges and all
16  the payments that were made to this point in
17  time.
18     Q. Okay.
19     THE DEPONENT: And if you'll help
20  me remember that, we can verify that.
21     MR. WADSWORTH: Well, yeah, it's
22  your testimony today. But we'll take a look
23  and make sure we don't surprise anybody at

1  trial.
2      THE DEPONENT: Right.
3      Q. (BY MR. HEISTERHAGEN:) And on
4  page 119, the invoice does state that Perkins
5  Communication had paid $116,010?
6      A. That's what this says.
7      Q. And what you just told me was
8  you're not sure whether that's accurate;
9  correct?
10     A. I'm not sure that's accurate.
11     Q. And there are no charges for
12  installation on this invoice; correct?
13     A. No.
14     Q. And that's because Mike Moore and
15  Mr. Hallman did the installation on their own
16  paid by you?
17     A. I paid them separately. And there
18  are e-mails that verify that Scott Erickson
19  through this process had promised to, quote,
20  send the team down from Tennessee to install
21  my windows, that he, quote, would handle the
22  installation. It wasn't something that they
23  normally do, but they'd handle the

1  installation. Yes, now, there are no
2  installation costs here and that was another
3  deception.
4      Q. So at the end of the day, Perkins
5  Communication essentially purchased products
6  from D'Shannon; correct?
7      A. Yes.
8      Q. And I think you told me a little
9  while ago, and please correct me if I'm wrong
10  on the number, but that Perkins Communication
11  has paid D'Shannon $133,799?
12     A. No. And it would have been
13  Perkins Communication and Matrix.
14     Q. And Matrix, okay.
15     A. Paid, according to what Kim Hines
16  told me yesterday from research I asked her to
17  do, that we had paid D'Shannon $133,999, one
18  dollar short of 134,000.
19     Q. Okay.
20     A. And this shows that according to
21  their files, which I'm not sure are accurate
22  at all, that at this point in time, this is
23  October the 9th. Let's see, you know, at the

125

1   end of September they're still talking about
2   coming to install the engines and having
3   things finished up on October the 9th. I had
4   already paid $116,000, according to their
5   records, in advance.
6       Q. Do you recall making any payments
7   to D'Shannon after the October 9, 2013 e-mail?
8       A. I wouldn't recall it.
9       Q. But your business record would
10  show that, wouldn't they?
11      A. Sure.
12      Q. Okay. How did you decide to
13  allocate the payment for this work between
14  Matrix and Perkins Communication?
15      A. Just based off of where I wanted
16  the expense to come from.
17      Q. Okay. Do you remember when Mr.
18  Moore and Mr. Hallman delivered the D'Shannon
19  engines and airframe upgrades to you here in
20  Tuscaloosa?
21      A. The date?
22      Q. If you remember the date, that
23  would be great, but --

126

1       A. I don't.
2       Q. -- if you don't, the general time
3   frame?
4       A. I think it was sometime in
5   October.
6       Q. And then Mr. Moore and Mr. Hallman
7   performed the installation work at Dixie Air;
8   correct?
9       A. Yes.
10      Q. Do you remember about how long
11  that took?
12      A. Oh, gee, it probably took two
13  weeks.
14      Q. Okay.
15      A. Three weeks -- between two and
16  three weeks.
17      Q. And at that point when Mr. Moore
18  and Mr. Hallman were performing the work
19  installing the D'Shannon engines and upgrades,
20  you were back on good terms with Mr. Moore; is
21  that right?
22      A. I had come to the conclusion that
23  Mr. Moore had been badly treated by Scott

127

1   Erickson, that -- and particularly with Dennis
2   Hallman in the equation, I felt that Mr. Moore
3   was competent to do the installation job.
4       Q. When Mr. Moore and Mr. Hallman
5   arrived with the engines and the airframe
6   upgrades, did you ever tell anyone from
7   D'Shannon or Mr. Moore that you did not want
8   those products?
9       A. No.
10      Q. Okay. Did you ever tell Mr.
11  Erickson or anyone with D'Shannon that you
12  needed to return or exchange the windows?
13      A. Now, when the whole debacle with
14  the windows was taking place, Mike Moore was
15  actually doing the installation and he was
16  communicating with D'Shannon about having them
17  replaced.
18      Q. Okay.
19      A. I was not talking to Scott
20  Erickson at that time.
21      MR. HEISTERHAGEN: Can we go off
22  the record?
23      THE VIDEOGRAPHER: Going off the

128

1   record at 12:01.
2       (Whereupon, a lunch recess was
3       taken.)
4       THE VIDEOGRAPHER: This begins
5   disk four in the deposition of Joe Perkins.
6   Going back on the record at 1:02.
7       Q. (BY MR. HEISTERHAGEN:)
8   Mr. Perkins, before we took the lunch break,
9   we were talking a little bit about Mr. Moore
10  and Mr. Hallman installing the D'Shannon
11  products onto your aircraft; do you recall
12  that?
13      A. Yes.
14      Q. And once the D'Shannon engines and
15  airframe upgrades were installed on your
16  Baron, you made the decision to engage Mr.
17  Moore and Mr. Hallman to perform additional
18  airframe work on the Baron; correct?
19      A. Yes.
20      Q. And why did you decide to use
21  them?
22      A. Well, for one thing, Dennis
23  Hallman has an incredible record with

129

1  restoration of vintage aircraft.  I mean, the
2  man that has traveled all over the world
3  restoring aircraft.  Secondly, Dennis actually
4  has a hangar in his backyard with a runway
5  behind it.  So the -- I knew that the plane
6  would physically be in Dennis' hangar and that
7  he would be overseeing the primary portions of
8  the airframe work.
9      Q.  So once the installation of the
10  D'Shannon products was completed, Mr. Moore
11  and Mr. Hallman obtained a ferry permit for
12  the Baron and took it to North Carolina; is
13  that correct?
14     A.  Yes.
15     Q.  And would that have been sometime
16  in November of 2013 to the best of your
17  recollection?
18     A.  I don't recall.  That would have
19  been about right.
20     Q.  And how long did the work by Mr.
21  Hallman and Mr. Moore take?
22     A.  I don't think -- now, this -- once
23  again, dates are not my strong suit, but I

130

1  think I got the airplane back in April.
2      Q.  So Mr. Hallman and Mr. Moore
3  performed about five months' worth of work on
4  your aircraft assuming that it left in
5  November of 2013?
6      A.  Yeah.
7          (Whereupon, Defendant's
8          Exhibit 14 was marked
9          for identification.)
10     Q.  Mr. Perkins, if you would take a
11  look at what I've marked as Exhibit 14.  Is
12  Exhibit 14 an April 5, 2014 airframe logbook
13  entry that is signed by Dennis Hallman?
14     A.  That's what it appears to be.
15     Q.  Have you ever -- and for the
16  purposes of the record, I'll represent to you
17  that it looks like the first two pages are
18  duplicate and that the only difference is on
19  the first page it looks like it was folded
20  when it was copied towards the center.  And we
21  can actually to make this easier, just pull
22  the first page off.  And we'll put that
23  sticker -- that way there's no confusion.

131

1          And, Mr. Perkins, have you ever
2  reviewed this airframe logbook entry?
3      A.  Only briefly.
4      Q.  And we're not going to go through
5  each and every item of maintenance that was
6  performed on the Baron, but Mr. Hallman and
7  Mr. Moore performed a substantial amount of
8  work on the airframe of the Baron, didn't
9  they?
10     A.  I think so.
11     Q.  And did the work shown in Exhibit
12  14 need to be performed in order for the Baron
13  to be airworthy?
14     A.  I don't think so.
15     Q.  To the best of your knowledge,
16  once the D'Shannon engines and upgrades were
17  installed on the Baron, could you have flown
18  the Baron without any problems?
19     A.  The Baron at that time was out of
20  annual.  You talked -- you had questions
21  earlier about currency.
22     Q.  Uh-huh.
23     A.  The Baron at that time would have

132

1  been out of annual.  And one of the reasons
2  for having to get the ferry permit was it was
3  out of annual.  And rather than pay for an
4  annual to be done with the work that was about
5  to ensue, we got the ferrying permit to take
6  it.
7          If I had just said good-bye to
8  Dennis and to Mike and had the annual done,
9  then it is my belief that an AP would have
10  probably declared the plane airworthy unless
11  we did something else to it.
12     Q.  Do you recall when the Baron would
13  have gone out of annual in the summer or fall
14  of 2013?
15     A.  Well, you see, the Baron, it sat
16  there for months waiting for the D'Shannon
17  engines.  I think its annual would probably --
18  and this is, once again, a matter of record
19  because it would be in the logbooks.  But my
20  recollection is it would have been July --
21  June or July that it would have gone out of
22  annual.
23     Q.  Okay.  And I think you told me

1  earlier that the airframe work was part of
2  your attempt to make the Baron, I think what
3  you said was a first-class aircraft; correct?
4     A. Yes.
5     Q. Would you have had the work
6  described in Exhibit 14 performed if the
7  D'Shannon engines and airframe upgrades would
8  have been delivered in, say, June or July of
9  2013?
10    A. Well, you know, that's looking
11  back and changing the whole set of
12  circumstances. I mean, there are so many
13  factors that would -- if the contingency you
14  just stated had taken place, it would have
15  meant that a lot of other things were
16  different, too. So I don't know. I mean, I
17  can't -- I can't empathize to that
18  hypothetical and give you a rational response.
19    Q. When you made the decision to
20  purchase the D'Shannon engines, did you intend
21  to have additional airframe work such as that
22  described in Exhibit 14 performed on the
23  Baron?

1     A. Now, I had planned additional
2  work, yes.
3    Q. Okay.
4      (Whereupon, Defendant's
5      Exhibit 15 was marked
6      for identification.)
7    Q. Mr. Perkins, Exhibit 15 is a
8  letter from Mike Moore to you with numerous
9  photographs attached to it?
10    A. Uh-huh.
11    Q. Have you seen that letter before?
12    A. I guess I have, yes.
13    Q. And in this letter, Mr. Moore is
14  describing a number of problems or issues with
15  the Baron; correct?
16    A. Yes.
17    Q. And did you know about the
18  problems described by Mr. Moore in Exhibit 15
19  prior to receiving Exhibit 15?
20    A. Most of these I did not know, no.
21    Q. Did any A&P or IA ever describe
22  any of the problems set forth in Exhibit 15
23  prior to receiving Exhibit 15 from Mr. Moore?

1     MR. WADSWORTH: Object to the
2  form. You can answer.
3    A. What's your question again?
4    Q. (BY MR. HEISTERHAGEN:) Prior to
5  receiving Exhibit 15 from Mr. Moore --
6    A. Ever -- did any ever --
7    Q. Did any A&P or IA ever point out
8  any of these problems to you?
9    A. I haven't been through this
10  letter.
11    Q. Okay.
12    A. There may have been some of them
13  that were pointed out. We knew, for example,
14  that the heater needed to be overhauled as
15  pointed out in this letter, I think. We knew
16  that. That was one of the things that we were
17  going to do. The other minor things in this
18  we knew we were going to do. I think this
19  letter from Mike was an intention to try to
20  create a punchlist of things to be done, and
21  so it hopefully was comprehensive. I was
22  paying them to do this work.
23    Q. Yeah. And so to the best of your

1  recollection, this was essentially an attempt
2  by Mr. Moore to say these are the issues we
3  need to fix on the Baron?
4    A. I hired them to go find everything
5  wrong possible. The direction I gave them was
6  to find everything.
7    Q. Okay. And that was, like we
8  talked about, part of your attempt to make the
9  Baron a first-class aircraft; correct?
10    A. Yeah.
11    Q. Following the delivery of the
12  D'Shannon engines, have you ever looked at the
13  logbook entries for the right or left
14  D'Shannon engines drafted by Mr. Moore?
15    A. Oh, yes.
16    Q. Did you look at those prior to
17  this lawsuit?
18    A. Prior to the lawsuit?
19    Q. Yes, sir.
20    A. When I received them, I looked at
21  them to make sure that they were signed
22  appropriately and in compliance with the FAA
23  required for me to have legal documentation

1    for the airplane.
2        Q.   And, Mr. Perkins, were you happy
3    with the work performed on the airframe by Mr.
4    Hallman and Mr. Moore?
5        A.   On the airframe?
6        Q.   Yes, sir.
7        A.   Largely.
8        Q.   Okay.
9        A.   I mean, yeah, I don't think you
10   ever make anybody totally happy with the work
11   you do, but largely.
12       Q.   Okay.  And --
13       A.   Let me -- I mean, for the sake of
14   specificity, would you like for me to be very
15   specific about that, Tim?
16       Q.   Please.
17       A.   Okay.  There were parts of the
18   work that was not satisfactory that I just had
19   to have redone.
20       Q.   Okay.
21       A.   The interior that -- we bought new
22   plastic for the interior of the airplane, the
23   plastic molding that Mike Moore himself

1    installed, it -- I just had a shop in Florida
2    redo the whole thing because it was not
3    installed properly.  It was warped.  The
4    screws weren't even in anything.  They were
5    just stuck into the plastic.
6        When I got the airplane, I had
7    paid for a custom built glare screen to go on
8    the front of the airplane with a reflective
9    lens that goes over the -- Mike Moore
10   essentially was refusing to put it in and I
11   made him put the lens in that I had bought.
12       The -- there were a number of
13   those small kinds of problems.  But in terms
14   of the major structural work, I was 90 percent
15   happy with the work that Dennis Hallman
16   primarily, and this -- once again, this was in
17   Dennis' backyard in his hangar.  So I was
18   happy with that work.
19       Q.   Prior to April 22nd of 2015, which
20   is the day you had the low oil pressure
21   problem, did you have any problems with the
22   D'Shannon engines?
23       A.   Yes.

1        Q.   What problems were those?
2        A.   The magnetos on the right engine
3    were out of time and problematic.  There were
4    clamps that were part of the engine structure
5    that just were not there.  There was hardware
6    that was supposed to be on, starters that were
7    just absent that was never put on, yes.
8        Q.   The magneto that was giving you
9    problems, that was replaced by D'Shannon,
10   wasn't it?
11       A.   Yes, I think it was.  Although
12   what we did was we called the magneto
13   manufacturer directly and the magneto
14   manufacturer arranged for compensation from
15   D'Shannon.  We did not go through D'Shannon.
16       Q.   And would any work that had to be
17   performed to fix the problems you just talked
18   about, would that have been done by Dixie Air?
19       A.   Yes.
20       Q.   Okay.  So any of that work should
21   be noted in their records?
22       A.   Yes.
23       Q.   Okay.

1        A.   I think Mike Terry has spoken to a
2    good bit of that work.
3        Q.   Was there any of the work that was
4    done to fix any problem with the D'Shannon
5    engines that was not done by Mike Terry?
6        A.   Not that I recall.  Once again if
7    there was, it would be reflected in logbooks.
8        Q.   Okay.  And, Mr. Perkins, following
9    the delivery of the D'Shannon engines, you and
10   Scott Erickson were still arguing, weren't
11   you?
12       A.   Yes.
13           (Whereupon, Defendant's
14           Exhibit 16 was marked
15           for identification.)
16       Q.   And I'd like to show you what I've
17   marked as Exhibit 16.  And Exhibit 16 is an
18   e-mail from you to Scott Erickson with copies
19   to Bert Guy and Kim Hines dated November 12 of
20   2013; correct?
21       A.   Yes.
22       Q.   And as of November 12, 2013, the
23   D'Shannon engines and airframe upgrades had

1   been delivered and installed on the Baron;
2   correct?
3      A.  Now what?  What did you just --
4   that they had been installed on the Baron?
5      Q.  Yes, sir.  As of --
6      A.  That the D'Shannon upgrades had
7   been installed?
8      Q.  Yes, sir, as of November 12th of
9   2013.
10     A.  I guess so.  I'm not sure.
11     Q.  Okay.  If you look at the second
12   full paragraph, in the middle, the sentence
13   that states, I further have concrete evidence
14   that on numerous occasions you intentionally
15   deceived me, perhaps even defrauded me,
16   regarding the status of my engines and the
17   work being done.
18     A.  Yes.
19     Q.  Have you provided all evidence
20   that you have of that claim to your attorney
21   to be turned over to us?
22     MR. WADSWORTH:  Object to the
23   form.  Can you ask one more time, Tim?

1     Q.  (BY MR. HEISTERHAGEN:)  The e-mail
2   states that you have -- and I'm going to
3   paraphrase this time -- that you have concrete
4   evidence that Mr. Erickson intentionally
5   deceived you or perhaps defrauded you
6   regarding the status of the engines and the
7   work.  What I want to know is have you
8   provided all of the evidence supporting that
9   claim to the defendants in this case?
10     A.  I haven't provided the defendants
11   anything.
12     Q.  Have you provided all of that
13   information to your attorneys to be turned
14   over to the defendants?
15     A.  So you're asking me about my
16   relationship with my attorney?
17     Q.  I'll ask it a different way
18   because I don't want to know about
19   communications between you and your lawyer.
20   What I want to know is -- well, let's do it
21   this way.  What evidence do you have that Mr.
22   Erickson intentionally deceived you or
23   defrauded you?

1     A.  Well, a lot of it is on the table
2   here in front of me that you've given me
3   today.  You've showed me a succession of
4   e-mails that shows that he made claims at one
5   point in time that successive e-mails show
6   were not true.  The earlier e-mails were not
7   true.  And you've given me that entire chain
8   of evidence that shows a consistent attempt to
9   defraud, to lie, to mislead.
10     Q.  And what I'm trying to find out,
11   is there anything that you have regarding this
12   claim that has not been produced in this
13   litigation?
14     A.  I do not know.  You see, I can't
15   go behind a mechanic and determine whether or
16   not the mechanic has -- my lawyers have
17   provided everything to you that I think that I
18   understand they need to substantiate the
19   claims we're making.  Now, are you asking me
20   is there anything else?  See, if you're asking
21   me if there's anything else I haven't thought
22   of, then I haven't thought of it.  If you're
23   asking me if there's something that I am

1   withholding?  Is that what you're asking me?
2     Q.  Yes.
3     A.  The answer is no.
4     Q.  Okay.  That's what I want to know,
5   is there anything that you have that you
6   haven't turned over?
7     A.  Am I trying to deceive you?  No.
8     Q.  Okay.  And that's what I'm trying
9   to find out, do you have any documents
10   regarding your claim of fraud that you have
11   not given to your lawyers?
12     A.  I have not intentionally withheld
13   anything from my lawyers for any of these
14   claims.
15     Q.  Okay.
16     A.  Does it mean that nothing else
17   exists that I don't recall or can think -- no,
18   I'm not going to say that.
19     Q.  Okay.  And that's fair.  Upon
20   learning that Mr. Erickson allegedly deceived
21   you as to the status of the engines and the
22   work being done, did you take any action?
23     A.  Well, as the evidence you've laid

1  out here shows, this was a continuing process
2  of one revelation after another. The only
3  action that I chose to take during that time
4  was to try to get the value for the money I
5  had paid. The -- I don't know what you mean
6  by "action". What I continued to do was try
7  to get the product that I had paid for.
8      Q. And you answered my question. The
9  next sentence of that second paragraph also
10 states that you have evidence that Mr.
11 Erickson was claiming your engines were at a
12 specific state of completion when Mr. Erickson
13 knew that he had not paid for the required
14 parts to bring the engines to that level of
15 completion --
16     A. Uh-huh.
17     Q. -- do you see that? Where did you
18 obtain that level of information?
19     A. Mike Moore told me that for one
20 thing, that -- that in fact he was telling me
21 the engines were being worked on when orders
22 from North Carolina were being ignored by
23 Wisconsin.

1      Q. And upon learning of that alleged
2  deception, your response was to continue to
3  try and obtain what you had paid for; is that
4  right?
5      A. Yes.
6      Q. In the third full paragraph, you
7  were negotiating with Mr. Erickson regarding
8  aircraft rentals; is that right?
9      A. That's part of it.
10     Q. And you state that -- and I'm
11 paraphrasing, that you had to rent the Cessna
12 Citation to accommodate your work but you're
13 not charging D'Shannon for that rental;
14 correct?
15     A. That's correct.
16     Q. And you also recognize that you
17 chose not to charge D'Shannon for the Citation
18 rental because you may have had to use the
19 Citation even if the Baron had been in
20 service; correct?
21     A. To some extent. I also had
22 documents pulled in the last couple of days on
23 total rental during the periods of time --

1  during the time of this downtime for the Baron
2  and after the failure last year. We paid over
3  $80,000 for airplane rental for our business,
4  which as you noted in earlier documents is
5  essential to my business.
6      Q. In looking over those documents,
7  which I don't have here in front of me and
8  neither do you, are there any times where you
9  used the Citation that you would not have been
10 able to use the Baron even if it was in
11 service?
12     A. All right. The -- what I say in
13 the paragraph is that there are rentals I am
14 not holding him accountable for.
15     Q. Uh-huh.
16     A. I say that in writing here. The
17 answer to your question is in writing in this
18 paragraph.
19     Q. And I'm asking not what are you
20 trying to hold or not hold D'Shannon
21 accountable for, what I'm trying to find out
22 is in your review of the rental documents that
23 you just talked about, while the Baron was

1  down, were there any times that you've rented
2  the Citation where you would have had to rent
3  the Citation even if the Baron was available?
4      A. Yes.
5      Q. And if you had those documents in
6  front of you, could you point those out to me?
7      A. Probably.
8      Q. Okay.
9          MR. WADSWORTH: Tim, would you
10 like for us to print those off for you at the
11 break or --
12         MR. HEISTERHAGEN: I've got some
13 Dixie documents that we can look at.
14         MR. WADSWORTH: Okay.
15         MR. HEISTERHAGEN: And when I get
16 to those, let's look at them and see if --
17     A. Tim, the sentence says, on several
18 occasions I've had to rent a Citation to
19 accommodate my work but I am not charging you
20 for the Citation rental because I may not have
21 been able to perform the mission demanded of
22 it even if my airplane had been in service.
23 So why are you talking about something that I

149

1  am not charging him for? I didn't charge him
2  for my car or for my water bill or for my
3  power, you know, during this period either.
4      Q.  (BY MR. HEISTERHAGEN:) Because at
5  this point --
6      A.  If that's not part of the claim
7  why are you talking to me about that?
8      Q.  At this point your attorney has
9  turned over some Dixie Air documents that
10  include the rental of a Citation and you just
11  told me that there were some documents that
12  you just looked at recently --
13      A.  Uh-huh.
14      Q.  -- that included the rental of a
15  Citation and it's my --
16      A.  And the document showed the total
17  rentals.
18      MR. WADSWORTH:  And, Tim, we can
19  go through them one by one.  That might be the
20  easiest way to get this figured out.
21      Q.  (BY MR. HEISTERHAGEN:) Now,
22  Mr. Perkins, if you --
23      A.  What was the amount that was

150

1  claimed?  Are we talking about -- it looks
2  like the conclusion here is that the amount
3  that was claimed, this is -- this totals
4  $8,680.  I'm telling you our total rentals
5  during those two periods of time were $80,000.
6      Q.  And --
7      A.  And we're talking about charging
8  D'Shannon $8,680.  Would you like to go
9  through those documents and let's pick out
10  8,680 dollars' worth of charges?
11      Q.  No.  If what you're telling me now
12  is that your only claim for rental of another
13  aircraft in this case is $8,680, then I'll
14  accept that and we can stop talking about it.
15      A.  Isn't that what this says?
16      Q.  That is what the e-mail says.  But
17  I have received documents showing many --
18      A.  The total magnitude --
19      Q.  -- many more rentals.  And what
20  I'm trying to determine right now and what I'm
21  entitled to determine is, are you seeking to
22  recover the entirety of the rental while the
23  Baron was down from my clients?

151

1      MR. WADSWORTH:  And I think this
2  gets into what would be a settlement offer.
3  But --
4      MR. HEISTERHAGEN:  No, it doesn't
5  because the discovery period ends in a week.
6      MR. WADSWORTH:  Yeah.
7      MR. HEISTERHAGEN:  And I am fully
8  entitled to know exactly what the damages are
9  and not hear, I don't know, I can't determine
10  it, and then at trial this is my list of
11  damages.
12      MR. WADSWORTH:  Well, and, Tim,
13  we've produced -- and, yeah, I mean, trust me,
14  I don't want to blindside you on this, but we
15  produced kind of in the mid five hundreds
16  these invoices.  If you want to kind of go
17  through them one at a time, I'm sure
18  Mr. Perkins can say this is something he's
19  making a claim for, this is something we're
20  not making a claim for.
21      A.  And what is not mentioned here,
22  the date of this letter, Tim, is November
23  12th, 2013.  The rentals that took place

152

1  because the D'Shannon engines failed last year
2  are not even mentioned here.
3      Q.  (BY MR. HEISTERHAGEN:) Let's
4  leave this e-mail alone for right now because
5  I understand that what we're talking about in
6  this e-mail is a very small amount.  I'm
7  trying to figure out what the amount of
8  aircraft rental that you're claiming from
9  D'Shannon in this lawsuit is.
10      A.  Well, right here it says $8,680 at
11  this point in time.
12      Q.  Okay.
13      A.  Now, we frankly have not
14  discussed, and I presume that it would be part
15  of some settlement discussion at some point,
16  last year when the airplane was down I had to
17  rent airplanes again.  And that -- if that is
18  because of D'Shannon's negligence or poor
19  work, then I think they should be liable for
20  some of that, too.  But as to this period in
21  time, this is in black-and-white.
22      Q.  All right.  So up through November
23  12 of 2013, Perkins Communication, Matrix are

38 (Pages 149 to 152)

153

1  only claiming $8,860 and --
2      A.  For me to say anything different
3  would be to contradict --
4      MR. WADSWORTH:  Joe, hold on for
5  just a second.  I'm going to object to the
6  extent that it calls for a legal conclusion.
7  If you have --
8      MR. HEISTERHAGEN:  It's not a
9  legal conclusion.  I'm entitled to the facts
10  of his damages.  I am entitled in the initial
11  disclosures.  I asked for it in discovery an
12  itemization of everything that you're claiming
13  in damages.  He can either -- and I'm not
14  arguing with you -- he can either give it to
15  me or he can't.
16      MR. WADSWORTH:  Well, and we're
17  not --
18      MR. HEISTERHAGEN:  I'm not asking
19  what damages is Matrix and Perkins entitled to
20  recover.
21      A.  Is it a jury question as to
22  whether or not I've been defrauded?
23      Q.  (BY MR. HEISTERHAGEN:)  Yes.

154

1      A.  Okay.  If it's a jury question and
2  if that is -- would that be considered damage
3  to me?
4      MR. WADSWORTH:  Should we go off
5  the record real quick?  Are we --
6      MR. HEISTERHAGEN:  Yeah, please.
7      MR. WADSWORTH:  Let's go off the
8  record.
9      THE VIDEOGRAPHER:  Going off the
10  record at 1:36.
11      (Whereupon, a short break was
12      taken.)
13      THE VIDEOGRAPHER:  Going back on
14  the record at 1:44.
15      Q.  (BY MR. HEISTERHAGEN:)
16  Mr. Perkins, we just talked a little bit about
17  the rentals.  And what I'm going to do at this
18  point is just kind of take this sort of back
19  to the beginning and I'm going to ask you
20  about what moneys you believe my clients, the
21  defendants, owe you in this case.  You've made
22  claims in this case for negligence,
23  wantonness, breach of contract and fraud; do

155

1  you understand that to be true?
2      A.  Yes.
3      Q.  Okay.  As to the engines
4  themselves, you replaced the D'Shannon engines
5  with rebuilt Continental 550-Cs engines;
6  correct?
7      A.  Yes.
8      Q.  Okay.  And are you claiming in
9  this case that you are entitled to the cost of
10  those two rebuilt Continental engines?
11      A.  Yes.
12      Q.  Okay.  Are you --
13      A.  And the installation of them.
14      Q.  I was just about to ask you that.
15  Are you claiming that you are entitled to or
16  that your companies are entitled to the cost
17  to remove the D'Shannon engines and
18  installed -- and install the rebuilt
19  Continental engines?
20      A.  Yes.
21      Q.  Okay.  As we sit here today, do
22  you recall how much the two rebuilt
23  Continental engines cost?

156

1      A.  No.
2      Q.  And the most accurate place to get
3  that would be Continental's quote to you,
4  wouldn't it?
5      A.  It would be what we paid for it.
6      Q.  What you paid for it.  Okay.
7      A.  Yeah.
8      Q.  And the best place to get the
9  information regarding the removal of the
10  D'Shannon engines and the rebuilt Continental
11  engines would be Mike Terry's records;
12  correct?
13      A.  Yes, Dixie Air's charges for it.
14      Q.  Other than Dixie Air and Mr.
15  Freeman, did anyone do any work on the Baron,
16  removing the D'Shannon engines,
17  troubleshooting those engines or installing
18  the new -- sorry, rebuilt Continental IO-550-C
19  engines.
20      A.  Not to my knowledge.
21      Q.  As it relates to the engines
22  alone, are you claiming any other costs in
23  this case other than the cost of the engines,

1  and the removal of the D'Shannon engines and
2  the installation of the rebuilt Continental
3  engines?
4      A.  The cost of rental for airplanes
5  while the Baron was down during this period of
6  time.
7      Q.  Okay.  And I will get to that with
8  you and I want to ask you a few more questions
9  about your damages.  I understand that you
10 have a fraud claim.  I understand that you've
11 made a claim for punitive damages.  Other than
12 the cost of the rebuilt Continental engines,
13 the cost to remove the D'Shannon engines and
14 install the rebuilt Continental engines, and
15 the cost of rental aircraft while the Baron
16 was down, have either of your companies
17 incurred any out-of-pocket costs?
18     A.  Tim, I think the only things we've
19 had to pay for are the removal, the purchase
20 of the new engines, the shipping of those
21 engines, putting those engines on.  We had to
22 pay the -- Don Freeman's operation for
23 whatever they did on the engines, which we

1  received no value for.  And then we had to pay
2  for rental.  I don't think -- as I sit here, I
3  cannot think of other cash transactions.
4      Q.  And that's what I'm trying to --
5  that's -- I think we're on the same page now.
6      A.  Uh-huh.
7      Q.  Some of the mechanics in this case
8  have testified that the D'Shannon engines
9  could have been repaired and returned to
10 service.  Why didn't you do that?
11     A.  A whole list of reasons.
12     Q.  Okay.
13     A.  First I was told by a number of
14 people that it would be less expensive to go
15 ahead and buy the new engines.  And let me
16 make it clear, when we ordered the Continental
17 engines from Continental, we had them in a
18 week.  We had them in a week.
19         So in terms of pure downtime and
20 cost, actual cost of what would have to be
21 done to those engines, the old D'Shannon
22 engines to restore them to go back on any
23 airplane, I was told in terms of pure cost it

1  would be less expensive to buy the new
2  engines.
3          Secondly in terms of time, it was
4  clear that it would be less expensive timewise
5  for me to have the new engines put on.  Those
6  are the major factors in the purchase of the
7  new engines.  I guess the third thing is that
8  after I received the reports on the
9  workmanship of the left engine, there was a
10 general sense of fear, real fear about
11 trusting anything with the engines going
12 forward.
13     Q.  Okay.
14     A.  It would have been a real problem
15 after seeing what had taken place with the
16 left engine to have said we will simply
17 restore them.  And, you know, there's
18 something else I need to put in context.  You
19 can fix anything.  And I listened to the
20 depositions you had with the other people and
21 there's something -- five weeks ago I flew a
22 P-51 Mustang.  Do you know what that is?
23     Q.  Yeah.

1      A.  It was a thrill.  It was a bucket
2  list kind of thing.  And at the hangar where I
3  flew this P-51 there were four P-51s.  And the
4  guy, he took me over to one of them and he
5  says, I've got to show you something.  Do you
6  know what was original on that P-51?  The data
7  plate.  It was the data plate.
8      Q.  Yeah.
9      A.  You can fix anything.  If you have
10 a data plate from an IO-550-C engine, you can
11 build the whole thing from brand-new stuff.
12 And if you've got the data plate and put it on
13 it, it's the original engine.  So, yes, it
14 would have been possible to fix the engines,
15 but in that context, it would not have been
16 worth the anxiety, the cost or the time.
17     Q.  Okay.  In terms of the cost, who
18 told you, if you can recall, that it would be
19 less expensive to buy the rebuilt Continental
20 engines?
21     A.  Well, Mike Terry told me that.
22 And that was after he got quotes from several
23 engine manufacturers and we looked at what had

1   to be done to the two engines. Well, now I
2   believe, and y'all will end up verifying this
3   one way or another, I believe that that was
4   Don Freeman's comment as well.
5      Q. Okay.
6      A. I talked to several other people
7   who were not A&Ps but run airplanes or in the
8   airplane business. And when we started
9   looking at the process that would have to be
10  taken because even with the right engine, to
11  verify the parts we would have to take it
12  it totally apart. And if you take it totally
13  apart and even put it back together again,
14  then there are certain things -- once you take
15  a crankshaft out, you can't simply turn around
16  and put it back in. I mean, you can't do
17  that. You've got to do the same thing to that
18  crankshaft that you would do if you were
19  rebuilding the engine. The same requirements
20  are there.
21      So we were talking about
22  rebuilding those engines totally. This was
23  not a matter of taking a few parts out and

1   putting a few more parts back in. So when
2   people who have done this for life and for a
3   living looked at me and said, it will cost you
4   just as much, it will take you much, much
5   longer and you're still going to have the
6   D'Shannon product, those three things made
7   fixing those engines and putting them back on
8   my airplane unacceptable.
9      Q. Do you remember any of the
10  overhaulers or engine shops that Mr. Terry
11  obtained the quotes from?
12     A. I don't but he would have them.
13  We looked at a couple of the custom engine
14  shops, the -- I mean, they're well-known. And
15  I'm sure Mike would be happy to share that.
16  It's no big secret.
17     Q. Okay.
18     A. And we decided to buy the
19  Continentals directly from the factory.
20     Q. Following the problem with the low
21  oil pressure and the subsequent discovery of
22  the issues with the D'Shannon engines, did you
23  ever contact Mike Moore or anyone with

1   D'Shannon to ask them to repair the engines?
2     A. No, of course not.
3     Q. Okay. Mr. Perkins, I'm going to
4   show you what I'm going to mark as Exhibit 17.
5   And these two exhibits will get us into these
6   aircraft rentals.
7      (Whereupon, Defendant's
8      Exhibit 17 was marked
9      for identification.)
10     A. Uh-huh.
11     Q. And Exhibit 17 seems to be a Dixie
12  Air statement that is dated October 27, 2015
13  in the upper-right corner and then lists a
14  number of charges that Perkins
15  Communications -- Communication incurred from
16  approximately June 30th of 2013 through it
17  looks like November 27, 2013.
18     A. Uh-huh.
19     Q. Does that seem to be correct?
20     A. It -- it seems to be what this is,
21  yes.
22     Q. And the -- there's a handwritten
23  note on the first page, which is Plaintiffs

1   551, that states July 26, 2013 through
2   November 10, 2013, $12,969.50; do you see
3   that?
4     A. Yeah, I see the note.
5     Q. Do you know who wrote that?
6     A. No.
7     Q. Okay. Does that look like Ms.
8   Hines' handwriting?
9     A. It could be but I don't know.
10     Q. There are again a number of
11  charges on here and then various payments by
12  you. But if you could go through Exhibit 17
13  and highlight for me what rentals resulted
14  from the Baron being down as a result of the
15  delayed work by D'Shannon.
16     A. Tim, I'll do my best, but --
17     Q. And that's all -- I mean, that's
18  all I can ask.
19     A. -- the other thing this would
20  require is for me sitting with a calendar --
21     Q. Okay.
22     A. -- and looking at it from two
23  years ago because I've already proven to you

1 that I can't remember some things from last
2 week. Now, to recall what a particular rental
3 was on a particular day -- but if your
4 question is what was caused by the Baron being
5 down --
6 Q. Yes, sir.
7 A. -- that very specific scope helps
8 me.
9 Q. Yes.
10 A. Because everything on here during
11 this period of time -- the only thing we're
12 looking for -- it would be easier to look for
13 the things that shouldn't be here; do you see
14 what I'm saying? Because I would have been
15 using the Baron for all of this.
16 Q. Okay.
17 A. You see?
18 Q. So what you're telling me then is
19 anytime that you had -- or strike that.
20 Any reference to an aircraft
21 rental on Exhibit 17 was a result of the Baron
22 being down?
23 A. I'm telling you that it would be

1 easier for me to look -- the only thing that
2 would be excluded from this is if I used
3 the -- and we've already talked about this, if
4 I use the Citation at some time that the Baron
5 simply wouldn't have done the job, and my note
6 here says I didn't charge them for that
7 anyway.
8 Q. Okay. And --
9 A. And I'm not being -- I'll go
10 through and mark this, but do you see what I'm
11 saying?
12 Q. Yes, sir. And the next exhibit
13 we're going to get into is your 2015
14 rentals --
15 A. Uh-huh.
16 Q. -- which are not encompassed in
17 that e-mail. And that's where I'm going to
18 need you to look at the Citation, to the
19 extent that you can --
20 A. Yeah.
21 Q. -- look at the Citation rentals
22 and try to exclude them. But to the best of
23 your ability, if you can mark for me on 17

1 what rentals --
2 A. Should be included?
3 Q. -- or what other charges resulted
4 from the Baron being down.
5 A. Okay.
6 Q. And if it's only going to be two
7 things that shouldn't be on there, that might
8 be the easier way to do it.
9 A. Yeah, I think that's the easier
10 way to do it.
11 MR. WADSWORTH: And, yeah, we can
12 do that. Should we take a few minutes? Do we
13 want to do this on tape or off tape?
14 MR. HEISTERHAGEN: I think we can
15 do it off the tape.
16 MR. WADSWORTH: Yeah. I mean,
17 it's just going to take him a couple of
18 minutes to go. If you want -- before we go
19 off the record --
20 MR. HEISTERHAGEN: Let's
21 identify --
22 MR. WADSWORTH: Before we go off
23 the record, do you want to hand him the other

1 invoice as well?
2 A. And, Tim, let me go ahead and say,
3 see, there are some things on here that are
4 clearly marked that they're not rental.
5 Q. (BY MR. HEISTERHAGEN:) That's
6 right.
7 A. But like a hangar rental, that
8 was --
9 Q. That has nothing to do --
10 A. -- that's not aircraft rental.
11 Q. And the 2015 rentals may be a
12 little easier because somebody's already
13 highlighted them.
14 MR. WADSWORTH: Take a look at
15 this copy, there's some light highlighting on
16 17 as well.
17 (Whereupon, Defendant's
18 Exhibit 18 was marked
19 for identification.)
20 Q. (BY MR. HEISTERHAGEN:) All right.
21 Before we go off the record to review these,
22 Mr. Perkins, I'm going to show you what I've
23 marked as Exhibit 18 --

169

1    A.  Okay.
2    Q.  -- which is or seems to be a
3    statement from Dixie Air services dated
4    October 23, 2015 that has various charges to
5    Perkins Communication and Matrix as well
6    toward the back.  The charges related to
7    Perkins Communication are on Plaintiffs 533
8    through 537 and the charges related to Matrix
9    are Plaintiffs 538 through 543.  And just to
10   confirm, Exhibit 18 is what I just described
11   to you, isn't it?
12   A.  I think so.
13   Q.  Okay.  And if -- we're going to go
14   off the record and give you a few minutes.
15   But if you could do the same thing with
16   Exhibit 17 and 18 and that's mark for me --
17   A.  What shouldn't be there?
18   Q.  Whatever is easier and we'll
19   clarify that when we get back on.
20   A.  Okay.
21   Q.  But identify for me somehow what
22   should and what shouldn't be on there.
23   A.  Okay.

170

1    Q.  And then once we get back on the
2    record, we'll set forth how we did that.
3    A.  Okay.
4    MR. HEISTERHAGEN:  All right.  We
5    can go off.
6    THE VIDEOGRAPHER:  This ends tape
7    four in the deposition of Joe Perkins.  We're
8    off the record at 2:03.
9    (Whereupon, a short break was
10   taken.)
11   THE VIDEOGRAPHER:  This begins
12   disk five in the deposition of Joe Perkins.
13   Going back on the record at 2:55.
14   Q.  (BY MR. HEISTERHAGEN:)  All right.
15   Mr. Perkins, you have taken some time to look
16   at Defendant's Exhibits 17 and 18; correct?
17   A.  Yes.
18   Q.  And how have you identified
19   aircraft rentals relating to the Baron being
20   down on Exhibit 17?
21   A.  Well, first of all, the time
22   period.
23   Q.  Okay.

171

1    A.  We know the calendar dates when it
2    was down, so obviously we're looking at all
3    rentals from that period of time.
4    Q.  Okay.
5    A.  The second thing I did in looking
6    at these invoices, and I got my lady who does
7    our accounting on the line, we talked about
8    it.  We excluded any pilot's fees that might
9    have been paid during that time because we
10   would have had to pay a pilot's fee anyway.
11   Q.  Okay.
12   A.  And we excluded the rent fees that
13   we would have paid anyway.
14   Q.  Okay.
15   A.  Then we looked at particular
16   flights to determine if they were flights
17   that -- where we would had to have used the
18   Citation anyway.
19   Q.  Okay.
20   A.  All right.  Now, that has resulted
21   in this.  Do you want me to give you my
22   report --
23   Q.  Yes, sir.

172

1    A.  -- on that?  All right.  Exhibit
2    17 --
3    Q.  Okay.
4    A.  -- I've gone through that and it
5    is our conclusion that we would claim
6    $13,064.50.
7    Q.  Okay.  And have you identified --
8    A.  Yeah.  Have you got your copy?
9    Q.  Yes, sir.
10   A.  All right.  So starting on the
11   front page, the 10/18 [sic] charge which is
12   $1,115.50, that is included.
13   Q.  And that is a rental for 210;
14   correct?
15   A.  Yes.  1734 Uniform.
16   Q.  Okay.
17   A.  All right.  And then the 10/13,
18   $4,850.
19   Q.  Okay.
20   A.  Go to the next page.
21   Q.  And for purposes of this record.
22   That's labeled as Plaintiffs 552; correct?
23   A.  Yes.  Uh-huh, page 552.

43  (Pages 169 to 172)

1    Q.  Okay.
2    A.  All right.  The August 30 charge,
3  which is $1,212.50 --
4    Q.  Okay.
5    A.  -- that is included.
6    Q.  That's also the Cessna 210, the
7  August 30 charge?
8    A.  Yes.
9    Q.  Okay.
10    A.  Plaintiffs page 553 --
11    Q.  Okay.
12    A.  -- the charge from 7/31 for
13  $2,903.
14    Q.  Okay.  And that is for the
15  Citation; correct?
16    A.  It is.
17    Q.  Okay.
18    A.  Now, I'll note something in a
19  minute, but let's get all this down.  To page
20  554 --
21    Q.  Yes, sir.
22    A.  -- at the top for 10/23, the
23  charge for $2,983.50.

1    Q.  Okay.
2    A.  That's included.
3    Q.  And the 10/23 charge is also for
4  the Citation; correct?
5    A.  Yes.
6    Q.  Okay.
7    A.  Now, I do want you to notice on
8  page 553, there is a twenty-five thousand
9  eight hundred dollar charge for the
10  Citation --
11    Q.  Yes.
12    A.  -- that is not included.
13    Q.  Okay.  And that's dated July 15?
14    A.  Yes.
15    Q.  And those four -- five aircraft
16  rentals add up to $13,064.50?
17    A.  To the best of my determination,
18  yes.
19    Q.  When you rent aircraft for the
20  business purposes of Perkins Communication or
21  Matrix, do you pass those rental costs on to
22  your client?
23    A.  The -- in some cases, yes, and

1  some cases, no.  For example the twenty-five
2  thousand dollar charge was largely billable to
3  a client.
4    Q.  Okay.
5    A.  That's another thing Kim did.  She
6  went through and if we could directly charge
7  all of it, she didn't include it.
8    Q.  Okay.  So the five aircraft
9  rentals that are included on Exhibit 17 that
10  we talked about, were those rentals charged to
11  any clients?
12    A.  According to the lady I just
13  talked to in my office, none of the rentals
14  included here were charged to a client.
15    Q.  Okay.  Regarding the two Citation
16  rentals, the one on July 31 and the one on
17  October 23rd, is there any reason that you can
18  recall why you would have rented the citation
19  over, say, the 210?
20    A.  Probably availability.
21    Q.  Okay.
22    A.  Or probably the number of seats.
23  The Baron has -- the Baron will carry six

1  people.  The 210 really carries four, if
2  you're good friends, five.
3    Q.  Okay.
4    A.  The 182 carries four people,
5  period.
6    Q.  Yeah.  And so that would have had
7  something to do possibly with the number of
8  people --
9    A.  Yes.
10    Q.  -- or availability?
11    A.  Yeah.  Availability or people.
12  See, the Baron we can put six people in, put a
13  bunch of stuff in it.  If you can close the
14  doors, it will fly.
15    Q.  Okay.  And I would imagine Dixie
16  Air would be the best source for availability
17  of their aircraft; correct, in terms of the
18  availability of the 210?
19    A.  Yeah.
20    Q.  It's not your 210, is it?
21    A.  It's not my 210.
22    Q.  All right.  Let's move on to
23  Exhibit 18.

1     A.  Uh-huh.
2     Q.  And what is the total amount of
3   the rental charges that you're claiming as
4   identified on Exhibit 18?
5     A.  We have gone through this line by
6   line in the last few minutes and we are
7   claiming $73,896.
8     Q.  Seventy-two thousand eight
9   hundred --
10    A.  No, no.  I'm sorry, 73,896.
11    Q.  896, okay.
12    A.  Now, to simplify the understanding
13  of that, there are no rent fees, there are no
14  pilot's fees.  And there is one flight that
15  took place on -- it's on page 540.  540.
16    Q.  Okay.
17    A.  It is for May the 11th for $5,265.
18    Q.  Okay.
19    A.  And we would had to have rented
20  the Citation anyway.  That has been excluded.
21    Q.  Okay.
22    A.  Everything else we could have done
23  in the Baron and a lot of it is the 182 rental

1   anyway.
2     Q.  And again the use of the Citation
3   over piston engine aircraft would have been
4   due to availability or number of passengers;
5   correct?
6     A.  Number of passengers.  For most of
7   these trips the longest one I think for most
8   of these is New Orleans.  And the time
9   difference between Baron and the Citation on a
10  trip to New Orleans is just a few minutes.
11    Q.  Okay.  And I assume that you've
12  excluded pilot fees because --
13    A.  If I --
14    Q.  -- you weren't flying the
15  Citation; correct?
16    A.  Well, the Citation or there may
17  even be some time where the 210 was rented and
18  we had a pilot fly it.
19    Q.  Okay.
20    A.  But that pilot would have been
21  flying the Baron.
22    Q.  Okay.  Okay.  So if you were
23  getting a pilot, you would have been getting a

1   pilot regardless of what aircraft it was, is
2   that what I'm hearing?
3     A.  If there's a pilot fee on there --
4     Q.  Okay.
5     A.  -- it means that I was not
6   available to fly.
7     Q.  Okay.
8     A.  They actually make me do some work
9   other than fly airplanes.
10    Q.  I hate that for you.
11    A.  Me, too.
12    Q.  Okay.  So I think at this point
13  we've talked about all of your cash or
14  out-of-pocket charges related to the D'Shannon
15  engines; correct?
16    A.  I think so.
17    Q.  That you can recall as we sit here
18  today?
19    A.  Uh-huh.
20    Q.  You're also claiming as a part of
21  your fraud claim compensatory damages and
22  punitive damages related to that claim;
23  correct?

1     A.  Yes.
2     Q.  And I think we've been through
3   this, but you cannot quantify those damages as
4   you sit here today, can you?
5     A.  No.  It's -- once again, I
6   hesitate to practice law, but I think that's
7   probably something that is determined through
8   another process.
9     Q.  Okay.  Are you making claims for
10  emotional distress or mental anguish in this
11  case?
12    A.  Let me make one thing clear, I saw
13  Mike Moore's statement that there would have
14  been no jeopardy if I had taken off.  That is
15  hogwash.
16    Q.  And I understand your position.
17  And what I'd like to know is are you making a
18  claim for mental anguish or emotional distress
19  in this case?
20    A.  The -- I don't know.
21    Q.  Okay.
22    A.  I don't know.  What I know is
23  this, I cranked the airplane and had started

181

1  taxiing down the taxiway. And I was literally
2  probably thirty seconds from launching that
3  plane into the air when a continued variation
4  in oil pressure made -- God made me stop and
5  think. And I looked at it and I said, I need
6  to look at this again. And I stopped -- I was
7  off the ramp, onto the taxiway onto -- headed
8  toward the end of the runway and God made me
9  stop and look again. I turned around and came
10  back to the ramp, examined it there, and
11  that's when I decided that I needed to shut it
12  down and get the mechanic to look at it. If I
13  had taken off -- if the presumption that at a
14  higher RPM I'm going to get the pressure I
15  need, if I had fallen prey to that, which is
16  what a lot of pilots would have done, I would
17  have died. I would have been 250 feet off the
18  ground, the engine would have seized, the
19  airplane would have rolled inverted and I
20  would have been in the trees off the end of
21  runway 2 -- 1-2 in Tuscaloosa. Now, you ask
22  me if I'm disturbed about it? It disturbs me
23  now to think about it.

182

1      Q.  Okay.
2      A.  You have children, you mentioned
3  them. My kids fly with me in that airplane.
4  My wife flies with me in that airplane.
5      Q.  And I understand that and I think
6  you've answered my question. Was anyone with
7  you on April 22nd, 2015?
8      A.  Might I have killed someone else,
9  also? No, I was in the airplane by myself.
10     Q.  And your wheels never left the
11  ground on that day, did they?
12     A.  They did not.
13     Q.  And that's because the run-up
14  procedure did what it was supposed to do;
15  right?
16     A.  The -- only partially. Now, the
17  initial indication wasn't a full failure. It
18  wasn't flat. It wasn't empty. It was just
19  irregular. And there was something that made
20  me say this is irregular enough that I need to
21  check it more closely. I was literally
22  seconds from launching.
23         I'm sorry. I know I answered the

183

1  question much too extensively, but you asked
2  about an emotional issue.
3      Q.  No. And --
4      A.  This is how I feel about this.
5      Q.  Uh-huh. And I understand that.
6  Have you seen any physicians or health care
7  professionals as a result of that incident?
8      A.  As a result of that incident? No.
9  I am a child of the South and an old
10  southerner. We don't go to -- we have to
11  learn to get over it. The answer is no, I
12  have not sought psychiatric care for that. Am
13  I changed by it? Yeah.
14     Q.  Has that incident prevented you
15  from being able to fly?
16     A.  It hasn't stopped me from it. It
17  has changed my perspective on it and will for
18  the rest of my life.
19     Q.  Mr. Perkins, we've been through a
20  few different types of damages in this case
21  and I am not about to ask you what damages you
22  are entitled to under the law of Alabama.
23  What I'm asking you is, is there anything else

184

1  that you believe D'Shannon or Scott Erickson
2  or Mike Moore owe you that we have not
3  discussed?
4      MR. WADSWORTH: Object to the form
5  to the extent it calls for a legal conclusion.
6  But you can answer.
7      A.  I don't think what we have
8  discussed sufficiently covers what they owe
9  me.
10     Q.  (BY MR. HEISTERHAGEN:) All right.
11  And I assume at this point you cannot quantify
12  that amount for me?
13     A.  No, quantification on things like
14  this is difficult. I mean, and that's the
15  reason we have the process, I guess.
16     Q.  I have to figure out where we were
17  earlier.
18     (Whereupon, Defendant's
19      Exhibit 19 was marked
20      for identification.)
21     Q.  Mr. Perkins, I'd like to show you
22  what I've marked as Exhibit 19. And is
23  Exhibit 19 an e-mail chain between you and Mr.

46  (Pages 181 to 184)

185

1  Erickson and Mr. Guy and Ms. Hines dated --
2  A.  I'm sorry.  I had this turned off
3  until a few minutes ago when we left the room.
4  I'm sorry.  That won't happen again.  Now,
5  what was your question?
6  Q.  Is Exhibit 19 an e-mail chain
7  between you and Mr. Erickson with copies to
8  Mr. Guy and Ms. Hines dated November 26 and
9  November 27 of 2013?
10  A.  Yes.
11  Q.  And at the very bottom e-mail is
12  from you to Mr. Erickson; correct?
13  A.  Yes.
14  Q.  And in that e-mail, the November
15  26th e-mail, you stated that you had inquired
16  about insurance from Mr. Erickson; correct?
17  A.  Yes.
18  Q.  And then Mr. Erickson tells you
19  that he will not be sending any insurance
20  paperwork until D'Shannon is paid?
21  A.  Yes.
22  Q.  And then you state that works for
23  me, you have no insurance, you and I both know

186

1  it, soon the whole world will know; correct?
2  A.  Yes.
3  Q.  And when you say soon the whole
4  world will know, what do you mean by that?
5  A.  That this kind of fraud cannot be
6  hidden long-term, that Mike Moore was telling
7  the entire world that he didn't have
8  insurance.  It was being spread through the
9  aviation community by the people who had
10  worked for Erickson.
11  (Whereupon, Defendant's
12  Exhibit 20 was marked
13  for identification.)
14  Q.  And, Mr. Perkins, if you'll look
15  at what I've marked as Exhibit 20.
16  A.  I just -- could I say one other
17  thing, Tim?
18  Q.  Yeah.
19  A.  What this points out also is that
20  on November 26, 2013, Erickson was still
21  holding the final documentation that would
22  have been necessary for my airplane to fly.
23  Q.  And as of November 27 of 2013, Mr.

187

1  Moore and Mr. Hallman had your aircraft in
2  North Carolina, didn't they?
3  A.  Yes.
4  Q.  And your aircraft couldn't be
5  flown until that air work was completed;
6  correct?
7  A.  Right -- well, no.  My aircraft
8  could not have been flown because it was
9  completed and fly -- I flew it from Tuscaloosa
10  to North Carolina.  What the documentation
11  it's talking about here, the books that were
12  not signed, those signatures are necessary for
13  the aircraft to be legal and they were
14  withholding it.  And he tells you there that
15  he's withholding it.
16  Q.  I believe he just is referring to
17  insurance paperwork in that e-mail.  I know --
18  A.  No, he's not.  No, it's explicit.
19  What I say -- the logbooks, first the logbooks
20  for my engines have not been signed.  I
21  understand they have not been signed because
22  the AP who supervised the building of my
23  engine says the engine work was not covered by

188

1  insurance.  It says explicitly logbooks.
2  Q.  And I don't want to get into an
3  argument with you about this, but Mr.
4  Erickson's e-mail does say, we will not be
5  sending any of our insurance paperwork.
6  A.  That's because the rest of this
7  says that I was demanding proof of insurance.
8  Q.  And the aircraft as we discussed
9  was in North Carolina around this time;
10  correct?
11  A.  Yes.
12  Q.  And --
13  A.  Or shortly thereafter.
14  Q.  Sometime, it could have been a few
15  days before, it could have been a few days
16  after?
17  A.  Or even a few weeks after.
18  Q.  Okay.  If Mr. Erickson had
19  provided the signed logbooks, the aircraft
20  still would have been down for the maintenance
21  being performed by Mr. Moore and Mr. Hallman;
22  correct?
23  A.  By my choice.

1    Q. That's right.

2    A. Which is totally not an issue

3  here. It's not an issue on the rental of the

4  airplane. It's -- you know, that was my

5  choice. This (pointing) was not my choice.

6    Q. Mr. Perkins, I've handed you what

7  I've marked as Exhibit 20. And is Exhibit 20

8  an e-mail from you to Mr. Erickson dated

9  November 27 of 2013?

10    A. Uh-huh.

11    Q. Why did you send this e-mail?

12    A. He had sent me a sarcastic

13  Thanksgiving e-mail, and I just replied with

14  the proverb never confuse good manners with

15  weakness.

16    Q. Okay.

17    (Whereupon, Defendant's

18    Exhibit 21 was marked

19    for identification.)

20    Q. Mr. Perkins, is Exhibit 21 an

21  e-mail between -- an e-mail chain between you

22  and Mr. Erickson? And it looks like Mr. Guy

23  and Ms. Hines were also copied on some of the

1  earlier e-mails --

2    A. Yes.

3    Q. -- dated November 30th of 2013?

4    A. Uh-huh.

5    Q. And in that e-mail, you accused

6  Mr. Erickson of insurance fraud; correct?

7    A. I said -- it was a question.

8  You'll notice there's a question mark at the

9  end there. It says, trying your hand at a

10  little insurance fraud, Scott?

11    Q. Did you have any evidence that Mr.

12  Erickson was committing insurance fraud?

13    A. I had evidence that he was lying

14  to me about the status of his insurance.

15    Q. Okay. And is that what you meant

16  by insurance fraud?

17    A. Yeah. But, you know, once again,

18  I'm not a lawyer and that's a term of art that

19  was probably incorrectly used.

20    Q. And you also seemed to accuse Mr.

21  Erickson of abusing his family; do you see

22  that?

23    A. I do.

1    Q. Why did you do that?

2    A. The -- you can tell our

3  relationship had somewhat deteriorated. And

4  during this period of time Mr. Erickson was

5  being sued by his family for -- by his wife

6  for domestic abuse.

7    Q. But that really didn't have

8  anything to do with this case, did it?

9    A. It didn't have anything to do with

10  it.

11    MR. WADSWORTH: If we didn't have

12  the usual stipulations, I would have even

13  objected to relevance to the question, but...

14    (Whereupon, Defendant's

15    Exhibit 22 was marked

16    for identification.)

17    Q. (BY MR. HEISTERHAGEN:)

18  Mr. Perkins, I've marked as Exhibit 22 an

19  e-mail chain between you and Mr. Erickson with

20  copies to Mr. Guy and Ms. Hines dated November

21  30th of 2013; correct?

22    A. Yes.

23    Q. And really what I want to know is

1  did you ever contact Allianz regarding

2  D'Shannon?

3    A. Yes. We had a cover page on an

4  insurance document, and this says we will

5  contact Allianz about it on Monday. We

6  attempted a call to them, and Bert may have

7  tried to call them, too. I'm not sure. But

8  this was a correspondence that was intended --

9  it is carbon-copied to my attorney. And the

10  response -- and I've got an entire -- my

11  memory on the whole insurance issue, the

12  sequence of everything is still pretty good, I

13  think. These folks at the time that we got

14  information from them did not have a policy in

15  force in my memory.

16    Q. Do you recall ever speaking with

17  anyone who worked for Allianz, actually

18  talking to them?

19    A. I don't recall it directly, no.

20    Q. Okay. And I think you told me

21  just a minute ago that you don't know whether

22  Bert got in touch with them; correct?

23    A. I don't know. I don't remember.

193

1    Q.  Okay.  I have not seen any e-mails
2  between you or Mr. Guy and anyone from
3  Allianz.  Do you recall any such e-mails?
4    A.  No.  But the volume of all of it
5  is so great.  And then what I would have
6  gotten from Bert would have been simply a
7  report from my lawyer.
8    Q.  Okay.  And you also state that
9  you'll be turning over files, e-mails and
10 recordings over to legal authorities; correct?
11   A.  Yeah.
12   Q.  And I think we confirmed earlier
13 that you never did that, did you?
14   A.  Has the statute run?
15   Q.  I'll ask the questions.  You've
16 not done that, have you?
17   A.  Not yet.
18   Q.  Okay.  Do you have any recordings
19 of Mr. Erickson?
20   A.  No.
21   Q.  Okay.  Do you have any recordings
22 of Mr. Moore?
23   A.  No.

194

1    Q.  Do you have any recordings of
2  anyone who works for D'Shannon?
3    A.  No.
4      (Whereupon, Defendant's
5      Exhibit 23 was marked
6      for identification.)
7    Q.  Mr. Perkins, I've handed you what
8  I've marked as Exhibit 23.  And is that
9  exhibit an e-mail chain between you and Mike
10 Moore dated March 15, 2014?
11   A.  Yes.
12   Q.  And in your e-mail to Mr. Moore
13 you state that as you have said all along,
14 you'll sign any papers necessary indemnifying
15 him from liability on the engines; do you see
16 that?
17   A.  Yes.
18   Q.  At this time on March 15, 2014,
19 was it your intent to execute the paperwork
20 necessary to indemnify Mr. Moore from
21 liability on the engines upon delivery of the
22 signed logbooks?
23   A.  It would have been -- at this

195

1  point in time, it would have been absolutely
2  my intention to sit down with Mike Moore and
3  look at appropriately drafted documents by our
4  attorneys to appropriately indemnify him for
5  his work.
6    Q.  Okay.  Did you ever have any
7  indemnification papers drafted?
8    A.  None.
9    Q.  Mr. Perkins, we talked about this
10 briefly a few minutes ago and I'd like to talk
11 a little bit about the day of the oil pressure
12 problem and then the couple of days before.
13 Based on the records that I've looked at, on
14 April 20th of 2015, which would have been two
15 days before the oil pressure problem, the
16 Baron flew from Tuscaloosa to Birmingham and
17 then from Birmingham to Baton Rouge.  Do you
18 have any recollection of that trip?
19   A.  Not offhand, no.
20   Q.  And on the day before the oil
21 pressure event on April 21 of 2015, the Baron
22 essentially flew the reverse route, from Baton
23 Rouge to Birmingham and then Birmingham back

196

1  to Tuscaloosa.  Do you have any recollection
2  of that trip as we sit here today?
3    A.  No.
4    Q.  Do you recall whether you were the
5  pilot who flew from Tuscaloosa to Baton Rouge
6  through Birmingham?
7    A.  I could look at my logbook.
8    Q.  Okay.
9    A.  But I probably was.
10   Q.  Okay.  Do you remember flying the
11 plane back to Tuscaloosa from Baton Rouge
12 through Birmingham the day before the oil
13 pressure event?
14   A.  Not vividly, no.
15   Q.  But if you weren't the pilot, I
16 believe the only other person it would have
17 been was Stewart Allen or --
18   A.  Stan Allen.
19   Q.  -- Stan Allen; correct?
20   A.  Probably.
21   Q.  Okay.  At that time back in April
22 of last year, would there have been anyone
23 else that was flying the Baron?

197

1     A.  I don't -- I don't think so.
2  There was -- Glen Sanders periodically does a
3  little work for us, but --
4     Q.  Is he just kind of a relief pilot?
5     A.  Yes.
6     Q.  All right.  Do you remember
7  whether the Baron experienced any problems of
8  any kind within the three months leading up to
9  the oil pressure event?
10    A.  None of any significance.
11    Q.  Okay.  Did you have any trouble
12  with either of the D'Shannon engines that you
13  can recall in that time period?
14    A.  In that specific time period, no,
15  nothing that jumps out at me.
16    Q.  Okay.  On April 22nd, 2015 which
17  is the day the low oil pressure indication
18  occurred, do you remember where you were
19  going?
20    A.  No.
21    Q.  And when you fly the Baron
22  typically, do you go to the Tuscaloosa Airport
23  and the aircraft is out on the ramp ready for

199

1  the engines and do your run-up; correct?
2     A.  Yes.
3     Q.  And --
4     A.  Well, you don't do the run-up
5  right there.
6     Q.  Okay.  You -- so you start the
7  aircraft, start the engines on the aircraft,
8  and then you taxi --
9     A.  Yeah, there are certain things you
10  have to do.  You have to wait until the oil
11  temperature reaches at least 70 degrees.  And
12  then after it reaches that temperature, then
13  you can taxi.  You lean the engine somewhat
14  for taxiing.  You get to the end of the runway
15  and then you do the run-up.
16    Q.  Okay.  And if everything looks
17  good with the run-up, you go ahead and go as
18  long as you're clear to take off --
19    A.  Uh-huh.
20    Q.  -- correct?
21    A.  Right.
22    Q.  Okay.  On April 22nd, 2015, do you
23  recall doing anything differently from the

198

1  you?  Or how do you -- sort of walk me through
2  your normal procedure for getting the Baron
3  ready to fly.
4     A.  I usually call the airport on my
5  way driving in, ask them to pull it out and
6  put it on the ramp for me.
7     Q.  Okay.  If it needs fuel, do you
8  take care of that?
9     A.  No.  I ask them to make sure that
10  it's topped off.  In fact, the standard rule
11  is that when the Baron lands, it is topped
12  off.  And after it is -- the engines are
13  cooled, they check the oil.
14    Q.  And then when you're ready to fly,
15  you go out to the ramp and perform your
16  preflight; correct?
17    A.  I do an entire walk-around of the
18  exterior.  I check the oil level in both
19  engines.  I do everything you're supposed to
20  do.  I check all the flight surfaces, control
21  surfaces, tires, PDOS, static air.
22    Q.  And then once you're done with
23  your preflight, you enter the aircraft, start

200

1  procedure you just described to me?
2     A.  No.
3     Q.  And we talked about this a few
4  minutes ago, but I just want to make sure that
5  I'm clear, you started the engine, you taxied
6  to the runway, and then you checked your oil
7  pressure again and realized there was a
8  problem; correct?
9     A.  Yeah, there were fluctuations that
10  got my attention as soon as I started to taxi.
11  And I was actually on the ramp taxiing toward
12  the run-up area when it alarmed me enough to
13  turn around and go back.
14    Q.  Okay.  And then you taxied back to
15  Dixie Air's hangar; is that right?
16    A.  Yes, to their ramp.
17    Q.  To their ramp?
18    A.  Yeah.
19    Q.  And you went ahead and got Mike
20  Terry; correct?
21    A.  Yes.
22    Q.  Okay.  And what did you do from
23  there?

201

1      A.  I told Mike about the readings.
2  And he said, first of all, that it could be an
3  improper annunciator, that a sensor might be
4  bad.  And the best way to check it -- and Mike
5  is extremely thorough, extremely good.  He
6  said the only way to check it is with a manual
7  pressure gauge.
8          So we shut the engine down.  He
9  removed a portion of the cowling.  He actually
10 took the pressure sensors off from the oracle
11 that go into the airplane.  He attached a
12 manual pressure gauge.  He stood next to the
13 wing behind the propeller, told me to crank
14 it.  We cranked the engine.  He's sitting
15 there reading it.  And then he looked up and
16 he said cut it (indicating).
17     Q.  After you cut the engines, what
18 did you do?  You exited the aircraft?
19     A.  Yes.
20     Q.  And then did you kind of wait
21 around and see what Mike Terry found out or
22 did you leave the airport at that point?
23     A.  I don't remember, Tim.

202

1      Q.  Okay.
2      A.  You know, I obviously didn't fly
3  the airplane.  Mike and I talked about what
4  needed to be done next, and I clearly was
5  getting in the airplane to go to work
6  someplace.  I made some arrangement to take
7  care of whatever obligation it was I had.
8      Q.  Okay.  Were you with Mike Terry
9  when he took the oil filter off of the left
10 engine?
11     A.  No.
12     Q.  Okay.  Were you with Mike Terry
13 when he pulled the pressure relief valve from
14 the oil pump?
15     A.  No.
16     Q.  Were you with Mike Terry when he
17 drained the oil from the left engine?
18     A.  No.
19     Q.  So is April 22nd, 2015 the last
20 time that you saw the D'Shannon engines
21 installed on your Baron?
22     A.  No.  I mean, this went on for
23 several days of examination and explanation

203

1  and brainstorming about what the problems
2  were.
3      Q.  So after the day of the oil
4  pressure problem, there were then a few days
5  of you and Mike Terry sort of getting together
6  and trying to figure out what was wrong?
7      A.  Uh-huh.
8      Q.  And when did Mr. Terry make the
9  decision to send the left engine initially to
10 Mr. Freeman?
11     A.  Well, and I don't know.  And Mr.
12 Terry would be the best source to answer that
13 question.  But it was sometime after we had
14 determined that there was some major problem
15 with the engine.
16     Q.  And Mr. Terry is the one who made
17 the decision to send the engine to Mr. Freeman
18 with your approval; correct?
19     A.  With my approval and full
20 concurrence.
21     Q.  Okay.  Did you ever see the left
22 D'Shannon engine at Mr. Freeman's shop?
23     A.  No.

204

1      Q.  And you were not involved with the
2  teardown of that engine, were you?
3      A.  No.
4      Q.  Did you ever see any of the
5  material that Mike Terry says he pulled from
6  your engine?
7      A.  He showed me metal flakings that
8  came from the oil filter, and then I know I
9  saw metal from the engine.  I'm not sure where
10 all of it came from.
11     Q.  Okay.  And is it your
12 understanding that that metal was somehow
13 transmitted to Mr. Freeman or do you know
14 where that metal went?
15     A.  I don't know.
16     Q.  Okay.  Do you know where that
17 metal is as we sit here today?
18     A.  No.
19     Q.  You don't have it, do you?
20     A.  There was some -- some pieces of
21 metal we do have.  There were these pieces of
22 bolts that were just floating around inside
23 the engine.

1    Q.  Well, I've seen those.
2    A.  And we do have those.  Those were
3  big enough to keep.
4    Q.  I've seen those.
5       (Whereupon, Defendant's
6       Exhibit 24 was marked
7       for identification.)
8    Q.  Mr. Perkins, I'd like to show you
9  what I've marked as Exhibit 24.  And is
10  Exhibit 24 an e-mail from Mike Moore to you --
11    A.  Yeah.
12    Q.  -- regarding the left engine
13  problems dated April 23, 2015?
14    A.  Yeah.
15    Q.  How did you first inform Mr. Moore
16  of the problem with the left engine?
17    A.  I don't recall.  I don't know if
18  he called me or I called him.  I think he
19  called me because when we actually talked
20  about it, I do recall I was in some other town
21  in a hotel room at night not long before I was
22  going to bed and we had a conversation, which
23  makes me think he called me.

1    Q.  Okay.  So did he -- to the best of
2  your recollection, did he just happen to call
3  you around this time and then you told him
4  what had happened?
5    A.  No, he had heard --
6    Q.  He heard?  Okay.
7    A.  -- about the problem with the
8  engine.
9    Q.  Okay.  And in this e-mail it looks
10  like Mr. Moore was attempting to troubleshoot
11  the issue; is that right?
12    A.  I don't know what Mr. Moore was
13  trying to do.  I mean, that -- you take that
14  on its face for whatever it says.  It sounds
15  to me in part that he's trying to find
16  somebody else to blame.  First, all engine
17  shops love dissecting and mudslinging at
18  competing shops.  So I'm not sure what Mr.
19  Moore was trying to do with this epistle.
20    Q.  Did you ever respond to Mr.
21  Moore's e-mail?
22    A.  No, I didn't think it took --
23  needed a response.

1    Q.  Okay.  Did you ever give Mr. Moore
2  an opportunity to see the engine, the left
3  D'Shannon engine before it was torn down by
4  Mr. Freeman?
5    A.  That's ridiculous.  I would have
6  had no obligation to let Mr. Moore look at an
7  engine that had nearly killed me.  There was
8  no obligation morally or legally for me to let
9  that man close to my airplane again.
10    Q.  And I understand if that's your
11  position, but did you tell him he had the
12  opportunity to do that?
13    A.  No.  In fact, I would have told
14  him to stay away from my airplane.
15    Q.  Okay.  Did you ever inform Mr.
16  Erickson or anyone with D'Shannon of the
17  problems with the left engine and later the
18  right engine prior to filing this lawsuit?
19    A.  No.
20    Q.  Okay.  And was that because the
21  relationship was just completely broken at
22  that point?
23    A.  Oh, I had in writing from Scott

1  Erickson that I had no warranty.  I had that
2  in writing.
3    Q.  Uh-huh.
4    A.  I had in writing from him that he
5  wished to talk to me no more.  The -- I was
6  convinced that the man was dishonest, so I saw
7  no value in that relationship.
8    Q.  Okay.  Have you spoken with Mr.
9  Moore since April 23 of 2015?
10    A.  I don't think so.
11    Q.  Okay.  Have you spoken with Mr.
12  Erickson since the day of the oil pressure
13  problem?
14    A.  No.
15    Q.  Okay.  A few minutes ago we talked
16  about the fact that you started up the engine
17  so that Mr. Terry could manually check the oil
18  pressure.
19    A.  Uh-huh.
20    Q.  And then you and Mr. Terry had
21  discussions in the days following the oil
22  pressure problem with the left engine.  Were
23  you personally involved in the investigation

1  of the problems with either D'Shannon engine
2  after that?
3      A.  What do you mean by "personally
4  involved"?  Obviously I was personally
5  involved to some degree in every aspect of it.
6  Are you --
7      Q.  Did you touch those engines after
8  that?  Physically touch --
9      A.  Do I do anything to them?
10     Q.  Yes, sir.
11     A.  After some of the parts -- I think
12 the first time I might have touched the engine
13 was when you walk into the hangar and I saw
14 the parts lying there, laid out for
15 examination.
16     Q.  Okay.
17     A.  I think that was probably the
18 first time that I was physically close to the
19 engines to touch them.
20     Q.  Okay.  Have you communicated at
21 all with the FAA regarding the D'Shannon
22 engines?
23     A.  John Park called me, yes.

1      Q.  Okay.  Do you remember about when
2  that was?
3      A.  It was in the -- well, probably
4  the week after April 22nd of 2015.
5      Q.  And did you only speak with Mr.
6  Park one time?
7      A.  No, it was a couple of times,
8  several times.
9      Q.  Okay.  Did you have any in-person
10 meetings with Mr. Park?
11     A.  No.
12     Q.  I believe Mr. Terry sent some
13 documentation to Mr. Park; is that right?
14     A.  I think so.
15     Q.  Okay.  Did you send -- did you
16 personally send any documents to Mr. Park, if
17 you can remember?
18     A.  I -- I can't remember.  I don't
19 know.  I wrote a synopsis of what happened,
20 but I think it was in the documents that I
21 prepared for y'all of the -- of what took
22 place on the day.  I don't think that went to
23 Park.  I -- but I truly don't remember.

1      (Whereupon, Defendant's
2      Exhibit 25 was marked
3      for identification.)
4      Q.  Mr. Perkins, I'll show you what
5  I've marked as Exhibit 25.  Is Exhibit 25 the
6  synopsis you were referring to?
7      A.  (Reviewing document.)  Yeah, I
8  think so.
9      Q.  But you don't know whether this
10 was sent to the FAA or not?
11     A.  I truly don't remember.  It may
12 have been.  It may have been that John Park
13 asked for this and that's why I prepared it,
14 but I don't remember.
15     Q.  Have you spoken with Mr. Freeman
16 about the D'Shannon engines?
17     A.  I haven't talked to him at all.
18     Q.  Okay.  Mr. Perkins, it's my
19 understanding based on your Complaint and then
20 your Proposed Amended Complaint that you are
21 alleging that Mr. Erickson represented that
22 D'Shannon had -- that D'Shannon had insurance
23 that would cover the engines and that they

1  actually did not; is that correct?
2      A.  Yes.
3      Q.  Okay.  When was the first time
4  that you discussed the issue of whether
5  D'Shannon had insurance with Mr. Erickson?
6      A.  I don't recall the first time.
7      Q.  Okay.  Are you claiming that Mr.
8  Moore made any misrepresentations to you
9  regarding the insurance issues?
10     A.  That he made any
11 misrepresentations?
12     Q.  Regarding D'Shannon's insurance to
13 you.
14     A.  I think all of my issues about
15 insurance with D'Shannon centered around Scott
16 Erickson.
17     Q.  Okay.  Are any of your fraud
18 claims related to Mr. Moore to the best that
19 you can tell me?
20     A.  All right.  Now you see, once
21 again, and I don't mean to split hairs with
22 you, but I'm not going to get into the
23 business here of trying to determine what is

1  and is not fraud.

2     Q.  Okay.

3     A.  Did Mike Moore lie to me?  Yeah,

4  he lied to me.

5     Q.  Okay.

6     A.  Did he mislead me?  Yes, he misled

7  me.  Did he do things that I think are

8  dishonest?  Yes, he did things I think that

9  are dishonest.

10     Q.  So --

11     MR. WADSWORTH:  And, Tim, just

12  kind of as a matter of law, I'm willing to

13  stipulate that the fraud claims have to do

14  with what Scott Erickson told Joe Perkins

15  before the time of contract, that really when

16  we make these allegations about what D'Shannon

17  communicated, Erickson is the one who made

18  these statements, not Mike Moore.

19     MR. HEISTERHAGEN:  And so I'm

20  clear, the fourth count -- I'm going to talk

21  to him for a second.

22     THE DEPONENT:  Yeah.  Go ahead.

23  Talk amongst yourselves.

1     MR. HEISTERHAGEN:  The fourth

2  count of either the Complaint or the Amended

3  Complaint --

4     MR. WADSWORTH:  The amended --

5     MR. HEISTERHAGEN:  -- if it's

6  allowed, the fraud is not related to Mike

7  Moore; correct?

8     MR. WADSWORTH:  No, we're talking

9  about statements that were made -- correct.

10  We're talking about statements that were made

11  at or before the time of contracting --

12     MR. HEISTERHAGEN:  That's right.

13     MR. WADSWORTH:  -- and those were

14  made by Scott Erickson.

15     MR. HEISTERHAGEN:  So anything at

16  or before the time of contracting is related

17  to Erickson and not Mike?

18     MR. WADSWORTH:  Yeah.  And

19  obviously, Joe, if you have statements that

20  Mike said, you know, feel free to add them

21  here.  But --

22     THE DEPONENT:  Well --

23     MR. WADSWORTH:  -- that's kind of

1  my understanding, is --

2     A.  Only that initially Mike supported

3  the claims of Erickson about the status of the

4  shop and the status of their abilities.  Mike

5  is a very strong salesman.  So particularly --

6  initially Mike reinforced the claims that

7  Erickson made.  And then as we went through

8  the process -- and now my attorney knows what

9  the nature of the Complaint is and I'm not

10  going to speak to that, but Mike Moore as we

11  continued through the process continued to

12  mislead me about the status of the engines.

13     Q.  (BY MR. HEISTERHAGEN:)  Okay.

14     A.  Now, whether that is pertinent to

15  the claim of fraud in our filing is something

16  I'm not smart enough to know.

17     Q.  Okay.

18     (Whereupon, Defendant's

19     Exhibit 26 was marked

20     for identification.)

21     Q.  Mr. Perkins, I'd like to show you

22  what I've marked as Exhibit 26.  And is

23  Exhibit 26 an e-mail from you to Mr. Erickson

1  dated November 18 of 2013?

2     A.  Well --

3     Q.  This is the first time that I

4  think that e-mail has been referenced.

5     A.  I thought this was -- let's see.

6  November 18th.  Yeah, and I thought this was

7  actually a repeat of something you had shown

8  me earlier.

9     Q.  I think there were e-mails in

10  previous chains that reference that e-mail.

11     A.  Uh-huh.

12     MR. WADSWORTH:  Exhibit 22, the

13  first e-mail like on the very back page

14  references that one.

15     Q.  (BY MR. HEISTERHAGEN:)  But I have

16  not yet shown you that e-mail.

17     A.  Yeah.  Okay.

18     Q.  Towards the bottom of the e-mail,

19  the middle of the page, you state -- you were

20  asking Mr. Erickson at this time two

21  questions, number one, was insurance coverage

22  in place when I sent you a deposit to begin

23  work on my engines; do you see that?

217

1    A. Uh-huh.
2    Q. Was this November 18, 2013 e-mail
3 the first time that you asked whether
4 D'Shannon had insurance?
5    A. No.
6    Q. Okay. And you told me a few
7 minutes ago that you cannot recall the first
8 time you asked about that; correct?
9    A. Right.
10   Q. Okay. Do you remember sending any
11 e-mails inquiring about D'Shannon's insurance
12 prior to Exhibit 26?
13   A. Now, the -- all of our e-mails are
14 part of the body of this, I believe, and it's
15 just a matter of putting them in chronological
16 order. I don't recall.
17   Q. And I'll represent to you that I
18 have not seen any other e-mails. And, again,
19 I'm just trying to confirm that you can't
20 recall anything before this?
21   A. No, but I had telephone
22 discussions with him about the insurance
23 issue.

218

1    Q. Okay. Were those discussions
2 before you entered into the contract with
3 D'Shannon?
4    A. When I received this document, one
5 of the discussions I had -- see, he actually
6 sent me a draft of the warranty they were
7 preparing. And at the time they sent me a
8 draft of the warranty they were preparing, I
9 asked them explicitly whether there would be
10 insurance to help back the warranty. And
11 his -- it was as a matter of fact, well, of
12 course.
13   Q. And that would have been towards
14 the beginning of the relationship; correct?
15   A. Yeah, this -- this is -- it was
16 probably prior to this, and this is June 5th.
17   Q. Do you have any documents or other
18 information showing that D'Shannon did not
19 have insurance prior to October 7 of 2013?
20   A. I have documents that I think you
21 have as well of e-mails between Mike Moore and
22 Scott Erickson where Moore challenges him on
23 having the insurance, and then Erickson

219

1 confirms to him that he is doing his best to
2 try to get insurance in place essentially
3 confirming that he did not have it. And I
4 think you have those e-mails.
5    Q. When was the first time you
6 realized that there may be a problem with
7 D'Shannon's insurance?
8    A. Probably when Mike Moore raised
9 the issues.
10   Q. And that event when Mike Moore
11 raised the issue, that led to a significant
12 amount of correspondence between you and Mr.
13 Erickson regarding insurance; correct,
14 starting with Exhibit 26?
15   A. It may have been there, but we had
16 discussed insurance before.
17   Q. Okay.
18   A. Mike Moore raised the issue about
19 insurance because Mike Moore, as he became
20 increasingly frustrated with Scott Erickson
21 and refused to continue to participate in
22 deceiving me, became very cautious of Erickson
23 because Erickson had made, according to Moore,

220

1 a number of representations to Moore about
2 insurance and about the protections Moore
3 would have for his AP, AI license. And Moore
4 became distressed because he became aware that
5 none of those assurances were in place or so
6 that is what he conveyed to me. And then I
7 subsequently saw the -- he shared the e-mail
8 chain between he and Erickson where that was
9 discussed and I saw Erickson's response.
10   Q. When you learned that D'Shannon
11 may not have had insurance, did you take any
12 action of any kind other than simply e-mailing
13 Mr. Erickson?
14   A. No. (Witness pointing.)
15   Q. And similarly --
16   A. I sent him this letter.
17   Q. Exhibit 26?
18   A. Exhibit 26.
19   Q. And was the reasoning similar to
20 what we talked about earlier, that you were
21 simply attempting to get the benefit of what
22 you had paid for?
23   A. This saga had started in May.

221

1  This was November.
2      Q.  You just wanted to get the engines
3  and get out of there; right?
4      A.  I wanted to get the engines and
5  get out of there.
6      Q.  And I think we've discussed sort
7  of ad nauseam the issue with the deadline and
8  the sort of continuing delays; correct?
9      A.  Yeah.
10     Q.  Okay.  And there's also been
11 allegations that Mr. Erickson represented to
12 you that they had a cutting edge engine shop;
13 correct?
14     A.  Yeah.  Yes.
15     Q.  And based on what you found out
16 from Mr. Moore, you found or you believed that
17 that wasn't true; correct?
18     A.  As we got well into the process,
19 one of the excuses that was given to me by
20 Mike Moore for not meeting the continual --
21 continually moving deadline was that they just
22 didn't have the things.  And they even sent me
23 photographs.  I don't know if this is part of

222

1  this record or not, but I think it is, the
2  test stand didn't exist.
3      Q.  I think we looked at some pictures
4  earlier.
5      A.  Of the test stand?  Do you know
6  what I'm talking about?
7      Q.  Yeah, I know what a test stand is,
8  but I don't recall seeing pictures of it.
9      A.  I think they sent a picture of the
10 test stand well in -- because they were very
11 proud of finally getting the test stand.
12 There's even some e-mail correspondence about
13 the test stand did not exist until months
14 after D'Shannon sold me the engines and
15 started getting my money.
16     Q.  And did Mr. Moore ever represent
17 to you that D'Shannon had a cutting edge
18 engine shop?
19     A.  At the very beginning he sold the
20 engine shop very aggressively.
21     Q.  Okay.
22     A.  Yes, we have the best people, it
23 is going -- he told stories.  You've met Mike

223

1  Moore.  He's an incredible human and has an
2  ability for the recall of detail that -- I
3  mean, he -- it's remarkable.  So he tells me
4  these stories at the very beginning about how
5  the standard for the measurement of the weight
6  of lifters, what the standard is for engines
7  and that in my engines, there will be no
8  variation on the weight of the lifters because
9  they will all be precisely the same weight.
10 And because the lifters and these other things
11 are so precise, there won't even be any
12 break-in time for these engines.  I mean, the
13 sales pitch went on and on about how
14 high-performance, high-tech superior these
15 engines would be.
16     Q.  And the final allegation in the
17 first amended counterclaim would be that Mr.
18 Erickson or someone from D'Shannon told you
19 that only Continental approved parts would be
20 used; is that correct?
21     A.  That's true.
22     Q.  Did you understand Continental
23 approved parts to mean that ECI parts or

224

1  superior parts could be used?
2      A.  What I understood it to mean was
3  we will overhaul your existing engine to new
4  limits which includes 100 percent mandatory
5  replacement parts as defined by Continental
6  Motors.
7      Q.  Okay.
8      MR. WADSWORTH:  For the record,
9  which exhibit is that?
10     THE DEPONENT:  This is Exhibit 5.
11     Q.  (BY MR. HEISTERHAGEN)  And the --
12 I know that we have an issue in this case with
13 the Barons and eligibility issue with the
14 Barons.  What I want to know is do you have a
15 problem with the use or did you have a problem
16 with the use of PMA parts that were approved
17 for the 550 engines?
18     A.  Here's what I had a problem with,
19 first, this was the assurance I was given,
20 that this would be parts, mandatory
21 replacement parts as defined by Continental,
22 capital C, Continental Motors.  All right.  So
23 that's the assurance that I was given.  Then

1 what distressed me greatly was after the April
2 22nd occurrence and we queried ECI about the
3 parts that were listed in the parts list for
4 my engines, ECI said that those engines --
5 those parts did not qualify to go in those
6 engines and should not be there. Now, I am
7 not a mechanic, but I have a letter from ECI
8 that says those parts aren't supposed to be in
9 my engine.
10     Q. Okay. Have you ever spoken with
11 anyone at ECI regarding those parts?
12     A. No. I have their written
13 correspondence, though.
14     Q. And is that the e-mail that was
15 sent to Mike Terry?
16     A. Yes.
17     Q. Okay. You don't have a separate
18 letter than that, do you?
19     A. No.
20         (Whereupon, Defendant's
21         Exhibit 27 was marked
22         for identification.)
23     Q. Mr. Perkins, I'd like to show you

1 what I've marked as Exhibit 27. And Exhibit
2 27 we mentioned briefly at the beginning of
3 the deposition, which was Exhibit A to
4 D'Shannon's counterclaim. You told me that
5 you had never seen this invoice before;
6 correct?
7     A. Now, is this the invoice that came
8 with your counterclaim?
9     Q. Yes, sir.
10     A. I've never seen this invoice.
11     Q. And you told me that the --
12     A. Is this -- let me ask you
13 something. Is this the invoice that your
14 client says was sent to me?
15     Q. The -- as Stephen and I had
16 discussed, those claims were pled in the
17 alternative. And it was my understanding that
18 this was the final invoice that was --
19     A. Your client --
20     Q. -- delivered.
21     A. -- told you he sent me this
22 invoice?
23     Q. I'll ask the questions today. And

1 I believe our claim speaks for itself. But
2 you told -- you just told me that you've never
3 seen this invoice; correct?
4     A. Not until it appeared on your
5 counterclaim.
6     Q. And you told me that although Mr.
7 Erickson and you had discussed the damage to
8 one of the 520 cores, he had never stated that
9 he was going to charge you for that; correct?
10     A. I said that Mr. Erickson and I had
11 discussed the damage to one of the 520 cores?
12     Q. I believe so. And then you said
13 you would have wanted to look at it?
14     A. What did I say?
15     Q. We can go back, but I believe that
16 you said that you and Mr. Erickson had spoken
17 about it.
18     A. No, I think you asked me the
19 question whether or not I ever examined the
20 cores, and I said, no, I had not.
21     Q. Okay. Let me ask the question
22 now, have you and Mr. Erickson ever spoken
23 about damage to one of the 520 cores that was

1 taken off of the Baron?
2     A. That never came up at all --
3     Q. Okay.
4     A. -- until perhaps even -- it was at
5 the end of this whole process. It was -- it
6 was never mentioned.
7     Q. And I --
8     A. It was when we were in the process
9 when our lawyers were actually speaking to
10 each other about trying to settle this issue
11 that that issue ever arose for the first time.
12     Q. Okay. And I believe you told me
13 earlier that you would have wanted to look at
14 that core; correct?
15     A. Certainly.
16     Q. Okay.
17     A. And, Tim, is the date on this
18 supposed to be the date when this was issued,
19 6/28/13?
20     Q. I'm going to continue to ask the
21 questions. Other than your attorneys and Mr.
22 Terry, to the extent that you discussed the
23 problems with the -- the D'Shannon engines

229

1  with him, have you discussed this case or the
2  underlying facts with anyone else?
3      A.  Of course.
4      Q.  Okay.  And were those
5  conversations sort of general conversations
6  about what's going on or did you -- or strike
7  that.
8      Have you spoken to any mechanics
9  other than Mr. Terry about this case, A&P
10  mechanics?
11      A.  A&P?  No, I don't think so.
12      Q.  Okay.  Have you spoken with anyone
13  who told you they were considering buying
14  products from D'Shannon about this case?
15      A.  No.
16      Q.  Have you made any Internet
17  postings at all about this case?
18      A.  No.
19      MR. HEISTERHAGEN:  I think I'm
20  done, but I want to just take a couple of
21  minutes to go through these -- I was jumping
22  around -- to make sure I covered what I want
23  to cover.

230

1      MR. WADSWORTH:  Sure.
2      MR. HEISTERHAGEN:  We can go off.
3      MR. WADSWORTH:  Yeah, let's go off
4  the record.
5      MR. HEISTERHAGEN:  Yeah, let's go
6  off.  You can just change the tape.
7      THE VIDEOGRAPHER:  This concludes
8  tape five of the deposition of Joe Perkins.
9  Going off the record.
10      (Whereupon, a short break was
11  taken.)
12      THE VIDEOGRAPHER:  This begins
13  disk six in the deposition of Joe Perkins.
14  Going back on the record at 4:17.
15      Q.  (BY MR. HEISTERHAGEN:)
16  Mr. Perkins, I have one quick question for
17  you.  And we discussed earlier I think you
18  told me that you had paid D'Shannon $133,999;
19  correct?
20      A.  Yes.
21      Q.  And we talked about this off the
22  record, but just to confirm, D'Shannon has
23  actually received $116,010; correct?

231

1      A.  Yes.
2      Q.  And the remaining $17,989 has not
3  been paid to D'Shannon and has been put into
4  escrow as a result of the prior negotiations;
5  correct?
6      A.  Yes.
7      Q.  Okay.  So if you can find for me
8  Defendant's Exhibit 13, and it's going to look
9  like this (pointing).
10      A.  I'm sorry.  I should have kept my
11  paper in better order.
12      Q.  Check at the bottom of that stack.
13  There we go.  And if you'll flip to Plaintiffs
14  119, which is the third page of that exhibit.
15      A.  Uh-huh.
16      Q.  The invoice is accurate to the
17  extent that D'Shannon received $116,010 and
18  that there was still a balance due of $17,798;
19  correct?
20      A.  That is what is on this, and that
21  is correct.  They had received 116,010 and we
22  had placed another almost 18,000 in escrow.
23      Q.  Okay.  That's all I have.  Thank

232

1  you.
2
3  EXAMINATION BY MR. WADSWORTH:
4      Q.  Mr. Perkins, just a couple of
5  quick questions.  Mr. Perkins, do you know
6  what a kickback is?
7      A.  Well --
8      Q.  In terms -- in the realm of
9  aircraft.
10      A.  In the realm of engine --
11      Q.  Engines.
12      A.  -- operations?
13      Q.  Yes.
14      A.  Yes, I do.
15      Q.  Okay.  What is it?
16      A.  Well, a kickback takes place at a
17  mistiming in the cycle of pistons as they move
18  through their cycle of combustion and exhaust.
19  And it can take place with a relatively minor
20  mistiming.  But when it does, it creates an
21  explosion that sends the crankshaft to the
22  engine essentially in the opposite direction.
23      Q.  Have you ever been in an airplane

## 233

1  that had a kickback?
2      A.  No, I haven't.
3      Q.  Do you know what a kickback would
4  look like or feel like?
5      A.  I have seen engines that have been
6  the -- that have suffered a kickback, and it
7  is -- it's explosive.
8      Q.  If a kickback had happened in the
9  Baron between the time of overhaul and April
10  22nd, 2015, would you have been able to tell?
11      A.  I -- yes.  I'm not a mechanic, but
12  usually the only example I have seen --
13  examples I have seen of engines that suffered
14  kickback is that there was literally a large
15  hole and all of the oil exited and pieces of
16  metal went through the cowling.
17      Q.  To your knowledge, did the Baron
18  have a kickback between the time of overhaul
19  and the time that you lost oil pressure?
20      A.  Certainly not.
21      Q.  Mr. Perkins, do you know what a
22  prop strike is?
23      A.  Oh, yes.

## 234

1      Q.  What is a prop strike?
2      A.  It's when the prop strikes a
3  foreign object, the ground, a post, anything
4  like that.
5      Q.  Between the time of overhaul and
6  April 22nd, 2015, did the Baron suffer any
7  prop strikes?
8      A.  No, the Baron suffered no prop
9  strikes.  And as this documentation shows, the
10  Baron had brand-new Scimitar three-blade props
11  on them.  I mean, they're -- they're
12  beautiful.  They are delicate.  And they would
13  show quickly if there was any prop strike.
14  But there's been nothing that took place that
15  would even come close to being a prop strike.
16      MR. WADSWORTH:  That's all I have.
17
18  REEXAMINATION BY MR. HEISTERHAGEN:
19      Q.  Mr. Perkins, a couple of
20  questions.  Prior to the day in February where
21  we all came and inspected the left engine, had
22  you ever seen inside the case of that left
23  engine?

## 235

1      A.  No.
2      Q.  Okay.  Have you ever seen the
3  interior of the starter adapter that was
4  installed on that left engine?
5      A.  Not to my knowledge.
6      Q.  And you're not an A&P or an IA,
7  are you?
8      A.  No.
9      Q.  Okay.  That's all I have.
10      MR. WADSWORTH:  Me, too.
11      THE VIDEOGRAPHER:  This concludes
12  the deposition of Joe Perkins.  Going off the
13  record at 4:24.
14      FURTHER THE DEPONENT SAITH NOT
15
16
17
18
19
20
21
22
23

## 236

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA)
4  COUNTY OF SHELBY)
5      I hereby certify that the above
6  proceedings were taken down by me and
7  transcribed by me using computer-aided
8  transcription and that the above is a true and
9  correct transcript of said proceedings taken
10  down by me and transcribed by me.
11      I further certify that I am neither of
12  kin nor of counsel to any of the parties nor
13  in anywise financially interested in the
14  outcome of this case.
15      I further certify that I am duly licensed
16  by the Alabama Board of Court Reporting as a
17  Certified Court Reporter as evidenced by the
18  ACCR number following my name found below.
19      /s/Maya Rose
20      Maya Rose, ACCR#242
21      Expires 9/30/17
22      State of Alabama at Large
23      Commission Expires 3/7/17