IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

PERKINS COMMUNICATIONS, LLC,       )
and MATRIX, LLC,                   )
                                   )
        Plaintiffs,                )CASE NO.:   7:15-CV-01172-LSC
                                   )
    vs.                            )
                                   )
D'SHANNON PRODUCTS, LTD.,          )
SCOTT ERICKSON, MICHAEL MOORE      )
and EARL RAMEY,                    )
                                   )
        Defendants.                )
                                   )
_____ )


DEPOSITION OF MICHAEL MOORE

(Taken by Plaintiffs)

Charlotte, North Carolina

Friday, July 1, 2016


Exhibit

B


Reported in Stenotype by
Christine McMinn, CSR
Transcript produced by computer-aided transcription



```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ALABAMA
 2                       WESTERN DIVISION

 3

 4   PERKINS COMMUNICATIONS, LLC,      )
     and MATRIX, LLC,                  )
 5                                     )
             Plaintiffs,               )CASE NO.:  7:15-CV-01172-LSC
 6                                     )
        vs.                            )
 7                                     )
     D'SHANNON PRODUCTS, LTD.,         )
 8   SCOTT ERICKSON, MICHAEL MOORE     )
     and EARL RAMEY,                   )
 9                                     )
             Defendants.               )
10                                     )
     _____  )
11

12

13

14               DEPOSITION OF MICHAEL MOORE

15                  (Taken by Plaintiffs)

16              Charlotte, North Carolina

17                Friday, July 1, 2016

18

19

20

21

22

23               Reported in Stenotype by
                 Christine McMinn, CSR
24    Transcript produced by computer-aided transcription

25
```

## Page 2

```
1                    APPEARANCES
2  ON BEHALF OF PLAINTIFFS:
3      Stephen D. Wadsworth, Attorney at Law
       CAMPBELL GUIN WILLIAMS GUY & GIDIERE, LLC
4      505 North 20th Street
       Suite 1600
5      Birmingham, Alabama 35203
       (205) 224-0750
6      stephen.wadsworth@campbellguin.com
7
   ON BEHALF OF DEFENDANTS:
8
       Timothy A. Heisterhagen, Attorney at Law
9      ARMBRECHT JACKSON, LLP
       1300 Riverview Plaza
10     63 South Royal Street
       Mobile, Alabama  36602
11     (251) 405-1300
       tah@ajlaw.com
12
13
14
15
16
17
18
19
20         DEPOSITION OF MICHAEL MOORE, a witness called on
21  behalf of Plaintiffs, before Christine McMinn, Certified
22  Shorthand Reporter and Notary Public, in and for the State of
23  North Carolina, at Charlotte, North Carolina, on Friday,
24  July 1, 2016, commencing at 9:05 a.m.
25
```

## Page 3

```
1                 INDEX OF EXAMINATION
2  BY MR. WADSWORTH    . . . . . . . . . .   PAGE 6, 138
3  BY MR. HEISTERHAGEN  . . . . . . . . . .   PAGE   119
4
5                  INDEX OF EXHIBITS
6  MOORE                                        PAGE
7   - 1  Email dated June 20, 2013, Bates-stamped
         Plaintiff's000094                        18
8
    - 2  Email dated June 26, 2013, Bates-stamped
9        DPL00070                                 27
10  - 3  Email chain dated July 22, 2013, Bates-stamped
         Plaintiff's 000105                       33
11
    - 4  Email chain dated August 16, 2013, Bates-
12       stamped DPL-00136                        34
13  - 5  Email chain dated August 26, 2013 with attachment,
         Bates-stamped DPL-00141 and 42           36
14
    - 6  Email chain August 27, 2013 Bates-stamped
15       DPL-00143                                40
16  - 7  Email chain dated September 2, 2013, Bates-
         stamped DPL-00146                        43
17
    - 8  Email chain dated September 9, 2013, Bates-
18       stamped DPL-00159-61                     44
19  - 9  Email chain dated September 10, 2013,
         Bates-stamped DPL-00177-184              50
20
    -10  Email chain dated September 11, 2013,
21       Bates-stamped DPL-186-187                52
22  -11  Email chain dated September 27, 2013,
         Bates-stamped DPL-00223-24               53
23
    -12  Email chain dated September 23, 2014,
24       Bates-stamped DPL-00232-233              56
25
```

## Page 4

```
1                    INDEX OF EXHIBITS
2  DEPOSITION                                      PAGE
3  -13  Email dated September 16, 2013 with
        photograph attachments, Bates-stamped
4       Plaintiff's 000109-112                     58
5  -14  Email dated October 16, 2013, Bates-stamped
        Plaintiff's 000124                         63
6
   -15  Email chain dated October 23, 2013,
7       Bates-stamped Plaintiff's 000128           67
8  -16  Email dated November 18, 2013, Bates-stamped
        Plaintiffs 000150                          69
9
   -17  Email chain dated March 21, 2014 and letter dated
10      March 24, 2014, Bates-stamped DPL-00309-310  73
11 -18  Email dated December 18, 2013, Bates-stamped
        Plaintiff's 000557                         73
12
   -19  Aviation Commercial General Liability
13      Insurance Policy, Bates-stamped
        Plaintiff's 000026-69                      76
14
   -20  Email chain dated September 16, 2013,
15      DPL-00205                                  77
16 -21  Document dated 5/5/15, Bates-stamped
        Plaintiff's 000162                         80
17
   -22  Photocopies of color photographs, Bates-stamped
18      MM 376-400                                 82
19 -23  Continental Aircraft Engine Maintenance and
        Overhaul Manual                            97
20
   -24  Logbook entry, Bates-stamped DIXIE 000483-484  98
21
   -25  Logbook entry, Bates-stamped DIXIE 000328-331  104
22
   -26  ECI invoice 133644-1, Bates-stamped DIXIE 000299-
23      309                                        106
24 -27  Memo dated November 28, 2013, Bates-stamped
        Plaintiff's 000558                         108
25
```

## Page 5

```
1                    INDEX OF EXHIBITS
2  DEPOSITION                                      PAGE
3  -28  FAA document dated November 10, 2015, Bates-
4       stamped MM-00375                           132
5  -29  Logbook entry, Bates-stamped AJ-Dixie 00085-89  133
6  -30  Email chain dated March 15, 2014, Bates-
        stamped MM-0035                            143
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1    S T I P U L A T I O N S
2        IT WAS STIPULATED AND AGREED by and between counsel
3    for the respective parties that each question in this
4    deposition is deemed to be followed by an objection, and the
5    requirement for providing at this time a specific reason for
6    the objection is waived, same to be made at the time of
7    trial, except an objection as to form, and each answer, or
8    portion thereof, is deemed to be followed by a motion to
9    strike, and the objections and motions to strike may be ruled
10   upon by the presiding judge at any hearing or trial of this
11   cause with the same force and effect as if made and ruled
12   upon by the proper person at the proper time.
13
14        MICHAEL MOORE,
15   having been first duly sworn, was examined
16        and did testify as follows:
17
18        EXAMINATION
19   BY MR. WADSWORTH:
20   Q    Can you state your name for the record.
21   A    Michael Moore.
22   Q    Michael, what is your address?
23   A    4470 Slanting Bridge Road, Sherrills Ford,
24   North Carolina.
25   Q    Do you go by Mike?

Page 7

1    A    Mike.
2        MR. HEISTERHAGEN:  Sorry to interrupt.  Usual
3    stipulations?
4        MR. WADSWORTH:  Yes.  Sorry.
5    Q    And where do you work, Mike?
6    A    I work for Windecker Aircraft.
7    Q    Is that your company?
8    A    No.
9    Q    Who owns that company?
10   A    A Chinese individual.
11   Q    What do you do for Windecker?
12   A    I run the day-to-day operations.  Specifically R&D,
13   research and development.  I recently restored an airplane
14   for them.
15   Q    Is restoration a large part of what you do?
16   A    It is.
17   Q    Do you still do overhauls, engine --
18   A    A few, yeah.  I do for friends.
19   Q    What does Windecker do?  What is the purpose of
20   Windecker?
21   A    They were purchased to export a type certificate to
22   China.  So it's a firm that is validating a type certificate
23   for a Chinese investor.
24   Q    Would that still be under FAA rules or would it be
25   under Chinese rules?

Page 8

1    A    The exports are governed by the FAA.
2    Q    How long have you been with Windecker?
3    A    A little over two years.
4    Q    Before Windecker, who did you work with?
5    A    D'Shannon Aviation, and for myself.
6    Q    Now, what was your own company called?
7    A    Avworks, A-v-w-o-r-k-s.
8    Q    How long did you have Avworks?
9    A    Roughly ten years.
10   Q    What did they do?
11   A    We built custom engines.
12   Q    For airplanes?
13   A    For airplanes.
14   Q    Any other type of engines or just airplanes?
15   A    Occasional car engines for friends, but maybe two or
16   three in my whole life.
17   Q    D'Shannon Aviation, what was your position with
18   them?
19   A    To build engines.
20   Q    Were you the owner of D'Shannon?
21   A    No.
22   Q    Were you an employee of D'Shannon?
23   A    I was supposed to be, but I was a contractor.  They
24   were supposed to make me an employee, but that never
25   transpired.

Page 9

1    Q    When you worked for D'Shannon, what were the terms
2    of the contract?  What were the terms of that?
3    A    That I build engines, that I don't deal with
4    customers, and provide them with engine support type --
5    anything to do with an airplane engine.
6    Q    Is that how the job turned out?
7    A    No, it was not.
8    Q    What part specifically did not -- I guess you had to
9    deal a lot with customers, didn't you?
10   A    Yes, as Scott gave my name to customers when things
11   weren't delivered as he had promised.
12   Q    And how long were you with D'Shannon?
13   A    About six months.
14   Q    When did it start?  When did your relationship
15   start?
16   A    It started as a relationship a year or two before,
17   but formally for the purposes of the engine shop, that
18   formally started in March or April of 2013, probably closer
19   to April.
20   Q    When did you end your relationship with D'Shannon?
21   A    October --September/ October.  I don't remember the
22   specific dates.
23   Q    Of 2013?
24   A    Yes.
25   Q    Were you still working for D'Shannon when you were

1 performing the work on Joe Perkins' engines?

2    A    No, sir.

3    Q    All right.  So did you complete the work on

4 Joe Perkins' engines after you left D'Shannon?

5    A    The actual engine work, they were built while in the

6 employment of D'Shannon.  They were not installed under the

7 employment of D'Shannon.

8    Q    That's right.  They were installed in around April

9 of 2014, correct?

10    A    No.  They were installed October of 2013.

11    Q    October of 2013?

12    A    Correct.

13    Q    At that point, you had already left D'Shannon?

14    A    Yeah.  The moment I went to work for Joe, I had left

15 D'Shannon.

16    Q    What is your educational background?

17    A    I have an associate of applied sciences in aviation

18 maintenance technology, and about 15 hours short of a

19 mechanical engineering degree or aerospace degree.

20    Q    Where did you go to college?

21    A    Southwest Missouri State University to start with.

22 I got a two-year degree from Eastern New Mexico University

23 and then Oklahoma State.

24    Q    Are you from Missouri?

25    A    No.

1    Q    Where are you from?

2    A    Originally, Kentucky.  My father got transferred

3 from his job, and I ended up in Missouri and New Mexico.

4    Q    Do you have any professional certifications?

5    A    I'm a licensed A&P mechanic.

6    Q    How long have you held the A&P license?

7    A    Since 2001.

8    Q    Were you privately licensed as an A&P?

9    A    I was.

10    Q    When did you first get your A&P?

11    A    '93.

12    Q    When did that certification lapse?

13    A    From '99 to 2000, approximately.

14    Q    Why did that happen?

15    A    I was accused of a making a fraudulent logbook

16 entry.

17    Q    What was the story behind that?

18    A    There was a customer's airplane that the description

19 of the -- the description of the work performed in the

20 logbook did not match the airplane.  That's because I had

21 disassembled the airplane after I made the entry.

22    Q    So basically you had made the logbook entry, and you

23 disassembled it again and rebuilt it, and that's why the

24 parts didn't match?

25    A    No.  I had repaired the airplane.  The customer

1 didn't pay his bill.  I took it apart to send the parts back

2 to the manufacturers to get my money back.

3    Q    Then at some point the customer did pay his bill?

4    A    No, he never paid his bill.

5    Q    How did the FAA get involved?

6    A    The disgruntled customer obtained the logbooks to

7 the airplane which I held in my custody, sent them to the FAA

8 with a complaint that the airplane doesn't match the work

9 performed.

10    Q    And the FAA did the rest?

11    A    Yes.

12    Q    Then in 2001, you became an A&P again?

13    A    Correct.

14    Q    Have you ever been an IA?

15    A    Yes.

16    Q    When were you an IA?

17    A    Up to that same time.

18    Q    '99?

19    A    Yes.  2000.  Somewhere in there.

20    Q    Since 2001, you have never been an IA?

21    A    No.

22    Q    Now, you described your relationship with D'Shannon

23 as being a contractor relationship for the most part,

24 correct?

25    A    Correct.  It wasn't supposed to be that way, but,

1 yes --

2    Q    When you were with D'Shannon --

3         I'm sorry, I didn't mean to interrupt.  You said

4 "Yes"?

5    A    Yes, I was, but it wasn't supposed to be that way

6 for any length of time.

7    Q    While you were there during the time you were doing

8 the work on Joe Perkins' and the other engines for D'Shannon,

9 were you receiving paychecks from D'Shannon?

10    A    I was.

11    Q    Who else was working with you during that time?

12    A    There were several other employees there.  A man

13 named Dave -- David Posey, Earl's son, Derek Ramey, a person

14 named Lance that was sent from Scott.  Another person named

15 Kurtis.  There were anywhere from half a dozen to ten at any

16 given time.  They floated in and out at Scott's request.

17    Q    Was D'Shannon paying their paychecks, as well?

18    A    I don't know what arrangements he had made, but some

19 of the employees there were paid by him.

20    Q    Were some of them paid directly by you?

21    A    No, nobody was paid by me.

22    Q    Who was paying the utilities on the shop while you

23 had that relationship with D'Shannon?

24    A    We paid nothing.  D'Shannon paid all the bills.

25    Q    Okay.

1    A   We had no access to -- we didn't even have a debit
2   card.  If we needed something arbitrary, toilet paper, we
3   would have to buy it ourselves and send it in as an
4   expense.
5    Q   When it came to ordering parts, how was that --
6    A   The request was emailed to Scott, and he would
7   handle the order from there.  Sometimes I would call the
8   vendor directly, but all the paperwork went through the
9   Minnesota office.
10   Q   At the time that you were working with D'Shannon,
11  was your spot in North Carolina -- your work shop -- what
12  term do you prefer?
13   A   It was a shop.
14   Q   Your shop in North Carolina, was it a repair
15  station?
16   A   It was not.  They were working on my certificate.
17  That was not supposed to be that way, either, for any length
18  of time.
19   Q   What was it supposed to be like?
20   A   It was supposed to be immediately, as soon as
21  possible, a repair station.
22   Q   What goes into certifying a repair station?
23   A   A qualification of the people and a certification of
24  the facility.  You can look up all the details under FAR 145.
25  It outlines the requirements for a domestic repair station.

1    Q   What qualifications was your shop short, I guess,
2   during the time you worked at D'Shannon?  Why wasn't yours
3   qualified as a repair station at that time?
4        MR. HEISTERHAGEN:  Object to the form.
5        You can answer.
6        THE WITNESS:  We have to have things to apply for
7   the repair station.  We have to have the paperwork.  It's a
8   full-time job for at least one or two people, and we simply
9   weren't staffed.  He had hired somebody to handle that, and
10  it never came to pass.
11  BY MR. WADSWORTH:
12   Q   So it wasn't a question of having the correct tools,
13  was it?
14   A   No.
15   Q   It wasn't a question of having qualified people, was
16  it?
17   A   The shop had everything it needed to conduct its
18  work.
19   Q   As a repair station?
20   A   As any maintenance facility, you're required to have
21  the data, the tools, and the qualifications to return an
22  article to service.  The shop had all the paperwork and all
23  the tools required to build engines.
24   Q   Do you know whether Scott Erickson was telling
25  people it was a repair station at the time?

1    A   I really don't know.
2    Q   Did you ever hold it out to be a repair station?
3    A   No, sir, never.  That was my major complaint, and
4   that was one of the reasons I left.  I could not afford the
5   liability of sending engines out on my certificate.
6    Q   What sort of coverage would you get if it was a
7   repair station as to what it was, not a repair station?
8    A   You could get the coverage either way.  You have to
9   pay for it.
10   Q   At a higher premium?
11   A   I have no idea of the cost of premiums.
12   Q   What made you think it would be lesser liability if
13  you were certified as a repair station?
14   A   It's not on my certificate as an individual.  The
15  engines are released to service as approved by a repair
16  station, which is an entity, not an individual.
17   Q   So if there is a problem with the engines, the FAA
18  goes after the repair station, not after Mike Moore?
19   A   Correct.
20   Q   You say that it could have been certified as a
21  repair station had Scott Erickson paid a couple of
22  administrative people to handle the paperwork?
23   A   They could have paid anybody to do it.  I could have
24  done it, but I can't do administrative work and engine work
25  at the same time.

1    Q   Were there any other A&Ps working for you during
2   that time you worked at D'Shannon?
3    A   No, sir.
4    Q   Were there any IAs working with you at that time?
5    A   No, sir.
6    Q   Who is Dennis Soloman?
7    A   He is a mechanic and an IA that helped Joe put the
8   engines in and do the repairs to the airplanes after the
9   engines were installed.
10   Q   Did he have any relationship with D'Shannon?
11   A   Only peripherally, but, no, he didn't want anything
12  to do with D'Shannon.  Either did I.
13   Q   Why was that?
14   A   We had a fundamental disagreement in the way he did
15  business.
16   Q   "He" being Scott Erickson?
17   A   Yes.
18   Q   What was the disagreement?
19   A   One, was I believe there was an ethical issue on how
20  he treated his people.  The second, he was supposed to become
21  a repair station quickly, and he didn't.  And third, I
22  believed the conditions of my employment were that we were
23  properly insured to do the job that we did.
24   Q   All right, let's take those in turn.
25       How was he treating his people unethically?

Page 18

1   A   Our paychecks wouldn't clear the bank. Unrealistic
2   expectations.
3   Q   What sort of unrealistic expectations?
4   A   He would put us in a situation on a timeline for
5   something or for a promise he had made that we couldn't
6   deliver for timeliness.
7       MR. WADSWORTH: I will go ahead and mark this as
8   Exhibit 1.
9       (Moore Exhibit 1 was marked for
10      identification.)
11      MR. WADSWORTH: Tim, just to let you know, I'm not
12  handling these sequentially. This is going to be Moore
13  Exhibit 1.
14      MR. HEISTERHAGEN: Yes. Okay.
15  BY MR. WADSWORTH:
16  Q   Mr. Moore, have you ever seen this email before?
17  A   I have not.
18  Q   You see it's an email sent from Scott to
19  Joe Perkins -- to Kim, I'm sorry -- at Matrix that says, (As
20  read) "Was hoping you could pass a message on to Joe. Please
21  let him know we are coming close to finishing his engines and
22  would like to go over a few details on the Auracle engine
23  monitor, as well as his governors and his FBO."
24      You see that this email is dated June 20, 2013?
25  A   I do.

Page 19

1   Q   I give that preface as to ask this question:
2       As of June 20, 2013, were you coming close to
3   finishing his engines?
4   A   At that point in time, I hadn't even started.
5   Q   Now, I asked Mr. Erickson about this in his
6   deposition, and he said he told Joe that in reliance of what
7   you had told him, that you were getting close to finishing
8   the engines.
9   A   If you look, the engine numbers on the logbook
10  entries are dated 06-23, I believe, '13. That was the date I
11  got the phone call from Scott that the engines were now a
12  job. I had no knowledge of Mr. Perkins or his engines until
13  the date that you see on the cover of that logbook. Engine
14  one was -- don't quote me -- but 062013 and 062013-1. That
15  was the day that that engine was told to me it was a job.
16  Q   "062013" would be June 20, 2013; is that correct?
17  A   Yes. That is was the way I explained to Scott to
18  label -- he had no formal accounting method to track work in
19  the shop, so I had to establish a simple method to track
20  engines that all labor and all parts would be associated with
21  an engine number, because I didn't need to know the customer,
22  and I'm not supposed to be in the customer relations, because
23  that was the deal we agreed.
24      To run a safe shop, we can't have customers on the
25  phone or dealing with customers. That's customary in an

Page 20

1   engine shop. You can't go to McDonald's and watch them make
2   your hamburger.
3   Q   You want to keep the sales and production separate,
4   correct?
5   A   You want to keep the production safe, which means no
6   distractions.
7   Q   So it would be fair to say that you didn't know that
8   Mr. Perkins' engines were supposed to be completed until the
9   date that this was --
10  A   I had no knowledge that the name was even Perkins on
11  that date. I was told there were two engines that needed to
12  be built.
13  Q   You said paychecks wouldn't clear --
14  A   Correct.
15  Q   -- and you also said that it was a timeline issue,
16  which we discussed, and there were unrealistic timeline
17  issues.
18      Were there any other unethical concerns that you
19  had?
20  A   I had a lot of personal ethical concerns with Scott,
21  but none that governed the final product. In other words,
22  the -- he wasn't asking me to cut a corner on an engine. He
23  was asking me to do unrealistic things to get the engines
24  done.
25  Q   But he never asked you to do anything that you felt

Page 21

1   would violate FAA regulations?
2   A   No.
3   Q   Now, the repair station, we went over that.
4       You also mentioned the insurance, that you had an
5   issue with Scott when it came to insurance.
6       What was that?
7   A   After I had asked specifically for proof of
8   insurance as we started building and delivering engines,
9   after the second one, I said, I don't want to do any more
10  until you can prove to me that I'm covered. So he responds
11  back that he was making strides with his insurance company to
12  get me covered.
13  Q   Do you remember roughly when this was?
14  A   July or August. I don't recall exactly. It has
15  been three years. He made remarks that we were covered, that
16  I was covered. I took it upon myself because he, in an
17  email, left the name of his insurance agent in the company, I
18  sent that insurance agent an email. I called him, at which
19  point he responded to me and said, You are not covered.
20  Q   Had you ever been covered?
21  A   I don't know. I can't attest if we were or not. I
22  have no idea.
23  Q   This conversation with the insurance agent, about
24  when was that?
25  A   I think in the same time frame. August. Like I

1  said, it has been three years. I don't recall. I would have
2  to look up the emails.
3      Q   And after you discovered this in August 2013, what
4  did you do?
5      A   I told -- I gave him time to fix it. At that point,
6  Scott turned over my phone number to Joe, at which point Joe
7  called me and asked very bluntly, I want to know the
8  disposition of my engines. He made threats to me. So I
9  began to tell him exactly the truth of the status of his
10  engines.
11      Q   These phone calls started about when?
12      A   It was probably late June or early July, because it
13  was before we left for the air show in Oshkosh, which is late
14  July. I spoke with him and let him know the disposition,
15  that we were working on preparations for a show, and I was
16  instructed by my boss at that time to work on that.
17      Q   What did you have to do for the show?
18      A   Prepare for the show. Get displays made. We had a
19  mock-up engine that was painted to go on the roof. Typical
20  exhibition-type stuff.
21      Q   I'm trying to remember the name. We talked about
22  this with Scott Erickson. I think it was a Debonair engine.
23      Did you have anything to do with that engine?
24      A   I did not. That happened after I left.
25      Q   When Joe Perkins called you in June of 2013, did you

1  get the feeling he was upset because the engines hadn't been
2  delivered as promised?
3      A   Oh, I immediately knew he was upset. I had no idea
4  what was promised to Joe at that time. All I could tell him
5  was what was before me, as far as parts, and what I could do
6  to deliver. At that point, I developed a relationship with
7  him and reported to him on a regular basis. I couldn't be
8  fired. I was a contractor at that time.
9      Q   What was the status of the parts as of that phone
10  call? Did you have all the parts needed to complete the
11  overhaul on the Baron engines?
12      A   Not even close.
13      Q   Looking back in time, I know this has been three
14  years, what sort of parts were you missing at that time?
15      A   Quite a bit, actually. I think we had cylinders by
16  mid June, somewhere in there, but we lacked -- we were
17  working on other customers' engines. There were two others
18  delivered prior to Joe's. Maybe one. I can't remember
19  exactly. But there weren't enough parts. You could see by
20  the logbook entry and purchase orders that a lot of the parts
21  didn't arrive until August/September.
22      Q   You told Joe this in June 2013?
23      A   I did.
24      Q   You told him you didn't have all the parts in June
25  2013, correct?

1      A   I did.
2      Q   Did you have any estimate or idea when these parts
3  would arrive when you first started talking with Joe?
4      A   The estimates I gave him were based on what I was
5  told by Scott. Since we weren't in control of availability
6  of parts based on funding or the money required to buy the
7  parts, I couldn't make any assertions of when they would
8  actually show up.
9      Q   Did you have all the equipment needed to complete
10  the rebuild as of --
11      A   We did.
12      Q   -- June 2013?
13      A   We did.
14      Q   In particular, I'm thinking of there was a running
15  stand you didn't have at that point; is that correct?
16      A   In June, we didn't have it, but I think we had it
17  before we delivered. Every engine was running.
18      Q   Was there any other big pieces like that that didn't
19  necessarily go in the plane as component parts, but were
20  needed for the running or testing or building of the engines
21  that you lacked, as of June 2013?
22      A   We already established there were parts missing at
23  June 2013. We didn't have the engine parts to build the
24  engine by June 2013. But by the time the logbooks were
25  signed that the engines were done, we had to have all the

1  parts, obviously, and we had a running stand to run the
2  engine. It was actually quite an elaborate device. It had
3  data collection. It simulated the cockpit of an airplane.
4      Q   How does that work?
5      A   It's a full-functioning engine stand. It has a fuel
6  tank and fuel pumps, and it had an electronic gauge that had
7  all the manifold pressure and oil pressure. And there was a
8  service bulletin in part of the overhaul manual that dictates
9  how the engine is to be run. When you install it on the
10  stand, you run it in accordance with the manual. It's just
11  like being on the airplane.
12      Q   How long do you run it on the stand before you put
13  it on the airplane?
14      A   Between one and two hours. It's not constant. It's
15  staged. There are several intervals. First one is 5
16  minutes, then 10 minutes, and then 15 minutes. It
17  encompasses somewhere between 1.6 hours and 1.3 hours and two
18  hours. Somewhere in that neighborhood. The minimum is about
19  an hour.
20      Q   At any point, did you become comfortable that you
21  were -- that you did have insurance coverage on your work at
22  Joe Perkins?
23      A   At no point -- I was never comfortable that we had
24  insurance. Nobody provided me with proof of insurance, that
25  I was covered to do the work. They may have been insured for

1 other stuff, but that wasn't the genesis of my digging into
2 the insurance.
3    Q   Is insurance covering the cost of this litigation?
4        MR. HEISTERHAGEN:  No, no.  That's
5 attorney-client.
6        MR. WADSWORTH:  Can't blame a man for trying.
7        MR. HEISTERHAGEN:  Don't answer that.
8        I guess, objection, I instruct you not to answer on
9 the basis of attorney-client privilege
10        I'm also going to lodge an objection based on what
11 we talked about with Scott, which is the distinction versus
12 coverage and having insurance, on the basis that Mr. Moore is
13 not an insurance-coverage lawyer.
14        MR. WADSWORTH:  Yeah.  That's fine.  Really, I was
15 more interested in his conversations with the insurance
16 agent.
17    Q   But, I mean, obviously, you're not an attorney, are
18 you, Mr. Moore?
19    A   No, I'm not.
20        MR. HEISTERHAGEN:  Okay.
21 BY MR. WADSWORTH:
22    Q   Have you ever been deposed before?
23    A   I have.
24    Q   How long ago was that?
25    A   17, 18 years ago.

1    Q   Was it in connection with the 1999 FAA
2 proceedings?
3    A   Similar.  It was during the same time frame.  I was
4 going broke.  I had a customer that made a deposit to repair
5 an airplane that we didn't complete.
6    Q   And he sued you for breach of contract?
7    A   He did.
8    Q   How did that case turn out?
9    A   I paid him back and life went on.
10    Q   Have you ever been retained as an expert witness in
11 a case?
12    A   I have provided a lot of expert advice for other
13 cases, yes.  I have never -- I have never -- I have never
14 testified.
15    Q   When you say you provided expert advice, what sort
16 of expert advice would you provide?
17    A   Engine expertise to some aviation attorneys.
18    Q   Were you ever retained or named as an expert in
19 those cases, that you're aware of?
20    A   I don't know if they did or not.  They would come to
21 me and ask engine questions pertinent to a case they were
22 working on.  I would show them the ins and outs of the
23 details regarding their question.
24        MR. WADSWORTH:  We will mark, as Exhibit 2, DPL70.
25        (Moore Exhibit 2 was marked for

1 identification.)
2        MR. HEISTERHAGEN:  Mike, the documents with "DPL" on
3 the bottom were the documents produced by D'Shannon.  The
4 documents with "MM" on the bottom are the ones we produced on
5 behalf of you.
6        THE WITNESS:  Okay.  So this is produced by
7 D'Shannon; is that what you said?
8        MR. HEISTERHAGEN:  Yes.  This number here is called
9 a Bates number.  The "DPL" is D'Shannon, and any documents
10 with "MM" are the ones you gave me to produce.
11        THE WITNESS:  Okay.
12 BY MR. WADSWORTH:
13    Q   So this is an email chain between you and Mike,
14 correct?  I'm sorry, between you and Scott Erickson,
15 correct?
16    A   Yes.
17    Q   Have you seen this email before or these emails?
18    A   Yes, I have seen this.  I obviously did.  It was
19 sent to me.  I just don't recall.
20    Q   This is you requesting sales dates for the engine
21 orders, correct?
22    A   Correct.  Which post dates the email you previously
23 sent me by six days.
24    Q   It does.
25    A   That was probably the day I first heard the name

1 Joe Perkins, because as of June 20th, it was just Baron
2 engines.
3    Q   Before June 26th, you didn't know Joe Perkins'
4 name?
5    A   I did not.  The only engines that were before me
6 were Jim Rice and Steve Purvis (phonetic).
7    Q   And what is the significance of the sales dates?
8    A   Like I previously explained, there was no way of
9 tracking the job internally in the shop.  So when you -- all
10 the paperwork needs to be congruent with the whole project.
11 When you buy a part, you use a part, you have to have some
12 method of internally tracking where the parts goes.  Without
13 an accounting system at the shop or a work order number, I
14 had to use some number to track the activities of an
15 engine.
16    Q   Just to kind of get into the process a little bit,
17 once you had a sales date, internally, how long would it take
18 you to overhaul and return an engine to service?
19    A   Depends on the conditions of the engine and depends
20 on the nature of what the customers wanted.  So if an engine
21 came in -- these were outright sales, but if an engine came
22 in for overhaul, you have to take it apart and find out what
23 is wrong, and you have to go find the parts.  It could be
24 anywhere from three to five weeks on a really good case, and
25 it could take as much as eight to ten weeks on one that

1 required a lot of extra work. It just depends.
2   Q   Those estimates you gave me relate to overhauls
3 rather than sales, correct?
4   A   Well, a sale is a point of sale. The engines that
5 were outright sales to Joe and Rice, those were overhauls, as
6 well, but we had an engine core on hand to overhaul. We
7 didn't have to wait for their engines to come in, tear them
8 apart and investigate them.
9   Q   If you had an engine core on hand, would that reduce
10 the amount of time needed?
11   A   It could. Depending on the nature of the core and
12 when you take that apart. The difference being that you have
13 it on hand and you can start immediately, theoretically, but
14 that is based on the workload at the shop, as well. Flow
15 control through the shop can be important. That was one of
16 the things I remarked on unrealistic expectations. Clearly,
17 I'm hit with four engines that one date.
18   Q   If you had four engines that are in various states
19 of repair as of June 26th -- and, I mean, you know what kind
20 of engines these are -- are all of them similar twin engine
21 sort of overhauls?
22   A   All 520 and 550 series engines, regardless of what
23 they are installed in, are fundamentally identical.
24   Q   If you have four of these 520 and 550 repairs, how
25 long do you think it's going to take to get them out the

1 door?
2   A   It's a function of manpower and parts availability.
3 If there is 200 man-hours, which is approximately what is
4 required to overhaul an engine, everything being normal,
5 divide the man-hours up by the staff you have, and that's how
6 long it would take.
7   Q   It would take approximately 200 man-hours to
8 overhaul each of these engines?
9   A   Correct, without any unforeseen circumstances that
10 would require something outside of a normal overhaul. A bad
11 crankshaft, something broken that you have to find. That
12 type of thing.
13   Q   You testified earlier, I'm trying to remember, did
14 you say you had about five or six mechanics on staff?
15   A   It varied. When we started, we had only four.
16   Q   So that would be about five -- I'm sorry, it would
17 be about a week and a half, if you were working full time on
18 one engine, correct?
19   A   Yes. Not including the time it takes if you're
20 outsourcing some machine work, waiting for that to come back.
21 So if you had a start date and you called to order a part and
22 it's not available, that goes into the time equation.
23   Q   So the --
24   A   The man-hour requirement is not a function of the
25 calendar at that point, if you understand my meaning. There

1 could be 200 man-hours in an engine dispersed over four, five
2 or six weeks, depending on the requirements to get the engine
3 returned to service.
4   Q   What were you outsourcing?
5   A   If need be, anything that we couldn't do in-house.
6 All the machine work was outsourced, we didn't do complex
7 machine work in-house, which is typical of almost every
8 engine shop in the United States. There are speciality shops
9 for machines.
10      For instance, cylinders were overhauled by an
11 entity. If there were some complex machines. We outsourced
12 anything that wasn't covered in the overhaul manual. On a
13 case-by-case basis, that could be small or large things.
14   Q   For the purpose of Joe Perkins' engines,
15 specifically, what was outsourced?
16   A   We outsourced some magnetic particle inspection; we
17 outsourced the cylinder overhauls; we outsourced cam lifter
18 grinding. Anything that you see in the logs that have a
19 yellow tag were outsourced.
20   Q   The yellow tag means it was outsourced, and what tag
21 meant it was done in-house?
22   A   The remainder of the work, if there was no proof of
23 it being outsourced, was done in-house. There are other
24 forms -- the yellow tag is a slang. A specialty inspection
25 from an entity approved to do an inspection is the same

1 thing. So you will see in there there are fuel pumps that
2 were overhauled, Magnetos that were overhauled.
3      So, for instance, we wouldn't do complex crankshaft
4 grinding; we wouldn't do crankcase board; we wouldn't do
5 cylinder overhaul.
6   Q   Who did the crankshaft grinding?
7   A   It didn't need any grinding. It's only done as
8 required, as I mentioned before. If it doesn't need it, we
9 don't do it. It's not a standard operation. It's a
10 requirement to be done if needed.
11   Q   In this case, there was no crankshaft grinding
12 done?
13   A   The shafts were perfect.
14      MR. WADSWORTH: We will mark, as Exhibit 3, another
15 email between Scott and the people at Matrix.
16      (Moore Exhibit 3 was marked
17      for identification.)
18 BY MR. WADSWORTH:
19   Q   Do you know Kim Hines is?
20   A   I do. That's Joe's assistant.
21   Q   This is, again, another email that you weren't
22 copied on, but you see where it says that "everything is
23 moving. It should be finished next week."
24      Did you tell Scott Erickson the engines would be
25 finished by the end of July?

Page 34

1    A    No, never.  You can see by the logbook entries and
2  the dates of the components in the logbook entries, I didn't
3  even have parts.
4    Q    Where would he get this idea?
5    A    I have no idea.
6    Q    Did Scott Erickson often tell you things that
7  weren't true?
8        MR. HEISTERHAGER:  Object to the form.
9        You can answer.
10       THE WITNESS:  I have no idea if he lied to me or
11  not.  I have suspicions, but that's only suspicions.
12       MR. WADSWORTH:  I'm going to mark, as Exhibit 4, an
13  email that you were copied on from August 16th.
14       (Moore Exhibit 4 was marked
15        for identification.)
16  BY MR. WADSWORTH:
17    Q    Mike, do you remember this email?
18    A    Vaguely.
19    Q    In the bottom one, Joe says that (As read) "I
20  understand August 26th is the target date for us to begin
21  hanging the engines and making the plane airworthy."
22        What does that mean, "hanging the engines"?
23    A    Installed.
24    Q    Would the engines have to be done before they were
25  installed?

Page 35

1    A    I beg your pardon?  Can you repeat that?
2    Q    Would the overhaul be complete before the --
3    A    They --
4    Q    -- engines were installed?
5    A    -- would have to be.
6        THE REPORTER:  Counsel, I am not getting the end of
7  your questions.
8        MR. WADSWORTH:  If you could try to wait until I
9  finish my question before you begin your answer and I will
10  try to wait, as well.
11    Q    The question was, would the engine overhaul be
12  complete before they were installed?
13    A    It would have to be.
14    Q    So where would Joe get the idea that August 26th was
15  the target date?
16    A    Per the way it's read, it says, "I understand that
17  August 26th is the target date," so apparently somebody told
18  him that.
19    Q    Would you have told him that?
20    A    I would not have.
21    Q    As of August 16th, if you had to have guessed what a
22  realistic target date for installation would have been, what
23  would your guess have been?
24    A    I have -- I have -- are you saying retrospectively,
25  what would I would be guessing, or --

Page 36

1    Q    At the time, if somebody asked you on August 16th.
2    A    The installation of the engines would be precluded
3  by them being completed.  You can't complete them without
4  parts.  You can look in the logbook entries and see clearly
5  that some of the parts didn't arrive until late August or
6  September.  I can't hang an engine without the parts to
7  finish the engine first.
8    Q    You can't spend the 200 man-hours required until you
9  have the parts in order to complete the labor, correct?
10    A    Correct.
11       MR. WADSWORTH:  I will mark, as Exhibit 5, another
12  email from August 26th.  This is from Dale Erickson.
13       (Moore Exhibit 5 was marked
14        for identification.)
15  BY MR. WADSWORTH:
16    Q    Do you know who Dale is?
17    A    I do.
18    Q    He is sending this to Earl Ramey and cc'g you.
19        Do you remember this email?
20    A    I'm not recalling it yet, but I'm reading it, so.
21    Q    There is also some on the back.
22    A    I don't recall, probably because I was cc'd or
23  something.  Again, there is a certain amount of
24  administrative work that Scott was supposed to handle on his
25  own and not be plaguing us to do in the engine shop.

Page 37

1    Q    Did Earl handle administrative stuff for you?
2    A    No, sir, Earl was an engine builder.
3    Q    Let's take an aside.
4        Tell me about Earl Ramey.
5    A    Earl was a veteran NASCAR engine builder, probably
6  one of the winningest NASCAR engine builders in recent
7  history.  He is very good and very diligent.  He is good at
8  what he does.
9    Q    Before he started working for you, did he have any
10  experience with airplanes?
11    A    He did not, but I had worked with him on race-engine
12  stuff, so I knew of his experience.
13        Understand, there is a qualification element to the
14  certification of an aviation entity.  You can possess an A&P
15  license.  In the eyes of the FAA you would be certified, but
16  you're not qualified.  Earl was overly qualified.  The fact
17  that it's a piston engine for an airplane versus a car does
18  not change the nature of his abilities.
19        Scott hired Earl on the recommendation of me to
20  assist me in building these engines.
21    Q    So he would be qualified, just not certified?
22    A    That's correct.  Just like the factory.  The people
23  that work on the factory floor at Continental are qualified
24  to do their job, but certainly not certified.
25    Q    And how long have you known Earl Ramey?

1    A   Oh, I will guess seven or eight years.

2    Q   From today or from 2013?

3    A   From today.  At least seven or eight years.  Yeah,

4  eight years from today.

5    Q   How did you first meet him?

6    A   Through a friend at a machine shop where we built

7  engines.

8    Q   What drivers did he work for?

9    A   He owned his own team, but just about every truck

10  and Bush team there were at one time.  He didn't work for a

11  driver.  He sold engines to teams.

12    Q   On the back of Exhibit 5, there is a Genesis Engine

13  Weekly Purchase List.

14    A   Uh-huh.

15    Q   Did you ever fill out a form that looked like

16  that?

17    A   I did not.

18    Q   And this says on the back, "Date purchased for

19  Joe Perkins July 6, 2013.  Date promised August 9, 2013."

20        Do you know whether these are just examples, or do

21  you think that that --

22    A   I honestly don't recall ever reading the email.

23  Dale was Scott's dad, who I would occasionally get emails

24  from, but it was more of a distraction.  So I didn't pay any

25  attention to Dale Erickson.

1    Q   What you mean is, several parts would be imprinted,

2  correct, with the part number?

3    A   Depends.  Some are, some are not.  In fact, some are

4  serialized, some are not.

5    MR. WADSWORTH:  I will mark, as Exhibit 6, an email

6  between, looks like, you and Peggy Hargreaves.

7        (Moore Exhibit 6 was marked

8        for identification.)

9  BY MR. WADSWORTH:

10    Q   Do you know who Peggy is?

11    A   Uh-huh.  She was Scott's assistant.

12    Q   What was her role in rebuilding the engines?

13    A   None.

14    Q   Did she help you, though, with some administrative

15  tasks?

16    A   The help we needed for administration to run the

17  engine shop was not the help she was able to provide.

18    Q   What sort of help was that?

19    A   Well, we needed an accounting, a numbering, a

20  traceability or tracking system.  You know -- and, so, in

21  short of not having that, that's why I used the dates from

22  when I received the order when I was told there was an engine

23  sold.  I was left to tracking it on my own.  We asked for it,

24  but we didn't get it.  Back to my fundamental disagreement

25  with the way he runs the business.

1    Q   At this point, was there accusations coming from the

2  Minnesota part of D'Shannon that you all weren't completing

3  the engines on time as promised?

4    A   That was coming from the customers, such as Joe.

5  Scott made a promise he couldn't keep, and he let the noose

6  fall on our necks.

7    Q   Did Scott tell you you were not working fast

8  enough?

9    A   No.  Not that I recall.  He would say he would like

10  to have something sooner.

11        Understand, a 50-cent screw could preclude an engine

12  from being completed.

13    Q   How so?

14    A   If it's required and you don't have it, the engine

15  is not complete.  If I have an engine assembled and I'm

16  waiting on one last part to say it's complete, then it's

17  incomplete.

18    Q   You couldn't go down to Lowe's or Home Depot and

19  pick up that screw?

20    A   Of course not.  It would have to come from certified

21  sources.

22    Q   The parts have to have FAA traceability, correct?

23    A   Some have FAA traceability, but things such as bolts

24  don't have FAA traceability, but there are ways to identify

25  them that they are, in fact, approved hardware.

1    Q   In the last paragraph of the email it says, (As

2  read) "Please note that Scott has told me to relate to you

3  guys that he is not paying for over 40 hours."

4        What does that mean?

5    A   We were working 60 and 80 hours a week to get things

6  done.  We had to be very careful.  You can't come back in

7  dragging tired.  We would work seven days a week sometimes --

8  sometimes -- to try to catch up with schedules, mostly

9  because we needed to get Joe's done.  There were other engine

10  customers in the loop, as well.  He would establish, well, I

11  need these engines by this day, but we are not paying more

12  than 40 hours.

13    Q   Did he ever cut some of your bills?

14    A   Be specific.

15    Q   If you billed 60 hours in a week, would he ever only

16  write a check for 40?

17    A   There were times I didn't get paid at all.

18    Q   It's basically -- I want to understand your

19  testimony.  He is only paying you for 40 hours in a week, and

20  there was no way to complete the engines in a timely manner

21  in the time that he promised in 40 hours a week; is that

22  correct?

23    MR. HEISTERHAGEN:  Objection to form.

24        You can answer.

25    THE WITNESS:  Let's take a look at that.  When we

1  talk about that 40-hour work week, in a shop environment you
2  have about a 70-percent productivity rate, which is average.
3  An employees is going to the bathroom, have a Coke.  Of a
4  40-hour work week, 30 hours are productive.  In order to get
5  40, 50 hours' worth of billable time, you know as an
6  attorney, you might have to work 10 or 15 percent more than
7  that.
8      When you have a job that takes 200 man-hours to do
9  and you throw in the fact you can't work, and you don't get
10  paid, and we can't get parts, that stretches the job out.
11  Those are factors that go into the timeline I gave you.
12  BY MR. WADSWORTH:
13  Q   What you provided to D'Shannon, was that only your
14  billable time or was it all time that they were in the
15  shop?
16  A   No.  If we worked, we were there, we expected to be
17  paid.
18  Q   So it was like clocking in and clocking out, rather
19  than, I worked 0.3 hours for Joe on this date, correct?
20  A   If we didn't work, we didn't bill it.  We worked a
21  minimum of 40 hours a week, and a lot of times we would
22  continue to work 50 and 60 hours a week with the assumption
23  we were not going to get paid for it.
24  Q   Is that part of what led to the breakup with
25  D'Shannon?

1  A   Again, like I mentioned, unrealistic expectations.
2  Q   Which included underpayment?
3  A   Not getting paid didn't slow me down.  It didn't
4  slow anybody down.  They all continued to work.
5      MR. WADSWORTH:  I will mark the September 2nd email
6  as Exhibit 7.
7      (Moore Exhibit 7 was marked
8      for identification.)
9  BY MR. WADSWORTH:
10  Q   Mike, have you seen this email?
11  A   I may have.  It has been so long, I don't
12  remember.
13  Q   Scott says, (As read) "We are all in agreement on
14  Mike and his arrival the week of September 9th."
15      Did you --
16  A   I don't see that.
17      MR. HEISTERHAGEN:  Let him ask his question.
18  BY MR. WADSWORTH:
19  Q   Right here at the top.  (As read) "I left you a
20  voicemail" --
21  A   Okay.
22  Q   -- "that we were all in agreement on Mike and his
23  arrival the week of September 9th."
24      Had you made plans to go Tuscaloosa on the week of
25  September 9th?

1  A   I don't remember the dates, but I coordinated with
2  Joe to bring his engines down and install them when they were
3  done.
4  Q   We will get into the engine logs in depth, but were
5  the engines done as of September 2nd?
6  A   I don't remember.  I would have to look and see.
7  They were maybe being finished at that point.
8  Q   We will get into that in a bit.
9      So it's possible that they were done, you just can't
10  remember.  One might have been in the process --
11  A   One might have been finished, but I don't recall the
12  dates because it has been years.  I didn't author that email.
13  So, at that point, I wasn't making any promises to anybody on
14  deliverables.  What I maintained was, when the engines were
15  done, then they were done.
16      MR. WADSWORTH:  I will go mark, as Exhibit 8, an
17  email from Bob Kobielush.  I will let you review that.
18      (Moore Exhibit 8 was marked
19      for identification.)
20  BY MR. WADSWORTH:
21  Q   While you're doing so, do you remember who
22  Bob Kobielush was?
23  A   I do.
24  Q   Who was Bob Kobielush?
25  A   Scott's father-in-law.

1  Q   What was his job with D'Shannon?
2  A   Nobody really knows.
3      MR. WADSWORTH:  Let's take a real quick five-minute
4  break.
5      (Recess.)
6  BY MR. WADSWORTH:
7  Q   When we left off, I handed you Exhibit 8 and I asked
8  about Bob.  You said that he was Scott Erickson's
9  father-in-law, correct?
10  A   Correct.
11  Q   Do you remember why he was brought into the
12  process?
13  A   I was never given anything specific, but I believe
14  it was an attempt to try to aid Scott with some
15  organization.
16  Q   What sort of organization?
17  A   To help streamline things through the shop.
18  Q   Your shop?
19  A   D'Shannon's shop.
20  Q   So just generally -- okay, "D'Shannon's shop,"
21  meaning what?
22  A   D'Shannon Aviation's engine shop.
23  Q   The one that you were running in Morrisville,
24  though, correct?
25  A   Correct.

Page 46

1  Q   Why did it need streamlining?
2  A   It was his impression it needed streamlining.  We
3  didn't have any streamline issues, we had parts-interruption
4  issues.
5  Q   Did Bob say that Scott thought that you all were
6  running slow?
7  A   I don't know what Scott told Bob.  Bob was very
8  nice, I would say, in his approach to try to find solutions
9  to what he believed were problems reported to him by Scott.
10  Q   What sort of problems were being reported to him by
11  Scott?
12  A   I have no idea, but that was his approach to solve
13  those problems.
14  Q   So he told you, I need to -- I'm trying to
15  understand.  He told you, I'm here to solve problems, but I'm
16  not going to tell you what the problems are; is that fair?
17  A   No.  He said, I'm here to solve problems, and I'm
18  sure that remark was based on whatever problems Scott told
19  him.  He didn't say.  He said, I'm here to try to help you
20  guys.
21  Q   Bob is not a mechanic, is he?
22  A   I think he is a preacher and he ran church-based
23  camps.
24  Q   So was Bob helpful when it came to your process of
25  putting these engines together?

Page 47

1  A   No, he wasn't.  He was not a mechanic, so he didn't
2  help the process of putting engines together, no.
3  Q   How did Bob try to help you on your end?  What
4  advice would Bob give you?
5  A   Bob was trying to see what our reality was so that
6  he could, I guess, consult with his son-in-law to give us
7  better support.
8  Q   Did you ever see any better support as a result of
9  Bob's efforts?
10  A   I departed in the same time frame just as Bob showed
11  up.
12  Q   It says, (As read) "Glad to see that most of, in
13  fact nearly all the work relates to getting the engines out
14  the door despite interruptions."
15      Is that referring to your work getting engines out
16  the door?
17  A   Um, I'm not seeing that.
18  Q   At the very top email up here.
19  A   There we go.  Okay.
20      So what was the question regarding that?
21  Q   Do you know what he is saying when he says, "Glad to
22  see that most, in fact nearly all the work relates to getting
23  engines out the door"?
24  A   That's where all of our work was in the first place,
25  it was our job to get engines out the door, not deal with

Page 48

1  customers or flow interruption with parts.
2  Q   Did you receive calls from customers, other than
3  Joe Perkins?
4  A   Yes.
5  Q   Were all of those customers upset?
6  A   They were.
7  Q   Why were they upset?
8  A   Apparently they were told one thing and the outcome
9  was something else.
10  Q   The thing that they were -- regarding the delivery
11  deadlines?
12  A   Yes.
13  Q   So, as best as you could figure out, all of these
14  customers were told by Scott Erickson that the engines were
15  about to be delivered when, in fact, they were in various
16  states of the overhaul, and they weren't about to be
17  delivered, correct?
18  A   I would assume that would be the story, but I don't
19  know what the actual content of that would be.  I'm sure it
20  was on a broken-delivery promise.
21      MR. WADSWORTH:  I will mark, as Exhibit 9 --
22  A   Actually, before I do, what is Scott Erickson's
23  knowledge of the engine-rebuild process?
24  A   Scott's actually very sharp.  He was explaining a
25  lot about the engine overhaul process, and he has been in the

Page 49

1  business his entire life.  For the most part, he has a very
2  good understanding, but, for the details of it, he probably
3  lacked that understanding at the time he opened the shop.
4  Q   The details being --
5  A   He realizes there is a dollar value and an end
6  product, but the actual amount of work it takes to get to the
7  product, he may not have totally understood.
8  Q   So Scott would understand the design, correct?
9  A   He has been in the business of selling engines for a
10  long time.  They might have been factory (inaudible) or a
11  deal with another engine shop or something.  He knows the
12  engine-delivery business.  He knows what it takes.
13  Q   Would Scott be able to show up in your shop and have
14  been a contributing member of the --
15  A   No, no, he is not a mechanic.  He could have been
16  administratively.
17  Q   In terms of doing what Earl Ramey does, that is not
18  what Scott --
19  A   Scott is not a mechanic.
20  Q   -- does, correct?
21  A   Correct.
22  Q   Did Scott provide you with the specifications for
23  what parts would go in the engine?
24  A   No.  The manufacturer does.
25      MR. WADSWORTH:  Let's take a look at Exhibit 9.

1 This is another Bob Kobielush email chain.

2       (Moore Exhibit 9 was marked

3       for identification.)

4 BY MR. WADSWORTH:

5   Q   Feel free to look over this and tell me if you

6 remember this email.

7   A   Vaguely.  It looks like I cut and pasted something

8 to him, but, again, it has been three years.

9   Q   What does this email concern?

10   A   I haven't read it all, but looks like I explained to

11 him what I needed to do to run an engine before I return it

12 to service.

13   Q   Does this relate to the engine stand that we

14 referred to earlier?

15   A   It refers to any engine returned back to service.

16 So, in this case, it's probably with the engine stand.

17   Q   This is September 10, 2013, correct?

18   A   Yes.  I asked for specific stuff.  I couldn't get

19 it.  I had to -- I wanted things that were elaborate and

20 nice, and I had to go back with simple stuff.

21   Q   Did you believe that the stuff that you used was

22 adequate?

23   A   Oh, of course.

24   Q   We have an email at the bottom of the first page

25 that says, (As read) "Mike, Holy, blank, this is serious."

1 Just a bunch of random letters.

2       Do remember what it was that grabbed his attention

3 as being serious?

4   A   I explained to him the things -- it says, (As read)

5 "Bob, you were asked what has to be done at a minimum, so

6 here you go."

7       I explained to him what I needed.  I had a lot of

8 these tools and instruments myself, but I didn't believe it

9 was my responsibility to supply them to the company, and if

10 he wanted to be in the engine business, that he needed to buy

11 these things for the company and not use my stuff.

12       So before having all the nice electronics, which

13 aren't required for an oil pressure gauge, I used mechanical

14 oil pressure gauges, the same thing that would have been in

15 Joe's airplane.

16   Q   Bob was, at this point, still going back and forth

17 trying to figure out what you need to have an operational

18 repair station for D'Shannon?

19   A   For operation of what?

20   Q   Operational repair station; is that --

21   A   I don't know what they -- Bob was trying to get us

22 the things we needed from Scott.  Whether that was towards

23 the repair station, at that point, regarding this email

24 specifically with me explaining to him what I need to

25 legally -- it says right here, (As read) "I can't release an

1 engine unless these things have been accomplished."

2       MR. WADSWORTH:  I will mark, as Exhibit 10, another

3 email chain between you and Scott, with Bob and others

4 copied.

5       (Moore Exhibit 10 was marked

6       for identification.)

7 BY MR. WADSWORTH:

8   Q   The very first email on the chain on the bottom of

9 the second page says, (As read) "Scott, Perkins' engines

10 won't be ready to run tomorrow, so I would not spend the

11 money for UPS overnight shipping for fuel systems.  UPS

12 ground will be fine."

13       First question:  What are the fuel systems he was

14 sending you?

15   A   If you read the next one it says, They will go from

16 Michigan.  So we sent the fuel control units sometime prior

17 to this to a place in Michigan to be overhauled.  We had sent

18 them a long, long time prior to this, but they had not been

19 returned.

20   Q   (As read) "It looks like the Perkins engines won't

21 be ready to run even with" --

22   A   I believe the "s" on engines is a typo.  I believe

23 one was run at that point, and this was the second one.

24   Q   Do you remember --

25   A   They were three or four weeks apart from one being

1 finished to the next one.

2   Q   My question is, do you remember why the engines, be

3 it one or both, wouldn't have been ready to run as of

4 September 11th?

5   A   It says here, the fuel parts.  (As read) "I will not

6 spend the money for UPS overnight for the fuel systems.  UPS

7 ground will be fine."

8       It's contingent on those parts and possibly some

9 other parts.  The genesis of the email is, don't overnight a

10 part for intended use for tomorrow when I won't be ready to

11 use them tomorrow.

12   Q   So it would be your guess there were other parts

13 that weren't ready to run, in addition to the fuel --

14   A   That's apparently what the genesis of the email is.

15 It has been three years.  I can't remember all the specifics,

16 but I'm telling him, don't spend overnight shipping for

17 something to arrive.  I won't be ready to run the engine

18 anyway.

19       MR. WADSWORTH:  I will mark, as Exhibit 11, an email

20 chain, and the part I want you to focus on is on the back

21 page of this.

22       (Moore Exhibit 11 was marked

23       for identification.)

24 BY MR. WADSWORTH:

25   Q   Let me ask you, do you remember this email?

Page 54

1    A   I do.  There was a nut on the outside of the engine
2  that we found cracked after the engine had run.  It was a
3  cylinder hold-down nut.  We believed that the nuts were
4  possibly manufactured incorrectly.  I had never seen it
5  before.  So we ordered replacements and changed them.
6    Q    The hydrogen embrittlement, would that have been
7  something that would have been due to treating at you-all's
8  end, or treating at the manufacturer's end?
9    A   The Manufacturer.
10   Q    Let me get this question prefaced.
11       I'm sure that you know that the allegations in this
12  case are that two crankshaft bolts broke and were found in
13  the oil sump with the lock wire still attached.
14       Would these have had the same process done to
15  them?
16   A   No.  The bolts in the crankshaft are a different
17  material and a different bolt all together.
18   Q    For whatever reason it failed, it wouldn't have
19  anything to do with hydrogen --
20   A   I can't attest to that.
21   Q    Without having seen it.
22   A   You're comparing apples and oranges.  These bolts
23  are external and they are cad plated for corrosion prevention
24  inside the engine.  There is no plating on them because they
25  are exposed to engine oil.  I can't attest to what caused the

Page 55

1  bolts to fail.  I have never even seen them.
2    Q    This one you did see, and your best guess is it was
3  hydrogen embrittlement?
4    A   That's what it was, a guess.
5    Q    What steps did you take to fix this problem?
6    A   We replaced them all.
7    Q    Every bolt?
8    A   Every one of the nuts.  We ordered all new nuts.
9  One of the nuts broke.
10       MR. WADSWORTH:  I will mark, as Exhibit 12 --
11   Q    Real quick, Exhibit 11 was dated September 17, 2013,
12  correct?
13   A   Yes.
14   Q    What was the status of the engine when this bolt
15  broke?
16   A   You know it had run and was ready to deliver, I
17  believe, or it was ready to run.  I don't recall.  It has
18  been a long time.
19   Q    Do you remember whether it was one or both of
20  them?
21   A   One or both what?
22   Q    Engines.
23   A   That was only related to one engine.
24   Q    Do you know whether the other engine was ready to
25  run as of this time?

Page 56

1    A   I don't.  I don't remember the specific dates.
2        MR. WADSWORTH:  We have the logbooks.  We will go
3  through that in a bit.
4        For Exhibit 12, we have an email from Scott to Joe
5  that you're copied on.
6        (Moore Exhibit 12 was marked
7        for identification.)
8  BY MR. WADSWORTH:
9    Q    Do you remember these emails?
10   A   Not exactly.  I have read it, but it's not jumping
11  out at me.
12   Q    Look over it for a few minutes.
13   A   Yeah, I don't recall -- if it wasn't pertinent to
14  something -- I'm not recalling at the email.
15   Q    From your conversations with Joe Perkins, do you
16  know when he expected his engines to be delivered?
17   A   I don't know what Joe's expectations were based on
18  what somebody else was telling him.
19   Q    He never told you, I was expecting them by this
20  date?
21   A   He conveyed several times what Scott had told him,
22  because the relationship was bad at that point.  So all I
23  told Joe was that I would stay in contact with him and keep
24  him abreast of progress.
25   Q    You don't know what date Scott told him?

Page 57

1    A   I don't.
2    Q    It says -- the last paragraph on the first page
3  says, (As read) "in a constant effort to be transparent, I
4  believe this is the reality of the timeline.  Losing Mike for
5  a few days last week really hurt.  I apologize sincerely for
6  not making the Thursday delivery as we truly believed that
7  was attainable."
8        Do you know what he was talking about?  Were you out
9  the previous week, if you remember?
10   A   I had probably taken a day or some time off.  I
11  don't remember.  He made reference that I was in Kentucky, so
12  I was probably visiting my mother.
13   Q    Did you remember there being a deadline of
14  Thursday --
15   A   I maintained the whole time that the engines would
16  be ready when I have all the parts and they were successfully
17  run.  Whatever date that is, that is, and I maintained to Joe
18  I will do my best that I could to get that, short of me
19  buying the parts myself, which I was not in a position to do.
20  When I got all the parts and the engine successfully run, I
21  would deliver the engines.
22       All these other promise dates with Scott are
23  inconsequential.  I didn't make those promises to anybody.  I
24  didn't have the wherewithal to make the promises.
25   Q    You made no promises to --

1    A   I made no promises. I'm not in a position to do
2    that. I'm not in control of the parts, I'm not in control of
3    the money, and apparently, at that point, you can see I'm not
4    in control of the labor either.
5    Q   How do you mean you're not in control of the
6    labor?
7    A   He limited 40 hours, as not being paid, then people
8    might not want to work.
9        I made no promises to Joe as to delivery, other than
10   as soon as they were done and they were right, I would
11   deliver them.
12       MR. WADSWORTH: I will mark this as Exhibit 13.
13       (Moore Exhibit 13 was marked
14       for identification.)
15       MR. HEISTERHAGEN: Are you going to ask him about
16   the pictures in the email?
17       MR. WADSWORTH: Yes.
18       MR. HEISTERHAGEN: We have some more in addition to
19   that, so let me give those to you.
20       MR. WADSWORTH: My questions on the pictures aren't
21   detailed, but I will take what you have.
22       Are these pictures produced as part of Mike's
23   production or --
24       MR. HEISTERHAGEN: Yes. These are going to be --
25   they are pictures I just had printed off.

1        MR. WADSWORTH: But were these the ones that were,
2    like, previously Bates labeled --
3        MR. HEISTERHAGEN: No, no. These are new. They
4    encompass some of the pictures on 109, and I meant to give
5    them to you at the beginning of the deposition.
6        MR. WADSWORTH: Okay. Sure.
7        Mike, we are going to get into the details of these
8    pictures your counsel has handed me in a bit, maybe after a
9    break, but I have just been handed Bates-labeled MM376
10   through 400. I have a couple of questions about the
11   pictures, generally.
12   Q   Mike, what are these pictures?
13   A   They were taken by a photographer for Scott's
14   advertisement for his website.
15   Q   When were they taken?
16   A   During the build process of Joe's engines, I
17   believe. One of them shows a date, a tag, and there is
18   "Perkins" written on some stuff. So I believe those to be
19   Joe's engines.
20   Q   Do you believe all of these parts went into Joe's
21   engines?
22   A   Well, no, there are parts in the pictures that don't
23   go to the engines, but -- for instance, there is a shot with
24   four or five crankshaft gears. Only one goes in.
25   Q   Are you referring to 381?

1    A   If you look, there are two sets of crankshaft gears.
2    That's to show how clean they were maintained.
3    Q   All of these parts are pre-installation, correct?
4    A   Correct.
5    Q   And these pictures were taken in the
6    August/September time frame of 2013?
7    A   From the time we opened the shop to the time I left
8    the shop, somewhere in that time. I don't remember the exact
9    dates.
10   Q   You said these were taken for promotional purposes,
11   correct?
12   A   Yes. Scott had a photographer take them for
13   promotional purposes. It just so happens that one of them I
14   believe to be Joe's engines. There is a tag on one of them
15   that is written "Perkins."
16   Q   How did these pictures come to be in your
17   possession?
18   A   I was given them the day they were taken,
19   electronically.
20   Q   We will go through each of these in turn in a bit,
21   just to figure out which parts, you know, you believe belong
22   to Joe's --
23   A   You will see one labeled "Baron." That is the only
24   Baron engine rebuild when I was there were Joe's. Some of
25   them might say "Perkins." Those would be relevant, but as to

1    the others, I have no idea.
2        For instance, there is a box with 40 rocker arms in
3    it --
4    Q   We will go through each of them in turn in a bit.
5    It's a little off track from where I was going. Some of
6    these pictures are here on Exhibit 13 --
7    A   Uh-huh.
8    Q   -- do you know when the pictures on Exhibit 13 were
9    taken?
10   A   No.
11   Q   Scott represents to Joe in the top part of the email
12   that they were part of the assembly last week.
13   A   That may be correct. I don't know.
14   Q   It may be, it may not be. You don't know; is that
15   fair?
16   A   It has been three years. I can't attest that the
17   pictures were taken on those dates.
18   Q   Do you know whether the parts that are referenced --
19   the parts that are pictured here, are these all parts of
20   Joe's engines?
21   A   Like I mentioned earlier, some I believe to be
22   Joe's, others are extras going to other engines. I made
23   reference to a box full of rocker arms. I know only 12 would
24   have gone to Joe's. All engines at this stage would like
25   identical. So you could say -- there are all identical parts

Page 62

1 that go on every 550.
2  Q   You were building four 550s at that time; is that
3 correct?
4  A   No. One was already delivered, and Joe's were next,
5 and one was after that in the fall. I don't recall
6 exactly.
7  Q   Are there any of these pictures that you can point
8 at and say that is definitely part of Joe's rebuild?
9  A   There is one with the tag, you can zoom in and see,
10 that's one of Joe's engines. It says --
11  Q   That is at the top of Plaintiff's 110?
12  A   Yes. There is another one you were handed earlier
13 that you said you would address later, and it says "Baron" --
14  Q   Yes. I'm sticking strictly to Exhibit 13 at this
15 point --
16  A   More than likely, you can look at the tag and zoom
17 in on the date and get the serial number on the back of the
18 first page. You can see what serial number and its
19 corresponding logbook entry.
20  Q   Are there any that you can look at and say --
21  A   They were all taken the same day.
22  Q   Are there any pictures in Exhibit 13 that you can
23 look at and say that these were the parts that would belong
24 to multiple engines?
25  A   Not in this picture, no. Like I said earlier, they

Page 63

1 are all the same parts for all 550s.
2  Q   What you can say for a fact about plaintiff's
3 Exhibit 13 is, this is an action shot of the shop, but you
4 can't say these were Joe's engines being worked on in every
5 picture, right?
6  A   That's not what I said. I said, if you zoom in on
7 this and you can read the serial number, you can determine
8 that that was Joe's engine.
9  Q   For that one particular picture?
10  A   They were all taken the same day, and that would be
11 the only engine being built there at that time, so I believe
12 that to be Joe's engine.
13  Q   Fair enough.
14   MR. WADSWORTH: I will mark, as Exhibit 14,
15 Plaintiff's 124.
16   (Moore Exhibit 14 was marked
17   for identification.)
18 BY MR. WADSWORTH:
19  Q   Have seen this email before?
20  A   Yeah, I saw the email.
21  Q   What was the purpose of this email?
22  A   It was my understanding that Joe had withheld
23 payment from Scott to the tune of $225,000, and Scott could
24 not make ends meet, could not pay the guys at the shop
25 without all of the full payment from the customer. So Joe

Page 64

1 came to me and said, I got this, what should I do?
2   I said, Well, I would do it.
3   He even references that, at the urging of Mike and
4 Earl. I think Earl called Joe and said, Can you send money
5 so we can get our paychecks.
6  Q   At that point, D'Shannon was withholding your
7 paychecks?
8  A   He didn't have any money to make the paychecks.
9  Q   Was D'Shannon generally struggling financially?
10  A   I wouldn't think so. He missed paychecks, but he
11 paid them, and he doesn't owe me anything.
12  Q   Does he owe other people some money?
13  A   I have no idea what he owes.
14  Q   So did Joe Perkins ever make payment directly to you
15 and Earl while you all were working on the Baron?
16  A   While we were working on the Baron or working on
17 the engines?
18  Q   On the engines.
19  A   No. The entire engine overhaul was conducted under
20 D'Shannon.
21  Q   He is kind of directing Scott in this email to use
22 the money he was going to pay to help get paychecks cashed,
23 right?
24  A   That's what it says. It says, (As read) "with the
25 hopes on their parts and mine that this transfer will allow

Page 65

1 Earl and others at the shop to get their paychecks cashed."
2  Q   What was the basis for your understanding that Joe
3 had withheld any amount of money?
4  A   There were a lot of things. Timeliness. Joe is
5 incurring the expenses to rent an airplane while his airplane
6 was down.
7  Q   Do you know whether Scott and Joe had any sort of
8 agreement as to whether or not there would be
9 reimbursements for the --
10  A   I know they were negotiating --
11   MR. HEISTERHAGEN: Objection.
12   THE WITNESS: I know they were negotiating, but I
13 don't know of any final decision.
14 BY MR. WADSWORTH:
15  Q   The two were arguing over money, correct?
16  A   That's what I was told, yeah.
17  Q   But you never worked for the accounting or
18 administrative part of the D'Shannon, did you?
19  A   No. As I previously stated, my job was to build
20 engines and build engines only.
21  Q   So, really, the better testimony as to what
22 transpired between Scott and Joe would probably come from
23 Scott and Joe, correct?
24  A   That is between Joe and Scott, not me.
25  Q   You said that -- I guess this email shows that you

1  and/or Earl had contacted Joe about the payment issue; is
2  that correct?
3      A    At that date, I think I'm in Alabama.  I believe I
4  was installing the engines at that time.  I was approached by
5  Joe showing me this email -- of course it was from Joe copied
6  to me -- and there was some discussion.  I don't recall to
7  what extent we discussed it.  But I didn't want to see any of
8  the guys at the shop not get paid, and that's what Joe agreed
9  to do with Scott.
10     Q    Was it just a payroll issue or other things they
11  weren't paying, as well?
12     A    I don't know.  I wasn't involved in the accounting.
13  I don't know anything about their outstanding debts.
14     Q    Well, were you able to keep the lights on at the
15  shop at all times?
16     A    They went off once while I was there, but it might
17  have been an oversight and the bill didn't get paid.
18     Q    That was your understanding, that the bill hadn't
19  been paid at that point?
20     A    Well, you have electricity at your house.  If the
21  power got turned off, what would you think?
22     Q    Fair enough.
23         Were there any other utility-payment issues at that
24  time?
25     A    No.

1      Q    Do you know whether they were making their insurance
2  payments at that time?
3      A    Like I said earlier, I was not involved in the
4  accounting at all.  I have no idea.  We were separated by
5  about 1,300 miles.
6      Q    It's hard to get to Minneapolis, isn't it?
7      A    I have no cause to ever go there.
8          MR. WADSWORTH:  I'm going to mark, as Exhibit 15, an
9  email that I don't believe you are copied on.
10         (Moore Exhibit 15 was marked
11         for identification.)
12  BY MR. WADSWORTH:
13     Q    I want to ask you, have you ever seen this email?
14     A    It -- I -- it doesn't stand out.  I don't recall
15  ever seeing it, but -- I don't remember seeing it, if I did
16  see it.
17     Q    This is Plaintiff's 128.  It says it's from
18  Kim Hines.  The second email on here is the one I'm looking
19  at.  He asks Peggy Hargreaves, (As read) "Do you have the
20  paperwork that we need to certify the engines?"
21         Let me ask you this:  What paperwork is needed to
22  certify the engines?
23     A    I would -- I don't know what they would have been
24  asking for at that point in time.  I really don't.
25     Q    This is a more general question.  In order to

1  certify the engines, like to return them to service, what
2  paperwork would you need?
3      A    Logbook entries.
4      Q    Like repair logs?
5      A    The overhaul entries that are made -- that I signed
6  off to return the engines to service.
7      Q    You would need to have the -- would the logbook
8  entries have to be physically signed?
9      A    They would be.
10         Well, let's make a correction to that.  A record has
11  to be signed.  Whether it's in a logbook or on a piece of
12  notebook paper doesn't matter.  There has to be a record
13  signed by the mechanic to return the engines to service.
14     Q    What would be included in the record?
15     A    A description of the work performed.
16     Q    How detailed?
17     A    As detailed as little or much as you see fit.
18     Q    Would it need a description of the parts --
19     A    It's not required, but it's recommended.
20     Q    You don't know whether this is the paperwork that
21  Kim Hines is referring to at this point or not?
22     A    There was a lot going on between Joe and Scott at
23  that time, so I have no idea.
24     Q    Do you know when the logbooks were signed?
25     A    I signed them the day I finished the work and ran

1  them that they were ready to return to service.
2          MR. WADSWORTH:  I will mark, as Exhibit 16, an email
3  that goes to the insurance issue we were talking about
4  earlier.
5          (Moore Exhibit 16 was marked
6          for identification.)
7  BY MR. WADSWORTH:
8      Q    You weren't copied on this that I see, but have you
9  ever seen this email?
10     A    I recall talking about this with Joe.  Understand
11  that I --
12     Q    What is this?  What did you talk about with Joe?
13     A    Not signing the logbook.  I explained to Joe I would
14  not sign them and release them to him.  We just used the term
15  sign.  I would not release the logbook entries with my name
16  in them until I was cleared that I was indemnified from the
17  liability or insured for the work that I had done.
18     Q    The date on this email is November 18, 2013,
19  correct?
20     A    Correct.
21     Q    I want to make sure.  Your testimony is that, as of
22  that date, you had signed the logbooks --
23     A    Correct.  I had made a record entry that I
24  overhauled engine number, serial number, and serial number,
25  per the recommendations to the FAR, saying they were legit

Page 70

1 logbook entries and signed it, because the plane was intended
2 to be flown.
3    Q   You had not released the logbooks, had you?
4    A   No.
5    Q   Why had you not released the logbooks?
6    A   As I previously stated, I would not release them, as
7 I previously stated, until I was either indemnified by any
8 liability from Joe or coverage by Scott from Scott's
9 insurance.
10    Q   Is that ultimately the wedge that was -- that kind
11 of ended your relationship with D'Shannon?
12    A   The insurance?
13    Q   Yes.
14    A   I would say that would be the straw that broke the
15 camel's back. Ultimately at the end of the day he could run
16 the business however he wanted, as long as the work was done
17 in accordance with regulations and I was insured with it, I'm
18 fine with that.
19    Q   Do you remember when you released the logbooks?
20    A   They were the following spring after all of the work
21 was done, and after Joe sent me an email saying he would
22 indemnify me from any liability. When he said that, I
23 thought it was safe to release the logbooks.
24    Q   Did you ever receive any letter like that from
25 Joe Perkins?

Page 71

1    A   No. He told me he would provide it at any time I
2 wanted it, in many discussions thereafter. I trusted him,
3 and I didn't feel it was necessary.
4    Q   This is the first I'm hearing about this.
5        What was the scope of the indemnity supposed to
6 be?
7    A   There is an email to that content that you may have
8 had that says -- Scott -- after I refused to release the
9 logbooks, Scott had another mechanic that agreed to sign
10 them. Joe sent me an email wherein Scott said, If Mike won't
11 provide you the logbooks, I will. Joe sent me an email that
12 says, I would prefer you sign them, and I would indemnify you
13 or provide you with whatever you need to indemnify you from
14 any liability.
15    Q   You all never reduced any indemnification to writing
16 on --
17    A   We were social and friends at the time, I didn't
18 feel it was necessary. I trusted him.
19    Q   This appears to be a letter from Scott Erickson to
20 Joe Perkins. I'm not sure this was ever actually sent to Joe
21 Perkins. If you take a look, it's dated March 24, 2014, and
22 in the second sentence of the paragraph it says, (As read)
23 "John Clegg our director of operations will generate the
24 necessary sign-offs to make the engines legal."
25        Is that what you were referring to earlier --

Page 72

1    A   Correct.
2    Q   He would be the one who would sign off on the engine
3 if you didn't --
4    A   It was purely ethics. I didn't want to release the
5 logbooks unless I was indemnified from the liability, which
6 is what the insurance does, covers the liability in the first
7 place. So I was going to have one or the other. So he
8 offered to have another mechanic sign it, which Joe declined
9 and said, I would rather you do it.
10    Q   Do you believe Mr. Clegg was able to sign off on the
11 logbooks?
12    A   Able as he could write with a pen, he was physically
13 able to sign.
14    Q   My question was different than that.
15        Was he legally able to sign the logbooks?
16    A   I don't know if he was or not. That would be a
17 question for the FAA.
18    Q   As of March 2014, your relationship with D'Shannon
19 was over?
20    A   Mine was over as of the date I left to go to Alabama
21 with those engines.
22    Q   When was the last paycheck you received from
23 D'Shannon?
24    A   I don't remember. He continued to pay me some of
25 the expenses that I incurred for quite sometime. A couple of

Page 73

1 months. Three months after.
2        MR. WADSWORTH: That will be Exhibit 17.
3        (Moore Exhibit 17 was marked
4        for identification.)
5        MR. WADSWORTH: I will mark, as Exhibit 18, an email
6 you sent to Scott Erickson, dated December 18, 2013.
7        (Moore Exhibit 18 was marked
8        for identification.)
9 BY MR. WADSWORTH:
10    Q   Have you seen this email before?
11    A   I believe I authored this email.
12    Q   Do you remember it?
13    A   I remember it clearly.
14    Q   What was the purpose of this email?
15    A   To -- there was a negotiation on the table for Clegg
16 to sign -- between Scott and Clegg and Mr. Perkins -- to have
17 Mr. Clegg sign the logbooks. Ethically I disagreed with that
18 and I believed he should just provide the insurance.
19        This was simply quoting the regulations as I
20 interpreted them, as I believed they applied to the
21 situation. Just cited chapter and versus of the regs as they
22 applied to the situation. I also had to explain, me not
23 releasing Joe's logs was not an effort to do anybody harm,
24 because Joe and I had an understanding behind the scenes
25 that, You don't have to worry about the logbooks, I will

Page 74

1  release them to you before the airplane is ready to go back
2  into service.
3      Q    Could the airplane have been returned to service
4  without the signed logbooks?
5      A    If someone else wanted to come in and sign them,
6  yes. That is the discretion of the individual that chooses
7  to sign them. If he wanted to come in and sign my work, it's
8  not illegal. It's just not ethical.
9          MR. WADSWORTH: I'm sorry, can you read back the
10  question, please.
11          (Record read by the court reporter:
12          "QUESTION: Could the airplane have
13          been returned to service without the
14          signed logbooks?")
15  BY MR. WADSWORTH:
16      Q    My question is, before the airplane could be
17  returned to service, somebody had to sign the logbooks,
18  correct?
19      A    Correct. Somebody would have to return the work to
20  service.
21      Q    Why did you believe that Mr. Clegg and Scott
22  Erickson would be headed to a future of pure hell if Clegg
23  signed off on the work?
24      A    Because Joe told me, on occasion, if he did that, he
25  would take action knowing that Clegg shouldn't have signed

Page 75

1  them off in the first place. In his email to me, he said, as
2  a matter of law, that would not be legal in his opinion, and
3  it could pose future harm to him, and he wouldn't want that
4  to happen.
5      Q    Who can sign off on a logbook, generally? Not in
6  this case, but as a general matter, who can sign off on
7  one?
8      A    Anybody that is qualified or certified to do the
9  work. Qualified and certified to do the work. Any mechanic
10  could have come and at their discretion. It's totally up to
11  them. If they feel they have enough information to sign off
12  the work, they can do that.
13      Q    Would it just be a question of -- would they have to
14  break down the engine to inspect all the parts in order to
15  sign off on it?
16      A    They would have to take into account anything they
17  deemed necessary for them to sign it. If they thought it was
18  required for them to take apart the engine, they would do it.
19  I wouldn't sign off on anybody's engine. I would say, I'm
20  sorry, I will have to take it apart. I can't attest to what
21  I can't see.
22      Q    So, essentially, you would have to do the rebuild
23  over again before you would feel comfortable --
24      A    If it were in my shoes, I would. I can't speak for
25  any other mechanic.

Page 76

1      Q    Why do you think Mr. Clegg was willing to sign off
2  on your work?
3      A    Money. Why would any mechanic blindly sign off on
4  anybody else's work?
5      Q    As of December 18, 2013, you were still concerned
6  that you weren't covered by any insurance, correct?
7      A    I had been given no information by anybody that I
8  was covered by any insurance to this day.
9          MR. WADSWORTH: I'm going to mark, as Exhibit 19, an
10  insurance policy.
11          (Moore Exhibit 19 was marked
12          for identification.)
13  BY MR. WADSWORTH:
14      Q    Have you ever seen this insurance policy before?
15      A    I have not.
16      Q    It says the policy period is from November 27, 2013
17  to November 27, 2014.
18  Scott Erickson never sent you this new policy?
19      A    I wasn't working for him as of November 27th. I
20  have never seen any of this.
21      Q    Do you know whether or not your work on Joe Perkins'
22  Baron would be covered by this insurance policy?
23      A    I have no idea. It wasn't an issue at that time.
24  Joe sent me an email that he was going to release me of any
25  liability.

Page 77

1      Q    When you said that you had spoken with an insurance
2  agent earlier, that was under a previous policy of some
3  sort?
4      A    I don't know of any policy. I spoke to an agent as
5  to whether or not with his knowledge of the existing policy,
6  was I covered. His email response was, No.
7      Q    When did that conversation take place, roughly?
8      A    August or September. Somewhere in there. I don't
9  remember. I would have to find the email and provide it.
10          MR. WADSWORTH: I will mark, as Exhibit 20, an email
11  that might help refresh your memory on that issue -- an email
12  from Bob Kobielush to you and to Scott.
13          (Moore Exhibit 20 was marked
14          for identification.)
15  BY MR. WADSWORTH:
16      Q    The last bullet point is, "Scott and I fully
17  understand the gravity of the insurance situation. Another
18  big issue" --
19      A    On the back?
20      Q    No. The front.
21      A    The top?
22      Q    Yes.
23      A    Okay. The first sentence confirms my original
24  statements to you, "distracted by management issues."
25          MR. HEISTERHAGEN: He asked you about the last

1 bullet point, Mike.

2      THE WITNESS: Oh. There you go.

3 BY MR. WADSWORTH:

4   Q  This is as of September 16th.

5     Do you remember whether it had been ongoing?

6   A  I don't remember when I first initiated -- after him

7 assuring me I was insured, I don't remember the date. I

8 would have to refer to the emails of when I corresponded with

9 the insurance company. I don't remember the exact dates.

10 this may be after that. I don't recall. It may be before.

11 I don't recall. I don't recall. I'm guessing it's after I

12 learned that I was not covered or the discussion would

13 probably not be on the table at that point.

14   Q  At what point did you tell Joe Perkins that you

15 weren't covered?

16   A  As soon as I started talking with him early on about

17 the delivery of his engines. I told Joe, after your engines

18 are done, I'm leaving D'Shannon. The only reason I finished

19 them is because I felt sorry for him, and I stayed there and

20 finished them and I left. That was our understanding.

21   Q  The reasons you left, what we talked about earlier,

22 the ethical issues, the repair-station issues, and the

23 insurance issue?

24   A  Correct.

25   Q  Were there any other issues beyond that?

1   A  Not to my knowledge. Ethics being a broad scope.

2   Q  Ethics having several components. The paychecks

3 that wouldn't clear, the promises to the customers, and other

4 issues, correct?

5   A  Other issues, correct.

6   Q  What were the other issues?

7   A  A lot of details. Just personal things.

8   Q  Like what?

9   A  I don't know that they are pertinent. I didn't like

10 the way he did things. This is a broad, all-encompassing

11 statement.

12   Q  Like what particular things?

13   A  We had touched on the major items. I was told one

14 thing about insurance and it wasn't there. The paycheck

15 issues that were there. Things of that nature. Me being in

16 between customers. These are situations I believe I should

17 have never been in.

18   Q  Just to make sure, were there other miscellaneous

19 things that you had in mind?

20   A  None that are relevant.

21   Q  What would be an irrelevant one?

22   A  I didn't like his hair. How about that?

23   Q  Any others?

24   A  I'm sure there are. Nothing of any relevance.

25   Q  Relevance has a broad definition here --

1     MR. HEISTERHAGEN: I will object. If you're trying

2 to get him to personally attack Scott's appearance or the way

3 he is --

4     MR. WADSWORTH: No, I certainly wasn't looking for

5 his hair. I was looking to see what all the reasons are

6 behind the split. I agree -- I think we agree that, as a

7 matter of the record, that he looks exactly like Tim Robbins,

8 but --

9     THE WITNESS: Ethics could be one, that was enough

10 for me to leave. Insurance was another, that was a reason to

11 leave. Letting my friends' paychecks not get done, that was

12 a reason to leave. Each one was reason for me to leave. I

13 stuck it out to get Joe's engines done so he wouldn't be hung

14 up in the middle, and that was it.

15     MR. WADSWORTH: I want to go through two more and we

16 may take a quick break because I'm going to change gears a

17 little bit.

18     MR. HEISTERHAGEN: That's fine.

19     MR. WADSWORTH: I will mark, as Exhibit 21, a

20 memo or letter from Don Freeman of Aviation Engines, dated

21 May 5, 2015.

22     (Moore Exhibit 21 was marked

23     for identification.)

24 BY MR. WADSWORTH:

25   Q  Have you ever seen this before?

1   A  I have seen the letter.

2   Q  Did you have any opportunity to inspect the engines

3 after the failure?

4   A  No.

5   Q  So you have no reason to either verify or question

6 what Don Freeman found, correct, it's just something you have

7 no firsthand knowledge of?

8   A  I can't attest to anything on this. I wasn't privy

9 to anything.

10   Q  Have you seen the pictures from the inspections?

11   A  I have seen some. I want to clarify that they --

12 those pictures could have been any pictures of any engine.

13 Since I wasn't there, I wouldn't have any idea knowing they

14 were from that engine or not.

15     MR. HEISTERHAGEN: Steve, have you seen any

16 pictures other than what is in Mike Terry's email, because

17 Don Freeman's wife told us he deleted all the pictures from

18 the inspection.

19     MR. WADSWORTH: I haven't seen any from Don. I was

20 talking about ones from your expert's inspections --

21     MR. HEISTERHAGEN: Okay. I wanted to make sure that

22 Don --

23     MR. WADSWORTH: No, I haven't seen anything from

24 Don.

25     MR. HEISTERHAGEN: Okay.

Page 82

1 BY MR. WADSWORTH:

2 Q   You wouldn't dispute that the engines malfunctioned

3 at some point, correct?

4 A   I really -- I don't know how to answer that. I'm

5 assuming something malfunctioned, but --

6 Q   But you personally haven't inspected the engines to

7 figure out what or why; is that fair?

8 A   That would be true.

9 MR. WADSWORTH: Let's go ahead and take a break.

10 (Recess.)

11 MR. WADSWORTH: I would like to go through these

12 pictures. I see where you still have the copy over there --

13 MR. HEISTERHAGEN: To make sure you have them all,

14 Steve, it's 376 through 400.

15 MR. WADSWORTH: That's what I have.

16 MR. HEISTERHAGEN: I have two 400s here, so I wanted

17 to make sure.

18 MR. WADSWORTH: I have them. Let's mark this as an

19 exhibit.

20 (Moore Exhibit 22 was marked

21 for identification.)

22 BY MR. WADSWORTH:

23 Q   Looking at picture MM376, do you know whether this

24 part came off of Joe Perkins' engine or what was --

25 A   I would say that that was intended for install in

Page 83

1 Joe Perkins' engine, but, honestly, I don't know if it's one

2 they pulled off the shelf to prop up and take a picture. I

3 can tell by looking at that it's not ready for install. I

4 can't tell you with certainty it's intended for Joe's

5 engine.

6 Q   You don't know whether this part was intended for

7 the Baron's engines?

8 A   I don't know. There is one or two out of this stack

9 that one said "Baron," but there was a tag on it. I could

10 swear to you the part that was tagged was going on there.

11 You know what I'm saying? I didn't take them. These

12 pictures were staged for marketing purpose.

13 Q   Okay. That's fine.

14 A   I would assume -- there is one that you can see has

15 a tag and you can look at the serial number on the tag, and

16 then look in the logbook and see if they match.

17 Q   For 377 and 378, are these pictures of the same

18 part?

19 A   They are. All 550 pistons are identical.

20 Q   Do you know whether this particular part was used in

21 Joe Perkins' Baron?

22 A   Again, I'm making assumptions. I didn't -- I don't

23 recall. I do -- I would have to assume they were going in

24 his engine, yes.

25 Q   For picture 379, what are these parts?

Page 84

1 A   Rocker arms. You can look at the shiny surface and

2 tell that they have been cleaned and polished and inspected.

3 You can see that they have a corrosion prevention sprayed on

4 them or the cardboard wouldn't be oil soaked. These are

5 inspected, ready for bushings to be installed, at which point

6 they get inspected again before they are installed.

7 Q   Were these --

8 A   This is mid process.

9 Q   Were these rocker arms used in Joe Perkins' Baron?

10 A   I would say that 12 of those -- 24 of those out of

11 that box probably went into Joe Perkins' Baron.

12 Q   You couldn't tell looking at these which ones?

13 A   It's impossible. There are all identical. I take

14 that back. There is intake and exhaust. So there is one of

15 each kind.

16 Q   For picture 380, what are we looking at?

17 A   Two alternator face gears, one crankshaft gear --

18 large crankshaft gear, and four Magneto drive gears. One is

19 on its side, three are vertical.

20 Q   Do you know whether any of these parts went into the

21 Baron's engine?

22 A   I don't know if any of these particular parts did,

23 but I would say they are destined for Joe's engines, because

24 the proper parts count for two engines, these are finished,

25 these are completed, there is no post-process work. They are

Page 85

1 polished and have been inspected, so I would say, at that

2 date, they were destined for Joe's engines. It's an

3 assumption.

4 Q   The big one at the bottom, that is the large

5 crankshaft gear?

6 A   Yes.

7 Negative. That is a camshaft gear. Sorry. The two

8 little round ones are alternator gears.

9 Q   Picture 381, I think we will get to what we were

10 talking about.

11 What do we see in 381?

12 A   Three prop governor drive gears, the ones in the

13 lower corner and standing up. On the two opposite corners,

14 right and left, upper and lower, are the small crankshaft

15 gear, the one that is in question. The copper one in the

16 corner is the copper large crankshaft gear.

17 Q   How do you know one of them is the one in

18 question?

19 A   I don't know -- the part number that is in question.

20 Not the actual gear that is in question. The one in the

21 middle is a prop governor drive shaft.

22 Q   Do you know whether any of these parts wound up in

23 either of Joe's engines?

24 A   I don't. We had several engines disassembled, and

25 what you do is you take all the parts, and after they are

1 prepped for -- prepped like this, then they are measured.
2 Remember, gears work in a family. So you can have a gear by
3 itself that is airworthy, but it doesn't run in mesh within
4 limits to another gear. Two worn-out gears may have
5 excessive lash between them, but you replace one with a new
6 gear and the lash becomes within spec. It's a dance. You
7 marry them up where they have the best clearance. That's
8 standard procedure. You may have a half a dozen gears with a
9 half a dozen different lives on them. That's a typical item
10 that is reused. It's based on condition only. You may look
11 at it and think after it has been inspected, Hey, that gear
12 was airworthy. Yet when you run it in mesh with another
13 gear, it may have too much lash. So you have to change one
14 or the other.
15    Q   It comes down to if they are made together --
16    A   Correct. So I can't tell you which one of these
17 went into anybody's engine.
18    Q   Looking at 382, who are these gentlemen in the
19 photograph?
20    A   Earl Ramey is the one with the plastic pusher in his
21 hand, and David Posey is the one holding the cylinder.
22    Q   We had a question about David's name. How do you
23 spell his last name?
24    A   P-o-s-e-y.
25    Q   This has a tag on it. What is this part that they

1 are working on?
2    A   They are inserting the piston into the cylinder.
3    Q   Do you know whether this is one of Joe Perkins'
4 Baron --
5    A   If you look behind the red oil can, you will see a
6 tag at the 11:00 position that says "Baron." So I would
7 assume that the part that has a tag on it is destined for a
8 Baron. I would guess that, yes, that's probably Joe's
9 stuff.
10    Q   Because that was the only Baron you were working on
11 at the time, correct?
12    A   That's the only one I worked on while working at
13 D'Shannon. It wouldn't make sense to cross contaminate
14 Baron, Bonanza or anything else. Everything on the table is
15 usually relevant to that particular build. So that's why I'm
16 making the assumption that all of that would be for Joe's
17 engine. I don't have the tags. You can see they are all
18 attached. Every one has a cylinder tag attached to it. If I
19 could zoom in and read them, I can say, Yup, with certainty,
20 that's Joe's, that's Joe's.
21    Q   There is a slightly bigger picture on --
22    A   Correct.
23    Q   -- 383 --
24    A   And I did that --
25    Q   And what --

1    THE REPORTER: You guys are talking over each other.
2    THE WITNESS: I'm sorry. Go ahead.
3 BY MR. WADSWORTH:
4    Q   There is a slightly bigger picture on 383. What is
5 that part?
6    A   That is a cylinder. If you zoom in on it, the
7 serial numbers are 96070-24, you will find that corresponding
8 number in one of Joe's logbooks.
9    Q   You believe this cylinder is being installed on
10 Joe's --
11    A   Correct.
12    Q   -- engine, correct?
13    A   Correct.
14    Q   384, what is this?
15    A   I would say that's the same engine without a
16 cylinder on it. Assuming it's taken the same day, based on
17 those assumptions.
18    Q   Do you believe this is one of Joe's engines?
19    A   I believe it could be.
20    Q   You are not sure?
21    A   I can't be certain. I don't have it marked for the
22 picture. Like I said, these weren't pictures for purposes of
23 tracking anything. These were marketing pictures. We don't
24 make cylinders and engines pose for any reason. I'm not
25 trying to be rude. I'm just saying that this picture was not

1 taken for the purposes of tracking Joe's parts.
2    Q   I didn't take it that way. I'm just trying to
3 figure out what these are --
4    A   Yeah, and I want you to understand --
5    Q   -- and what the part is, what the purpose for it.
6    A   I'm not being allusive. I just can't commit. I
7 would assume it would be Joe's engine.
8    Q   For 385, what are these parts?
9    A   The same cylinders on a bench from a different
10 angle, and the six pieces laying in front of you are wrist
11 pins, or also known as piston pins.
12    Q   Do you believe these parts belong to Joe Perkins'
13 engines?
14    A   I would. Assuming all the rest of it is Joe
15 Perkins' engine.
16    Q   What about 386, what are we looking at?
17    A   Oil pump.
18    Q   Did you have to replace the oil pump?
19    A   It was in excellent shape, and it's not common
20 practice to replace the oil pump gears unless it's required.
21 They can go tens of thousands of hours. The oil pumps that
22 these came out of had only been through one life cycle. I
23 can tell it's a Baron oil pump. If you look at the end of
24 the pump shaft, there is a pilot sticking out of the end and
25 to the left of it is a dowel pin and that drives the

1 tachometer in a Baron.

2    Q    Did you do any work at all to the oil pump?

3    A    Cleaned it, inspected it, made sure it was in
4 compliance, put a new pressure relief valve in it, and put it
5 back together.

6    Q    You believe that the picture in 387 is a part of Joe
7 Perkins' engine?

8    A    I do.

9    Q    387, what are we looking at there?

10    A    Same view of the previous pictures -- excuse me, a
11 different view of all of the same previous pictures.

12    Q    What is this round piece to the right right here?

13    A    Which one?

14    Q    Here.

15    A    That is a piston.

16    Q    That's a piston?

17    A    Uh-huh.

18    Q    You believe that all these parts belong to the
19 Baron?

20    A    I do.

21    Q    388?

22    A    Another angle of the same thing.

23    Q    What is that?  Is that grease?

24    A    An assembly lube.  It's a grease.  Specifically an
25 engine-assembly grease.

1    Q    389 is kind of the same picture --

2    A    Yes.

3    Q    -- that we have seen?

4    A    Yes.

5    Q    What are we looking at in 390?

6    A    Same thing.  Another view of the oil pump we saw
7 earlier.  It's a different angle.

8    Q    How about 391?

9    A    Those are pushrods.  You will notice there is
10 different -- they are boxed by size and length.  You will see
11 they are new pushrods because the ends have a gold tint to
12 them.  You will see the part numbers are facing the end so
13 they are readily viewed by the technician.  12 go into each
14 engine.  Even though they may bear the same part number,
15 there may be minor differences in length.  Each one is
16 checked for the proper length before it's installed.

17    Q    There is an email that is in here that I didn't
18 mark, but showing Earl Ramey digging through bins for parts.

19        Was everything that well organized in your shop?

20    A    Everything in the shop kept that organized, yes.
21 Just like when you go home and dig around for your keys.
22 Everything we kept in the shop was that organized, yes.  You
23 have to.

24    Q    Why?

25    A    You can't work efficiently or effectively or safely

1 if you don't keep it organized.

2    Q    Do you know whether some of these went into
3 Joe Perkins' engines?

4    A    I'm sure they did.  That's considered a finished
5 part and not a base assembly part where length is important.
6 They are readily available right next to the station where
7 they would be installed.  So 12 of some pushrod went into
8 Joe's engines.

9    Q    Some of these pushrods wound up in other planes?

10    A    They are all new.  You take them and put them where
11 you need them.  There is 12 per engine, and there is easily
12 there 30 to 40 in the view.

13    Q    What is this in 392?

14    A    All the work we subbed you bring back in and
15 inspect, including the cylinder work.  So this is
16 Joe Perkins' cylinders that were disassembled and inspected.
17 So we can't take it for granted that ECI did all of the work
18 perfect, or you don't take it for granted that any vendor
19 does their work perfect.  The onus is on the installer.  Per
20 the FARs, the installer is the final authority on the
21 worthiness of a part.

22    Q    The installer in this case, would that be you or
23 D'Shannon?

24    A    I'm working for D'Shannon, so I'm acting on the
25 behalf of D'Shannon.

1    Q    As the A&P, are you the one ultimately responsible
2 for this?

3    A    I'm responsible at that point in time that I see it.
4 The shipper that shipped me that part, he was responsible for
5 that time.  But it could have been damaged in shipping on the
6 way from Texas back to North Carolina.  The onus is on me to
7 take it apart to whatever extent I deem necessary to assure
8 that it didn't incur any shipping damage or anything else.
9 That's what we do.  That's standard practice.

10    Q    For 393, what are we looking at?

11    A    Idler gears.  Those go between the crankshaft and
12 the Magneto's timing gears.

13    Q    And do you believe these belonged to Joe Perkins'
14 engines?

15    A    I believe two of them went into his engines, one in
16 each.  If you see in that picture where they are polished in
17 a bin with a tag, they have been inspected.

18    Q    These have been inspected?

19    A    Are they in a bin?  I'm asking you?

20    Q    Well, no, I ask the questions today.

21    A    If it's in a bin and it's tagged, then it's been
22 inspected.

23        To answer the question, the picture, that represents
24 inspected gears.  There is a tag in the bin, as well, that
25 identifies each gear.  You can only see one.

1    Q    394, what are these?

2    A    Oil filter housings in the middle looking like UFOs.

3    To the right, behind them, are motor mount legs.  Directly

4    behind the two in the middle are two tachometer generator

5    drive adapters.  To the left are Cirrus motor mounts.  To the

6    right is a Cirrus intake manifold.  Behind that is a Magneto

7    drive pad.  In the front you see three covers.  Those are

8    tachometer drive adapter covers.  To the right, a cylindrical

9    device with a groove in it, it's an oil dip stick bushing.  To

10   the right are three medallions with two holes in it.  It's a

11   cam bore cover that goes on the front.  Just behind it looks

12   like another three-legged flying saucer, that is an intake

13   tube (inaudible).

14   Q    Do you believe these parts went into the Baron?

15   A    Um, no, none of those parts.  Most of those are

16   Cirrus parts.  Some are universal.

17   Q    394 is just a promotional picture with no bearing to

18   Baron whatsoever?

19   A    Every picture you have shown me is a promotional

20   picture.  To the extent I could swear to you what went into

21   the Baron, I have.

22   Q    395, what are these?

23   A    Intakes tubes.  That is a special type of a paint.

24   That was a branded color.  Per the overhaul manual, the parts

25   need to be treated for corrosion proofing.  You will see the

1    gold color on parts previous, that is an alodyne conversion

2    coating for corrosion protection, and the last, a

3    preventative measure, is a paint.

4    Q    Did these parts go into the Baron?

5    A    Those are acceptable on many.  Parts similar to that

6    went into the Baron.

7    Q    But maybe not any of these in particular?

8    A    And maybe all of those in particular.  I don't know.

9    The same parts go into lots of 520 and 550 engines.

10   Q    396, same as 395?

11   A    It looks like the same picture not as dark.  Maybe

12   different.  I don't know.

13   Q    397, what are these parts?

14   A    The intake elbows for a Baron.

15   Q    So do you believe these went into Joe Perkins'

16   engines?

17   A    I believe the proper amount -- there is -- those are

18   three right -- left-hand intake elbows.  I would say one went

19   into each of these engines.

20   Q    398 would be the same parts that were in --

21   A    Yes, it's a close-up picture.  These are all for

22   marketing that Scott requested to be taken.

23   Q    399, that these parts?

24   A    Pushrod tubes.  Those are the little rods that you

25   saw previously that looked like little shafts.  They live

1    inside of that.  The fuzzy picture to the lower left are the

2    springs that go to the tubes.  Those are same tubes that go

3    in any 550, 520, or 470 engine.

4    Q    So you don't know whether any of these pushrod tubes

5    wound up in Joe's engines, do you?

6    A    I know 12 pushrod tubes went into each of Joe's

7    engines.

8    Q    You don't know about these in particular --

9    A    A lot of the parts, I can't attest to in particular

10   where any of these parts went.

11   Q    How about 400, what is this?

12   A    A cylinder.  Inside view of a cylinder showing your

13   valves, the finish on the cylinder wall.

14   Q    Is this the sort of cylinder that would have gone

15   into Joe's engine?

16   A    It is.  I can tell by this picture it's not ready

17   for install.  It has been posed for a picture.

18   Q    Is it the same part on 376?  Are we coming full

19   circle here?

20   A    It appears to be, yes.

21        Those were all for marketing that Scott had

22   requested.  Those were never for permanent records for any

23   aircraft.

24   Q    That's fine.  This is the first time I had seen

25   them.  While I had the expert here, I figured I would go

1    ahead and ask what they were.

2    A    Sure.

3        MR. WADSWORTH:  When you referred to the

4    Continental -- I will go ahead and mark this.  This is not

5    the version that you used, I don't believe, but I want to

6    make sure we are talking about the same document, generally,

7    that you followed.  I will mark this as Exhibit 23.

8        (Moore Exhibit 23 was marked

9        for identification.)

10   BY MR. WADSWORTH

11   Q    You produced something similar to this, I believe,

12   as well, but the manual you followed would have looked like

13   this, correct?

14   A    You're correct.  This is not the one I produced.

15   This one post dates the engines.  The one I produced was

16   current starting in, I believe, 2011.  I don't recall

17   exactly.

18        But, again, most engine shops don't provide the

19   level of detail that I did.  I provided this to show I was in

20   receipt of the most recent version of the appropriate manual

21   to overhaul the engine.

22   Q    But you would have used -- I believe you are

23   correct.  It would have been in, like, August 2011, whenever

24   it was in 2011, but it would have been this Continental

25   Maintenance and Overhaul Manual that you would have

Page 98

1 referenced and would have followed --

2    **A**   **Correct. That's what I referenced in the logbook,**

3 **correct.**

4    MR. HEISTERHAGEN: I think Continental did produce

5 that version.

6    MR. WADSWORTH: It did. I just --

7    **THE WITNESS: It will only produce the most recent**

8 **version. You have to request the historical version.**

9    MR. WADSWORTH: They did. We are using that, or I

10 hope we are using that for filings with the court. For

11 whatever reason, I brought the wrong version.

12    MR. HEISTERHAGEN: That's fine. I just wanted to

13 make sure you knew that.

14    (Moore Exhibit 24 was marked

15    for identification.)

16 BY MR. WADSWORTH:

17    Q   For Exhibit 24, have you seen this document

18 before?

19    **A**   **I have.**

20    Q   What is this document?

21    **A**   **The logbook entry I made for Joe for his engines --**

22 **for his one engine.**

23    Q   What is the purpose of the logbook?

24    **A**   **To describe under the FAR the work performed.**

25    Q   Whatever it says on here, does this accurately

Page 99

1 describe the scope of your work?

2    **A**   **It does. There is probably more or less -- keep in**

3 **mind, I could have just made one entry that said engine was**

4 **overhauled in accordance with engine overhaul manual and been**

5 **done with it. But because of the nature of the situation, I**

6 **decided to make a more elaborate logbook entry because Joe**

7 **wasn't getting what he was needing out of Scott, and he**

8 **needed the information to keep in the historical records of**

9 **his airplane.**

10    MR. HEISTERHAGEN: Can we make clear for the record

11 what engine this is?

12    MR. WADSWORTH: This is the left engine. Serial

13 number 683263. The other one has "right engine" on the

14 front, but I just wanted to make it clear

15    MR. HEISTERHAGEN: I wanted to make sure when we go

16 back and look at everything, it's clear.

17 BY MR. WADSWORTH:

18    Q   Looking at this today, are there -- is there any

19 work that you performed on the Baron's left engine that is

20 not reflected in this log?

21    **A**   **Well, I can make a 200-hour long document to mirror**

22 **every step up to it. This is paraphrasing. I went through a**

23 **little extra detail for the benefit of Joe.**

24    Q   Is this more detailed than your logbooks would

25 normally be?

Page 100

1    **A**   **Just a little bit. I put certain traceability of**

2 **things that Joe would need for the future for traceability in**

3 **the event D'Shannon ceased operations. They would have been**

4 **impossible for him to get. I made an attempt to make a very**

5 **elaborate logbook entry that was completely unnecessary, but**

6 **I thought it would be helpful for Joe.**

7    Q   While unnecessary, do you believe that the --

8 maybe -- do you believe the details contained in this log are

9 accurate?

10    **A**   **Somebody made a correction for apparently a**

11 **typographical error. Short of any typos, the description of**

12 **the work I did -- which is summarized in the last statement**

13 **"the engine was assembled in accordance with the most recent**

14 **data" -- I would agree to that, and I would agree to the**

15 **content where the different things were noted.**

16    **So could I have inadvertently swapped some serial**

17 **numbers, engine to engine log, yeah, you know, it's a pretty**

18 **detailed document, so, yeah. Like I said, short of some**

19 **typos.**

20    Q   When you say "swapped some serial numbers engine to

21 engine log," what do you mean?

22    **A**   **If you look on item 8 in the middle of the second**

23 **page, you will see items A, B, C, D, E, F. On each tag of**

24 **the engine, you will look in the records, I will say**

25 **installed on left engine or right or Perkins engine, they may**

Page 101

1 have be crisscrossed, but all the pertinent data that would

2 go with the logbook entry for Mr. Perkins was provided for

3 Mr. Perkins. There may be typos in the document, but other

4 than that, as far as content, which is summarized in the last

5 sentence of the last paragraph, that the engine was assembled

6 in accordance with the most recent data, I would say that is

7 an accurate statement.

8    Q   Are there any typos that you're aware of? I will

9 give you time to look over this. Are there any typos or

10 anything in here that you wish to correct?

11    **A**   **You're asking me to proof it now after the fact?**

12    Q   Well, yeah, really, I guess my question is: Are you

13 comfortable with the information in this log? You said there

14 might be typographical errors, but --

15    **A**   **I'm comfortable, but I would have to go back and**

16 **pull out the manual and make sure my citings where I have**

17 **cited the manual are exactly, but to make a blank statement,**

18 **I believed when I signed this that they were accurate. But**

19 **short of typos where somebody says I may have had a serial**

20 **number swapped, there is a lot of data on 500 moving parts to**

21 **try to summarize on two pages, especially when there is**

22 **200 hours of work that constitute this document.**

23    Q   Let me -- you're referring to the hand notation

24 there at the top of paragraph five, correct?

25    **A**   **Forgive me, I'm referring to the entire document.**

Page 102

1  If you want me to preview it and verify that it's exactly
2  accurate, I will do that, but I will need some time.
3      If you have something specific, you can ask me.
4  Q   Here's my specific question:  The handwritten
5  note --
6  A   I didn't make that.
7  Q   Do you know who made --
8  A   I have no idea.
9  Q   -- that?
10  A   No.
11      When I tendered this typewritten document, I didn't
12  have it with any notes off to the side.
13  Q   You didn't circle "683263" at the top, did you?
14  A   No.
15  Q   All the handwritten notes on page 483, those are
16  someone else's, correct?
17  A   Yes.  I would have gone back and corrected it in
18  typewritten form.  You know what I mean?  At that point, why?
19      So, I mean, to answer your question, if you would
20  like me to review it, I can, but I need some time, because I
21  try to cite the manual the best way I can to make sure
22  that -- are the i's and t's crossed, to the extent I feel
23  necessary.  Even though I provide some unnecessary
24  information, like I said, I would have been perfectly legal
25  to say this engine was overhauled in accordance with the

Page 103

1  manual and been done.
2      MR. HEISTERHAGEN:  Let's take a few minutes and let
3  him look through it.  I don't want there to be any questions,
4  Is there a typo?  And then he says, No.  And you're asking a
5  vague question and later he comes back and says, There is a
6  typo.  And then you say, No, no, no, you told me there
7  weren't any typos.
8      MR. WADSWORTH:  Off the record a second.
9      (Discussion held off the record.)
10  BY MR. WADSWORTH:
11  Q   Mr. Moore, having looked at this document, I believe
12  the state of the testimony is that the typewritten materials
13  and the signatures on the document are yours, correct?
14  A   Correct.
15  Q   The notes on the document, like the handwritten
16  notes and the highlighting on the document, were done by
17  someone else, correct?
18  A   Correct.
19  Q   At the time you signed the document, this engine
20  log, Exhibit 24, you believed the information to be
21  correct?
22  A   I believe that the content of the logbook entry, as
23  far as the final product, was correct.  I swore in the
24  statement that the engine was approved for return to service
25  and was assembled, but I didn't put in there, This document

Page 104

1  is free from typographical errors.
2  Q   During the lunch break or at some point in time, you
3  are going to have the opportunity --
4  A   Yeah.
5  Q   -- to review this for typographical errors,
6  correct?
7  A   Correct.
8  Q   We are trying to make sure we all agree to what is
9  going on.  I'm not trying to trap you.
10  A   Okay.
11      MR. WADSWORTH:  Let me introduce the right engine
12  log --
13      THE WITNESS:  I apologize if you feel like I'm not
14  trying to cooperate.  That's not the intent.
15      (Moore Exhibit 25 was marked
16      for identification.)
17  BY MR. WADSWORTH:
18  Q   This has a cover sheet on it --
19  A   I supplied it with both of them.
20  Q   Do you recognize this document, Exhibit 25?
21  A   I do.  It appears to be the other engine logbook --
22  the logbook entry.
23  Q   The same question:  You signed this logbook,
24  correct?
25  A   Correct.

Page 105

1  Q   Did you type this logbook?
2  A   I did.
3  Q   At the time that you signed the logbook, did you
4  believe it to be true and correct?
5  A   I did.
6  Q   Do you believe it accurately reflected the work you
7  did on the right engine?
8  A   I did.
9  Q   Do you believe it accurately reflected the parts
10  that were put into the right engine?
11  A   I did.
12  Q   The same question for 24:  Did you believe that
13  Exhibit 24 accurately reflected the parts that were put into
14  the left engine?
15  A   I did.
16      I will be allowed to -- do you want me to review
17  that one, as well?
18  Q   You can review them both.
19  A   Okay.
20      MR. WADSWORTH:  I will mark, as Exhibit 26, some
21  invoices from ECI to D'Shannon, dated June 28, 2013 --
22      THE WITNESS:  Uh-huh.
23      MR. WADSWORTH:  -- and I think that's actually the
24  invoice for Joe Perkins, not necessarily the -- this
25  invoice --

1    THE WITNESS:  Uh-huh.

2    MR. HEISTERHAGEN:  There is a bunch of different

3 invoices.

4    (Moore Exhibit 26 was marked

5    for identification.)

6 BY MR. WADSWORTH

7    Q   Have you seen these documents?

8    A   I had.  I had to procure them for Joe.  Keep in

9 mind, I'm not required to provide invoices, but to prove the

10 parts were purchased, this, that and the other, I provided

11 them for Joe's benefit.  This is, again, over and beyond what

12 I was required to Do.

13    Q   Where did you receive these?

14    A   I had to call ECI after the fact and have them

15 emailed to me.  This would have been later on in the fall

16 that year.

17    Q   Okay.  Obviously there are handwritten notes on

18 here, but these invoices reflect generally what ECI sent you,

19 other than the highlighting and the handwritten notes?

20    A   If you look at the highlighting, they refer to

21 serial numbers that correspond to logbook entries.  This is

22 my verification to verify which cylinders went where.  If I

23 recall, a box of 12 came in and I had to verify which went

24 where.

25    Q   Is this your handwriting at the bottom of DIXIE 299,

1 the front page?

2    A   Here?

3    Q   Yes.

4    A   Yes.  That is my handwriting.  That is the other

5 engine, 68263.  So I validated those parts went into that

6 engine serial number.

7    Q   Then if we turn to the second page, 300, is the

8 highlighting there yours, again, trying to verify which parts

9 were put into the engine number?

10    A   No.  The handwriting that says "approved" and "not

11 approved," that is not mine.

12    Q   How about the highlighting on the first --

13    A   Yes, the highlighting.

14    Q   How about the writing inside the highlighting in the

15 middle of the page that says "12 each 683263"?

16    A   Yes, that's mine.

17    Q   And then "1 set 683263," that's yours, as well?

18    A   That's correct.

19    Q   Then this handwriting "balance of prepaid amount,"

20 is that yours or someone else'S?

21    A   That's not mine.

22    Q   Do you see any handwriting on 301 that is yours?

23    A   Nope.

24    Q   Looks like the next one that I see that might be

25 yours would be on DIXIE 303.  There is some highlighting and

1 one that says "1 each 683262"--

2    A   Correct.

3    Q   -- that's yours?

4    A   Yes.

5    Q   One down bottom, "8 each 683263," is that yours?

6    A   Down the bottom?

7    Q   Yes.

8    A   Yes, those are mine.

9    Q   Plus the highlighting in the first column there?

10    A   Correct.

11    Q   And these invoices, to your knowledge, and to the

12 extent that they have been -- the parts that you identified

13 on these invoices as having been installed in the left

14 engine, 683263, to your knowledge, those parts were installed

15 on the engine?

16    A   Correct.

17    MR. WADSWORTH:  I'm marking, as 27, an email between

18 you and Joe Perkins.

19    (Moore Exhibit 27 was marked

20    for identification.)

21 BY MR. WADSWORTH:

22    Q   I was wondering if you recognize that document?

23    A   I do.

24    Q   Before I start asking you questions about this, and

25 I don't think I have them with me, but did you provide a

1 similar set of invoices for the right engine as you did the

2 left?

3    A   I believe I did.

4    Q   Did the right engine require the same parts as the

5 left engine?

6    A   Fundamentally, yes, it might have required an extra

7 piece here or there that didn't pass inspection or something

8 of that nature, but the required parts were all the same.

9    Q   Generally, and subject to obviously what the

10 logbooks say -- they say what they say, and that will be the

11 final statement on the matter -- but, generally, the parts

12 that we see that you ordered here would be installed in the

13 right engine, as well, if they were required?

14    A   Any required part was put into the engines, yes.

15    Q   Turning to 27, this is largely about the insurance

16 dispute between you and Scott Erickson, correct?

17    A   It appears to be.

18    Q   And then down bottom you list --

19    A   I understand, Joe and I were social at the time.  We

20 had become friends.

21    Q   All right.

22    A   I felt it okay to speak openly with him.

23    Q   The matters in this email, though, at the time you

24 wrote it you believed to be true, correct?

25    A   Joe had asked me, at points in time, did he owe

1 anybody else money? There was a litigious situation brewing.
2 So since I no longer worked for Scott, I felt a sense of
3 loyalty to Joe.
4    Q   You wanted to make sure Joe got his engines?
5    A   I wanted to make sure Joe -- yes, I wanted to make
6 sure -- I didn't want him hung up in a mess any more than he
7 was.
8    Q   It says at the time that Scott Erickson owed you
9 about $6- to $8,000; is that correct?
10   A   At the time, he owed me somewhere in that price
11 range, yeah.
12   Q   Have you all since settled that?
13   A   Yes. He doesn't owe me any money.
14   Q   Down at the bottom it mentions Doug Neal,
15 Kirk Nelson, ECI and others.
16       Do you know whether Scott Erickson owes any of these
17 people money currently?
18   A   I don't.
19   Q   Who is Kirk Nelson?
20   A   Kirk was the individual that Scott purchased the
21 engine cores from.
22   Q   The engine cores that were used how?
23   A   To rebuild, to exchange -- the same purpose that
24 Continental factory does. They exchange an engine with you.
25 You give them your engine, they give you back an overhauled

1 engine. The intent of having a core bank is to shorten the
2 time for engine delivery. You don't have to wait for another
3 to come in and be disassembled and inspected. You already
4 have them in your possession.
5    Q   Were the cores that Kirk Nelson provided used in
6 Joe Perkins' engines.
7    A   Two of Kirk's cores were put into Joe's engines.
8 Keep in mind, Kirk kept only first-run cores. In other
9 words, no core could be used that we could not attest to the
10 time and service of the core. No questionable parts.
11   Q   What happened to Joe's old cores?
12   A   They were, I believe, sent back to D'Shannon. I
13 don't know.
14   Q   You don't know what happened to them after they left
15 your shop and --
16   A   Joe's old cores were never at our shop. When I got
17 to Alabama to install his new engines, his old ones were
18 sitting there on the floor.
19   Q   Did you ever inspect the old cores?
20   A   Visually, yeah. I didn't go in depth and take them
21 apart.
22   Q   You don't know what the condition of those cores
23 were?
24   A   I know the condition of one of them. It suffered an
25 alternator hub failure which ingested into the engine.

1    Q   How do you know that?
2    A   Joe told me, I looked at it, and you could see the
3 evidence of where the hub failed.
4    Q   You don't know where those engines are today?
5    A   I have no idea.
6    Q   Your knowledge of that one core is based off of --
7    A   Visual inspection, and Joe told me. So when he told
8 me, I went and looked at it. They were right there next to
9 the airplane the entire time I was there.
10   Q   When did you install the engines?
11   A   I got there late September, early October. I don't
12 remember. It has been a long time. You can go back and ask
13 Joe. He has the hotel bills and all that stuff.
14       MR. WADSWORTH: I'm sure we will.
15       I'm pretty close to done.
16       Do you want to take, I guess, a lunch break?
17       (Discussion held off the record.)
18       (Recess.)
19 BY MR. WADSWORTH:
20   Q   I understand that during the break you had the
21 opportunity to review your logbooks?
22   A   I did, briefly.
23   Q   Is there anything in there that you would like to
24 draw our attention to or correct?
25   A   Yeah. I can't swear to it, but I think there is a

1 couple of typos in there. One is a wording and the other one
2 is a number.
3    Q   Let's start with the wording.
4    A   Under --
5    Q   First of all, what exhibit are you on?
6    A   24. It's the same on both.
7    Q   Go ahead.
8    A   On the first page, item five, crankshaft serial
9 number, according to this person, is a typo. I added
10 additional information down to sub-part C "the crankshaft
11 gear was heated at 350 and installed with new bolts and dowel
12 pin."
13       I don't have the manual in front of me, but 300
14 stands out in my mind. So I believe that is possibly a typo.
15 I couldn't swear to it.
16   Q   Let me stop right there.
17       You know that -- or just, in your mind, you don't
18 believe that 350 is the same number that it is in the manual,
19 correct.
20   A   I don't believe it is.
21   Q   You don't, sitting here three year later, remember
22 whether you heated it to 300 or 350, correct?
23   A   I know I heated it to what the book says, but I
24 don't have that chapter in front of me. I do it per the
25 book. It's inconsequential. The cylinder heads are approved

1 to go to 450. The fact it would go to 550 wouldn't matter.
2 You asked about typographical errors.
3 　　The second one is under item 11, "The fuel system
4 was sent to D&G," blah, blah, blah, and it goes on to the end
5 of the sentence says, "for the compensating fuel pump."
6 　　I believe we installed non-compensating fuel pumps.
7 They are both approved. The compensating versions are
8 problematic, and I believe I made the recommendation to Joe,
9 even though that was a newer pump, I advised against running
10 those. I believe, in my best recollection, that the engines
11 left with non-compensating fuel pumps. That applies to both.
12 　　When I made this document, of course, I make one and
13 cut and paste the appropriate data from engine to engine.
14 That same typo is in both logbook entries.
15 　　Then minutia on other details that I think may or
16 may not be incorrect, but it's not in content. It's, again,
17 as in how it might be interpreted.
18 　　Item 19, serviceable pushrods. Well, brand new is
19 serviceable. There are always a combination of new or used
20 pushrods. I couldn't attest that they were all brand new or
21 half used or whatever. That is typical to review pushrods in
22 an engine. They will go 10- to 12,000 hours of flight time.
23 　　Those are the only three things that jumped out at
24 me, other than can I confirm the cylinder serial numbers are
25 correct, engine to engine, I can't. I thought I took the

1 precautions to make sure each one was reflected in the
2 appropriate entry. The serial numbers and model numbers of
3 the Magnetos, I don't recall exactly if those are correct or
4 not, but I'm reasonably sure they are correct.
5 　　But then I summarize in the last statement that the
6 remainder of the engine, meaning the remainder of what is not
7 described here, was assembled in accordance with the most
8 recent data from Continental. So even though I may have made
9 a typo on something, I'm referring back to the Continental
10 manual, of which I can pull up an electronic copy and verify
11 those.
12 　　They are both -- like I said, I used one document
13 and changed the serial numbers --
14 Q  Yeah.
15 A  -- for the appropriate -- because I did the same
16 thing on both engines. I overhauled them both.
17 　　Just so you know, the gear is heat treated at
18 around 970 Fahrenheit. Until you reach that temperature, up
19 to 969 would probably not affect the gear.
20 　　If you were to go on record, if there was ever a
21 mistake you can make in installing the gear, it is not to
22 heat it enough. The heating is required for it to expand and
23 slide over the crankshaft pilot. The gear cools almost
24 instantly. So as soon as you put it on there, it shrinks.
25 You don't have a whole lot of time.

1 　　So what I'm getting at is, if a mechanic was to make
2 a mistake in this process, because if you read the assembly
3 process it tells you to follow up with a brass hammer -- I
4 have seen mechanics where they don't get them hot enough and
5 put them on there and beat it on with a hammer, and it's
6 evident when you take the gear off if it has evidence of
7 galling.
8 Q  And I guess I'm trying to go through all of the
9 these.
10 　　The main typo that you said that you're reasonably
11 sure was a typographical error was -- I think it was on the
12 second page?
13 A  First page, item 5, sub-part C.
14 Q  You think that that was a typographical error
15 because you think that the Continental manual said something
16 different --
17 A  I installed one a week or ten days ago, so 300
18 stands out in my mind.
19 Q  You don't remember whether you did it to 300 or 350,
20 but you know --
21 A  I did it to the manual, whatever that is. If I can
22 go back in the previous-dated manual and it says 300, then
23 300 is what I did, yeah.
24 Q  But you have no physical memory of that?
25 A  I'm not a savant. I can't remember all that data

1 for three years. I do know I do it by the book.
2 　　So if the book told me at 350, I did it at 350. If
3 it told me at 300, I did it at 300.
4 　　A lot of these items, when you go to overhaul an
5 engine, you don't try to recall from memory. You refer to a
6 manual.
7 Q  If all of this was done by the Continental manual --
8 let's go ahead and assume that for this question -- if it's
9 all done by the Continental manual, how long do you expect
10 the D'Shannon engines to last
11 A  To TBO, unless they encounter some other kind of
12 failure outside the scope of normal operation.
13 Q  What is that, "TBO"?
14 A  Time before overhaul.
15 Q  How long would that be for the 5 --
16 A  15- to 1,700 hours. Most of them don't make it.
17 For instance, Joe's original engines didn't make it. They
18 fell short by 3- to 500 hours. It's reasonable to expect
19 them to get close.
20 Q  Would you have expected them to have major
21 difficulty at 147 hours?
22 A  Absolutely not.
23 Q  Then one last question on the logbooks.
24 　　I don't see any notifications here of any field
25 modifications that were performed.

Page 118

1    Were there any field modifications --
2    A   No.  The engine overhauled was adhered to strictly.
3  There were no field modifications.
4    If you read the logbook entry, it says that the
5  balance on the crankshaft was checked, it wasn't modified.
6  If we found the balance was off, then we would have a
7  problem.
8    Again, that is going above and beyond.  I wanted Joe
9  to have something nice.
10   Q   Okay.  There was the paragraph in 5c, which was 350,
11  and then there was one other.  I'm trying to remember what it
12  was.  You said you thought there was a part that --
13   A   The compensating fuel pump.
14    Basically what Continental did, without going into
15  crazy detail, is they installed a turbo-charged style fuel
16  pump on a naturally aspirated engine, and I advised against
17  it.  They are problematic and I advised against it.  Here I
18  put in there that it was set up and calibrated for the
19  compensating pump, but it was actually set up and calibrated
20  for a non-compensating pump, the best of my recollection.
21   Q   I'm guess what I'm trying to make a distinction
22  between here is, you remember that from your own memory there
23  was a non-compensating fuel --
24   A   That's correct.  There may be one on there.  It may
25  have been a compensating pump.  That would have been against

Page 119

1  my recommendation.  In my mind, I believe there was a
2  non-compensating pump.  If you supply a picture, you can
3  tell.  They are identifiably different.
4    Q   The basis of the other typos were more, not
5  necessarily from personal memory, but Continental says this,
6  and I believe I would have followed the Continental manual --
7    MR. HEISTERHAGEN:  Objection --
8    THE WITNESS:  I followed --
9    MR. HEISTERHAGEN:  -- as to form.
10  BY MR. WADSWORTH:
11   Q   -- is that fair?
12   A   I followed the Continental manual.  I don't recall.
13  exactly, but I'm believing that, 99 percent, it's 300
14  Fahrenheit, because I just did one.  I would have done it in
15  accordance with the manual back then, as well.
16    MR. WADSWORTH:  That's all I have, subject to
17  cross.
18    EXAMINATION
19  BY MR. HEISTERHAGEN:
20   Q   Mike, how long have you been an aircraft mechanic?
21   A   Since '89.
22   Q   How long have you been working on piston aircraft
23  engines?
24   A   Since '89.
25   Q   Mike, how many IO-550 engines have you overhauled --

Page 120

1    A   I would --
2    Q   -- since you first became an aircraft --
3    A   I would say over a hundred.
4    THE REPORTER:  Counsel, I didn't get the end of your
5  question.
6    MR. HEISTERHAGEN:  Okay.  Wait until I get done.  I
7  will start again.
8    Q   Mike, how many IO-550 engines have you overhauled
9  since you first became a --
10   A   I would say --
11   Q   -- an aircraft mechanic?
12   A   I'd say over a hundred.
13   Q   Would you say that you were very familiar with the
14  process for overhauling a Continental I0-550 -- engine?
15   A   I believe I am.
16   Q   Have you built engines in the past for the Red Bull
17  air race?
18   A   Yes.
19   Q   Can you tell me about that race.
20   A   For five years, I worked for a competitor in the
21  Red Bull air race and won the series three times with the
22  engines that I built.
23   Q   Are the engines used in the Red Bull air race
24  high-performance engines.
25   A   They are highly modified.

Page 121

1    Q   Were those Continental engines?
2    A   They were not.  The were Lycoming.
3  L-y-c-o-m-i-n-g.
4    Q   What kinds of aircraft did you install those engines
5  on?
6    A   A purpose-built race plane.
7    Q   So it's not a Cessna or Cirrus --
8    A   It's not.
9    Q   I want to ask you a few questions about the way you
10  install the crankshaft gears.
11    Tell me, generally, how you install the large and
12  small crankshaft gears on an IO-550-C engine.
13   A   You measure the bore of the gear and the pilot
14  flange of the crank, make sure the two have the acceptable
15  interference fit.  Then you make sure the surfaces are clean.
16  Then you heat the gear.  There is a requirement in the book
17  that no matter what you do, you don't heat it for more than
18  ten minutes.  Upon reaching 300 (inaudible) you place it on
19  the end of the crankshaft and make sure it's seated properly.
20  You install the bolts, but you don't tighten them at this
21  point.  You're allowed to use a brass hammer they tell you,
22  but any type of soft-faced hammer to make sure the gear is
23  properly seated, and you install the large gear over the top
24  of it, and you torque them the rest of the way down.
25    There is a sequence outlined in the service bulletin

1 in which way they get torqued, which is an opposing sequence.
2 You don't do it circular. You do it zigzag across from each
3 other.
4     Upon reaching the torque value, you have a second
5 person verify that the gears of the bolts are torqued, at
6 which point they are identified with a paint pin, and then
7 they are safety wired.
8   Q  So when you perform an overhaul on an IO-550-C
9 engine and you install the large and small crank gears on
10 that engine, do you normally have the torque of the
11 crankshaft bolts double checked?
12   A  Critical fasteners are always double checked.
13   Q  Is the method of installation that you just
14 described to us the way that you normally complete the
15 installation of the large and small crank gears?
16   A  It is.
17   Q  Is the installation method you just described to me
18 the standard practice in the aviation industry?
19   A  I believe it is.
20   Q  To the best of your knowledge it is?
21   A  To the best I can -- yeah, to the best I'm aware
22 of.
23   Q  When you're overhauling a Continental I0-550-C
24 engine, what manuals or other documentation do you have to
25 comply with?

1   A  Per the regs, you're to take advantage of any and
2 all documentation and pertinent data, including airworthiness
3 directives, service bulletins, the maintenance manual, and
4 independent components suppliers manuals. So if I buy a
5 magneto from a source, I need to have the Magneto manual on
6 hand, as well.
7   Q  And did you and your team in North Carolina comply
8 with all the required documentation in overhauling
9 Mr. Perkins' IO-550-C engines that he purchased from
10 D'Shannon?
11   A  I believe we did.
12   Q  And as to the two IO-550-C engines that Mr. Perkins
13 purchased from D'Shannon, did you and your team in
14 North Carolina follow the installation procedures you just
15 described to us?
16   A  Installation procedures for --
17   Q  For the large and small crank gears. Sorry.
18   A  Yes.
19   Q  While installing the large and small crank gears on
20 the D'Shannon IO-550-C engines that were delivered to
21 Mr. Perkins, did you and your team torque the crankshaft
22 bolts to CMI specifications?
23   A  Of course we did.
24   Q  Did you personally confirm that those bolts were
25 torqued to CMI specifications?

1   A  Yes.
2   Q  And how did you do that?
3   A  With a torque wrench.
4   Q  When you delivered the D'Shannon engines to
5 Mr. Perkins and installed them on his aircraft, were the
6 crankshaft bolts torqued according to Continental
7 specifications?
8   A  They were.
9   Q  Tell me how you order parts from a supplier to be
10 used in an overhaul of an engine.
11   A  Typically, I research the parts in the parts manual.
12 I make a list of the pertinent parts that are required, and I
13 either email or verbally order the parts by part number, and
14 that's it.
15   Q  When you receive the parts from the supplier, what
16 do you do at that point?
17   A  We did an incoming receiving inspection. The parts
18 are verified that they are properly identified with FAA
19 identification, that the proper part numbers have been
20 received, and then as they are being installed, there are
21 dimensional requirements. So you do a test fit of all of the
22 parts and pieces to make sure they fit in accordance with the
23 manual.
24   Q  So do you do a visual inspection and a fitment
25 test?

1   A  Visual and dimensional.
2   Q  And is the procedure that you just described for me
3 as it relates to ordering parts and confirming that you have
4 received the correct parts the standard procedure followed by
5 an A&P in the aviation industry, to the best of your
6 knowledge?
7   A  To the best of my knowledge, that should be the path
8 they follow.
9   Q  Did you follow the procedure you just described to
10 us in ordering parts to be used in the overhaul on
11 Mr. Perkins' engines?
12   A  I did.
13   Q  I would like you to assume for me the main bearings
14 installed on the D'Shannon engines were not approved for use
15 in those engines. Okay?
16   A  Okay.
17   Q  Is there a procedure by which the D'Shannon engines
18 which incorporated the ECI bearings could have been made
19 airworthy without tearing the engines down and replacing the
20 bearings?
21     MR. WADSWORTH: I will object to form. He is not
22 being asked to testify in this matter as an expert, to my
23 knowledge, but go ahead and answer.
24     MR. HEISTERHAGEN: We haven't designated yet.
25     THE WITNESS: Am I not an expert?

1 BY MR. HEISTERHAGEN:

2    Q    Just answer the question.

3    A    I believe they could have been.  If it was brought

4 to my attention that those were the incorrect bearings, but

5 they performed its intended function, as described by the

6 FARs, one could have employed what is known as a power plant

7 DER, or designated engineering representative, authorized

8 under Part 33 for piston reciprocating engines.  A

9 description of the bearing, possibly even a visual

10 examination of another bearing, as compared to the

11 appropriate bearing, would be made.  If it was determined by

12 the DER that bearing would, in fact, work and not pose any

13 risk, they could write a letter to the FAA, and on a

14 case-by-case basis, approve such a deviation.

15    Q    Did Mr. Perkins or anyone on his behalf ever ask you

16 to use the procedure you just described to have the D'Shannon

17 engines deemed airworthy?

18    A    Never.

19    Q    To the best of your knowledge, did Mr. Perkins or

20 anyone on his behalf contact Scott Erickson or D'Shannon and

21 ask them to contact the DER regarding the procedure you just

22 described?

23    A    Not to my knowledge.

24    Q    I want to talk for a second about the right

25 D'Shannon engine, and I would like you to assume for me the

1 only problem with the right D'Shannon engine on April 22,

2 2015 was the use of the ECI bearing.

3        If that assumption is true, could Mr. Perkins' right

4 engine have been repaired and returned to service?

5        MR. WADSWORTH:  Object to form.

6 BY MR. HEISTERHAGEN:

7    Q    You can answer.

8    A    Yes.  He could --

9    Q    And assume --

10    A    -- you can repair any engine from any state of

11 disrepair.

12    Q    Assuming the use of the ECI bearing was the only

13 problem with the right engine, tell me what you would have to

14 do an A&P mechanic to repair and return it to service.

15    A    Assuming I couldn't get it approved, I would be

16 required to disassemble the engine to facilitate and install

17 new bearings.

18        There is a list that Continental provides under its

19 service bulletins of what parts are mandatory to replace when

20 you open up and disassemble an engine.  Of which are all

21 stress fasteners, bearings, all have to be replaced and

22 disassembled anyway.

23        So I would buy all of the required parts outlined by

24 the service bulletin, including the appropriate bearing, and

25 reassemble it.

1    Q    How much would the work you described to me cost if

2 you were doing it?

3    A    Assuming there were nothing else to repair in the

4 engine and at that point that engine's components

5 measured within the service limits as outlined by the

6 factory, it would be approximately 60 to 80 hours' worth of

7 labor and whatever the cost of the required parts, which is,

8 I will guess, $5- to $7,000.

9    Q    Do you have an estimate as to how much the total

10 cost would be?

11    A    Around $15,000, assuming retail labor rates.

12    Q    I would like to ask you a few questions about the

13 left D'Shannon engine.  A couple of different assumptions for

14 this question.

15        The first assumption is, please assume that the use

16 of the ECI main bearing in the left engine was not

17 appropriate.  Additionally, please assume for me that the

18 only parts in the left engine that were damaged and could not

19 be used were the crankshaft bolts, the large and small crank

20 gears, the oil pump the camshaft and the lifters.  And if

21 those assumptions are true, could Mr. Perkins' left engine

22 have been repaired and returned to service?

23        MR. WADSWORTH:  Object to form.

24        THE WITNESS:  As I said before, any engine in any

25 state of disrepair could be repaired --

1 BY MR. HEISTERHAGEN:

2    Q    And --

3    A    -- and just like the right-hand engine, there is a

4 minimum list of parts that have to be replaced when the

5 engine is disassembled, which include the bearings previously

6 mentioned, all of the stress fasteners and bolts, which

7 include the crankshaft gear bolts, alternator gear bolts

8 camshaft bolts, connecting rod bolts, those all have to be

9 replaced if the engine is disassembled, regardless of the

10 time or what has occurred.  So a baseline of the same rough

11 $15,000 I would estimate no more than probably another 5,000

12 of parts for the crankshaft gear, the camshaft gear, oil

13 pump.  Those parts that you mentioned.

14    Q    What would that total cost be?

15    A    Probably around 20-grand.

16    Q    As we sit here today, could you still repair and

17 return the left engine to service?

18    A    Yes.

19    Q    And did you ever offer to inspect and repair

20 Mr. Perkins' left engine?

21    A    I did.

22    Q    What did he say to that offer?

23    A    He said he would get back to me.

24    Q    Has Mr. Perkins ever asked you to inspect and repair

25 his D'Shannon engines?

Page 130

1    A   No, sir.
2    Q   To the best of your knowledge, has Mr. Perkins ever
3   asked Scott Erickson or anyone with D'Shannon to inspect or
4   repair the D'Shannon engines?
5    A   I have no idea.
6    Q   Did the use of the ECI bearings in the D'Shannon
7   engines sold to Mr. Perkins present a safety-of-flight
8   issue?
9        MR. WADSWORTH:  Object to form.
10       THE WITNESS:  It's my opinion they did not --
11  BY MR. HEISTERHAGEN:
12   Q   Why is that?
13   A   -- based on the fact they didn't fail, I would say
14  that is confirmation of that assumption.
15   Q   In this case, did the presence of metal under the
16  oil pressure relief valve cause a safety-of-flight issue to
17  Mr. Perkins?
18   A   I don't believe it did.
19   Q   Why not?
20   A   The metal had been dislodged and trapped in the
21  filter.  The only oil that goes into the engine gets caught.
22  Metal fragments across the life of an engine in an air-cooled
23  engine are quite common.
24   Q   To the best of your knowledge, did Mr. Perkins ever
25  take off from the Tuscaloosa airport after discovering the

Page 131

1   oil pressure issue?
2    A   Not that I'm aware of.
3    Q   And, Mike, please assume that the following
4   statements are true regarding the left engine:
5        That there were fine particles of aluminum and steel
6   in the oil, that particles of steel were found in the oil
7   filter, and that three pieces of steel were found under the
8   oil pressure relief valve in the left engine.  Assuming that
9   those statements are true and that the metal allegedly found
10  in the engine was present during flight, would that have
11  caused a safety-of-flight issue for Mr. Perkins, assuming
12  that he took off on April 22, 2015?
13   A   Based on my knowledge of how the oil pump and the
14  oil pressure relief valve function, I would believe that it
15  could possibly not pose any safety of flight because the oil
16  pressure relief valve is open in flight.  The particles that
17  circulate through there are returned to the oil filter.  The
18  only oil that enters the engine is filtered oil.  So presence
19  of metal in the pump, in the oil pressure relief valve, at
20  that point in time, there is no guarantee that they would
21  have been in the oil pressure relief valve in flight.
22       MR. WADSWORTH:  Could I take a look at the question
23  one more time?
24       THE REPORTER:  Sure.  Here you go right there.
25       MR. WADSWORTH:  Okay.  Thank you.

Page 132

1   BY MR. HEISTERHAGEN:
2    Q   Mike, following the work that you performed on the
3   D'Shannon engines that were delivered to Mr. Perkins, did
4   someone initiate an FAA investigation against you?
5    A   Somebody did.
6    Q   Do you know who that person was?
7    A   I'm assuming it could have been anybody associated
8   with the -- with the issue at hand with the Perkins engine.
9   It could have been Joe, the mechanic, the engine shop.  I
10  don't know.
11       (Moore Exhibit 28 was marked
12       for identification.)
13       MR. HEISTERHAGEN:  I would like to show you what I
14  have marked as Exhibit 28.
15  BY MR. HEISTERHAGEN:
16   Q   Have you seen that letter before, Mike?
17   A   I have.
18   Q   What is that letter?
19   A   The letter to tell me the investigation was closed,
20  and that the investigation did not establish a violation.
21   Q   Mike, when you delivered the D'Shannon engine and
22  the D'Shannon airframe parts to Mr. Perkins, was D'Shannon's
23  work completed at that time?
24   A   To the best of my knowledge.  I don't know whether
25  there were obligations outstanding between D'Shannon and

Page 133

1   Perkins, to the best of my knowledge.
2    Q   Were the D'Shannon engines and related upgrades
3   installed on Mr. Perkins' aircraft by the end of October
4   2013?
5    A   I don't know what date it was, but when I left
6   Alabama, the plane was ready to be flown.  We had already
7   test flown it.  It was ready to be flown to another shop for
8   further repairs to the airplane.
9        (Moore Exhibit 29 was marked
10       for identification.)
11  BY MR. HEISTERHAGEN:
12   Q   Mike, I would like to show you what I have marked as
13  Exhibit 29.
14       Have you seen Exhibit 29 before?
15   A   I have.
16   Q   Can you tell me what that says?
17   A   This is release for the repairs to the airplane on
18  Joe's airplane.
19   Q   Is Exhibit 29 a logbook entry for the airframe dated
20  April 5, 2014?
21   A   It is.
22   Q   Does Exhibit 29 show a significant amount of work
23  that was done on Mr. Perkins' Baron?
24   A   It does.
25   Q   Did you participate in the work that is described by

1 this logbook entry?

2    A   I assisted.

3    Q   Where was the work described in Exhibit 29 done?

4    A   Dennis Hallman's shop.

5    Q   Who asked you and Dennis Hallman to do this work?

6    A   Mr. Perkins.

7    Q   Why was the work described in Exhibit 29

8 necessary?

9    A   The plane had been previously damaged and wasn't

10 repaired properly.

11    Q   Could Mr. Perkins' Baron have been flown after you

12 installed the -- strike that.

13       Do you remember when you started -- strike that.

14       Do you remember when you and Dennis Hallman started

15 the airframe work on Mr. Perkins' Baron that is described in

16 Exhibit 29?

17    A   I don't remember the exact date. But it was the

18 Fall of 2013.

19    Q   And was that work completed on April 5, 2014?

20    A   It was.

21    Q   So could Mr. Perkins' Baron have been flown by him

22 from when you started the work in Fall of 2013 until the work

23 was completed in April of 2014?

24       MR. WADSWORTH: Object to form.

25       THE WITNESS: It was unairworthy. I suppose he

1 could have flown it, but it would have been unairworthy. It

2 required an annual inspection. It was out of annual.

3 BY MR. HEISTERHAGEN:

4    Q   The reason for that is because --

5    A   Well, it had calendared out. The annual inspection

6 expired sometime during the time when the engines were being

7 overhauled. So for the plane to be returned to service, the

8 engines notwithstanding, the plane needed to have the

9 required annual inspection.

10       It was learned just prior to the test flights.

11 Mr. Perkins asked for a gear retract test, at which point we

12 found damage in the wings that needed to be repaired.

13    Q   Mike, were you given an opportunity to inspect the

14 D'Shannon engines prior to the filing of this lawsuit?

15    A   No.

16    Q   Is that something that you would wanted to to?

17    A   I would have liked to have been there at the tear

18 down. I believed I would have had a right to be there, but I

19 was not. It was done in secrecy.

20    Q   Have you seen the oil filter that was pulled from

21 the left D'Shannon engine on April 22, 2015?

22    A   I have not.

23    Q   Have you been given an opportunity to inspect or

24 analyze the metal allegedly found in the left D'Shannon

25 engine on April 22, 2015?

1    A   I have not.

2    Q   Are those items things that you would need to

3 attempt to determine the cause of these problems?

4    A   I would have liked to have seen them, and I would

5 have liked to have determined the cause.

6    Q   Were you ever given the opportunity to inspect those

7 items or analyze those items in any way?

8    A   I have not.

9    Q   Did Mr. Perkins hire you and Dennis Hallman to

10 install the D'Shannon engines and airframe upgrades?

11    A   He did.

12    Q   Did Mr. Perkins hire you to perform substantial

13 maintenance on his aircraft, as we talked about earlier?

14    A   He did.

15    Q   To the best your knowledge, did Mr. Perkins consider

16 you a competent and qualified mechanic?

17    A   He did.

18    Q   Did Mr. Perkins ever compliment your work on the

19 D'Shannon engines?

20    A   Repeatedly.

21    Q   Did he ever compliment anyone else -- the work --

22 strike that.

23       Did he ever compliment the work of anyone else who

24 worked on the D'Shannon engines?

25    A   Yeah.

1    Q   Who would that have been?

2    A   Earl Ramey, the rest of the crew at the engine shop,

3 Dennis.

4    Q   When you delivered the D'Shannon engines to Alabama,

5 did Mr. Perkins ever tell you that he did not want those

6 engines?

7    A   No.

8    Q   You talked about this a little while with

9 Mr. Wadsworth, but did Mr. Perkins agree to release you from

10 liability and hold you harmless in exchange for releasing the

11 Baron's logbooks?

12    A   Yes.

13    Q   Did you release those logbooks to Mr. Perkins?

14    A   I did.

15    Q   Did Mr. Perkins make threats against you during the

16 process of overhauling these engines?

17    A   Repeated.

18    Q   What were the nature of those threats?

19    A   That he knew the Attorney General in North Carolina,

20 and that he was going to make life hard on me. He would turn

21 me in to other authorities as he saw fit. General litigious

22 threats like that.

23    Q   Did Mr. Perkins threaten to have you prosecuted as a

24 result of the work that you performed on the D'Shannon

25 engines?

1     A  He said, I will have you in front of a federal
2 jury.
3       MR. HEISTERHAGEN: That's all I have.
4       MR. WADSWORTH: I do have a few questions following
5 up on those.
6          FURTHER EXAMINATION
7 BY MR. WADSWORTH:
8     Q  As we sit here today, you don't know the cause of
9 the left engine's failure, do you?
10     A  I do not. I have assumptions, based on my
11 experience.
12     Q  But not based off of your observations, correct?
13     A  Not based off of any empirical data that may have
14 been available to me.
15     Q  You said you personally checked the torque on the
16 crankshaft both, correct?
17     A  I do on every crankshaft.
18     Q  Were these bolts secured by safety wire?
19     A  They were.
20     Q  If --
21     A  Let me correct you on that.
22       Safety wire is not an item used to secure a bolt.
23 The tension on the bolt provided by the torque is what
24 secures the bolt. The bolt will stretch and hold itself in
25 the hole.

1     Q  What is the purpose of the safety wire?
2     A  Believe it or not, it's an old-school remedy carried
3 over into modern times. If you go look at the rod bolts on
4 the aircraft engine, the early 520s were cotter pinned. The
5 new ones are not. If the bolt loses its load to the point
6 where the safety wire is what is holding it in, it has
7 already failed. The safety wire provides no structural
8 integrity to the attachment at all. It's an inspection
9 method to verify it's been torqued.
10     Q  It would keep the screws from backing out,
11 correct?
12     A  It could, but that's not its intended function.
13     Q  It would keep the screws, though, from being removed
14 by turning them to the left?
15     A  You would have to cut the safety wire to remove the
16 bolts. The job of the safety wire is for no operational
17 function. It stands in that application to prove somebody
18 has gone through the extent of possibly following the manual,
19 torquing it as required, and that would be the final
20 inspection item. In the overhaul manual, it says after it's
21 torqued, to safety wire it.
22       Understand that if the bolt were to get loose, the
23 bolt has already failed.
24     Q  Bolts sometimes do fail, correct?
25     A  Bolts fail all the time.

1     Q  I want to make sure. I had a hard time following one
2 of Tim's questions.
3       Is it your testimony that given what you know today,
4 Joe Perkins could have taken off after discovering the oil
5 pressure safety?
6     A  If I wasn't there to stop him, he could have done
7 anything he wanted.
8     Q  Can he have done so safely?
9     A  I believe he could have done so safely, probably.
10 But the system in place to prevent him from doing that
11 worked. He did a run-up, it didn't make the appropriate oil
12 pressure, so he didn't go, so there was no danger. If he had
13 elected to go, would it have caused a catastrophic failure, I
14 doubt it. You're asking me to speculate, and that's my
15 speculative answer.
16     Q  Your statement about the run-up, your statement
17 about the oil pressure, and the statement about not taking
18 off, all of that is based off of things that you have heard
19 or read in this lawsuit, not your own personal knowledge,
20 correct?
21     A  No. That is the appropriate procedure for takeoff.
22 You do a run-up, you inspect that you have the appropriate
23 oil pressure, and you go.
24     Q  But, I mean, you don't have any firsthand knowledge
25 about what happened when Joe Perkins discovered the problem

1 with his engine, do you?
2     A  We are here. I have some knowledge of what he did.
3 He took it to his mechanic and had him take the engine off.
4     Q  That's based off of things that you read, not what
5 you personally observed, correct?
6     A  I didn't personally observe it. I wasn't there.
7     Q  What was the scope of the indemnity between you and
8 Joe Perkins?
9     A  Of the indemnity?
10     Q  Yes.
11     A  I would have to read the email. It says from all
12 liability and claims, and this, that and the other. It's in
13 an email.
14     Q  I'm trying to remember if I have it printed off. I
15 know I read it last night.
16       There was never a signed indemnity agreement between
17 you and Joe, was there?
18     A  There was an implied agreement where he said he
19 would do one thing if I did another, and I did my half.
20     Q  Okay. And you said that you felt that you had a
21 right to be there when the engine was torn down.
22       Is that based on a general notion of fair play, or
23 is there a right in the FAA --
24     A  I don't know if there is any kind of a right, but I
25 know that it's typical practice if something like that

Page 142

1 happens, the other parties are present, depending on the
2 circumstances.
3     Q   I think I only have one other question.  If we can
4 try to find that email before we go to make sure we are
5 talking about the same one.
6     A   It's a two-sentence email.
7     Q   We will go off the record after this question and
8 try to find it.
9        The repairs that are done here on Exhibit 29, these
10 are repairs to the airframe, correct?
11    A   Yes.  There were no repairs to the engine at that
12 time.
13    Q   Would any of these repairs have any effect
14 whatsoever on the crankshaft or the crankshaft bolts?
15    A   If the engines were mishandled, you could argue that
16 they could, but they were not mishandled.  In other words, if
17 you ran it up and hit something or whatever.  There is always
18 the potential, right, but, no.
19    Q   To your knowledge, these repairs as reflected in
20 Exhibit 29, had no effect on the crankshaft, correct?
21    A   No, sir.
22        MR. WADSWORTH:  Let's take a brief break and go off
23 the record.
24        MR. WADSWORTH:  Mr. Moore, one last exhibit for the
25 day, marked Exhibit 30.

Page 143

1        (Moore Exhibit 30 was marked
2         for identification.)
3 BY MR. WADSWORTH:
4     Q   Do you recognize this email?
5     A   I do.
6     Q   When we have discussed the indemnity agreement, this
7 is the email that you have been referring back to, correct?
8     A   Correct.
9     Q   Now, down right here, this sentence says, "as I have
10 said all along."
11       Can you read that into the record.
12    A   (As read) "As I have said all along, I will sign any
13 papers necessary indemnifying you from liability on the
14 engines."
15    Q   Did you ever have any papers drafted up?
16    A   At the time, Joe and I were friends.  I trusted him
17 and took him at face value.  Based on that comment to me, and
18 if you read what the first part of the sentence is, (As read)
19 "I have said all along," meaning he has told me this multiple
20 times, don't worry about it.  It won't happen.  I will take
21 care of you.  On that value alone, I trusted him, and I did
22 what I said I was going to do.
23    Q   But you never presented him with any necessary
24 indemnifying papers, did you?
25    A   I didn't have to.  I had it on record with an

Page 144

1 email.
2     Q   So that is a "No"?
3     A   I guess I believed that the email in itself
4 constituted enough record for me.
5     Q   And --
6     A   By the same intent that it's being entered here, I
7 am using it as the same intent.
8     Q   Joe never presented you with any sort of
9 indemnification papers, did he?
10    A   No.
11       I further explained to Joe I wasn't necessarily just
12 worried about him, but, in the event of any liability, he
13 can't waive for anybody else if anything else were to happen.
14       Does that make sense?
15    Q   Yes.
16    A   That was the genesis of requiring Scott to name me
17 as additional insured on his insurance.
18       MR. WADSWORTH:  I think that's all I have.
19       MR. HEISTERHAGEN:  I don't have anything else.
20       THE REPORTER:  Read and sign, Counsel?
21       MR. HEISTERHAGEN:  Mike, you have the right to read
22 and sign your deposition and you get an errata sheet and go
23 through it, and if there is anything misheard, you can change
24 that -- well, you can correct that, and so I would -- it's up
25 to you if you want to read and sign.

Page 145

1        THE WITNESS:  Do I have to read it all and sign it
2 today?
3        MR. HEISTERHAGEN:  No.  You will have 30 days.
4        THE WITNESS:  Yes, let's do that.
5        MR. HEISTERHAGEN:  Can I get a rough from you next
6 week, please.
7        MR. WADSWORTH:  Same.  I will need a rough, plus a
8 travel transcript with exhibits.  Just the pdf.  I didn't
9 need the paper.
10       MR. HEISTERHAGEN:  Just the normal thing, as long as
11 I have the electronic, but I do want the paper, as well.
12       (DEPOSITION OF MICHAEL MOORE concluded 1:05 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 146**

1    STATE OF NORTH CAROLINA.

2  COUNTY OF BUNCOMBE

3

4           REPORTER'S CERTIFICATE

5       I, CHRISTINE McMINN, a Notary Public in and for the

6  State of North Carolina, do hereby certify that there came

7  before me on Friday, the 1st day of July, 2016, the person

8  herein before named, who was by me duly sworn to testify to

9  the truth and nothing but the truth of his knowledge

10  concerning the matters in controversy in this cause; that the

11  witness was thereupon examined under oath, the examination

12  reduced to typewriting under my direction, and the deposition

13  is a true record of the testimony given by the witness.

14       I further certify that I am neither attorney or

15  counsel for, nor related to or employed by, any attorney or

16  counsel employed by the parties hereto or financially

17  interested in the action.

18       IN WITNESS WHEREOF, I have hereto set my hand, this

19  13th day of July, 2016.

20

21

22            _Christine Foley-McMinn_

23       Christine McMinn, Notary Public
      Notary Number 201419000084

24

25

**Page 147**

1           WITNESS'S CERTIFICATE

2

3       I, MICHAEL MOORE, do hereby certify

4  that I have read and understand the foregoing

5  transcript and believe it to be a true, accurate, and

6  complete transcript of my testimony, subject to

7  the attached list of changes, if any.

8

9  _____
            MICHAEL MOORE

10

11     This deposition was signed in my presence by

12  _____, on the _____ day of

13  _____, 2016.

14

15

16  _____
            Notary Public

17

18  My commission expires:

19

20

21

22

23

24

25

**Page 148**

1  CaseWorks, Inc.
   811 Ninth Street, Suite 260        (Page 1 of 2)

2  Durham, North Carolina 27705

3        E R R A T A   S H E E T

4  Re: Perkins Communications, LLC and Matrix, LLC v. D'Shannon Products, LTD, et al.

5  Deposition of: MICHAEL MOORE

6        Please read this transcript with care, and if
   you find any corrections or changes you wish made, list
   them by page and line number below.   DO NOT WRITE IN
   THE TRANSCRIPT ITSELF.  Return the

8  Certificate and Errata Sheet to this office after
   it is signed.  We would appreciate your prompt

9  attention to this matter.

10        To assist you in making any such corrections,
   please use the form below.  If supplemental or

11  additional pages are necessary, please furnish same and
   attach them to the errata sheet.

12  Page _____ Line _____ should

13  read:_____

14  Page _____ Line _____ should

15  read:_____

16  Page _____ Line _____ should

17  read:_____

18  Page _____ Line _____ should

19  read:_____

20  Page _____ Line _____ should

21  read:_____

22  Page _____ Line _____ should

23  read:_____

24  Page _____ Line _____ should

25  read:_____

**Page 149**

1  Page _____ Line _____ should        (Page 2 of 2)

2  read:_____

3  Page _____ Line _____ should

4  read:_____

5  Page _____ Line _____ should

6  read:_____

7  Page _____ Line _____ should

8  read:_____

9  Page _____ Line _____ should

10  read:_____

11  Page _____ Line _____ should

12  read:_____

13  Page _____ Line _____ should

14  read:_____

15  Page _____ Line _____ should

16  read:_____

17  Page _____ Line _____ should

18  read:_____

19  Page _____ Line _____ should

20  read:_____

21  Page _____ Line _____ should

22  read:_____

23  Page _____ Line _____ should

24  read:_____

25