Nelson

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| PERKINS COMMUNICATION, LLC, AND MATRIX, LLC, | ) CASE NO.<br>) 7:15-CV-01172-LSC<br>) |
| PLAINTIFFS, | ) DEPOSITION OF<br>) KIRK J. NELSON |
| VS. | ) |
| D'SHANNON PRODUCTS, LTD, SCOTT ERICKSON, MICHAEL MOORE, AND EARL RAMEY, | )<br>)<br>) |
| DEFENDANTS. | ) |

- - - - - - - - - - - - - - -

DEPOSITION OF KIRK J. NELSON, taken before Brianne L. Starkey, RPR, CRR, General Notary Public within and for the State of Nebraska, beginning at 9:49 a.m., on August 2, 2016, at the Law Offices of Baird Holm, LLP, 1700 Farnam Street, Omaha, Nebraska, pursuant to the within stipulations.

Job No. 110972

Exhibit C

## Page 2

```
            Nelson
       APPEARANCES
FOR THE PLAINTIFFS:
STEPHEN WADSWORTH, ESQ.
CAMPBELL, GUIN, WILLIAMS, GUY & GIDIERE
505 20th Street North
Birmingham, Alabama 35203



FOR THE DEFENDANTS (via LiveDepo):
TIM HEISTERHAGEN, ESQ.
ARMBRECHT JACKSON
63 South Royal Street
13th Floor Riverview Plaza
Mobile, Alabama 36602



FOR THE WITNESS:
WILLIAM DITTRICK, ESQ.
BAIRD HOLM
1700 Farnam Street
Omaha, Nebraska 68102
```

## Page 3

```
            Nelson
       I N D E X
CASE CAPTION ........................... Page    1
APPEARANCES ........................... Page    2
INDEX .................... Page    3
EXHIBITS .............................. Page    3
STIPULATIONS .......................... Page    4
TESTIMONY ............................. Page    4
REPORTER CERTIFICATE ................... Page    49
DIRECT EXAMINATION:
    By Mr. Wadsworth .................. Page    4

CROSS-EXAMINATION:
    By Mr. Heisterhagen ............... Page    32


       E X H I B I T S
EXHIBIT NO.                        MARKED
Exhibit 1. EMAIL DATED 3/26/13           7
Exhibit 2. EMAIL DATED 11/18/14          9
Exhibit 3. EMAIL DATED 11/18/13          10
Exhibit 4. EMAIL DATED 3/27/13           18
Exhibit 5. EMAIL DATED 1/2/14            20
Exhibit 6. INVOICE                       22
Exhibit 7. EMAIL DATED 6/15/16           25
Exhibit 8. EMAIL DATED 2/23/15           28
```

## Page 4

```
            Nelson
    (Whereupon, the following proceedings were
had, to-wit:)
         KIRK J. NELSON
      having been first duly sworn,
    was examined and testified as follows:
         DIRECT EXAMINATION
       MR. WADSWORTH:  Tim, usual
stipulations?
       MR. HEISTERHAGEN:  Yes.
       MR. WADSWORTH:  Okay.
BY MR. WADSWORTH:
    Q.  Mr. Nelson, my name is Stephen Wadsworth.
I'm an attorney with Campbell Guin in Birmingham,
Alabama.
       How are you today?
    A.  I'm fine.
    Q.  We have spoken over the phone several
times, but had we ever met before today?
    A.  No.
    Q.  And we are here today to talk about a case
involving two companies owned by Joe Perkins and
D'Shannon Aviation owned by Scott Erickson and Mike
Moore who -- Mike Moore is an individual, he's not
an owner of D'Shannon.
```

## Page 5

```
            Nelson
    Are you familiar with these individuals?
    A.  Yes.
    Q.  All right.  How do -- do you know Scott
Erickson?
    A.  I've known Scott for 20, 25 years as a
salesman for D'Shannon Products.
    Q.  Okay.  And do you know Mike Moore?
    A.  I met Mike about -- I think it was early
2013.  He was a new employee at the time for
D'Shannon developing their engine overhaul facility.
    Q.  Okay.  And do you know Joe Perkins?
    A.  I've become aware of Joe and I've talked
to him a couple times.  I know he's a customer of
Erickson's, of D'Shannon's, that two engines that I
provided to D'Shannon were overhauled and sold to
Mr. Perkins.
    Q.  So you originally had the IO-550-C engines
that were overhauled by D'Shannon and provided to
Mr. Perkins; is that correct?
    A.  That's correct.
    Q.  And Mr. Nelson, where do you live?
    A.  I live in Grand Island, Nebraska.
    Q.  Okay.  And what do you do for a living?
    A.  I'm an A&P mechanic.  I spent about ten
```

2

Page 6

```
 1              Nelson
 2   years working for Continental Motors, the
 3   manufacturer of these engines that are all in
 4   question.  And since about 2008, 2009, I've been
 5   self-employed.
 6       Q.  What's the name of your company?
 7       A.  K&B Aircraft Leasing.
 8       Q.  Now, does that do I guess both leasing and
 9   repair and overhaul of engines?
10       A.  Yeah.  It's an aircraft leasing company.
11   I buy and sell a lot of engine parts.  I'm not
12   actually an overhaul facility, though.
13       Q.  Okay.  And when did you work for
14   Continental?
15       A.  I believe I started in April of 2000, and
16   all the people in my department were released.
17   After the big economic implosion in 2008, I believe
18   I was let go in November or December of 2008.
19       Q.  And what sort of positions -- what
20   positions did you hold at Continental?
21       A.  Well, I worked in their marketing
22   department.  I was a -- basically a technical field
23   service rep, and I also worked with their
24   engineering department.
25       Q.  Did you ever do any work at Continental
```

Page 7

```
 1              Nelson
 2   that required use of your A&P?
 3       A.  Yes.
 4       Q.  What sort of work was that?
 5       A.  If we ever had engines in the field that
 6   had warranty problems, I was allowed to go out and
 7   work in the field under their MMF, equivalent to a
 8   repair station license by today's standards.
 9       Q.  So you would be signing off on behalf of
10   Continental?
11       A.  Correct.
12       Q.  You have brought some emails with you
13   today to the deposition, correct?
14       A.  I forwarded you a few, yes.
15       Q.  And these emails, just as a general
16   matter, they are true and accurate copies of what
17   they purport to be, right?  You haven't edited these
18   emails in any way?
19       A.  Correct.
20              (Exhibit 1
21              marked for identification.)
22   BY MR. WADSWORTH:
23       Q.  I'm going to mark as Exhibit 1 an email
24   dated March 26th, 2013.  It seems to be a chain
25   between you and Scott Erickson of D'Shannon
```

Page 8

```
 1              Nelson
 2   Aviation.  There is a memo on the back that seems to
 3   be outlining the history of D'Shannon Aviation.
 4       It starts off with, "I appreciate your
 5   extreme patience with me re: the purchase of the
 6   engine cores and parts.  I know time is running
 7   out."
 8       I just wanted to ask, was this email sent
 9   or received near the beginning of your relationship
10   with Scott Erickson and D'Shannon Aviation?
11       A.  Well, my relationship with Scott Erickson
12   and D'Shannon Aviation goes back into the '90s.
13   Scott's been a -- he was a -- the salesman and
14   marketing director, I guess you could say, for
15   D'Shannon Products going way back well into the
16   '90s.
17       But at this point in time, this is kind of
18   the beginning of an exchange where Scott is trying
19   to locate engines that he can overhaul to sell for
20   his upgraded engine programs.
21       Q.  Okay.  And I know that you provided him
22   with two IO-550-C engines that were overhauled for
23   Joe Perkins.  What else did you eventually provide
24   to Scott Erickson?
25       A.  There's a list I believe contained in this
```

Page 9

```
 1              Nelson
 2   email perhaps.
 3       Q.  Actually, I've got it here.  Let me go
 4   ahead and mark this as Exhibit 2, then.
 5       A.  I provided him with...
 6              (Exhibit 2
 7              marked for identification.)
 8   BY MR. WADSWORTH:
 9       Q.  I have marked as Exhibit 2 an email dated
10   November 18th, 2014, that seems to have an invoice
11   on the back of it.
12       Let me ask, is this the email that you
13   were referring to?
14       A.  Yes.
15       Q.  Okay.
16       A.  This is the email with an invoice on it
17   for cores, various new parts, and equipment that I
18   provided to D'Shannon on or about approximately
19   June 1st of 2003, the total invoice price of
20   $212,000.
21       Q.  Do you believe that that reflects all of
22   the parts, engines, and everything else that you
23   provided to D'Shannon during the relevant time frame
24   here?
25       A.  I do.
```

1  Nelson
2  (Exhibit 3
3  marked for identification.)
4  BY MR. WADSWORTH:
5  Q. Okay. I'll mark as Exhibit 3 an email
6  that was previously produced in this case as
7  Plaintiffs' 558. It's an email from Mike Moore to
8  Joe Perkins.
9  And down at the bottom, it lists several
10  creditors of D'Shannon Aviation. This is Mike Moore
11  listing what he believes to be the creditors of
12  D'Shannon Aviation?
13  A. Correct.
14  Q. It says that as of November 18th, 2013,
15  D'Shannon owes you or Scott Erickson owes you
16  approximately $150,000 for engine core and engine
17  parts.
18  Do you know where Mr. Moore would've
19  gotten this information?
20  A. Probably from myself, but he was acutely
21  aware of the situation of Scott getting these parts
22  and not performing and paying for these items.
23  I have never received an actual check from
24  Scott. The only way he was repaying me was through
25  doing work in trade for me. He overhauled two

1  Nelson
2  different engines for me, only one of which was
3  completed in an acceptable manner for resale.
4  The second engine was problematic from the
5  beginning and has since been removed from the third
6  party's airplane, and I think the engine is actually
7  sitting in D'Shannon's current overhaul facility
8  awaiting disposition.
9  Q. What sort of problems were there with that
10  engine?
11  A. It was not completely assembled correctly.
12  It suffers some kind of an oil pump failure and
13  other damage to the engine, and it was -- it
14  occurred within Scott's warranty -- within Scott's
15  warranty time frame. It was about six months in
16  use, as I recall, and the engine failed.
17  It was returned, and without -- without
18  being able to correct the issue, Scott probably not
19  having the money and the funds to do so, the engine
20  was -- I believe has been now replaced by a factory
21  engine direct, and so the core is sitting there at
22  this time with unknown status.
23  Q. It's sitting where at this time?
24  A. Oshkosh, Wisconsin.
25  Q. Is that where the D'Shannon Aviation has

1  Nelson
2  its main facility at this time?
3  A. Currently, yes. That's their overhaul
4  engine facility.
5  Q. Have you been to the overhaul engine
6  facility in Oshkosh?
7  A. I have not.
8  Q. Now, you mentioned that Mr. Erickson paid
9  you by doing work in trade. Did he ever provide you
10  with engine cores or engine parts?
11  A. Two of the engine cores that I provided to
12  him were returned to me less the logbooks that
13  originally went with him and several small parts
14  removed from the engines that were consumed in the
15  course of other business.
16  And then he also returned two IO-520-CB
17  engines that were the cores removed from Joe
18  Perkins' airplane.
19  Q. Now, he provided you with the cores to the
20  IO-520 engines. Why did he provide those to you?
21  A. Well, Scott is always needing additional
22  550-C engines to do these upgrades. He returned
23  those to me with the intent that I would exchange
24  those engines again with engines purchased from the
25  manufacturer so that he could get 550 cores again to

1  Nelson
2  rebuild. And these 520s that were originally the
3  Perkins engines would just go back to them as cores.
4  Q. Now, there's been testimony in this case
5  that the 520 engines were sent to you to store for
6  D'Shannon Aviation; is that true?
7  A. I don't agree with that statement.
8  Q. Why not?
9  A. He was storing them in his own hangar in
10  Buffalo, Minnesota, at the time when I picked them
11  up. He returned them to me with the intent that I
12  would use those to exchange for two more desirable
13  cores, 550 cores to be, again, used for his
14  additional upgrades in the future.
15  Q. Do you believe that D'Shannon Aviation
16  owns these cores?
17  A. I do not.
18  Q. Who do you believe owns the cores today?
19  A. They were returned to me, and I hold them,
20  as-removed condition, still in the box as they were
21  delivered to me, but they're in my possession.
22  And with Scott unable to repay me for any
23  of the parts and stuff that I provided to him, at
24  this time, they're in my possession and it's
25  effectively collateral against the loan -- or the

4

Nelson

debt that he owes me.

Q. Could I take a look at the invoice email? I believe it's Exhibit 2.

Today is the first time that I've seen this email, so I wanted to ask, on -- there is a page marked "Credit Memo"?

A. Correct.

Q. I wanted to ask you what -- what this page represents?

A. This represents the return of the TSIO-520-WB engines that I originally gave him that I had originally forwarded to him. And it shows credit for two other engines, an IO-550-N and an IO-360-S that I did receive and return for these -- the engines that were previously overhauled.

Q. Did -- so none of these engines on the credit memo page are Joe Perkins' 520?

A. These are not related to Perkins' engines.

Q. Have you provided Scott Erickson with any credit for the Perkins engines?

A. I don't believe I have.

Q. Why is that?

A. It was just something that occurred and there has been no follow up since then. Attempts to

Nelson

discuss these matters with Scott are usually -- the phone calls are screened and not answered, emails not returned, text messages not returned.

So any -- any further contact and communication with him has basically been broken off at Scott's doing.

Q. On the last paragraph of Exhibit 2, the first page of Exhibit 2, the email from you to Scott, the last full paragraph, it says, "You still should have several items that I provided an inventory: The two IO-520-CBs apparently disassembled. There should still be six new IO-550-N cylinders that you mentioned during my visit."

Are these 520-CBs, are those the original Joe Perkins engines?

A. These are not. These are two engines that I had provided to Scott as cores for his use and consumption and was part of my original invoice that I forwarded to him. Those were once-run runout cores, no damage, that I had provided to him and never received back.

Q. Do you remember approximately -- and it's okay if you don't remember the exact date.

Nelson

But do you remember approximately when you received the Perkins 520 engine cores from D'Shannon?

A. I could research it and get you an actual date, but it was about two years ago, as I recall.

Q. Would it have been in 2014 then?

A. I believe that's probably correct.

Q. Do you remember whether it was summer or fall?

A. Not specifically.

Q. Was there snow on the ground in Buffalo, Minnesota?

A. Probably so, but I think there's snow on the ground in July too, so...

Q. Okay. Well, that might not help us much.

Turning to Exhibit 3, I'll give you this back, the email from Mike Moore to Joe Perkins, there are several individuals who are listed. Do you know Doug Neal?

A. I do not.

MR. HEISTERHAGEN: Object to the form.

BY MR. WADSWORTH:

Q. Okay.

Nelson

MR. HEISTERHAGEN: You can answer.

BY MR. WADSWORTH:

Q. Do you know who ECI is?

A. Yes, I do.

Q. Okay. Do you know anything at all about the debt that Mike Moore mentions to ECI?

MR. HEISTERHAGEN: Object to the form.

THE WITNESS: The debt to ECI is for parts that were sent to ECI. Some of these parts were parts that were involved with engines that I was involved with that -- they were basically not returned back to D'Shannon at that time because he was on a COD basis.

BY MR. WADSWORTH:

Q. What's the basis for your knowledge?

A. Conversations with Mike Moore, Earl Ramey.

Q. Looking down the list of people, are there any of the -- are there any other names on here that you recognize?

A. Not directly. The landlord, I know that he was always behind on his rent and always being threatened with being locked out of his shop in Mooresville.

Page 18

```
 1       Nelson
 2       I'm aware that paychecks to all the
 3   employees in Mooresville were always being
 4   overnighted, frequently they were being bounced.
 5   And it was difficult to keep those guys engaged just
 6   because they weren't being paid reliably.
 7               (Exhibit 4
 8               marked for identification.)
 9   BY MR. WADSWORTH:
10       Q.  I'll mark as Exhibit 4 an email that you
11   provided today from March 27th, 2013.
12       It says, "We will write up a contract,
13   whatever you need in an effort to make you
14   comfortable and confident in the transaction."
15       Is this just an email -- is this another
16   email from kind of the beginning of your business
17   relationship of providing parts to Scott Erickson
18   and D'Shannon?
19       A.  Yes, it is.
20       Q.  Okay.  What were the terms of payments
21   supposed to be between you and D'Shannon?
22       A.  Unfortunately from my perspective, it was
23   never defined all that clearly.  But as he sold
24   engines and consumed these parts, I was to be
25   compensated equally for -- you know, as the parts
```

Page 19

```
 1       Nelson
 2   were consumed.
 3       Q.  Did that happen?
 4       A.  I have never received payment for any of
 5   these engines other than I gave him some credit for
 6   one engine that he overhauled.  It was an
 7   IO-550-November that I believe we sold for around
 8   $30,000.  I gave him a credit in the process for
 9   that amount.
10       But I also had to provide about 10,
11   $12,000 worth of parts so that he could perform the
12   work just because he did not have cash available to
13   perform the work himself.
14       Q.  Did you have any understanding about the
15   operation that D'Shannon had set up in Mooresville,
16   North Carolina?
17       A.  I was aware that Mike Moore was basically
18   running the operation there.  I was told time after
19   time that they had a repair station that was going
20   to be implemented in the operation.
21       Q.  Who told you that they had a repair
22   station?
23       A.  Scott Erickson.
24       Q.  Did he represent that there was currently
25   a repair station up and running or that they were
```

Page 20

```
 1       Nelson
 2   trying to create a repair station?
 3       A.  It was always in process.  I mean --
 4           MR. HEISTERHAGEN:  Object to the
 5   form.  Sorry.
 6           THE WITNESS:  He would make claims
 7   that the repair station was imminent, even though
 8   during some of our own research, we could never see
 9   any evidence that he had filed anything with the FAA
10   at that time, and I don't think he ever did while he
11   was in North Carolina.
12               (Exhibit 5
13               marked for identification.)
14   BY MR. WADSWORTH:
15       Q.  Mark as Exhibit 5 another email that you
16   produced today.  It is another email chain between
17   you and Scott Erickson from January 2nd, 2014, and
18   it's discussing the consumption of assets without
19   your understanding and approval or anyone there to
20   protect your interest if you look at the third from
21   the last paragraph.
22       I was just wondering if you could review
23   this and tell me what the purpose of this email was?
24       A.  This is an email where I'm concerned that
25   Scott is not paying back this invoice that -- as we
```

Page 21

```
 1       Nelson
 2   agreed both verbally and to some degree via emails.
 3       I'm mentioning here that I'm aware that he
 4   has about $20,000 outstanding in two engines that
 5   were -- as I said, went to Alabama which at that
 6   time I didn't know Mr. Perkins' name, but I was
 7   basically saying to him that I want the residual
 8   funds that come from Mr. Perkins to be forwarded to
 9   me when they are collected.
10       Q.  Did you believe that the -- the engines
11   that you had an interest in that were being held by
12   D'Shannon were being, for lack of a better term,
13   cannibalized for their parts?
14       A.  Yes.
15       Q.  What was the basis of your understanding?
16       A.  My understanding was just what I was
17   hearing from Mike Moore and Earl, that whenever they
18   needed parts for a different engine they were
19   working on, they would just remove parts as needed
20   to fulfill these demands because they didn't want to
21   go out and spend money for additional parts
22   themselves.  So they were just using my engines
23   basically as parts engines for the most part.
24       Q.  When you said that they didn't want to
25   spend money, is that Mike Moore didn't want to spend
```

Page 22

1  Nelson
2  the money?
3  A. No. It'd be Scott himself. It's not that
4  he maybe didn't want to spend money. He just was
5  short on cash. So, you know, rob from Peter to pay
6  Paul is really what it comes down to.
7  Q. And it was your understanding that those
8  engines and those parts were yours and not
9  D'Shannon, correct?
10  A. Correct.
11          (Exhibit 6
12          marked for identification.)
13  BY MR. WADSWORTH:
14  Q. Mr. Nelson, I'm going to direct your
15  attention to something that was attached to the
16  amended counterclaim in this action, it's
17  Document 13-1, as Exhibit A.
18      Have you ever seen this document before?
19  A. I don't believe so.
20  Q. It is an invoice from Perkins
21  Communication -- invoice to Perkins Communication
22  from D'Shannon Aviation.
23      And if you take a look down four lines
24  from the bottom, there's a line that says, "Core
25  returned - beyond economic repair"?

Page 23

1  Nelson
2  A. Correct.
3  Q. Do you have any understanding as to which
4  cores this would refer to?
5  A. This would be one of the engines that was
6  returned to me by Scott that came off the Perkins
7  engine -- or Perkins airplane. Which engine it is
8  exactly is unclear.
9  Q. Do you believe this would just be one of
10  the engines and not both?
11  A. It's one of the engines, yes.
12  Q. Which engine is it?
13  A. I don't know if it was left or right. I
14  don't know by serial number because it's not
15  identified on the document.
16  Q. Where is that engine as we sit here today?
17  A. It sits in Grand Island, Nebraska.
18  Q. In your hangar?
19  A. Correct.
20  Q. What is the condition of that engine?
21  A. The condition is as removed, as received
22  on my part. I have not done anything other than
23  open the box and look at it.
24      But I did -- I did view inside the engine
25  where the alternator drive assembly had failed, and

Page 24

1  Nelson
2  there is -- there is damage in that area that often
3  does lead to the engine core, primarily the
4  crankcase and the crankshaft in the engine. High
5  likelihood of those parts not being reparable.
6      But until you disassemble the engine and
7  send the parts out to a certified repair station for
8  rework, only then would you know if those parts are,
9  in fact, unserviceable.
10  Q. So today as we sit here, can you say with
11  certainty that the core is beyond economic repair?
12  A. I cannot say with certainty.
13      MR. HEISTERHAGEN: Object to the
14  form.
15  BY MR. WADSWORTH:
16  Q. Would you have the -- and you said what
17  would you have to do in order to be able to tell
18  whether it was beyond economic repair?
19  A. Disassemble the engine and have the
20  crankcase and crankshaft sent to a qualified repair
21  station for evaluation to see if the parts are, in
22  fact, unreparable or not.
23  Q. And this charge has been sent from
24  D'Shannon Aviation to Perkins Communication. Do you
25  believe that D'Shannon Aviation is entitled --

Page 25

1  Nelson
2  assuming that the part is beyond economic repair, is
3  D'Shannon Aviation the correct party in interest to
4  receive -- to receive the -- I guess the core return
5  charge?
6      MR. HEISTERHAGEN: Object to the
7  form.
8      THE WITNESS: I feel that I'm
9  entitled to that because I was never paid for the
10  engine that Joe received to begin with.
11      But it's probably not inappropriate that
12  the add-charge is on this invoice from D'Shannon to
13  Mr. Perkins because the engine was damaged prior to
14  all this replacement of these engines with these
15  550 engines as was done.
16      But there was never an intent by D'Shannon
17  to use these engines for anything other than return
18  cores to the manufacturer, which would not audit
19  these parts and back-charge as long as the engines
20  are assembled in an as-removed condition.
21          (Exhibit 7
22          marked for identification.)
23  BY MR. WADSWORTH:
24  Q. I'm going to mark as Exhibit 7 an email
25  chain that you produced today between you and Joe

7

1  Nelson
2  Perkins. I'm going to return to the part of the
3  chain from May 25th, 2016.
4      This paragraph right here which I'll read
5  before handing you since this is the copy that I
6  have, it says, "I was contacted by your counsel,
7  Mr. Wadsworth, last week learning that you now are
8  litigating with D'Shannon for issues with the
9  engines they provided you two and a half years ago.
10 Scott had sent me the cores engines from -- the
11 engine cores from your plane to try to help satisfy
12 my debts with him. I had asked Mr. Wadsworth to
13 discuss mutual concerns with you to see if we had
14 common interests to pursue our interests with
15 D'Shannon."
16     Is it your understanding that Scott had
17 sent you those cores to satisfy his debt to you?
18     A. Yes.
19     Q. Do you believe that if Perkins
20 Communication -- if the cores are inspected and
21 found to be beyond economic repair or that single
22 core is inspected, excuse me, and found to be beyond
23 economic repair, would Joe Perkins more correctly
24 owe you the money than D'Shannon?
25     A. That's my opinion.

1  Nelson
2      MR. HEISTERHAGEN: Object to the
3  form.
4      MR. WADSWORTH: Tim, at this point,
5  we are through the documents that I brought and
6  we're through the documents that he has produced. I
7  believe that we're going to have another stack
8  coming, so should we take a break?
9      Actually, here is the stack. I think --
10 has it been forwarded to Tim already?
11     MR. DITTRICK: Yes.
12     MR. WADSWORTH: Let me take about a
13 five-minute break to go through this, Tim, and then
14 we'll get back started.
15     MR. HEISTERHAGEN: All right. I'm
16 going to step out for a second, but I'll be back
17 within five minutes.
18     MR. WADSWORTH: Perfect. Thank you.
19         (10:24 a.m. - Recess.)

1       Nelson
2       (At 10:30 a.m., with parties present as
3  before, the following proceedings were had, to-wit:)
4           (Exhibit 8
5           marked for identification.)
6  BY MR. WADSWORTH:
7      Q. I'm going to mark as Exhibit 8 an email
8  from February 23rd, 2015, from Scott Erickson to
9  John and you copying Dale Erickson at D'Shannon
10 Aviation, subject, "Engine Logbooks."
11     It says, "Please confirm that you have the
12 logbooks from Joe Perkins' IO-520-CBs."
13     Have you seen this email before today?
14     A. I'm sure I did. It's sent to me, but this
15 is an attempt to Scott to communicate to John Clegg
16 that I'm requesting probably verbally at that time
17 the logbooks for two of the engines of mine that
18 were returned to me, along with the two engines of
19 Mr. Perkins' that was -- that was also returned to
20 me.
21     Q. And those are the two 520s that belonged
22 to Joe Perkins that we discussed earlier, correct?
23     A. That's correct, yes.
24     Q. And do you have those logbooks today?
25     A. I never received them. They were -- they

1       Nelson
2  told me they have now been lost.
3      Q. Who told you that they were lost?
4      A. Scott.
5      Q. Was this an isolated incident, him losing
6  those log books?
7      MR. HEISTERHAGEN: Object to form.
8      THE WITNESS: In my experience, all
9  the engines that he overhauled on my behalf and the
10 engines that were returned to me, none of them ever
11 had logbooks come back with them.
12     The engines that he did overhaul from
13 me -- for me from my observation, the original
14 engine logbooks were never provided and only a
15 single page entry on a new logbook was started by
16 Mr. Clegg every time they returned an engine to
17 service.
18 BY MR. WADSWORTH:
19     Q. What is the effect, if any, of the 520 Joe
20 Perkins engines in your possession not having the
21 original logbooks?
22     A. They're not returnable typically to the
23 factory. The factory wants logbooks with engines to
24 come back.
25     As far as resale of those engines, the

Page 30

Nelson

engines without logbooks are just a pile of parts as they sit without the logbook. You really have to have a logbook to sell an engine so that its pedigree and history can be proven to a repair station or anybody that's doing the work on it.

Q. Would it reduce -- would the lack of logbooks reduce both the damaged engine and the presumably in fairly good condition engine?

A. Yes.

Q. Would -- if the -- if the logbooks were attached to the engines, would the charge to Joe Perkins, if any, whether it's owed to you, whether it's owed to D'Shannon, whoever it's owed to, would it likely result in a lesser charge to Joe Perkins?

A. Possibly, yes.

Q. Now, as a -- you said you were an A&P or an IA?

A. I'm both.

Q. You're both.

As an IA who worked for Continental Motors -- for how long?

A. It was May of 2000 until October of 2008 or November of 2008, so about nine years, I guess.

Q. In your experience with Continental

Page 31

Nelson

Motors, did you ever see an engine kick back?

A. Yes.

MR. HEISTERHAGEN: Object to the form.

BY MR. WADSWORTH:

Q. When a Continental engine kicks back, would a pilot normally notice it?

A. Yes, during start-up, yes.

Q. If a kickback occurs, if there is damage to the Continental engine, where would you expect to find it?

MR. HEISTERHAGEN: Objection. Stephen, you haven't -- Mr. Nelson, just give me just a second, please.

Stephen, you haven't identified Mr. Nelson as an expert. The expert disclosure deadline is passed, and this is -- none of this is relevant or admissible.

MR. WADSWORTH: Well, yeah. That's possibly so, but I guess that's up for the judge to decide.

BY MR. WADSWORTH:

Q. You can answer the question, if you know.

A. Typically kickback damage, the Achilles

Page 32

Nelson

heel when we first look at it is usually in the start adapter with a clutched spring.

Further damage can also occur in the gear train in the back of the engine internally.

MR. WADSWORTH: I think that's all I have for now subject to -- if we get more documents or whatever Tim asks.

(Discussion had off the record.)

CROSS-EXAMINATION

BY MR. HEISTERHAGEN:

Q. All right. Mr. Nelson, as I mentioned, my name is Tim Heisterhagen, and I represent Mike Moore and D'Shannon and Scott Erickson in this case.

How long have you been an A&P?

A. 1985.

Q. And how about an IA? How long have you been an IA?

A. I believe since 1990.

Q. Have you ever been the subject of any enforcement action by the FAA?

A. I don't believe so.

Q. Have you ever had any disciplinary actions taken against your A&P license or IA by the FAA?

A. I've never had any disciplinary action,

Page 33

Nelson

no. I've held my license intact the entire time.

Q. Okay. Mr. Nelson, looking at some of the emails we've seen today, you have communicated with Mr. Perkins; is that right?

A. I have communicated with him on and off I think at times over the last couple years.

Q. Okay. Since you sent the email on June 15, 2016, to Mr. Perkins, have you spoken with him over the phone?

A. I believe once I have.

Q. What did y'all talk about?

A. Just the ongoing situation with the engines that Scott had over- -- that D'Shannon had overhauled for Perkins. It's that time he informed me that the engines had been removed and replaced with factory engines and that litigation was pending.

Q. Okay. Did Mr. Perkins ask you to help him in this litigation with Mr. Erickson or D'Shannon?

A. No. I think I probably asked him because I have my own -- my own issues with D'Shannon just because of lack of payment for the engine cores involved in this case, for example.

Q. Okay. So just to be clear, are you saying

9

Page 34

Nelson

that you asked Mr. Perkins for help with your issues?

A. I believe I probably phrased it that we should collectively work through this issue together since we have intermingled mutual concerns regarding these debts.

Q. Okay. And we've talked about this a bit today. You currently believe that Mr. Erickson and D'Shannon owe you money, correct?

A. Correct.

Q. And you're not very happy with Mr. Erickson about that, are you?

A. I provided him engines and parts and he refuses to communicate and do anything to address the matter, so here we are.

Q. So your relationship with Mr. Erickson as we sit here today is not a good one, is it?

A. It's not hostile, but I would just say it's a relationship that has gone silent.

Q. Okay. And that's because of the business dispute between you and Mr. Erickson; is that right?

A. Yes.

Q. How many times have you spoken with Mr. Wadsworth or any of Mr. Perkins' lawyers on the

Page 35

Nelson

phone?

A. I think Mr. Wadsworth is the only attorney I've discussed any matter with, and I think I've only talked to him once or twice.

Q. And that would have been around this time where you emailed Mr. Perkins and said you had spoken with his attorney; is that right?

A. I believe so.

Q. Did you and Mr. Wadsworth discuss the same issues that you had discussed with Mr. Perkins when you called him recently?

A. My conversation --

MR. WADSWORTH: Object to form, but you can answer.

THE WITNESS: My conversation with Mr. Wadsworth had more to do with scheduling this deposition specifically. I don't recall any detailed discussions about any matters that are occurring between Perkins and D'Shannon at this time.

BY MR. HEISTERHAGEN:

Q. Okay. So your communications with Mr. Wadsworth were mostly logistical communications, not substantive --

Page 36

Nelson

A. Yes.

Q. -- communications; is that right?

A. Yes.

Q. Have you ever spoken with Mike Terry or anyone at Dixie Air about this case?

A. I don't know who that is.

Q. Okay. Have you ever spoken with Don Freeman or anyone at Aviation Engines in Alabama regarding this?

A. I have no idea who that is.

Q. Okay. Mr. Nelson, were you involved with the overhaul of the 550 cores that were sold to Mr. Perkins by D'Shannon?

A. I was not.

Q. Have you seen those engines in person since those cores were shipped from you to Mooresville, North Carolina?

A. I have not.

Q. Do you have any information as we sit here today regarding the overhaul of the engines that were sold to Mr. Perkins by D'Shannon?

A. I'm not aware of the disposition of the engines or what -- exactly why they were removed.

Q. Okay. Mr. Nelson, since Mr. Wadsworth

Page 37

Nelson

attempted to elicit some opinions from you, have you been asked prior to this deposition to give any type of opinions regarding the kickback or the crankshaft assembly in this case?

A. In this case?

Q. Yes, sir.

A. I haven't been asked to give an opinion about kickbacks in this case. I've had opinions about kickbacks in several other cases in my prior employment with Continental and my involvement with engines of this nature over the course of my career.

Q. And I think you -- you got my -- you understand my question.

What I'm trying to find out is has Mr. Perkins or any of his attorneys retained you as an expert in this case?

A. They have not.

Q. And have you seen any photographs of the left D'Shannon IO-550-C that was removed from Mr. Perkins' aircraft?

A. I have not.

Q. Have you done any testing or taken any measurements of the components of that left D'Shannon?

10

Page 38

Nelson

Q. Have you seen any evidence or been given any information of any kind that the small crankshaft gear and the large crankshaft gear or the crankshaft holes were installed improperly in either of the 550-C engines that were sold to Mr. Perkins by D'Shannon?

A. I have no knowledge of that at all. I have no knowledge of exactly what happened to these engines and why they were removed.

I just know that one engine had some kind of failure and Mr. Perkins elected to replace them with factory engines and replace both engines out of his own choice, I guess, instead of having them repaired.

Q. Okay. Did you obtain that information from Mr. Perkins?

A. It was either Mr. Perkins directly or Mike Moore.

Q. Okay. Mr. Nelson, I want to ask you a little bit about engine core values generally.

How do you set the value for an engine core?

A. Market trends. The factory has an

Page 39

Nelson

exchange value. The real value is usually somewhere approximately around 50 percent of the actual core value that the factory sets on them.

Q. Okay. Do you use the factory value as your starting point?

A. Yes.

Q. And then there's certain factors that can affect that value based on the condition of the engine; is that right?

A. Yes.

Q. And I would assume, and please correct me if I'm wrong, but the major factor would be damage to the component of the core; is that right?

A. Correct.

Q. And the most valuable parts of the core would be the crankshaft and the crankcase; is that right?

A. Primarily, yes.

Q. If you -- strike that.

If a customer returned a Continental core to you and the crankshaft and crankcase were damaged beyond repair and could not be returned to service, would you give that customer any credit for that core?

Page 40

Nelson

A. I would deduct credit based on the cost of those components to be purchased outright instead of exchanged. If you have a bad crankshaft, there's going to be an add charge of, I don't know, 25 percent of the core value, usually somewhere in the 5 to $7,000 range. I haven't kept up with the market prices in the last couple years.

Crankcase is the same. If a crankcase is bad, you have to go out in the open market, purchase a crankcase, and whatever that price is is a chargeback. Again, crankcase is probably in the 4 to $5,000 range.

Q. Okay. And would you tell me what a chargeback is just for the purposes of the record?

A. It's just an additional charge when repairing an engine in this case for parts that need to be reparable when returned -- in an exchange case like this, they have to be reparable.

If they're not, the value of those parts has to be compensated to the overhaul facility or the person that's taken that core back in in exchange.

Q. Okay. And that's a standard practice in the aviation industry, isn't it?

Page 41

Nelson

A. Pretty much. Continental Motors typically does not charge back for damaged components just because they play a game of averages. They win some, they lose some. As long as the engine is running in as-removed condition and does not have any evidence of catastrophic failure, they'll usually give core credit appropriately.

If there is substantial damage, they usually reduce the core credit by 25, 50 percent in addition to the exchange price of the engine.

Q. Okay. In your experience at Continental, would they reduce the core value if an engine came in with a damaged crankcase and a damaged crankshaft?

A. Potentially, yes.

Q. Okay. And it would just depend on the severity of the damage, correct?

A. It depends on if the person that's receiving the core notated the damage and decided to add a chargeback or if they just processed it and run it through.

It's -- it's usually -- they don't -- they usually would not charge back if a crankshaft was found out of limits, out of, you know, wear limits.

11

Page 42

```
 1              Nelson
 2  They would take that back just fine.
 3         But if any part or component is damaged
 4  due to catastrophic failure, in this case with
 5  Mr. Perkins, there was an alternator failure as I
 6  understand it, if they noticed that, at that point
 7  they may look closer at the core and reevaluate the
 8  core credit accordingly.
 9     Q.  Would you consider an alternator drive
10  failure a catastrophic failure for an IO-520-CB?
11     A.  It is actually, yes.
12     Q.  And in your experience, what happens to an
13  engine such as an IO-520-CB when the alternator
14  drive fails?
15         MR. WADSWORTH:  Object to form.
16         THE WITNESS:  When the alternator
17  drive fails, the first thing that usually is damaged
18  is the alternator drive face gear that's bolted to
19  the crankshaft.
20         So when that happens, that face gear is
21  often damaged and the crankshaft flange where that
22  face gear is bolted to will get cracked or destroyed
23  in some fashion that makes the crankshaft
24  unserviceable.
25         At the same time, the alternator clutch
```

Page 43

```
 1              Nelson
 2  that that drive gear is driving, that can also fail
 3  and damage the crankcase in that area right around
 4  where that's located.
 5  BY MR. HEISTERHAGEN:
 6     Q.  Okay.  And I think you told me that as to
 7  one of Mr. Perkins' 520-CB engines, you knew that
 8  there had been an alternator drive failure but you
 9  had not opened those engines up and inspected the
10  interior components; is that right?
11     A.  I have not.
12     Q.  Where did you obtain the information that
13  there was an alternator drive failure?
14     A.  Mike Moore and Scott Erickson both told me
15  that that was the disposition of the engine, that
16  there had been a failure.
17         And I believe I recall Scott saying that
18  he was still trying to settle this matter with
19  Perkins to -- so he could collect his money so that
20  he could ultimately pay me.
21     Q.  Okay.  Did you confirm that there had been
22  an alternator drive failure by visual inspection?
23     A.  The engine as I received it, the
24  alternator is not installed on the engine.  There
25  was no alternator returned.
```

Page 44

```
 1              Nelson
 2         But looking internally where the
 3  alternator is bolted up, there is evidence that
 4  there was a drive failure that I can see.
 5     Q.  You told Mr. Wadsworth earlier that you
 6  had not given D'Shannon credit for the 520-CB cores
 7  because the communication with your -- your
 8  communication with D'Shannon --
 9         COURT REPORTER:  I didn't hear the
10  end of that question.
11         MR. HEISTERHAGEN:  I'm sorry.
12  BY MR. HEISTERHAGEN:
13     Q.  Mr. Nelson, you told Mr. Wadsworth earlier
14  that you had not given D'Shannon credit for the
15  520-CB cores that were removed from Mr. Perkins'
16  aircraft; is that right?
17     A.  Correct.
18     Q.  And I believe the reason that you said
19  that you had not given him credit at this time was
20  because your communication with Mr. Erickson and
21  D'Shannon had ceased; is that right?
22     A.  Yes.  I mean, I received the engines, I
23  hold the engines, but resolution of the debts that I
24  have with Scott never moved forward.  Scott would
25  often give me a dog and pony show to distract me,
```

Page 45

```
 1              Nelson
 2  and, you know, nothing has ever happened.
 3         So effectively, I have the engines, but I
 4  never provided Scott with any -- any invoicing or
 5  credit memos alike relative to these engines.
 6     Q.  If Mr. Erickson asked you to give him a
 7  credit, would you give him any credit towards his
 8  debt for the 520-CB that had the alternator drive
 9  failure?
10     A.  I might give him some credit, but I have
11  no opinion exactly what I would give him without
12  evaluating the engines myself.
13     Q.  Were you involved in any way in
14  D'Shannon's determination to charge back Mr. Perkins
15  $10,000 for the damaged 520-CB core?
16     A.  No.
17     Q.  And, Mr. Nelson, you drove up to Minnesota
18  and picked up those 520-CB cores; is that right?
19     A.  I did.  Mr. Erickson met me there and
20  helped load them.
21     Q.  Okay.  Would you have any communications
22  of any kind that would show when you got those cores
23  or invoices or anything?
24     A.  I'm sure if I searched through past
25  records, I could come up with a date that we did
```

Page 46

Nelson

this, yes. I just haven't done that at this point.

Q. Mr. Nelson, has anyone -- either Mr. Perkins or anyone on his behalf offered to sell you the D'Shannon IO-550-C engines that are currently being stored in Tuscaloosa?

A. It has not been offered to me.

Q. Have you offered to purchase those engines?

A. The only offer I believe I made to Joe was that before he sends the 550s that he currently has back to Continental, if he'd prefer, I can provide him with the 520-CBs that came off it originally if he'd rather send those back to Continental so that I can get what technically are my 550s back.

Q. Okay. Mr. Nelson, I don't want to know any communications that you may have had with an attorney, but are you currently contemplating any litigation against D'Shannon or Mr. Erickson?

A. Yes, I am.

Q. And is that litigation related to the debt that you allege that D'Shannon owes you?

A. Yes.

Q. And, Mr. Nelson, earlier we talked about an email that Mr. Moore -- Mike Moore sent to Joe

Page 47

Nelson

Perkins regarding some debts that D'Shannon allegedly owed to various people and companies. Do you remember that?

A. I do recall, yes.

Q. Other than any moneys that Mr. Erickson and D'Shannon may owe to you, what is the basis for your knowledge regarding the other debts that are described on that email to the extent you have knowledge?

A. Verbal communication with his employees.

Q. And would that have been Mike Moore and Earl Ramey?

A. Correct, possibly John Clegg.

MR. HEISTERHAGEN: Okay. Mr. Nelson, I believe that is all that I have.

THE WITNESS: All right.

MR. WADSWORTH: No questions.

THE WITNESS: Okay.

MR. HEISTERHAGEN: Electronic, the full size and condensed, and then we can do electronic exhibits as well. And bill me for the videoconference.

(Discussion had off the record.)

I don't think I need it that quick, but

Page 48

Nelson

maybe early next week. I mean, sort of a normal course.

MR. WADSWORTH: I would like a travel PDF and digital exhibits by tomorrow morning.

What Bill Dittrick, Mr. Nelson's attorney, Tim, has said is that he wants to read and sign the deposition. And here's the only issue that we have.

We are -- at least from my perspective, I'm happy to let you read and sign, obviously, a reasonable errata sheet, but we've got a basically dispositive motion deadline coming up on August 15th, so we'd like to be able to use basically kind of the immediate transcript and we'll substitute out if you have any changes.

Would that be okay?

MR. DITTRICK: Certainly.

(11:02 a.m. - Adjournment.)

\*\* \*\* \*\* \*\*

SUBSCRIBED AND SWORN BEFORE ME
THIS \_\_\_\_ DAY OF _____, 2016.
_____
(Notary Public) MY COMMISSION EXPIRES:_____

Page 49

Nelson

C E R T I F I C A T E

STATE OF NEBRASKA )
 ) ss.
COUNTY OF DOUGLAS )

I, Brianne L. Starkey, RPR, CRR, General Notary Public within and for the State of Nebraska, do hereby certify that the foregoing testimony of KIRK J. NELSON was taken by me in shorthand and thereafter reduced to typewriting by use of Computer-Aided Transcription, and the foregoing forty-eight (48) pages contain a full, true and correct transcription of all the testimony of said witness, to the best of my ability;

That I am not a kin or in any way associated with any of the parties to said cause of action, or their counsel, and that I am not interested in the event thereof.

IN WITNESS WHEREOF, I hereunto affix my signature and seal this 3rd day of August, 2016.

_____
BRIANNE L. STARKEY, RPR, CRR
GENERAL NOTARY PUBLIC

```
                                          Page 50
 1              ERRATA SHEET
 2       Case Name:
 3       Deposition Date:
 4       Deponent:
 5       Pg.  No. Now Reads     Should Read  Reason
 6       ___  ___ _____    _____   _____
 7       ___  ___ _____    _____   _____
 8       ___  ___ _____    _____   _____
 9       ___  ___ _____    _____   _____
10       ___  ___ _____    _____   _____
11       ___  ___ _____    _____   _____
12       ___  ___ _____    _____   _____
13       ___  ___ _____    _____   _____
14       ___  ___ _____    _____   _____
15       ___  ___ _____    _____   _____
16       ___  ___ _____    _____   _____
17       ___  ___ _____    _____   _____
18       ___  ___ _____    _____   _____
19       ___  ___ _____    _____   _____
20
                       _____
21
                       Signature of Deponent
22
         SUBSCRIBED AND SWORN BEFORE ME
23       THIS ____ DAY OF _____, 2016.
24       _____
25       (Notary Public)   MY COMMISSION EXPIRES:_____
```