## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| PERKINS COMMUNICATION, LLC, and MATRIX, LLC | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 7:15-cv-01172-LSC |
| D'SHANNON PRODUCTS, LTD, a Minnesota Limited Company, SCOTT ERICKSON and MICHAEL MOORE, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## JOINT STATUS REPORT

Come now the Parties in the above-styled action and, pursuant to this Court's Scheduling Order, hereby submit their Joint Status Report.

**I.     Narrative Statement of the Case**

This case involves claims brought by Perkins Communication, LLC ("Perkins Communication") and Matrix, LLC ("Matrix") (collectively referred to as "Plaintiffs") against D'Shannon Products, Ltd ("D'Shannon"), Scott Erickson ("Erickson"), and Michael Moore ("Moore") (collectively referred to as "Defendants") arising from the sale of two overhauled Continental Motors, Inc. ("CMI") IO-550-C engines and other components to be utilized in a Beechcraft Baron 58, Reg. No. N6745M, serial no. K-1124 (the "Aircraft"). Plaintiffs have

alleged negligence, wantonness, breach of contract, and fraud claims against the Defendants. Defendants have denied Plaintiffs' claims. D'Shannon has also asserted a counterclaim against Perkins Communication alleging claims for open account, account stated, and breach of contract. Perkins Communication has denied D'Shannon's counterclaims.

## II. Undisputed Material Facts

1.      Perkins Communication and Matrix are Alabama limited liability companies that are owned by Joe Perkins ("Perkins").

2.      D'Shannon is a Minnesota corporation that owns certain Supplemental Type Certificates ("STCs"), including the STC that was sold to Perkins Communication.

3.      D'Shannon does business as D'Shannon Aviation.

4.      Mr. Erickson is a resident of St. Michael, Minnesota and is the sole owner of D'Shannon.

5.      Mr. Moore is a Federal Aviation Administration ("FAA")-licensed Airframe and Powerplant ("A&P") mechanic.

6.      Perkins Communication owns a Beechcraft Baron 58, Reg. No. N6745M, serial no. K-1124 (the "Aircraft").

7.      When Perkins Communication purchased the Aircraft, it was equipped with two Continental Motors, Inc. ("CMI") IO-520-CB engines.

8.     Perkins Communication agreed to purchase the following products from D'Shannon:  1) powerplant upgrades; 2) baffle cooling kits; 3) windows; and 4) an AuRACLE engine analyzer.

9.     As part of the powerplant upgrades, D'Shannon overhauled and sold two CMI IO-550-C engines to Perkins Communication:  an IO-550-C engine, serial no. 683263 (the "Left Engine"), and an IO-550-C engine, serial no. 683402 (the "Right Engines") (collectively referred to as the "D'Shannon Engines").

10.     As part of the overhaul, D'Shannon installed the following parts in the D'Shannon Engines:  the connecting rod bearings (Part No. AEC642389), the main crankshaft bearings (Part No. AEC634503), and the main crankshaft bearings (Part No. AEC642720).

11.     Mr. Moore, along with a team of mechanics in Mooresville, NC, performed the overhaul of the D'Shannon Engines to be sold to Perkins Communication.

12.     Mr. Moore was an employee of D'Shannon while the D'Shannon Engines were being overhauled.

13.     Mr. Moore was not an employee of D'Shannon when the D'Shannon Engines and other products purchased from D'Shannon were installed on the Aircraft.

14.    The products purchased by Perkins Communication from D'Shannon were delivered to Perkins Communication and installed on the Aircraft.

15.    Mr. Perkins (or any other representative of Plaintiffs) never informed Defendants (or their representatives) that they did not want the products purchased from and delivered by D'Shannon prior to the filing of this lawsuit.

16.    D'Shannon had an Aviation Commercial General Liability Insurance Policy through Allianz as of May 10, 2013.

17.    That policy was canceled by Allianz as a result of non-payment on October 7, 2013.

18.    Mr. Erickson renewed the policy on November 27, 2013.

19.    On April 22, 2015, Mr. Perkins arrived at Tuscaloosa Regional Airport to fly the Aircraft.

20.    After entering the Aircraft, Mr. Perkins taxied to the runway and performed the preflight run-up procedure.

21.    While Mr. Perkins was taxiing to the runway, he realized that there were fluctuations in the oil pressure for the Left Engine.

22.    At that point, he taxied the Aircraft back to Dixie Air Services, Inc.'s ("Dixie Air") ramp to have Mike Terry, a mechanic at Dixie Air, investigate the low oil pressure indications.

23.     When Mr. Perkins informed Mr. Terry of the low oil pressure indications, Mr. Terry checked the oil pressure of the Left Engine with a manual pressure gauge.

24.     Mr. Terry then moved the Aircraft into the hangar, removed the cowling, removed the oil filter, cut open the oil filter, and inspected the Left Engine.

25.     After completing his inspection, Mr. Terry removed the D'Shannon Engines from the Aircraft and shipped the Left Engine to Don Freeman for further inspection.

26.     Mr. Perkins did not take off or otherwise fly the Aircraft following the low oil pressure indication on April 22, 2015.

27.     Upon receiving the Left Engine from Mr. Terry, Don Freeman found two boltheads from the crankshaft bolts in the oil sump and inspected the area where the bolts were located.

28.     After the teardown of the Left Engine, Mr. Freeman inspected the Right Engine.

29.     To date, Perkins Communication has paid D'Shannon $116,010.00 for the products purchased from D'Shannon.

**III.    Plaintiffs' Claims, Legal Theories, and Supporting Facts**

The Plaintiffs have claims for Negligence, Wantonness, Breach of Contract, and Fraud.

## A. Negligence

The Plaintiffs' negligence claim is rooted in the allegation that the Defendants failed to perform the overhaul in accordance with industry, manufacturer, and FAA standards. In short, the used parts in the overhaul which were not approved for use in the Engines.

Under Alabama law, to establish a claim for negligence, a plaintiff must show "(1) duty, (2) breach of duty, (3) proximate cause, and (4) injury." *Alfa Life Ins. Corp. v. Colza*, 159 So. 3d 1240, 1248 (Ala. 2014). "A legal duty to exercise care . . . arises . . . where the obligations are expressly or impliedly imposed by statute, municipal ordinance, or by administrative rules or regulations . . . ." *Gowens v. Tys. S. ex rel. Davis*, 948 So. 2d 513, 527 (Ala. 2006) (emphasis in original omitted). In this case, the FAA regulations set an "absolute, required standard of care" that creates the duty in this action. *Parker Bldg. Servs. Co. v. Lightsey ex rel. Lightsey*, 925 So. 2d 927, 930–31 (Ala. 2005).

In support of their negligence claim, Plaintiffs intend to show the following:

1. Defendants performed an overhaul of two engines for use on Plaintiffs' plane.

2.      Defendants performed the overhaul based on the then active "Continental Motors engine overhaul and service manual M-16 dated August 2011."

3.      Among other parts, the D'Shannon Defendants used the following parts in the overhaul: AEC642398 (Bearing, Connecting Rod); AEC634503 (Bearing, Main, Crankshaft); AEC642720 (Bearing, Crankshaft, Main); and AEC 646288 (Bearing Thrust)[1] (collectively the "Unapproved Parts").

4.      The Unapproved Parts were not approved by the FAA for use in IO-550-C engines like the Baron's.

5.      Michael Moore was aware that he used the Unapproved Parts during the overhaul.

6.      Because the Engines contain the Unapproved Parts, the Engines are unairworthy as a matter of law and should never have been placed into service.

7.      Even before the Engines failed, there were significant problems with the Engines that required repairs.

8.      The "intake clamps [were] loose, hardware on the alternators holding the wires secure [were] loose or missing . . . [the] magnetos had to be replaced . . . [and] a fuel pump . . . wasn't set up correct[ly]."

---

[1] AEC634503, AEC642720, and AEC646288 were sold as part of a Main Bearing Kit which bears the number AEC646592-A1. Ex. 35, Email from Carrie Ritchie to Mike Terry (May 27, 2015) (Terry Depo Plaintiff Exhibit 2); Ex. 32, Dennis Moore Expert Report at 14 n.2.

9.      The camshaft and lifters "had pitting and spalling way above" what was expected because the Defendants reused the "original camshaft and lifters instead of replacing them" as they should have done.

10.     The windows D'Shannon installed "leak[ed] like sieves" and didn't fit properly.

11.     The Engines failed after only 147 hours of service after the overhaul.

12.     The Unapproved Parts were only discovered after the failure.

13.     After the Engines failed, the Plaintiffs were required to spend money investigating the cause of the engine failure and determining the feasibility of repairing the Engines.

14.     On May 26, 2015, Aviation Engines charged the Plaintiffs $2,380 to disassemble and evaluate the Left Engine.

15.     On July 28, 2015, Aviation Engines charged the Plaintiffs $1,572.50 to tear down and loosely reassemble the Engines.

16.     On August 25, 2015, Dixie Air billed the Plaintiffs $975 for work performed repairing the propeller.

17.     During the scope of this inspection, it was discovered that two crankshaft bolts had broken and caused the metal contamination.

18.     The large and small crankshaft gear and other Engine parts had abnormal wear.

19.     There were leaks in five cylinders.

20.     Additionally, the failed crankshaft bolts harmed other Engine and ancillary components not refurbished or replaced during the overhaul including the crankcase, oil pump, and propeller.

21.     Perkins was informed that before being returned to service, the Left Engine would need (1) repairs to cure the damage caused by the bolts' failure (2) to have the Unapproved Parts replaced.

22.     Perkins was informed that before being returned to service, the Right Engine would need to have the Unapproved Parts replaced.

23.     Don Freeman, Mike Terry, and other people in the airplane business informed Joe Perkins that repairing the Engines to fix the problem it would cost as much as another complete overhaul and that he was economically better off ordering new from the factory.

24.     Perkins reasonably relied on the advice provided to him by Continental, Don Freeman, and Mike Terry and decided to purchase new engines rather than fix the D'Shannon Engines.

25.     In contrast to the long delays involved in D'Shannon's overhaul, the new engines were delivered within a week.

26.     The new Continental engines cost the Plaintiffs $98,264.00.

27.     Perkins Communications and Matrix then paid Dixie Air $13,857.24 to install the new Continental Engines on the Baron.

28.     Plaintiffs could not have feasibly repaired the Engines or obtained retroactive parts approval from the FAA.

29.     Perkins was required to rent a plane after the Baron's Engines failed.

30.     During the time the Baron was out of service after the oil pressure event, the Plaintiffs spent $73,896 in compensable rental fees.

## B. Wantonness

The Plaintiffs' wantonness claim is based on the same facts as their negligence claim described above.  In particular, Plaintiffs will emphasize that (1) D'Shannon knew that the Unapproved Parts were not approved by the FAA and (2) knew or should have know that the use of Unapproved Parts needlessly put Perkins's life in danger.  Plaintiffs intend to seek punitive damages on their claim for wantonness.

Wantonness is established by the same four elements as a negligence claim. *Edmonson v. Cooper Cameron Corp.*, 374 F. Supp. 2d 1103, 1106 (M.D. Ala. 2005). Wantonness differs from negligence in that "[w]anton conduct involves the conscious doing of some act or the conscious omission of some duty with knowledge of the existing conditions and while conscious that from the doing of that act or by the omission of that duty injury will likely or probably result." *Senn*

*v. Alabama Gas Corp.*, 619 So. 2d 1320, 1324 (Ala. 1993). Put differently, wanton conduct is conduct "which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code § 6-11-20(b)(3).

Punitive damages may be granted in civil actions "where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in . . .wantonness . . . ." Ala. Code § 6-11-20(a). Wantonness is "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code § 6–11–20(b)(3). Courts "have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996) (emphasis in original). That said, "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).

### C. Breach of Contract

Plaintiffs' claim for breach of contract rests on two different theories: (1) Defendants had a duty to timely complete the upgrade and (2) Defendants had a duty to deliver engines which complied with FAA regulations. The second portion of this claim relies on the same facts supporting the negligence and wantonness claims and is expressly pleaded in the alternative.

Under Alabama law, to recover for breach of contract a party must show "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the [counterclaim] defendant's nonperformance, and (4) damages." *S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995).

Plaintiffs intend to show:

1. A valid contract existed.

2. Plaintiffs performed their obligations.

3. The Defendants' did not perform.

4. Defendants set multiple deadlines for engine delivery and missed them all.

5. Defendants repeatedly lied to Plaintiffs concerning when the Engines would be delivered.

6. What was supposed to be a three-week overhaul took nearly four months.

7. Even after the overhaul was complete, Defendants did not release and install the Engine logs until over six months later.

8. Defendants promised to reimburse Plaintiffs for the aircraft rented during the delay.

9. Plaintiffs spent $13,064.50 in compensable rental fees during the delay.

10. Defendants did not pay Plaintiffs back for these expenses as promised.

**D. Fraud**

Plaintiffs fraud claims seek damages stemming from four separate misrepresentations made by Defendants:

- only Continental-approved parts would be used in the Engines.

- D'Shannon had a "cutting edge" engine shop.

- D'Shannon's mechanics had outstanding experience and expertise.

- D'Shannon had "insurance coverage for the engines . . . if there was an issue, that he would be covered."

Under Alabama law, "Fraud is defined as (1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation." *Deng v. Scroggins*, 169 So. 3d 1015, 1024 (Ala. 2014).

Plaintiffs intend to prove:

1. That Defendants made the four representations above.

2. That each of the statements were material to Plaintiffs' decision to do business with the Defendants.

3. That Plaintiffs relied on each of these misrepresentations.

4. That Defendants never had insurance in place that covered Mike Moore or their North Carolina operations.

5. That Defendants had no insurance whatsoever in place during some or all of the overhaul process.

6. That D'Shannon's machine shop lacked much of the equipment and parts it needed to complete the overhaul at the time it contracted with Plaintiffs.

7. That the lack of this equipment caused a significant portion of the delays on the work on the Plaintiffs' engines.

8. That Mike Moore was the only experienced airplane mechanic involved with the overhaul on behalf of D'Shannon.

9. That Mike Moore's license had been previously suspended by the FAA.

10. That (as detailed above) Defendants used parts in the engines that were not approved by the FAA.

11. That but for these misrepresentations, Plaintiffs would not have contracted with the Defendants.

That Plaintiffs were damaged as a result of the fraud.

## IV. Defendants' Legal Theories and Supporting Facts

The Defendants' legal theories and facts supporting its defenses to Plaintiffs' claims are set forth as follows:[2]

## A.     Defenses to Plaintiffs' Negligence Claims

### i.     Plaintiffs cannot prove their negligence claims.

1.     The procedure followed by Michael Moore in ordering the parts for the overhaul of the D'Shannon Engines is the standard procedure followed by mechanics in the aviation industry.

2.     Mr. Moore and his team installed the crankshaft gears and bolts in accordance with CMI's specifications and the standard practices in the aviation industry.

3.     The use of the ECi bearings did not cause any damage to the D'Shannon Engines, and could have been corrected without disassembling the D'Shannon Engines.

4.     The Right Engine did not suffer any damage prior to its removal from the Aircraft.

5.     The use of the ECi bearings did not pose a safety of flight concern.

---

[2] Defendants fully incorporate the facts and legal arguments set forth in their motions for partial summary judgment as to Plaintiffs' negligence, wantonness, and fraud claims, and the briefs and evidentiary materials submitted in support of those motions, which are being filed on even date herewith.

6. The Left Engine and its components were damaged as a result of an engine kickback during a single or multiple starting event(s), and not by any action by the Defendants.

7. In order to prove their negligence claim, the Plaintiffs "must establish that the [Defendants] breached a duty owed by the defendant to the plaintiff and that the breach proximately caused injury or damage to the plaintiff. Proof of injury or damage alone is, therefore, generally insufficient to establish negligence." *Lowe's Home Centers, Inc. v. Laxson*, 655 So. 2d 943, 945-46 (Ala. 1994); *see also Gollotte v. Peterbilt of Mobile, Inc.*, 582 So. 2d 459, 461-62 (Ala. 1991). Plaintiffs cannot prove that Defendants breached any duty to them because Defendants ordered parts and completed the overhaul in accordance with the standard practice in the aviation industry. *See Wilbanks v. United Refractories, Inc.*, 112 So. 3d 472, 474-75 (Ala. 2012); *see also Brown v. Chem Haulers, Inc.*, 402 So. 2d 887, 888-89 (Ala. 1991). Moreover, Plaintiffs cannot prove that any action of the Defendants caused any damage to the D'Shannon Engines. *See Wilbanks*, 112 So. 3d at 474-75.

### ii. Plaintiffs failed to mitigate their damages.

1. Plaintiffs could have repaired and returned the Right Engine to service without disassembly and replacement of the bearings by seeking approval from an FAA-approved Designated Engineering Representative.

2.     The Right Engine could have been repaired and returned to service for approximately $16,000.00.

3.     The Left Engine could have been repaired and returned to service for approximately $22,369.69.

4.     While the Aircraft was undergoing repairs, Plaintiffs rented aircraft that were materially different from and superior to the Aircraft.

5.     Plaintiffs charge their clients $495.00 to operate the Aircraft when it is being used for business purposes.

6.     Plaintiffs did not charge their clients any portion of the cost to rent substitute aircraft while the Aircraft was undergoing repairs related to this case.

7.     Plaintiffs are subject to a duty to mitigate their damages "in a reasonable manner consistent with what an ordinary prudent person would do in similar circumstances." *See Shelton v. Clements*, 834 So. 2d 775, 783 (Ala. Civ. App. 2002).  In this case, Plaintiffs failed to mitigate their damages by purchasing factory rebuilt engines from CMI rather than repairing the D'Shannon Engines and returning them to service.  Moreover, Plaintiffs rented aircraft that were far superior to the Aircraft and failed to charge their clients any portion of the rental cost, even though they would have charged their clients for the use of the Aircraft.

### iii.     Plaintiffs cannot recover emotional distress damages.

1.      Perkins Communication and Matrix are both Alabama limited liability companies.

2.      Corporate entities are incapable of suffering emotional distress and, therefore, Plaintiffs cannot recover damages for emotional distress. *See Lampliter Dinner Theater, Inc. v. Liberty Mut. Ins. Co.*, 792 F.2d 1036, 1039 (11th Cir. 1986) ("We agree with the district court that corporations cannot experience emotional distress and cannot therefore maintain a suit for outrageous conduct."); *Church of Zion Christian Center, Inc. v. Southtrust Bank of Ala.*, No. CA 96-0922-MJ-C, 1997 WL 3364511, *8 (S.D. Ala. July 31, 1997) ("A corporation is not capable of suffering emotional types of damages such as mental anguish, humiliation or embarrassment inasmuch as a corporation has no emotion."); *see also F.D.I.C. v. Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994) ("Since a corporation lacks the cognizant ability to experience emotions, a corporation cannot suffer emotional distress."); *Concealed Carry, Inc. v. City of Chicago*, No. 02 C 7088, 2006 WL 2860975, *3 (N.D. Ill. Sept. 28, 2006) ("A corporation is a legal entity. It can suffer no physical harm or emotional distress . . . ."); *Nicor Int'l Corp. v. El Paso Corp.*, 292 F. Supp. 2d 1357, 1378 (S.D. Fla. 2003) ("This claim is fatally flawed because a corporation is incapable of suffering any emotional distress.").

### iv.    Plaintiffs' tort claims are barred by the economic loss rule.

1.      The Right Engine did not suffer any damage.

2.     The only damage caused by the Left Engine was to the following components of the Left Engine:  the crankshaft bolts, the large and small crankshaft gears, the oil pump, the camshaft, the lifters, and the crankcase.

3.     No person or thing other than the D'Shannon Engines themselves was injured or damaged as a result of the alleged defects or problems with the D'Shannon Engines.

4.     The economic loss rule bars Plaintiffs' tort claims because the only damage caused by any alleged defects or problems with the D'Shannon Engines was to the D'Shannon Engines themselves.  *See Lloyd Wood Coal Co. v. Clark Equip. Co.,* 543 So. 2d 671, 673-74 (Ala. 1989); *see also Thomas v. Mahindra USA, Inc.*, No. 2:13-cv-01477-HGD, 2015 WL 6550669, *5 (N.D. Ala. 2015) (defective tractor); *Harris Moran Seed Co. v. Phillips*, 949 So. 2d 916, 931 (Ala. Civ. App. 2006) (defective tomato seeds); *Bay Lines, Inc. v. Stoughton Trailers, Inc.*, 838 So. 2d 1013, 1019 (Ala. 2002) (defective panels installed on freight trailers); *Ex parte Grand Manor, Inc.*, 778 So. 2d 173, 178-81 (Ala. 2000) (defective mobile home); *Wellcraft Marine, a Div. of Genmar Inds., Inc.*, 577 So. 2d 414, 418 (Ala. 1990) (defective boat); *Diaryland Ins. Co. v. Gen. Motors Corp.*, 549 So. 2d 44, 46 (Ala. 1989) (defective vehicle lighting system); *Lloyd Wood Coal Co. v. Clark Equip. Co.*, 543 So. 2d 671, 674 (Ala. 1989) (defective front-end loader).

**v.** **Plaintiffs' tort claims are barred because they arise from the same facts as Plaintiffs' breach of contract claims.**

1. The duty giving rise to Plaintiffs' tort claims is the same as the duty giving rise to Plaintiffs' breach of contract claims.

2. Under Alabama law, "when the duty allegedly breached is the duty created by the contract itself as opposed to the general duty of care owed to everyone, the court must treat the claim as a breach of contract and not as a tort." *See Citizens Bank & Trust v. LPS Nat'l Flood, LLC*, 51 F. Supp. 3d 1157, 1171 (N.D. Ala. 2014); *Cooper v. Sw. Marine & Gen. Ins. Co.*, No. 2:13-cv-1651-KOB, 2014 WL 769394, *3-4 (N.D. Ala. Feb. 26, 2014); *Utils. Bd. of City of Opp v. Shuler Bros, Inc.*, 138 So. 3d 287, 293-94 (Ala. 2013). As such, Plaintiffs' tort claims are barred.

**B.** **Defenses to Plaintiffs' Wantonness Claims**

**i.** **Plaintiffs cannot present any evidence that Defendants acted with a reckless or conscious disregard of the rights or safety of Plaintiffs.**

1. The procedure followed by Michael Moore in ordering the parts for the overhaul of the D'Shannon Engines is the standard procedure followed by mechanics in the aviation industry.

2. Mr. Moore and his team installed the crankshaft gears and bolts in accordance with CMI's specifications and the standard practices in the aviation industry.

3. The use of the ECi bearings did not cause any damage to the D'Shannon Engines, and could have been corrected without disassembling the D'Shannon Engines.

4. The Right Engine did not suffer any damage prior to its removal from the Aircraft.

5. The use of the ECi bearings did not pose a safety of flight concern.

6. The Left Engine and its components were damaged as a result of an engine kickback during a single or multiple starting event(s), and not by any action by the Defendants.

7. In order to recover based on a theory of wantonness, Plaintiffs must show that Defendants acted with a reckless or conscious disregard of the rights or safety of others. *See* Ala. Code § 6-11-20(b)(3); *Tolbert v. Tolbert*, 903 So. 2d 103, 114-15 (Ala. 2004). A showing of mere inadvertence is insufficient to prove a wantonness claim. *See Tolbert*, 903 So. 2d at 118. Simply showing that a defendant failed to do something and knew or should have known that someone could be injured as a result of that failure is insufficient to prove a wantonness claim. *See Agee v. Chugach World Servs., Inc.*, No. 5:12-cv-2119-MHH, 2014 WL 5795555, *9 (N.D. Ala. Sept. 30, 2014). In this case, Plaintiffs have failed to offer any evidence that Defendants acted with a reckless or conscious disregard of the rights or safety of Plaintiffs.

### ii. Plaintiffs' tort claims are barred by the economic loss rule.

1. The Right Engine did not suffer any damage.

2. The only damage caused by the Left Engine was to the following components of the Left Engine: the crankshaft bolts, the large and small crankshaft gears, the oil pump, the camshaft, the lifters, and the crankcase.

3. No person or thing other than the D'Shannon Engines themselves was injured or damaged as a result of the alleged defects or problems with the D'Shannon Engines.

4. The economic loss rule bars Plaintiffs' tort claims because the only damage caused by any alleged defects or problems with the D'Shannon Engines was to the D'Shannon Engines themselves. *See Lloyd Wood Coal Co. v. Clark Equip. Co.,* 543 So. 2d 671, 673-74 (Ala. 1989); *see also Thomas v. Mahindra USA, Inc.*, No. 2:13-cv-01477-HGD, 2015 WL 6550669, *5 (N.D. Ala. 2015) (defective tractor); *Harris Moran Seed Co. v. Phillips*, 949 So. 2d 916, 931 (Ala. Civ. App. 2006) (defective tomato seeds); *Bay Lines, Inc. v. Stoughton Trailers, Inc.*, 838 So. 2d 1013, 1019 (Ala. 2002) (defective panels installed on freight trailers); *Ex parte Grand Manor, Inc.*, 778 So. 2d 173, 178-81 (Ala. 2000) (defective mobile home); *Wellcraft Marine, a Div. of Genmar Inds., Inc.*, 577 So. 2d 414, 418 (Ala. 1990) (defective boat); *Diaryland Ins. Co. v. Gen. Motors Corp.*, 549 So. 2d 44, 46 (Ala. 1989) (defective vehicle lighting system); *Lloyd Wood*

*Coal Co. v. Clark Equip. Co.*, 543 So. 2d 671, 674 (Ala. 1989) (defective front-end loader).

### iii.    Plaintiffs' tort claims are barred because they arise from the same facts as Plaintiffs' breach of contract claims.

1.    The duty giving rise to Plaintiffs' tort claims is the same as the duty giving rise to Plaintiffs' breach of contract claims.

2.    Under Alabama law, "when the duty allegedly breached is the duty created by the contract itself as opposed to the general duty of care owed to everyone, the court must treat the claim as a breach of contract and not as a tort." *See Citizens Bank & Trust v. LPS Nat'l Flood, LLC*, 51 F. Supp. 3d 1157, 1171 (N.D. Ala. 2014); *Cooper v. Sw. Marine & Gen. Ins. Co.*, No. 2:13-cv-1651-KOB, 2014 WL 769394, *3-4 (N.D. Ala. Feb. 26, 2014); *Utils. Bd. of City of Opp v. Shuler Bros, Inc.*, 138 So. 3d 287, 293-94 (Ala. 2013).  As such, Plaintiffs' tort claims are barred.

### C.    Defenses to Plaintiffs' Breach of Contract Claims

### i.    Defendants did not breach their contract with Plaintiffs.

1.    Defendants did not state to Plaintiffs that the D'Shannon Engines would be ready at any specific time.

2.    The procedure followed by Michael Moore in ordering the parts for the overhaul of the D'Shannon Engines is the standard procedure followed by mechanics in the aviation industry.

3. Mr. Moore and his team installed the crankshaft gears and bolts in accordance with CMI's specifications and the standard practices in the aviation industry.

4. The use of the ECi bearings did not cause any damage to the D'Shannon Engines, and could have been corrected without disassembling the D'Shannon Engines.

5. The Right Engine did not suffer any damage prior to its removal from the Aircraft.

6. The use of the ECi bearings did not pose a safety of flight concern.

7. The Left Engine and its components were damaged as a result of an engine kickback during a single or multiple starting event(s), and not by any action by the Defendants.

8. A party seeking to recover based on breach of contract must prove: "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *City of Gadsden v. Harbin*, 148 So. 3d 690, 696 (Ala. 2013). In this case, Defendants did not fail to perform any contract with Plaintiffs and, even if they did, any such breach did not cause any damages to Plaintiffs.

      **ii.**     **Plaintiffs failed to provide Defendants with sufficient notice of any alleged defects in the D'Shannon Engines and failed to provide Defendants with an opportunity to cure any alleged defects.**

1.     Perkins Communication agreed to purchase the following products from D'Shannon:  1) powerplant upgrades; 2) baffle cooling kits; 3) windows; and 4) an AuRACLE engine analyzer.

2.     Perkins Communication accepted the Aircraft after the products purchased from D'Shannon were delivered to Mr. Perkins.

3.     Mr. Perkins never asked for his money back as it relates to the products sold by D'Shannon.

4.     He never stated that he did not want the products sold and delivered to him by D'Shannon.

5.     Mr. Perkins never asked anyone to fix the D'Shannon Engines or any other D'Shannon product after they were delivered to him.

6.     Plaintiffs never notified Defendants of any alleged defect in the D'Shannon Engines and never gave Defendants an opportunity to cure any alleged defect in the D'Shannon Engines.

7.     After goods have been accepted, the buyer must notify the seller within a reasonable time after the buyer discovers or should have discovered any alleged defect or the buyer is barred from any remedy.  *See* Ala. Code § 7-2-607(3)(a).  A buyer must give notice of a defect to the seller prior to bringing a lawsuit, or any remedy that the buyer may have will be barred.  *See Parker v. Bell Ford, Inc.*, 425 So. 2d 1101, 1102-03 (Ala. 1983); *see also Hobbs v. Gen. Motors*

*Corp.*, 134 F. SUpp. 2d 1277, 1285-86 (M.D. Ala. 2001). In this case, Plaintiffs failed to notify the Defendants of any alleged defect in the D'Shannon Engines and, therefore, Plaintiffs' breach of contract claim must be barred.

### iii. Plaintiffs failed to mitigate their damages.

1.     Plaintiffs could have repaired and returned the Right Engine to service without disassembly and replacement of the bearings by seeking approval from an FAA-approved Designated Engineering Representative.

2.     The Right Engine could have been repaired and returned to service for approximately $16,000.00.

3.     The Left Engine could have been repaired and returned to service for approximately $22,369.69.

4.     While the Aircraft was undergoing repairs, Plaintiffs rented aircraft that were materially different from and superior to the Aircraft.

5.     Plaintiffs charge their clients $495.00 to operate the Aircraft when it is being used for business purposes.

6.     Plaintiffs did not charge their clients any portion of the cost to rent substitute aircraft while the Aircraft was undergoing repairs related to this case.

7.     Plaintiffs are subject to a duty to mitigate their damages "in a reasonable manner consistent with what an ordinary prudent person would do in similar circumstances." *See Shelton v. Clements*, 834 So. 2d 775, 783 (Ala. Civ.

App. 2002). In this case, Plaintiffs failed to mitigate their damages by purchasing factory rebuilt engines from CMI rather than repairing the D'Shannon Engines and returning them to service. Moreover, Plaintiffs rented aircraft that were far superior to the Aircraft and failed to charge their clients any portion of the rental cost, even though they would have charged their clients for the use of the Aircraft.

**D.      Defenses to Plaintiffs' Fraud Claims**

      **i.      Any representation related to D'Shannon's insurance is not actionable because it was accurate at the time it was made.**

1.      D'Shannon had an Aviation Commercial General Liability Insurance Policy through Allianz as of May 10, 2013.

2.      That policy was canceled by Allianz as a result of non-payment on October 7, 2013, well after the contract had been entered into between Perkins Communication and D'Shannon.

3.      Mr. Erickson renewed the policy on November 27, 2013.

4.      Plaintiffs have alleged that any alleged misrepresentation related to D'Shannon's insurance occurred prior to contracting with D'Shannon.

5.      Under Alabama law, a representation is incapable of supporting a fraud claim when the statement is accurate at the time it is made, even if it later becomes inaccurate. *See Spearman v. Wyndham Vacation Resorts, Inc.*, 69. F. Supp. 3d 1273, 1282-83 (N.D. Ala. 2014). In this case, Mr. Erickson's alleged representation that D'Shannon had insurance was accurate when made and cannot

support a fraud claim simply because it became inaccurate when D'Shannon's insurance was canceled for non-payment.

> **ii.  Any representations related to D'Shannon's engine shop or the quality of the mechanics who overhauled the D'Shannon Engines are not actionable because they are mere "puffery."**

1.  Any statements made by Mr. Erickson or D'Shannon related to D'Shannon's engine shop or the quality of the mechanics who performed the overhaul of the D'Shannon Engines were made as part of sales negotiations.

2.  Plaintiffs have admitted that Defendants sold their engine shop very aggressively and that these statements were made in the context of a "sales pitch."

3.  Courts have consistently held that statements of opinion amounting to nothing more than sales talk or mere puffery cannot form the basis for a fraud claim under Alabama law. *See Water Works Bd. of the City of Birmingham v. AMBAC Fin. Group, Inc.*, 534 Fed. App'x 817, 820 (2013) (affirming trial court's dismissal of fraud claim that was based on an alleged statement that the defendant would "continue to deliver superior returns" is a vague promotional statement that could not support a fraud claim); *see also Fincher v. Robinson Bros. Lincoln-Mercury, Inc.*, 583 So. 2d 256, 259 (Ala. 1991) (holding that statements that a car was a "fine car," was "dependable and reliable," was "well-suited for [the plaintiff's] purposes," and "was well and properly constructed" could not support a fraud claim because they were "mere puffery"); *Russell v. Wilson*, 991 So. 2d 745,

749-50 (Ala. Civ. App. 2008) (holding that statements that a motorcycle was "in 'good shape,' that it was in 'fine working order,' that it was 'mechanically sound,' and that it was 'mechanically fine'" could not support a fraud claim because they were statements of opinion). As such, any statements regarding D'Shannon's engine shop or the quality of the mechanics who performed the overhaul of the D'Shannon Engines cannot support Plaintiffs' fraud claims because they are mere "puffery."

> **iii.** **Any representation related to the use of "Continental-approved" parts is not actionable because D'Shannon and Mr. Erickson did not have any intent to deceive Plaintiffs or any intent not to use "Continental-approved" parts when the parties entered into the contract.**

1. The procedure followed by Michael Moore in ordering the parts for the overhaul of the D'Shannon Engines is the standard procedure followed by mechanics in the aviation industry.

2. There is no evidence that Mr. Erickson (or any representative of D'Shannon) intended to deceive Plaintiffs or intended not to use "Continental-approved" parts at the time of entering into a contract with Perkins Communication. *See Heisz v. Galt Indus., Inc.*, 93 So. 3d 918, 925 (Ala. 2012); *Lacey v. Allstate Indem. Co.*, No. 2:12-cv-02051-SGC, 2015 WL 875379, *6 (N.D. Ala. March 2, 2015).

> **iv.** **Plaintiffs did not rely on any alleged misrepresentations by D'Shannon and/or Mr. Erickson.**

1.    Plaintiffs cannot show that they would not have done anything differently if they would have known about the alleged misrepresentations by D'Shannon and Mr. Erickson.

2.    Plaintiffs have affirmatively admitted that, after learning of the alleged misrepresentations, they did not change course and simply wanted to obtain the D'Shannon Engines they had purchased from D'Shannon.

3.    Plaintiffs did not take any action after learning of the alleged misrepresentations other than sending e-mails to Mr. Erickson.

4.    In order to prevail on a fraud claim, "the burden is on the party alleging fraud to prove by substantial evidence the element of reliance." *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 4 (Ala. 2004). "Reliance requires that the misrepresentation actually induced the injured party to change its course of action." *Id.* Importantly, "for a plaintiff to state a fraud claim, he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that is, that he took a different course of action because of the misrepresentation." *Id.* at 5; *see also Exxon Mobil Corp. v. Ala. Dept. of Conservation & Natural Res.*, 986 So. 2d 1093, 1116 (Ala. 2007) In this case, Plaintiffs have not provided any evidence that they would have changed course if they had known about the alleged misrepresentations and have affirmatively

admitted that they did not change course once they learned of the alleged misrepresentations.

> **v.    Plaintiffs were not damaged by any alleged misrepresentations by D'Shannon and/or Mr. Erickson.**

1.      Plaintiffs cannot quantify the damages the allegedly suffered as a result of the misrepresentations allegedly committed by D'Shannon and Mr. Erickson.

2.      Plaintiffs did not suffer any damages as a result of the alleged misrepresentations by D'Shannon and Mr. Erickson other than those damages allegedly related to the negligence and/or breach of contract claims.

3.      If the Plaintiffs "'would have adopted the same course irrespective of the misrepresentation and would have sustained the same degree of damages anyway, it can not be said that the misrepresentation caused any damage, and the defendant will not be liable therefor.'" *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 4 (Ala. 2004).  In this case, Plaintiffs did not suffer any damages different from those allegedly resulting from their negligence and breach of contract claims and, therefore, cannot recover on a fraud claim.

## V.    D'Shannon's Counterclaims, Legal Theories, and Supporting Facts

D'Shannon's legal theories and facts supporting its counterclaims against Perkins Communication are set forth as follows:[3]

## A.    Account Stated

1.    Perkins Communication agreed to purchase the following products from D'Shannon:  1) powerplant upgrades; 2) baffle cooling kits; 3) windows; and 4) an AuRACLE engine analyzer.

2.    Perkins Communication accepted the Aircraft after the products purchased from D'Shannon were delivered to Mr. Perkins.

3.    Mr. Perkins never asked for his money back as it relates to the products sold by D'Shannon.

4.    He never stated that he did not want the products sold and delivered to him by D'Shannon.

5.    Mr. Perkins never asked anyone to fix the D'Shannon Engines or any other D'Shannon product after they were delivered to him.

6.    The total cost of those products was $133,799.00.

7.    D'Shannon also charged Perkins Communication a $10,000.00 "core charge" as a result of the poor condition of one of the IO-520-CB engines that was removed from the Aircraft.

---

[3] D'Shannon fully incorporates the facts and legal arguments set forth in its motion for summary judgment on Count Three of the Counterclaim, and the brief and evidentiary materials submitted in support of that motion, which is being filed on even date herewith.

8. One of the two IO-520-CB engines removed from the Aircraft was severely damaged.

9. Specifically, that engine suffered an alternator hub failure, which is considered a catastrophic failure that can render the crankshaft unserviceable.

10. A "core charge" for a damaged engine core is a common charge in the aviation industry when purchasing aircraft engines.

11. To date, Perkins Communication has paid D'Shannon $116,010.00 for the products described above.

12. To date, Perkins Communications has not paid the remaining $27,789.00 for the products described above.

13. D'Shannon rendered a statement of account in the form of an invoice to Perkins Communication showing that Perkins Communication owed D'Shannon $27,789.00 related to the purchase of the above-described products.

14. In this case, D'Shannon is entitled to recover under a theory of account stated because (1) D'Shannon rendered a final invoice to Perkins Communication showing that Perkins Communication still owed $27,789.00 to D'Shannon related to the products purchased from D'Shannon; (2) there was a meeting of the minds as to the correctness of the invoice and Perkins Communication admitted liability because Perkins Communication did not question the invoice and accepted the products and installed them on the Aircraft

without any further communications. *See Stacey v. Pead*, 142 So. 3d 529, 532 (Ala. 2013).

**B.      Breach of Contract**

Perkins Communication agreed to purchase the following products from D'Shannon:  1) powerplant upgrades; 2) baffle cooling kits; 3) windows; and 4) an AuRACLE engine analyzer.

1.      Perkins Communication accepted the Aircraft after the products purchased from D'Shannon were delivered to Mr. Perkins.

2.      Mr. Perkins never asked for his money back as it relates to the products sold by D'Shannon.

3.      He never stated that he did not want the products sold and delivered to him by D'Shannon.

4.      Mr. Perkins never asked anyone to fix the D'Shannon Engines or any other D'Shannon product after they were delivered to him.

5.      The total cost of those products was $133,799.00.

6.      D'Shannon also charged Perkins Communication a $10,000.00 "core charge" as a result of the poor condition of one of the IO-520-CB engines that was removed from the Aircraft.

7.      One of the two IO-520-CB engines removed from the Aircraft was severely damaged.

8. Specifically, that engine suffered an alternator hub failure, which is considered a catastrophic failure that can render the crankshaft unserviceable.

9. A "core charge" for a damaged engine core is a common charge in the aviation industry when purchasing aircraft engines.

10. To date, Perkins Communication has paid D'Shannon $116,010.00 for the products described above.

11. To date, Perkins Communications has not paid the remaining $27,789.00 for the products described above.

12. A contract was created between D'Shannon and Perkins Communication when the products described above were ordered, delivered, and accepted by Perkins Communication. *See* Ala. Code § 7-2-206(1)(b). As such, Perkins Communication must pay the contract rates for the goods purchased and D'Shannon is entitled to recover any portion of the price that was not paid by Perkins Communication. *See* Ala. Code § 7-2-607(1); Ala. Code § 7-2-301; Ala. Code § 7-2-709(1)(a).

## VI. Perkins Communication, LLC's Defenses to D'Shannon's Counterclaims, Legal Theories, and Supporting Facts

Defendants have claims for open account, account stated, and breach of contract.

### A. Open Account

Under Alabama law:

In order to establish an open account there must be an account based upon running or concurrent dealings, the dealings must not have been closed, settled or stated, and some term of the contract must remain to be settled between the parties, or the agreement must contemplate further transactions between the parties.

*Rose Manor Health Care, Inc. v. Barnhardt Mfg. Co.*, 608 So. 2d 358, 360 (Ala. 1992) (quoting 1 C.J.S. *Account, Action on,* § 3 at 606–07 (1985)).

Plaintiffs intend to prove that:

1.     D'Shannon provided Plaintiffs with a final quote.

2.     Defendants performed the work in an untimely and negligent manner.

3.     D'Shannon provided a final invoice.

4.     The parties could not agree as to how much D'Shannon was actually owed.

5.     There was no term of the contract that remained to be settled between the parties.

6.     The agreement did not contemplate further transactions between the parties.

## A.     Account Stated

In order to succeed on a claim for account stated, the Defendants must show "(1) a statement of the account between the parties is balanced and *rendered to the debtor;* (2) there is a meeting of the minds as to the correctness of the statement;

and (3) the debtor admits liability." *Car Ctr., Inc. v. Home Indem. Co.*, 519 So. 2d 1319, 1323 (Ala. 1988) (emphasis in original).

Plaintiffs intend to prove that:

1.　　The statement attached to the Amended Complaint was never rendered to the Plaintiffs.

2.　　The final invoice provided to Plaintiffs differs from the statement attached to the Amended Complaint.

3.　　The statement Defendants are trying to enforce was never rendered to the Plaintiffs.

4.　　There was no meeting of the mind as the correctness of any invoice.

5.　　Plaintiffs do not admit liability to Defendants.

6.　　The Defendants' claims are barred by their own misrepresentations and breach of contract, described above.

## B.　　Breach of Contract

Under Alabama law, to recover for breach of contract a party must show "(1) the existence of a valid contract binding the parties in the action, *(2) his own performance under the contract*, (3) the [counterclaim] defendant's nonperformance, and (4) damages." *S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995) (emphasis added).

Plaintiffs intend to prove that:

1.      The Defendants failed to perform under the contract because they delivered engines that were unairworthy as a matter of law.

2.      Further, the Defendants delivered engines that were shoddily built that fell apart after 147 hours of use.

3.      The Plaintiffs provided the Defendants with all the money they were entitled to under the contract.

4.      The Defendants' claims are barred by their own misrepresentations, described above.

5.      Plaintiffs are entitled to a set off for the amounts Defendants owe Plaintiffs for airplane rentals and other damages.

6.      Defendants should not be allowed to profit from their own wrongdoing.

Date: November 14, 2016      CAMPBELL GUIN WILLIAMS
GUY & GIDIERE, LLC
Financial Center
505 N. 20th Street, Suite 1600
Birmingham, Alabama 35203
Telephone: (205) 224-0750


By: __*s/ Stephen D. Wadsworth (w/ permission)*__
    Andrew P. Campbell
    andy.campbell@campbellguin.com
    Bert M. Guy
    bert.guy@campbellguin.com
    Stephen D. Wadsworth
    stephen.wadsworth@campbellguin.com

Attorneys for Plaintiffs


Date: November 14, 2016      ARMBRECHT JACKSON LLP
Post Office Box 290
Mobile, Alabama 36601
Telephone: (251) 405-1300
Facsimile: (251) 432-6843


By: __*s/ Timothy A. Heisterhagen*__
    Sherri R. Ginger
    srg@ajlaw.com
    Timothy A. Heisterhagen
    tah@ajlaw.com

Attorneys for Defendant / Counterclaim Plaintiff D'Shannon Products, Ltd, and Defendants Scott Erickson and Michael Moore